Exhibit 1

FILED
TONI L. HELLON
CLERK, SUPERIOR COURT

4/15/2016 12:03:42 PM

BY: ALAN WALKER
DEPUTY

Case No. C20161794
HON. GUS ARAGON

1  MELISSA MARTIN McBEATH
2  3463 E. TERRA ALTA BLVD.
3  TUCSON, AZ 85716
4  Ph: (520) 449-9753
   *mel.mcbeath@cox.net*
5
6  Pro Se
7
8
9            **SUPERIOR COURT OF ARIZONA**
10              **COUNTY OF PIMA**
11
12                                    | Case No. _____
13  MELISSA MARTIN MCBEATH, an        |
14  individual,                       | **VERIFIED COMPLAINT**
15            Plaintiff,              | **DEMAND FOR JURY TRIAL**
16       v.                           |
17  TUCSON TAMALE COMPANY; an         | 1. Retaliatory Discharge in Violation
18  Arizona corporation,             |    of the Employment Protection Act
19  TODD RUSSELL MARTIN, an           | 2. Fraud in the Inducement
    individual; SHERRY MARTIN, an     |
20  individual; and LISA MARTIN, an   | 3. Negligent Misrepresentation
21  individual,                       | 4. Breach of Employment Agreement
22            Defendants.             | 5. Failure to Pay Bonuses in
23                                    |    Violation of Arizona's Wage Act
24                                    | 6. Conversion
25                                    | 7. Unjust Enrichment
26
27
28

10105.1

**THE PARTIES**

1.      Plaintiff MELISSA MARTIN MCBEATH (*"__Plaintiff__"*) brings this action against her former employer, TUCSON TAMALE COMPANY (*"__TTC__"*), for (i) retaliatory discharge in violation of Arizona's Employment Protection Act, (ii) fraud in the inducement, (iii) negligent misrepresentation, (iv) breach of employment agreement, (v) failure to pay bonuses in violation of Arizona's Wage Act, (vi) conversion, and (vii) restitution / unjust enrichment. Plaintiff seeks general, special, compensatory and punitive damages, attorneys' fees, costs, pre-judgment interest, post-judgment interest, and other appropriate relief.

2.      Plaintiff is an individual who resides in Pima County, Arizona.

3.      TUCSON TAMALE COMPANY is and, at all times mentioned in this Verified Complaint, was authorized to operate by the State of Arizona and qualified to do business in Pima County, Arizona. *See* AZ Corporation Commission File No. 14604539. TTC has a place of business and offices located at 2550 N. Dragoon Street, Suite 120, Tucson, Arizona 85745.

4.      Defendant TODD RUSSELL MARTIN (*"__TODD__"*) is a co-founder and, at all times relevant to this Verified Complaint, has been TTC's President and Chief Executive Officer. He resides and does business in Pima County, Arizona.

5.      Defendant SHERRY MARTIN (*"__SHERRY__"*) is a co-founder and, at all times relevant to this Verified Complaint, has been TTC's Secretary. She resides and does business in Pima County, Arizona.

6.      Defendant LISA MARTIN (*"__LISA__"*) is and, at all times relevant to this Verified Complaint, has been an individual that TTC employs to provide "global oversight" and "leadership development." She does business in Pima County, Arizona.

7.      TODD, SHERRY, LISA and TTC are referred to collectively as *"__Defendants__"* in this Verified Complaint.

1  8.  TODD and SHERRY are co-founders of the following three addi-

2  tional businesses authorized to operate by the State of Arizona and qualified to

3  do business in Pima County:

4        a.  Tucson Tamale Company Oracle, LLC

5        b.  Tucson Tamale Company Tanque Verde, LLC

6        c.  Tucson Tamale Wholesale Company, LLC

7  9.  Plaintiff is informed and believes that each Defendant was

8  associated or affiliated with one or more of the other Defendants in connection

9  with matters and conduct sued upon herein.

10  10.  Plaintiff is informed and believes that, at all times relevant to this

11  Verified Complaint, each Defendant acted with one or more of the other

12  Defendants under a common scheme, course of action, enterprise or conspiracy

13  and each Defendant is liable to Plaintiff for the events, happenings and damages

14  alleged.

15

16  **JURISDICTION AND VENUE**

17  11.  The Court has jurisdiction over the alleged torts and state law claims

18  under Arizona Constitution Art. 6 and Ariz. Rev. Stat. § 12-123.

19  12.  Venue is proper under Ariz. Rev. Stat. § 12-401 because the acts

20  alleged in this Verified Complaint occurred, and all Defendants reside or do

21  business, in Pima County, Arizona.

22  13.  The demand or value of property in controversy in this Verified

23  Complaint, exclusive of interest and costs, exceeds the minimum jurisdictional

24  requirements.

25  14.  This case is not subject to compulsory arbitration because the

26  amount in controversy exceeds $50,000.

27

28

## TERMS OF PLAINTIFF'S EMPLOYMENT
## AND TERMINATION

15.     Plaintiff began the interview process with TODD, SHERRY, and LISA in February 2015. They met at least six times over the course of several weeks, and talked for hours about the business and the vision Defendants had to grow TTC's tamale wholesale business. They expressed to Plaintiff that she would be ideally suited for the position they were going to create to run this business because of her close to twenty years' experience in wholesale sales and distribution.

16.     Defendants explained to Plaintiff that they were actively searching for a production facility to lease and therefore were not ready to hire her as a business development manager whose sole focus would be to grow and to manage TTC's expanded wholesale business.

17.     Defendants pleaded with Plaintiff to temporarily assume the Area Manager position ($45,000 annual salary) to oversee their three other affiliated restaurant and food service businesses (listed in Paragraph 8).

18.     Plaintiff stated that she needed an annual base salary of $75,000.

19.     TODD and SHERRY assured Plaintiff that after she completed the 90-day probationary period, her annual salary would be reviewed and increased to at least $50,000, based on performance. Of course even this salary would be temporary, pending the opening of the new production facility. At that point, Plaintiff would transition into the new role at an increased annual salary.

20.     Defendants unequivocally represented to Plaintiff that the new position would allow her an opportunity to make more money.

21.     Defendants further assured Plaintiff that she would not remain in the Area Manager position for more than six months.

22.     During the interview process, Defendants informed Plaintiff that TTC did not offer health benefits yet, but would shortly make them available.

23.    In light of the promises made to her regarding the terms of her employment, Plaintiff agreed to join TTC.

24.    Plaintiff turned down a more lucrative job offer she had received because she was excited and looked forward to the promising opportunities for professional growth at TTC that Defendants described to her.

25.    Plaintiff started working for TTC on April 20, 2015.

26.    Plaintiff was made a part of TTC's executive management team and in that capacity reported to TODD, SHERRY, and LISA.

27.    Defendants further told Plaintiff, and put in her offer letter, that she would be paid up to $2,500 under TTC's quarterly incentive plan. Plaintiff would be eligible to participate in the incentive plan after 90 days.

28.    After Plaintiff successfully completed the 90-day probationary period, she requested a salary review as promised and inquired about the health benefits she was promised. She was told to wait.

29.    In a written evaluation titled "90 Day Assessment," dated September 1, 2015, Plaintiff received glowing reviews in every area of responsibility because she performed her duties in an exemplary manner. This evaluation should have been conducted in July 2015.

30.    In September 2015, her annual salary was finally raised to $50,000.

31.    Plaintiff's first quarterly bonus was due by October 22, 2015. When Plaintiff asked TODD and SHERRY in an email when she would be paid the bonus, they responded that the bonus would be paid as soon as they finalized "the industry metrics used to evaluate performance."

32.    Plaintiff asked about the payment of her bonuses several times over the next few weeks but was told to wait until after the holidays because TODD and SHERRY were just too busy.

33.    In November 2015, Plaintiff began to report solely to SHERRY due to an in internal TTC restructuring of management roles.

34.     When TTC senior staff was notified about the change in roles, one of the general managers expressed great concern to Plaintiff. Having worked with SHERRY for several years, this general manager lamented to Plaintiff in tears: "You won't last long. She [SHERRY] runs all the good people off."

35.     At the end of January 2016, when the second quarterly bonus was due, Defendants failed even to acknowledge that Plaintiff was owed this money.

36.     Refusing to be brushed off any more, Plaintiff sent a direct and sternly-worded email to SHERRY on February 15, 2016, and insisted that Defendants address her bonuses and compensation before the end of the week.

37.     In response, SHERRY scheduled a meeting at the TTC corporate office on Friday, February 19, 2016.

38.     The meeting did not go well. SHERRY snidely asked Plaintiff: "Do you think you deserve your bonuses?" The tone of her voice clearly communicated to Plaintiff that Defendants had no intention of paying her this money. Plaintiff revisited the issue of TTC's obligation to pay not just her bonuses, but the bonuses owed to the general managers.

39.     Plaintiff also insisted that Defendants honor the promise they made in October 2015 to TTC's front-line employees to increase their wages.

40.     In an article titled *"20 million tamales: Tucson company plans big expansion,"* published in the Arizona Daily star on October 24, 2015, TODD boasted that: "The company plans to hire about 30 to 40 employees over the next year to handle demand, and plans to pay better than minimum wage, starting at $10 to $12 per hour...."

*http://tucson.com/business/local/million-tamales-tucson-company-plans-big-expansion/article_e25d4c29-4e64-50ea-a28e-d7229429e2cb.html*

41.     To date, not a single TTC front-line employee is paid $10 per hour.

42.     Finally, Plaintiff expressed her dismay that Defendants did not

1   honor their promise to make her the business development manager for the

2   wholesale business, which was the reason she had agreed to work at TTC in the

3   first place.

4        43.    On Monday, February 22, 2016, three days after they met, TODD

5   and SHERRY terminated Plaintiff's employment. The only reason they gave:

6   *"Our definition of success is different than yours."*

7        44.    The remark reminded Plaintiff of something SHERRY once said

8   when Plaintiff asked her to purchase an inexpensive rod and curtain for a

9   nursing mother returning to work and needed some privacy to express milk

10   postpartum: "I'm not fucking paying for that! If she wants to pay for it, that's up

11   to her." Plaintiff purchased the rod and curtain at her own expense.

12        45.    Defendants' definition of success apparently means that not only

13   will they refuse their employees even the smallest of professional courtesies if it

14   will cost Defendants anything, but they will lie, cheat and steal from their

15   employees to avoid paying them even the wages they've earned and deserve.

16        46.    TTC offered a discretionary severance payment of $6,250 to Plaintiff

17   that is the precise amount of the bonuses (prorated to the month) that TTC owes

18   to Plaintiff. The severance payment was conditioned on Plaintiff signing a

19   Release of Claims and Separation Agreement ("*Release*").

20        47.    The Release is essentially a take-it-or-leave-it contract of adhesion

21   that is unlawful under Arizona law because:

22             a.    The Release [Paragraph VI (I)] has a non-solicitation restric-

23   tion that is too broad because it forbids soliciting or accepting any business from

24   "Business Affiliates" that encompasses any "person, company, corporation, or

25   other entity with whom TTC and/or the TTC Group has or had a relationship, on

26   the Resignation Date or during the six (6) months prior, with respect to the sale

27   or servicing of any property, casualty, life, disability, homeowners, automobile,

28   bonds, medical insurance, and/or related insurance products or services."

1          b.    TTC is in the food industry. TTC does not have a protectable

2    commercial interest related to the motley businesses identified in the Release's

3    non-solicitation restriction. *See Olliver/Pilcher Ins. v. Daniels*, 148 Ariz. 530, 532

4    (1986) (holding that with respect to customers, employees, and independent

5    contractors, a non-solicitation restriction may only protect against solicitation of

6    those individuals with whom the employer has formed a meaningful business

7    relationship); *Amex Distrib. Co., Inc. v. Mascari*, 150 Ariz. 510 (1986) (holding that

8    restrictive covenants that "tend to prevent an employee from pursuing a similar

9    vocation after termination of employment are disfavored" and are strictly

10   construed against the employer).

11         c.    The 24-month, boundaryless non-solicitation restriction is

12   invalid because it is unreasonable in time and geographic scope. *Amex Distrib.*

13   *Co. v. Mascari,* 150 Ariz. 510, 518 (1986) ("When the restraint is for the purpose of

14   protecting customer relationships, its duration is reasonable only if it is no longer

15   than necessary for the employer to put a new man on the job and for the new

16   employee to have a reasonable opportunity to demonstrate his effectiveness to

17   the customers."); *Olliver/Pilcher Ins. v. Daniels,* 148 Ariz. 530, 532 (1986) (holding

18   that the geographic scope of a restrictive covenant must be reasonably necessary

19   to protect the employer's business and may not unreasonably restrict the right of

20   the employee to work in her chosen occupation).

21         d.    The Release [Paragraph VI (H)] states that the Restricted

22   Period may be 24, 18, 12 or 6 months, depending on what a "court of competent

23   jurisdiction determines." Because under Arizona law restrictive covenants are

24   strictly construed, this vague language of TTC's non-solicitation restriction

25   regarding the duration of the Restricted Period makes the restriction

26   procedurally and substantively unconscionable. An employee should not be

27   forced to sue an employer in court to find out how long the restrictive covenant

28   applies.

VERIFIED COMPLAINT                -7-

## TUCSON TAMALE COMPANY'S UNLAWFUL AND
## UNETHICAL BUSINESS PRACTICES

48.     Shortly after Plaintiff assumed her position as Area Manager, she became aware that TTC (and its three affiliated businesses) engaged in unlawful and unethical business practices.

A.     <u>Failure to comply with state and federal withholding laws.</u>

49.     TTC did not withhold the proper taxes from employees' tips, and did so partly to artificially inflate employees' wages so that they would not insist on wage increases.

50.     Tips were pooled and illegally distributed to restaurant employees who are not part of the "chain of customer service," such as managers and back-of-the-house employees who did not serve the patrons who paid the tips, in further violation of state and federal law.

51.     TTC does not take a "tip credit." *See* AZ Admin. Code R20-5-1207(B)(4) (allowing only employers who take a tip credit to enforce tip-sharing with employees not in the chain of customer service); *Oregon Rest. & Lodging Ass'n v. Perez*, 2016 U.S. App. LEXIS 3119, 26 Wage & Hour Cas. 2d (BNA) 10 (9th Cir. Feb. 23, 2016) (upholding the more restrictive federal regulation that prohibits tip-sharing with employees not part of the chain of service irrespective of whether the employer takes a tip credit).

52.     Until November 2015, a  production team of "tamale rollers" and prep cooks worked at the restaurant located at 2545 E. Broadway, Tucson, AZ 85716. This production team made tamales exclusively for TTC's wholesale and retail shipping orders placed online, and occasionally for catering orders placed as this location.

53.     Defendants required the other two TTC non-production restaurants to contribute $200 out of their tipping pool per pay period and distributed these tips to the production team who did not service the patrons who paid the tips.

54. The production team was also included in the Broadway restaurant's tipping pool.

55. When Plaintiff brought this illegal tip-sharing practice to Defendants' attention shortly after she joined the company, SHERRY angrily responded, "If we can't give them those tips, how the hell am I supposed to make that up?"

56. Plaintiff explained to SHERRY that the proper thing to do was to increase the wages of the members of the production team and not to use the hard-earned tip money of other TTC employees to subsidize the wages of staff who are not legally entitled to receive any part of those tips.

57. Plaintiff told Defendants to cease this unlawful practice as recently as December 2015, but SHERRY disregarded Plaintiff's advice. The unlawful practice continued through January 2016.

B.   <u>Unlawful Refusal to Pay Tips Earned.</u>

58. TTC illegally forced employees to forfeit tips earned if they quit without giving at least two weeks' notice or missed a scheduled shift.

59. Tips are paid out in cash every 14 days.

60. Plaintiff repeatedly told Defendants that they had to stop these blatantly unlawful practices tantamount to wage theft, but was ignored.

C.   <u>Unlawful Deductions.</u>

61. Defendants charged all TTC employees a non-discretionary meal fee for every shift worked regardless of whether the employees ate TTC restaurant food.

62. The meal fees were automatically deducted from all TTC employees' wages without their consent. Ariz. Rev. Stat. § 23-352 ("No employer may withhold or divert any portion of an employee's wages unless . . . [t]he employer has prior written authorization from the employee.").

1    D.    <u>Unlawful Retention of Bonuses Owed to General Managers.</u>

2         63.    TTC's three general managers were told when they were hired that

3    they would receive quarterly bonuses. Their offer letters do not state they must

4    meet specific sales goals to qualify for these bonuses.

5         64.    Sometime in October 2015, TODD and SHERRY unilaterally decided

6    that bonuses would be paid annually, not quarterly. And for the first time,

7    Defendants disclosed sales targets that general managers must meet that are

8    impossibly unattainable.

9    E.    <u>Violation of Fair Labor Standards Act's Overtime Pay Requirements.</u>

10         65.    TTC's general managers are employees whose job duties and

11    responsibilities are not exempt from the requirements to pay overtime under the

12    Fair Labor Standards Acts ("*FLSA*").

13         66.    Defendants improperly classified, and continue to classify, these

14    employees as exempt for the purpose of overtime compensation eligibility under

15    the FLSA without reference to the types of duties those workers perform.

16         67.    Plaintiff observed the general managers customarily and regularly

17    perform non-exempt physical or manual work. That is, the primary duties of the

18    general managers consist and/or consisted of handling food and beverage items,

19    busing tables, operating cash registers, cleaning, stocking, receiving and storing

20    of products and supplies and serving TTC customers and patrons.

21         68.    The general managers rarely, if ever, exercise true discretionary

22    powers in connection with matters of significance.

23         69.    The general managers are seldom authorized to make substantive

24    decisions regarding hiring or firing nor are they relatively free from supervision

25    in connection with matters of significance.

26         70.    Defendants seldom, if ever, disclose TTC's financial information to

27    the general managers that they would need to perform high-function duties of

28    greater responsibility.

1    71.    The general managers routinely and regularly work in excess of
2    forty (40) hours per workweek without being paid overtime wages.

3    72.    Plaintiff is informed and believes that Defendants are, or should be,
4    aware that state and federal law require TTC to pay its employees performing
5    non-exempt duties overtime wages for hours worked in excess of forty per week.

6    73.    Plaintiff is informed and believes that Defendants are aware, or
7    should be aware, that the general managers customarily and regularly perform
8    non-exempt physical or manual work consisting of handling food and beverage
9    items, busing tables, operating cash registers, cleaning, stocking, receiving and
10   storing of products and supplies and serving TTC customers and patrons and
11   rarely exercise true discretionary powers in connection with matters of
12   significance and were not and are not relatively free from supervision in
13   connection with matters of significance.

14   74.    Consequently, the general managers do not fall within the
15   "administrative, executive, or professional" exemptions from the overtime
16   requirements. Nor do they fall within any other exemption from the obligation to
17   pay overtime compensation under state and federal law.

18   75.    Plaintiff is informed and believes that Defendants' failure to pay the
19   general managers overtime wages for their work in excess of forty (40) hours per
20   week is willful and without justification.

21   76.    Plaintiff is informed and believes that SHERRY for years computed
22   overtime wages for non-exempt TTC staff based on an expanded eighty (80)
23   hour pay period rather than a forty (40) hour workweek to avoid paying
24   overtime.

25   77.    As a result of Defendants' unlawful acts, Plaintiff is informed and
26   believes that TTC employees have been deprived of wages, and are entitled to
27   recover these unpaid wages, plus liquidated damages, interest, attorneys' fees,
28   and costs.

F.  Violation of Arizona's Consumer Fraud Act.

78.    Arizona's Consumer Fraud Act makes it illegal for companies to misrepresent that goods or services are of a particular standard or quality if they are not, and falsely advertise goods or services with intent not to sell them as advertised. This public policy of the State of Arizona is designed to protect consumers and the community at large from fraudulent business practices. *Madsen v. Western Am. Mortgage Co.*, 143 Ariz. 614 (1985) ("The term 'deceptive' has been interpreted to include representations that have a 'tendency and capacity' to convey misleading impressions to consumers even though interpretations that would not be misleading also are possible. The meaning and impression are to be taken from all that is reasonably implied, not just from what is said, and in evaluating the representations, the test is whether the least sophisticated reader would be misled. Technical correctness of the representations is irrelevant if the capacity to mislead is found.").

79.    TTC engages in deceptive marketing schemes intended to mislead consumers, in violation of Arizona's Consumer Fraud Act. Ariz. Rev. Stat. § 44-1522 (A) ("The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false promise, misrepresentation, or concealment, suppression or omission, of any material fact with intent that others rely upon such . . . is declared to be an unlawful practice.").

80.    Genetically modified organisms (GMOs) are prohibited in organic products. To entice customers to purchase TTC food products, TTC's marketing materials repeatedly use the term "organic" to describe several of its products in a manner intended to mislead consumers into believing that *all* of its products are non-GMO and organic.

81.    Only TTC tamales are made from non-GMO masa and the ingredients *in* nearly all of the tamales are not organic. Masa is made from white or blue corn meal.

82.     Plaintiff is informed and believes that *__less than 1% of TTC's food products may be classified as being 100% organic.__*

83.     Defendants intended to commit acts that were deceptive and/or fraudulent, namely, to market, sell and distribute TTC food products as "organic" or "non-GMO" when, in fact, they are not. For example, the most popular product, the vegetarian Green Corn Tamale, TTC describes as follows:

> A Sonoran tradition, organic sweet corn and organic white corn make a moist and creamy masa. We fill the tamales with roasted green chiles and Cheddar and Monterey Jack Cheese.
>
> *https://tucsontamale.com/store/all-tamales/green-corn-tamale.html*

84.     Green Corn Tamales are not made from "green corn" or "organic sweet corn and organic white corn." They are made from the same masa as all the other tamales that TTC sells. The green chiles and cheese are not organic.

85.     The deceptive marketing scheme concerning TTC products violates Arizona's Consumer Fraud Act, because, among other things, Defendants:

        a.      knowingly conceal, suppress, or omit material information regarding the ingredients of products that customers are led to believe are made entirely from non-GMO organic ingredients, but are not; and

        b.      market, promote, and advertise products in a manner that leads customers to believe that all TTC food products are made from non-GMO organic ingredients.

86.     Plaintiff overheard TTC restaurant patrons comment to staff how glad they were to eat at TTC because all the food is organic. Defendants made clear to TTC's employees not to correct or to disabuse customers who mistakenly believe that all of TTC's food products are organic and non-GMO.

87.     Plaintiff is informed and believes that sometime in the fall of 2014, TTC ran a promotion through the popular website "LivingSocial.com"—an

1   internet company with a business model similar to Groupon. Customers

2   purchase coupons for products sold at a significant discount. Customers then

3   redeem the coupons at the place of business within a certain period of time set by

4   the sponsoring merchant.

5         88.    Plaintiff is informed and believes that SHERRY instructed all TTC

6   staff to tell the customers that they had to provide their email addresses to

7   redeem their coupon, a condition not disclosed at the time the customers

8   purchased the coupons. Had this requirement been disclosed, many customers

9   would not have proceeded with the purchase.

10        89.    When Plaintiff oversaw a similar promotion the following year

11  when she was the Area Manager, she instructed staff not to lie to the customers,

12  but to ask them politely if they wished to be placed on the company's mailing

13  list. That year, only about 30% of the customers gave their email addresses.

14        90.    At a management meeting in October 2015, SHERRY turned

15  beet-red angry at the staff for the low number of email addresses collected and

16  when the general managers told her they had ceased lying to customers as she

17  had instructed them to do the prior year. She stomped her feet and pounded the

18  table as she screamed and ranted at Plaintiff and the general managers for nearly

19  half an hour, hurtling insults and offensive epithets in rapid succession.

20        91.    Never in her entire professional career had Plaintiff seen such rage

21  and abuse directed at employees. But the general managers stood their ground.

22  They refused to lie again to customers, and two of them even threatened to

23  resign on the spot.

24        92.    Since December 2015 until Plaintiff was terminated, TODD and

25  SHERRY for months posted signs and instructed staff to tell TTC patrons that the

26  popular "pico de gallo" salsa is not available because TTC has had to reject the

27  tomatoes provided by its vendors because they do not meet TTC's high standard

28  of quality for freshness. This is not true.

93.   TODD purchased a machine to dice tomatoes that either does not function properly because it mashes the tomatoes, or more likely, TODD simply selected the wrong machine.

94.   Because of hubris, TODD and SHERRY prefer to lie to TTC's customers than admit the truth. In the meantime, TTC staff must uncomfortably mislead restaurant patrons with excuses to cover their petty lie.

95.   Defendants' concealment, suppression, omissions, deceptions, mis-representations, and/or unconscionable practices have the tendency, capacity, and likelihood to deceive TTC customers.

## MANAGEMENT SILENCE EMPLOYEES WHO
## SPEAK OUT AGAINST UNETHICAL BUSINESS PRACTICES

96.   During the time that Plaintiff was employed by TTC, she tried to set in place business processes and procedures consistent with industry standards. In fact, part of her written job description specifically states that one of her roles was to *"ensure the working environment is positive and free of drama, drugs and dingbats."*

97.   Plaintiff tried to do whatever she could to ensure that TTC did not continue to violate state and federal law.

98.   Plaintiff further tried to do whatever she could to ensure that TTC did not continue to breach its duty to exercise reasonable care in hiring, training and supervising employees as necessary to conduct TTC's business operations so that the public generally, and TTC employees specifically, would not be negligently harmed, which duty Defendants failed.

99.   Plaintiff tried to change TTC's oppressive management style, which adversely affects employee morale, but was thwarted by SHERRY at every turn because of her uncompromising refusal to collaborate, even though Plaintiff was a member of the company's executive management team.

100.   In the months that Plaintiff worked at TTC, she could not pierce through SHERRY's obsession with how things appear to others, even to the point of believing that outward image is more important than underlying reality. SHERRY was condescending, self-satisfied, self-important, pretentious, ego-absorbed, and always thought she was right. She was inconsistent and applied different rules in similar circumstances; she was habitually secretive and withheld information to control the narrative.

101.   SHERRY set unreasonable expectations. At times she inserted herself into matters not within her purview or outside of established process, either from a desire to feel involved, or from an unfounded belief that staff is not competent to make the right decisions.

102.   Plaintiff sensed that SHERRY knew that to prevent others from discovering the disturbing truth about her lack of knowledge or skill in a certain area, or about her character, SHERRY fabricated an image of competence, integrity, teamwork and leadership. And, of course, the most telltale sign of insecurity: she cannot tolerate people who publicly stand up to her and challenge her ideas or suggestions.

103.   SHERRY's punitive and autocratic management style thwarted every effort Plaintiff made to ensure that TTC complied with the law and did not engage in unethical business practices because:

a.   SHERRY micro-manages TTC employees. Plaintiff heard SHERRY speak to and of employees with contempt, disdain, condescension, and hostility. She adopts one-way communication; she does not consult with employees or give them a chance to provide their opinions, no matter the potential benefit of such input.

b.   SHERRY involves herself in detailed day-to-day activities, and rarely delegates or empowers subordinates.

1    c.    SHERRY assumes that employee motivation comes not

2  through empowerment, but by creating a structured set of rewards and

3  punishments.

4    d.    SHERRY gets work done by issuing threats and punishments

5  and evoking fear.

6    e.    SHERRY is short-sighted and concerns herself mostly with

7  dealing with the work at hand and not on developmental activities.

8    104.    When confronted, SHERRY was evasive and denied responsibility.

9  She misled people by omitting significant information that would explain a

10  situation and reveal the underlying truth about what happened. When others

11  countered with a fact-based explanation, she misstated and belittled that

12  person's viewpoint. When facts were not on her side, she misquoted others, or

13  misrepresented their meaning, then claimed they supported her ideas. She

14  rewrote history if she had to, and made herself believe it.

15    105.    SHERRY brags about herself, and exaggerates her own importance.

16  She tries to look as powerful as possible by telling stories that highlight her

17  cleverness and accomplishments. She portrays herself as highly adept and

18  skilled by claiming superior knowledge and experience on most topics. Of

19  course, she seldom admits mistakes and never apologizes.

20    106.    SHERRY is duplicitous and Machiavellian in her political

21  machinations to get her way, no matter who she harms along the way to further

22  her agenda. She lies, dissembles, and twists the truth.

23    107.    In short, SHERRY creates a toxic workplace for TTC employees. Her

24  avarice prevents her from caring about anything but money.

25    108.    SHERRY's obsession with the bottom line overrides any concern for

26  protecting TTC employees, providing accurate information to customers

27  regarding the ingredients of TTC's products, or even complying with basic state

28  wage laws.

10105.1

VERIFIED COMPLAINT                                        -17-

COUNT I

RETALIATORY DISCHARGE IN VIOLATION

OF THE EMPLOYMENT PROTECTION ACT

Ariz. Rev. Stat. § 23-1501

(Against All Defendants)

109.    Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Verified Complaint.

110.    An employer's traditional right to discharge an at-will employee is subject to limits imposed by public policy, in light of an employee's right to exercise statutory or constitutional rights or privileges. Whenever the basis of the discharge contravenes a fundamental public policy, such public policy must inure to the benefit of the public at large and must be grounded in some statutory or constitutional provision.

111.    Under Arizona's Employment Protection Act, it is unlawful to terminate an employee in retaliation for the employee's reasonable disclosure of the employer's violation of Arizona law. Ariz. Rev. Stat. § 23-1501 (A)(3)(c).

112.    At all times relevant to this Verified Complaint, it was the public policy of the State of Arizona, as codified, expressed and mandated by Arizona's Income Tax Act of 1978, Ariz. Rev. Stat. § 43-401(A) that: "Every employer at the time of the payment of wages, salary, bonus or other emolument to any employee whose compensation is for services performed within this state shall deduct and retain from the compensation an amount prescribed by tables adopted by the department."

113.    At all times relevant to this Verified Complaint, it was the public policy of the State of Arizona, as codified, expressed and mandated by Arizona's Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522 (A) that: "The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false promise, misrepresentation, or concealment, suppression or omission, of

1    any material fact with intent that others rely upon such. . . . is an unlawful

2    practice." This public policy of the State of Arizona is designed to protect

3    consumers and the community at large from fraudulent business practices.

4        114.   Plaintiff complained to Defendants that their willful failure to

5    withhold, account for, and pay withholding taxes from tips paid by TTC

6    customers to employees was illegal. *See generally* Ariz. Admin. Code R20-5-1210

7    (General Recordkeeping Requirements).

8        115.   Plaintiff complained to Defendants that it was illegal for TTC to

9    require its employees to share tips with all restaurant employees, including

10   managers who did not serve the restaurant patrons who paid the tips.

11       116.   Plaintiff complained to Defendants that they were willfully

12   committing wage theft because:

13           a.    TTC may not force employees to forfeit tips earned if they quit

14   without giving at least two weeks' notice or miss a scheduled shift.

15           b.    TTC may not unilaterally change the terms and conditions of

16   employment for the general managers by setting unattainable sales goals that

17   were never disclosed to the general managers when they received their written

18   offer letters.

19           c.    TTC may not charge employees for meals if they did not eat

20   TTC's restaurant food.

21       117.   Plaintiff expressed her concerns regarding Defendants' business

22   practice of marketing, selling and distributing TTC food products in a manner

23   intended to mislead consumers into believing that *all* TTC food products are

24   organic when, in fact, that is not true.

25       118.   TTC violated Plaintiff's statutory rights when TTC terminated her

26   employment because she objected to the Defendants' illegal and unethical

27   business practices.

28       119.   TTC further violated Plaintiff's rights when Defendants conditioned

1   the payment of severance benefits on the signing of a Release that contains an

2   illegal non-solicitation restriction that violates Arizona law for the reasons

3   explained above.

4       120.    Defendants either knew, or in the exercise of reasonable care, should

5   have known that their conduct was unlawful.

6       121.    Defendants' policies, practices and customs described above have

7   resulted in unjust enrichment and an unfair business advantage over businesses

8   that routinely adhere to the strictures of state and federal laws.

9       122.    Unless restrained by this Court, Defendants will continue to engage

10  in the unlawful conduct alleged above.

11      123.    Plaintiff is informed and believes that she was tortiously retaliated

12  against in contravention of the substantial public policy not to commit fraud or

13  to engage in illegal and unfair business practices. Accordingly, Defendants'

14  retaliation against Plaintiff on the grounds alleged and described in this Verified

15  Complaint were wrongful and in contravention and violation of the express

16  public policy of the State of Arizona and Arizona's Employment Protection Act.

17      124.    As a direct, foreseeable and proximate result of Defendants' wrong-

18  ful acts, Plaintiff has suffered substantial damages, including lost salary, benefits,

19  bonuses, loss of employment-related opportunities for growth, humiliation, and

20  embarrassment, all in an amount according to proof at time of trial.

21      125.    Defendants' acts were committed maliciously, fraudulently, or

22  oppressively with the intent to injure Plaintiff, and/or with a willful and

23  conscious disregard of Plaintiff's right to work in an environment free from

24  retaliation. Because these acts were carried out by managerial employees in a

25  despicable, deliberate and intentional manner, Plaintiff is entitled to recover

26  punitive damages in a sum sufficient to punish and deter future such conduct.

27      126.    An award of punitive damages will serve to punish Defendants and

28  set an example to other companies who may be in similar violations of state law.

**COUNT II**

**FRAUD IN THE INDUCEMENT**

**(Against All Defendants)**

127.    Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Verified Complaint.

128.    The elements of fraudulent inducement are the functional equivalent of fraud: (a) a representation, (b) its falsity, (c) its materiality, (d) the speaker's knowledge of its falsity or ignorance of its truth, (e) the speaker's intent that the information should be acted upon by the hearer and in a manner reasonably contemplated, (f) the hearer's ignorance of the information's falsity, (g) the hearer's reliance on its truth, (h) the hearer's right to rely thereon, and (i) the hearer's consequent and proximate injury. *Taeger v. Catholic Family & Cmty. Servs.*, 196 Ariz. 285 (1999); *American Pepper Supply Co. v. Federal Ins. Co.*, 205 Ariz. 465 (2003).

129.    Defendants knowingly and willfully conspired and agreed among themselves to harm Plaintiff by engaging in a pattern of intentional, willful, and malicious misrepresentations regarding the terms of her employment.

130.    Defendants committed actual fraud and fraudulently induced Plaintiff not to pursue or explore other employment so that she would agree to work at TTC, and continued to commit fraud and fraudulently induced Plaintiff to continue her employment with TTC and to continue working on the projects assigned to her by representing that employment with TTC would be more profitable, with the promise of future salary increases, bonuses and professional development.

131.    Plaintiff was induced to become an employee of TTC, not to seek positions elsewhere, and to share her knowledge and expertise with Defendants who leveraged her name, experience, and credibility, with current and prospective customers, clients, and employees. Plaintiff has lost income and

1  income opportunities.

2      132.   Defendants knew at the time they induced Plaintiff to accept TTC's

3  offer of employment that they would not honor the promises upon which

4  Plaintiff relied not to accept another, more lucrative offer of employment, and

5  which Plaintiff relied on to remain and to continue her employment with TTC

6  until she was wrongfully terminated.

7      133.   In September 2015, TODD asked Plaintiff to meet and to interview

8  the person he intended to hire as the business development manager for TTC's

9  expanded wholesale business. This was the position that Defendants had

10 promised to Plaintiff when they interviewed her and the only reason why

11 Plaintiff agreed to temporarily assume the restaurant Area Manager position for

12 TTC at a lower salary. Defendants filled the business development manager

13 position in September 2015 with a candidate who had absolutely no wholesale or

14 restaurant experience.

15     134.   Defendants designed, and intended to design, a scheme and artifice

16 to defraud Plaintiff by making promises, misrepresentations, and misstatements

17 that Defendants knew they had no intention of keeping or knew were false and

18 misleading, or in the alternative, by making such misrepresentations and

19 misstatements with disregard for their truth, veracity, or misleading nature with

20 the desire and intent to defraud Plaintiff and to avoid payment of due

21 compensation.

22     135.   The misrepresentations, misstatements and omissions were material

23 misrepresentations, misstatements and omissions of past or existing facts, or

24 false promises to do some act in the future on which Defendants intended

25 Plaintiff to rely, or on which Defendants induced Plaintiff to take further actions.

26 Plaintiff relied on the misrepresentations to her detriment and injury.

27     136.   As a direct, foreseeable and proximate result of Defendants'

28 wrongful acts, Plaintiff has suffered substantial damages, including lost salary,

1    benefits, bonuses, loss of employment-related opportunities for growth, humi-

2    liation, and embarrassment, all in an amount according to proof at time of trial.

3        137.   Defendants' acts were committed maliciously, fraudulently, or

4    oppressively with the intent to injure Plaintiff, and/or with a willful and con-

5    scious disregard of Plaintiff's right to work in an environment free from fraud

6    and retaliation. Because these acts were carried out by managerial employees in

7    a despicable, deliberate and intentional manner, Plaintiff is entitled to recover

8    punitive damages in a sum sufficient to punish and deter future such conduct.

9                       **COUNT III**

10            **NEGLIGENT MISREPRESENTATION**

11               **(Against All Defendants)**

12        138.   Plaintiff realleges and incorporates by reference the allegations of

13    each of the other paragraphs set forth in this Verified Complaint.

14        139.   Alternatively, if Defendants' representations and omissions

15    regarding the terms and conditions of Plaintiff's employment were not made

16    with the intent to defraud, they were negligently made. Plaintiff reasonably

17    relied on those misrepresentations and has been damaged as a result.

18        140.   Plaintiff is entitled to recover all actionable damages (including

19    general, consequential, incidental and special damages, lost wages, lost

20    opportunities and other damages) sustained as a proximate cause of Defendants'

21    negligent misrepresentations.

22                       **COUNT IV**

23         **BREACH OF EMPLOYMENT AGREEMENT**

24          **(Against Tucson Tamale Company)**

25        141.   Plaintiff realleges and incorporates by reference the allegations of

26    each of the other paragraphs set forth in this Verified Complaint.

27        142.   During the period of Plaintiff's employment with TTC, there existed

28    an express and implied in fact employment contract that set forth the terms and

1   conditions of PLAINTIFF's employment relationship with TTC.

2       143.   The total employment contract was evidenced by an offer letter and

3   written and oral representations Defendants made to Plaintiff.

4       144.   TTC breached the employment agreement by failing to provide the

5   wage increase, bonuses and benefits that Defendants promised to Plaintiff.

6       145.   TTC's refusal to perform its duties under the employment

7   agreement was unlawful, without justification and/or excuse, and constituted a

8   total and material breach of the agreement between the parties.

9       146.   As a direct, foreseeable and proximate result of TTC's breach of the

10  employment agreement, Plaintiff has suffered substantial damages, including

11  lost salary, benefits, bonuses, and loss of employment-related opportunities for

12  growth, all in an amount according to proof at time of trial. Plaintiff has sought

13  to mitigate wage-related damages.

14      147.   Plaintiff is entitled to recover her attorneys' fees and costs under

15  Ariz. Rev. Stat. §§ 12-341 and 12-341.01.

16                              **COUNT V**

17              **FAILURE TO PAY EARNED WAGES**

18          **IN VIOLATION OF ARIZONA'S WAGE ACT**

19              **Ariz. Rev. Stat. § 23-350 *et seq.***

20              **(Against Tucson Tamale Company)**

21      148.   Plaintiff realleges and incorporates by reference the allegations of

22  each of the other paragraphs set forth in this Verified Complaint.

23      149.   After the 90-day probationary period expired, TTC failed to pay the

24  promised increased salary and bonuses that Plaintiff accrued through the date of

25  her termination. To date, TTC has failed and refused, and continues to fail and

26  refuse, to pay the wages due.

27      150.   By the acts and omissions set forth above, including by failing to pay

28  all bonuses due to Plaintiff, TTC violated Arizona's Wage Act.

1    151.    As a result of TTC's violations of Ariz. Rev. Stat. § 23-351, Plaintiff

2    has been harmed, has suffered substantial losses and has been deprived of

3    compensation. Plaintiff is therefore entitled to an award of the unpaid wages,

4    with prejudgment interest, and treble the amount of such wages, together with

5    attorneys' fees and costs pursuant to Ariz. Rev. Stat. § 23-355.

6                                    **COUNT VI**

7                                    **CONVERSION**

8                            **(Against All Defendants)**

9    152.    Plaintiff realleges and incorporates by reference the allegations of

10   each of the other paragraphs set forth in this Verified Complaint.

11   153.    Plaintiff performed labor and services for TTC, at Defendants'

12   request, as described above. Defendants' committed wage theft because they

13   have wrongfully and unlawfully converted Plaintiff's wages by deliberately

14   failing to pay the promised increased salary, bonuses and benefits.

15   154.    By failing to pay the wages and benefits owed, and retaining the

16   sums earned by Plaintiff, Defendants wrongfully exercised dominion over

17   Plaintiff's property. Once Defendants intentionally applied these monies for their

18   own use and benefit, the conversion was complete.

19   155.    Plaintiff is informed and believes that Defendants withheld her

20   wages owed and failed to provide the promised benefits as a means of

21   decreasing overhead costs and increasing their profits, and to increase monies

22   directly or indirectly flowing to Defendants.

23   156.    As a result of Defendant's conversion, Plaintiff has been damaged in

24   an amount to be proven at trial.

25   157.    Defendants' acts were committed maliciously, fraudulently, or

26   oppressively with the intent to injure Plaintiff, and/or with a willful and con-

27   scious disregard of Plaintiff's rights. Because these acts were carried out by

28   managerial employees in a despicable, deliberate and intentional manner,

1   Plaintiff is entitled to recover punitive damages in a sum sufficient to punish and

2   deter future such conduct.

3                                    **COUNT VII**

4                      **RESTITUTION / UNJUST ENRICHMENT**

5                            **(Against All Defendants)**

6           158.   Plaintiff realleges and incorporates by reference the allegations of

7   each of the other paragraphs set forth in this Verified Complaint.

8           159.   Defendants benefited unjustly from their actions in wrongfully and

9   unlawfully failing to pay wages owed to Plaintiff.

10          160.   Defendants were under a duty to comply with Arizona's wage laws.

11          161.   Defendants have unjustly retained Plaintiff's wages.

12          162.   Defendants' unjust enrichment was conscious, deliberate,

13  intentional and/or malicious.

14          163.   Plaintiff is informed and believes that as a result of Defendants'

15  wrongful acts, they have been unjustly enriched in the amount to be proven at

16  trial.

17

18

19                          **DEMAND FOR JURY TRIAL**

20  *Plaintiff Melissa Martin McBeath hereby demands trial of this matter by jury.*

21

22

23

24

25

26

27

28

10105.1

VERIFIED COMPLAINT                          -26-

## PRAYER FOR RELIEF

Plaintiff Melissa Martin McBeath prays for judgment as follows:

1. General, special and compensatory damages;

2. Punitive damages;

3. All statutory damages;

4. Reasonable attorneys' fees due pursuant to contract and according to all attorney-fee statutes found by the Court to apply to the facts presented at trial;

5. Pre-judgment and post-judgment interest on all damages awarded;

6. Costs of suit incurred; and

7. For such other and further relief as the Court deems just and proper.

Dated:  April 15, 2016

/s/ *Melissa Martin McBeath*
Melissa Martin McBeath

10105.1

VERIFIED COMPLAINT

-27-

1  **VERIFICATION**

2  MELISSA MARTIN McBEATH, being first duly sworn, upon her

3  oath deposes and says:

4  I am the plaintiff in this matter. I have read and know the contents of the

5  foregoing:

6  VERIFIED COMPLAINT:

7  1.   Retaliatory Discharge in Violation of the Employment Protection Act

8  2.   Fraud in the Inducement

9  3.   Negligent Misrepresentation

10  4.   Breach of Employment Agreement

11  5.   Failure to Pay Earned Bonuses in Violation of Arizona's Wage Act

12  6.   Conversion

13  7.   Unjust Enrichment

14

15  The facts alleged in the Verified Complaint are within my own knowledge

16  and I know those facts to be true, except as to those matters stated upon my

17  information and belief, and as to those matters I also believe them to be true.

18

19  I declare (or certify, verify or state) under penalty of perjury under the

20  laws of the State of Arizona that the foregoing is true and correct. Executed on

21  April 15, 2016.

22

23  /s/ *Melissa Martin McBeath*

24  Melissa Martin McBeath

25

26

27

28

10105.1