MELISSA MARTIN McBEATH
3463 E. TERRA ALTA BLVD.
TUCSON, AZ 85716
Ph: (520) 449-9753
*mel.mcbeath@cox.net*

Pro Se

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA, TUCSON DIVISION

|  |  |
|---|---|
| MELISSA MARTIN McBEATH, an individual, Plaintiff, v. TUCSON TAMALE COMPANY, an Arizona corporation, Defendant. | Case No. 4:16-cv-0462-BPV **MELISSA MARTIN McBEATH OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS** Assigned to Hon. Bernardo P. Velasco Complaint filed: July 11, 2016 |

Plaintiff Melissa Martin McBeath hereby opposes the Motion for Judgment on the Pleadings ("***MJP***") filed by Tucson Tamale Company (***"TTC"***) on grounds that the motion is based on a fundamental misapplication of the doctrines of claim-splitting and *res judicata.* (Dkt. 18).

## SUMMARY OF RELEVANT FACTS

This is an employment litigation case. TTC operates three Mexican restaurants and a tamale production facility all located in Tucson, Arizona.

TTC hired McBeath in April 2015 as Area Manager of its three restaurants. TTC fired her in February 2016 after McBeath confronted management about their illegal and unethical business practices and because she asked them to pay the bonuses that TTC owed her and the other restaurant general managers.

On April 15, 2016, McBeath sued TTC and its principals for retaliatory discharge and other employment-related claims. McBeath's state court action alleges only claims based on Arizona law.[1] TTC promptly retaliated by countersuing her. TTC accuses McBeath of stealing confidential information and trade secrets. TTC alleges five causes of action based on Arizona law and one based on federal law.

McBeath further believes that TTC terminated her employment on account of her age and national origin (Mexican ancestry). McBeath timely filed a complaint with the EEOC. Because the EEOC still has not investigated her charges, McBeath elected to sue for age discrimination after she waited for 60 days, as permitted under the Age Discrimination in Employment Act. *See* 29 U.S.C. § 626(d); 29 CFR § 1626.18(c). McBeath will move to amend her complaint after the statutory deadline for the EEOC to act on her national origin charge lapses. McBeath intends to prosecute two federal discrimination claims in this action against TTC only and no other parties.

---

[1] Attached as <u>Exhibit A</u> is a cleaner and easier-to-read copy of the complaint filed in Pima County Superior Court than the copy provided by TTC.

**ARGUMENT**

A.  <u>McBeath has the right to pursue separate state and federal actions, even if they may arise from the same fact pattern because the legal and factual issues in this action are different from those presented in the Pima County Superior Court action.</u>

TTC contends that McBeath's state court action involves "claims between the same parties arising out of or relating to the same transactional circumstances, core set of facts, the same alleged wrongs, and the same subject matter." For this reason, TTC argues, she fails to state a claim because "of the rule against splitting a cause of action, requiring that all claims between the same parties arising out of or relating to the same transactional circumstances or core set of facts, or arising from a single wrong, or involving the same subject matter be joined in a single action." TTC's Amended Answer (Affirmative Defenses ¶ 2) (citation omitted) (Dkt. 17); MJP (pp. 3-4).

The U.S. Supreme Court long ago ruled that a plaintiff is "master to decide what law [s]he will rely upon,"[2] and, if she can maintain her claim on both state and federal grounds, she may ignore the federal question and assert only a state law claim, or vice versa.[3]

A plaintiff can maintain concurrent state and federal court actions arising from the same facts and circumstances,[4] albeit the plaintiff risks having his or her state court or federal court action barred by *res judicata* if a judgment is rendered in the other case.

In *Tonnemacher v. Touche Ross & Co.*, 186 Ariz. 125, 128, 920 P.2d 5, 8 (App. 1996), for example, the Arizona appellate court held that where ***two identical*** actions are filed in "state and federal courts having concurrent jurisdiction" the

---

[2]  *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913)

[3]  *Hunter v. United Van Lines*, 746 F.2d 634, 641 (9th Cir. 1984); 1A J.Moore & B. Ringle, Moore's Federal Practice para. 0.160[3.-3], at 231-32 (2d ed. 1986)

[4]  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 284 (1995).

action "may proceed simultaneously until one court reaches judgment."

Here McBeath's state and federal actions are different.

Merely because they may involve some common facts and one common party (TTC) does not mean that McBeath is claim-splitting:

> Although the claims in the present action arise from the same fact pattern, the legal and factual issues in the instant matter and state court litigations are different. *See Provident Bank v. Patterson,* 390 U.S. 102, 127, 88 S. Ct. 733, 747 (1968) (stating that although "a critical issue of fact" was the same in the underlying state action as in the federal declaratory judgment action, the "ultimate" issue in the cases was different and the declaratory judgment action should be entertained); 6A James W. Moore et al., Moore's Federal Practice P 57.08, at 57-58 (2d ed. 1992) ("It seems well settled that the mere pendency of another action involving the same set of facts does not in and of itself preclude the exercise of the declaratory jurisdiction.").[5]

McBeath's federal action pending before this Court is not parallel or duplicative of the state court action. This action will resolve only McBeath's *__federal discrimination claims__*; the state court action will not because nowhere in the state court action does she allege discrimination on account of her age or national origin.

"[I]n the absence of parallel state court proceedings, it is less likely that the claims of all parties in interest can satisfactorily be adjudicated in the state court proceeding."[6]

---

[5] *Continental Cas. Co. v. Coastal Sav. Bank,* 977 F.2d 734, 737 (2nd Cir. 1992); *Scottsdale Ins. Co. v. Detco Indus.,* 426 F.3d 994, 997 (8th Cir. 2005) (noting that two lawsuits involving different arguments and issues may not be parallel even though they may depend on some of the same facts).

[6] *Scottsdale Ins.,* 426 F.3d at 999 (*quoting Wilton,* 515 U.S. at 283).

1    **B.    *Res judicata* does not apply until final judgment is entered.**

2    Next TTC contends that McBeath's "claims are barred in whole or in part

3    because of the doctrines of *res judicata*, claim preclusion, and/or issue preclusion

4    resulting from or related to the previously filed, concurrently litigated" state

5    court action. TTC's Amended Answer (Affirmative Defenses ¶ 3) (citation

6    omitted) (Dkt. 17); MJP (pp. 7-9)

7    When a state court judgment is the source of the supposed *res judicata*

8    (claim preclusion), federal courts must give the state court judgment the same

9    full faith and credit as it would be entitled to in the courts of the state in which

10   the judgment was entered.[7]

11   Under Arizona law, the doctrine of *res judicata*, also known as claim

12   preclusion, "prevents a plaintiff from bringing a second lawsuit when a prior

13   judgment on the merits was rendered by a court of competent jurisdiction and

14   the matter now in issue between the same parties or their privities was, or might

15   have been, determined in the former action."[8]

16   The judgment must be final. A judgment is not final "unless the court

17   states that no further matters remain pending and that judgment is entered

18   pursuant to Rule 54(c)." Ariz. R. Civ. P. 54(c).

19   For claim preclusion to apply, a party must demonstrate:

20   (1)    an identity of claims in the suit in which a judgment was entered

21   and the current litigation,

22   (2)    final judgment on the merits in the previous litigation, and

23   (3)    identity or privity between parties in the two suits.[9]

24

25

---

26   [7]   *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373 (1985).

27   [8]   *Peterson v. Newton,* 232 Ariz. 593, 595, 307 P.3d 1020, 1022 (Ct. App. 2013).

     [9]   *Id.* (internal citations omitted); *see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe*

28         *Reg'l Planning Agency,* 322 F.3d 1064, 1077 (9th Cir. 2003).

Issue preclusion does not apply unless the issue is actually litigated, and the parties had a "full and fair opportunity" to argue its merits.[10]

An issue is "actually litigated" when it is "properly raised by the pleadings or otherwise, and is submitted for determination, and is determined."[11]

The U.S. Supreme Court has held that:

> Where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered. In all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising in a suit upon a different cause of action, the inquiry must always be as to the point or question actually litigated and determined in the original action, not what might have been thus litigated and determined. Only upon such matters is the judgment conclusive in another action. [12]

"This requirement means that preclusion is inappropriate if the parties did not raise the issue in the pleadings."[13]

*Res judicata* is used for separate, sequential lawsuits, while claim-splitting applies to currently pending lawsuits without final judgment where the two pending lawsuits are duplicative.

The recent decision in *Tank v. T-Mobile USA, Inc.*, 2013 WL 4401375 (N.D. Ill. 2013) is instructive. The court in that case applied the doctrines of claim-splitting and *res judicata* in an employment discrimination suit.

---

[10] *Corbett v. ManorCare of America, Inc.*, 213 Ariz. 618, 626, 22, 146 P.3d 1027, 1034 (App. 2006).

[11] *Chaney Bldg. Co. v. City of Tucson*, 148 Ariz. 571, 573, 716 P.2d 28, 30 (1986).

[12] *Cromwell v. County of Sac*, 94 U.S. 351, 353 (1876) quoted and followed by *Read v. Scottsdale*, 107 Ariz. 524, 526 (1971).

[13] *Gospel Missions of America v. City of Los Angeles*, 328 F.3d 548, 553 (9th Cir. 2003).

In 2012, Tank sued T-Mobile for employment discrimination and for violating the federal Telecommunications Act of 1996 (***"TCA"***), which makes it illegal to access customers' cell phone records without consent.

Tank claimed that T-Mobile accessed his cell phone records while investigating him after he filed an EEOC charge. Tank previously sued T-Mobile for discrimination in 2011. After Tank filed his second suit in 2012, T-Mobile moved to dismiss based on claim-splitting and *res judicata,* on grounds that Tank's second action was repetitive or duplicative litigation.

The federal court denied T-Mobile's motion to dismiss because plaintiff's TCA claims (based on T-Mobile's cell phone snooping) were not barred by claim-splitting or *res judicata*.

While both the 2011 and 2012 suits pled T-Mobile's discriminatory conduct, only the 2012 suit alleged T-Mobile violated the TCA's privacy provisions by scouring plaintiff's cell phone.

As a result, the Court ruled that the core of underlying facts giving rise to the 2011 suit (which exclusively involved employment discrimination claims) differed from the 2012 suit (which additionally involved T-Mobile's violation of the TCA). *Tank,* 2013 WL 4401375, *5-6.

*Tank* teaches that—when considering the same claim/same core of operative facts element of claim-splitting/*res judicata*—courts consider factual differences between two separate lawsuits that may look the same on the surface.

Here the evidence that McBeath will marshall to prove her discrimination claims will be different than the evidence that she and the four defendants will use in the state court action to support their respective claims, counterlcaims, and defenses. To the extent any factual issues are similar, any preclusive effect that one action may have on the other cannot be determined until these issues are actually litigated and adjudicated.

1    In other words, unless and until the Pima County Superior Court ***enters a***

2    ***final judgment*** in the state court action, the state court proceedings do not bar

3    this federal action under the doctrines of *res judicata*, claim preclusion, and/or

4    issue preclusion—and vise versa.

5        Were that to happen, then TTC may seek the appropriate relief at such

6    time, but not now.

7

8    Dated:   August 28, 2016                Respectfully submitted,

9    _____

10                                            Melissa Martin McBeath

Exhibit A

FILED
TONI L. HELLON
CLERK, SUPERIOR COURT

4/15/2016 12:03:42 PM

BY: ALAN WALKER
DEPUTY

Case No. C20161794
HON. GUS ARAGON

1
2 MELISSA MARTIN McBEATH
3 3463 E. TERRA ALTA BLVD.
   TUCSON, AZ 85716
4 Ph:  (520) 449-9753
   *mel.mcbeath@cox.net*
5
6 Pro Se
7
8
9               **SUPERIOR COURT OF ARIZONA**
10                   **COUNTY OF PIMA**
11

12 | Case No. _____
13 MELISSA MARTIN MCBEATH, an
   individual,
14                                    **VERIFIED COMPLAINT**
15          Plaintiff,
16     v.                             **DEMAND FOR JURY TRIAL**
17 TUCSON TAMALE COMPANY; an          1. Retaliatory Discharge in Violation
18 Arizona corporation,                  of the Employment Protection Act
   TODD RUSSELL MARTIN, an
19 individual; SHERRY MARTIN, an       2. Fraud in the Inducement
20 individual; and LISA MARTIN, an
   individual,                        3. Negligent Misrepresentation
21
22          Defendants.               4. Breach of Employment Agreement

23                                    5. Failure to Pay Bonuses in
24                                       Violation of Arizona's Wage Act
25
                                      6. Conversion
26
27                                    7. Unjust Enrichment
28

10105.1

# THE PARTIES

1. Plaintiff MELISSA MARTIN MCBEATH (*"**Plaintiff**"*) brings this action against her former employer, TUCSON TAMALE COMPANY (*"**TTC**"*), for (i) retaliatory discharge in violation of Arizona's Employment Protection Act, (ii) fraud in the inducement, (iii) negligent misrepresentation, (iv) breach of employment agreement, (v) failure to pay bonuses in violation of Arizona's Wage Act, (vi) conversion, and (vii) restitution / unjust enrichment. Plaintiff seeks general, special, compensatory and punitive damages, attorneys' fees, costs, pre-judgment interest, post-judgment interest, and other appropriate relief.

2. Plaintiff is an individual who resides in Pima County, Arizona.

3. TUCSON TAMALE COMPANY is and, at all times mentioned in this Verified Complaint, was authorized to operate by the State of Arizona and qualified to do business in Pima County, Arizona. *See* AZ Corporation Commission File No. 14604539. TTC has a place of business and offices located at 2550 N. Dragoon Street, Suite 120, Tucson, Arizona 85745.

4. Defendant TODD RUSSELL MARTIN (*"**TODD**"*) is a co-founder and, at all times relevant to this Verified Complaint, has been TTC's President and Chief Executive Officer. He resides and does business in Pima County, Arizona.

5. Defendant SHERRY MARTIN (*"**SHERRY**"*) is a co-founder and, at all times relevant to this Verified Complaint, has been TTC's Secretary. She resides and does business in Pima County, Arizona.

6. Defendant LISA MARTIN (*"**LISA**"*) is and, at all times relevant to this Verified Complaint, has been an individual that TTC employs to provide "global oversight" and "leadership development." She does business in Pima County, Arizona.

7. TODD, SHERRY, LISA and TTC are referred to collectively as *"**Defendants**"* in this Verified Complaint.

8. TODD and SHERRY are co-founders of the following three addi-
tional businesses authorized to operate by the State of Arizona and qualified to
do business in Pima County:

     a.    Tucson Tamale Company Oracle, LLC

     b.    Tucson Tamale Company Tanque Verde, LLC

     c.    Tucson Tamale Wholesale Company, LLC

9. Plaintiff is informed and believes that each Defendant was
associated or affiliated with one or more of the other Defendants in connection
with matters and conduct sued upon herein.

10. Plaintiff is informed and believes that, at all times relevant to this
Verified Complaint, each Defendant acted with one or more of the other
Defendants under a common scheme, course of action, enterprise or conspiracy
and each Defendant is liable to Plaintiff for the events, happenings and damages
alleged.

## JURISDICTION AND VENUE

11. The Court has jurisdiction over the alleged torts and state law claims
under Arizona Constitution Art. 6 and Ariz. Rev. Stat. § 12-123.

12. Venue is proper under Ariz. Rev. Stat. § 12-401 because the acts
alleged in this Verified Complaint occurred, and all Defendants reside or do
business, in Pima County, Arizona.

13. The demand or value of property in controversy in this Verified
Complaint, exclusive of interest and costs, exceeds the minimum jurisdictional
requirements.

14. This case is not subject to compulsory arbitration because the
amount in controversy exceeds $50,000.

## TERMS OF PLAINTIFF'S EMPLOYMENT

## AND TERMINATION

3       15.    Plaintiff began the interview process with TODD, SHERRY, and
4  LISA in February 2015. They met at least six times over the course of several
5  weeks, and talked for hours about the business and the vision Defendants had to
6  grow TTC's tamale wholesale business. They expressed to Plaintiff that she
7  would be ideally suited for the position they were going to create to run this
8  business because of her close to twenty years' experience in wholesale sales and
9  distribution.

10      16.    Defendants explained to Plaintiff that they were actively searching
11  for a production facility to lease and therefore were not ready to hire her as a
12  business development manager whose sole focus would be to grow and to
13  manage TTC's expanded wholesale business.

14      17.    Defendants pleaded with Plaintiff to temporarily assume the Area
15  Manager position ($45,000 annual salary) to oversee their three other affiliated
16  restaurant and food service businesses (listed in Paragraph 8).

17      18.    Plaintiff stated that she needed an annual base salary of $75,000.

18      19.    TODD and SHERRY assured Plaintiff that after she completed the
19  90-day probationary period, her annual salary would be reviewed and increased
20  to at least $50,000, based on performance. Of course even this salary would be
21  temporary, pending the opening of the new production facility. At that point,
22  Plaintiff would transition into the new role at an increased annual salary.

23      20.    Defendants unequivocally represented to Plaintiff that the new
24  position would allow her an opportunity to make more money.

25      21.    Defendants further assured Plaintiff that she would not remain in
26  the Area Manager position for more than six months.

27      22.    During the interview process, Defendants informed Plaintiff that
28  TTC did not offer health benefits yet, but would shortly make them available.

23.     In light of the promises made to her regarding the terms of her employment, Plaintiff agreed to join TTC.

24.     Plaintiff turned down a more lucrative job offer she had received because she was excited and looked forward to the promising opportunities for professional growth at TTC that Defendants described to her.

25.     Plaintiff started working for TTC on April 20, 2015.

26.     Plaintiff was made a part of TTC's executive management team and in that capacity reported to TODD, SHERRY, and LISA.

27.     Defendants further told Plaintiff, and put in her offer letter, that she would be paid up to $2,500 under TTC's quarterly incentive plan. Plaintiff would be eligible to participate in the incentive plan after 90 days.

28.     After Plaintiff successfully completed the 90-day probationary period, she requested a salary review as promised and inquired about the health benefits she was promised. She was told to wait.

29.     In a written evaluation titled "90 Day Assessment," dated September 1, 2015, Plaintiff received glowing reviews in every area of responsibility because she performed her duties in an exemplary manner. This evaluation should have been conducted in July 2015.

30.     In September 2015, her annual salary was finally raised to $50,000.

31.     Plaintiff's first quarterly bonus was due by October 22, 2015. When Plaintiff asked TODD and SHERRY in an email when she would be paid the bonus, they responded that the bonus would be paid as soon as they finalized "the industry metrics used to evaluate performance."

32.     Plaintiff asked about the payment of her bonuses several times over the next few weeks but was told to wait until after the holidays because TODD and SHERRY were just too busy.

33.     In November 2015, Plaintiff began to report solely to SHERRY due to an in internal TTC restructuring of management roles.

34.     When TTC senior staff was notified about the change in roles, one of the general managers expressed great concern to Plaintiff. Having working with SHERRY for several years, this general manager lamented to Plaintiff in tears: "You won't last long. She [SHERRY] runs all the good people off."

35.     At the end of January 2016, when the second quarterly bonus was due, Defendants failed even to acknowledge that Plaintiff was owed this money.

36.     Refusing to be brushed off any more, Plaintiff sent a direct and sternly-worded email to SHERRY on February 15, 2016, and insisted that Defendants address her bonuses and compensation before the end of the week.

37.     In response, SHERRY scheduled a meeting at the TTC corporate office on Friday, February 19, 2016.

38.     The meeting did not go well. SHERRY snidely asked Plaintiff: "Do you think you deserve your bonuses?" The tone of her voice clearly communicated to Plaintiff that Defendants had no intention of paying her this money. Plaintiff revisited the issue of TTC's obligation to pay not just her bonuses, but the bonuses owed to the general managers.

39.     Plaintiff also insisted that Defendants honor the promise they made in October 2015 to TTC's front-line employees to increase their wages.

40.     In an article titled *"20 million tamales: Tucson company plans big expansion,"* published in the Arizona Daily star on October 24, 2015, TODD boasted that: "The company plans to hire about 30 to 40 employees over the next year to handle demand, and plans to pay better than minimum wage, starting at $10 to $12 per hour. . . ."

*http://tucson.com/business/local/million-tamales-tucson-company-plans-big-expansion/article_e25d4c29-4e64-50ea-a28e-d7229429e2cb.html.*

41.     To date, not a single TTC front-line employee is paid $10 per hour.

42.     Finally, Plaintiff expressed her dismay that Defendants did not

honor their promise to make her the business development manager for the wholesale business, which was the reason she had agreed to work at TTC in the first place.

43.     On Monday, February 22, 2016, three days after they met, TODD and SHERRY terminated Plaintiff's employment. The only reason they gave: ***"Our definition of success is different than yours."***

44.     The remark reminded Plaintiff of something SHERRY once said when Plaintiff asked her to purchase an inexpensive rod and curtain for a nursing mother returning to work and needed some privacy to express milk postpartum: "I'm not fucking paying for that! If she wants to pay for it, that's up to her." Plaintiff purchased the rod and curtain at her own expense.

45.     Defendants' definition of success apparently means that not only will they refuse their employees even the smallest of professional courtesies if it will cost Defendants anything, but they will lie, cheat and steal from their employees to avoid paying them even the wages they've earned and deserve.

46.     TTC offered a discretionary severance payment of $6,250 to Plaintiff that is the precise amount of the bonuses (prorated to the month) that TTC owes to Plaintiff. The severance payment was conditioned on Plaintiff signing a Release of Claims and Separation Agreement (***"Release"***).

47.     The Release is essentially a take-it-or-leave-it contract of adhesion that is unlawful under Arizona law because:

a.     The Release [Paragraph VI (I)] has a non-solicitation restriction that is too broad because it forbids soliciting or accepting any business from "Business Affiliates" that encompasses any "person, company, corporation, or other entity with whom TTC and/or the TTC Group has or had a relationship, on the Resignation Date or during the six (6) months prior, with respect to the sale or servicing of any property, casualty, life, disability, homeowners, automobile, bonds, medical insurance, and/or related insurance products or services."

b. TTC is in the food industry. TTC does not have a protectable commercial interest related to the motley businesses identified in the Release's non-solicitation restriction. *See Olliver/Pilcher Ins. v. Daniels*, 148 Ariz. 530, 532 (1986) (holding that with respect to customers, employees, and independent contractors, a non-solicitation restriction may only protect against solicitation of those individuals with whom the employer has formed a meaningful business relationship); *Amex Distrib. Co., Inc. v. Mascari*, 150 Ariz. 510 (1986) (holding that restrictive covenants that "tend to prevent an employee from pursuing a similar vocation after termination of employment are disfavored" and are strictly construed against the employer).

c. The 24-month, boundaryless non-solicitation restriction is invalid because it is unreasonable in time and geographic scope. *Amex Distrib. Co. v. Mascari*, 150 Ariz. 510, 518 (1986) ("When the restraint is for the purpose of protecting customer relationships, its duration is reasonable only if it is no longer than necessary for the employer to put a new man on the job and for the new employee to have a reasonable opportunity to demonstrate his effectiveness to the customers."); *Olliver/Pilcher Ins. v. Daniels*, 148 Ariz. 530, 532 (1986) (holding that the geographic scope of a restrictive covenant must be reasonably necessary to protect the employer's business and may not unreasonably restrict the right of the employee to work in her chosen occupation).

d. The Release [Paragraph VI (H)] states that the Restricted Period may be 24, 18, 12 or 6 months, depending on what a "court of competent jurisdiction determines." Because under Arizona law restrictive covenants are strictly construed, this vague language of TTC's non-solicitation restriction regarding the duration of the Restricted Period makes the restriction procedurally and substantively unconscionable. An employee should not be forced to sue an employer in court to find out how long the restrictive covenant applies.

## TUCSON TAMALE COMPANY'S UNLAWFUL AND
## UNETHICAL BUSINESS PRACTICES

48.     Shortly after Plaintiff assumed her position as Area Manager, she became aware that TTC (and its three affiliated businesses) engaged in unlawful and unethical business practices.

A.     <u>Failure to comply with state and federal withholding laws.</u>

49.      TTC did not withhold the proper taxes from employees' tips, and did so partly to artificially inflate employees' wages so that they would not insist on wage increases.

50.     Tips were pooled and illegally distributed to restaurant employees who are not part of the "chain of customer service," such as managers and back-of-the-house employees who did not serve the patrons who paid the tips, in further violation of state and federal law.

51.     TTC does not take a "tip credit." *See* AZ Admin. Code R20-5-1207(B)(4) (allowing only employers who take a tip credit to enforce tip-sharing with employees not in the chain of customer service); *Oregon Rest. & Lodging Ass'n v. Perez,* 2016 U.S. App. LEXIS 3119, 26 Wage & Hour Cas. 2d (BNA) 10 (9th Cir. Feb. 23, 2016) (upholding the more restrictive federal regulation that prohibits tip-sharing with employees not part of the chain of service irrespective of whether the employer takes a tip credit).

52.     Until November 2015, a  production team of "tamale rollers" and prep cooks worked at the restaurant located at 2545 E. Broadway, Tucson, AZ 85716. This production team made tamales exclusively for TTC's wholesale and retail shipping orders placed online, and occasionally for catering orders placed as this location.

53.     Defendants required the other two TTC non-production restaurants to contribute $200 out of their tipping pool per pay period and distributed these tips to the production team who did not service the patrons who paid the tips.

54.     The production team was also included in the Broadway restaurant's tipping pool.

55.     When Plaintiff brought this illegal tip-sharing practice to Defendants' attention shortly after she joined the company, SHERRY angrily responded, "If we can't give them those tips, how the hell am I supposed to make that up?"

56.     Plaintiff explained to SHERRY that the proper thing to do was to increase the wages of the members of the production team and not to use the hard-earned tip money of other TTC employees to subsidize the wages of staff who are not legally entitled to receive any part of those tips.

57.     Plaintiff told Defendants to cease this unlawful practice as recently as December 2015, but SHERRY disregarded Plaintiff's advice. The unlawful practice continued through January 2016.

B.      Unlawful Refusal to Pay Tips Earned.

58.     TTC illegally forced employees to forfeit tips earned if they quit without giving at least two weeks' notice or missed a scheduled shift.

59.     Tips are paid out in cash every 14 days.

60.     Plaintiff repeatedly told Defendants that they had to stop these blatantly unlawful practices tantamount to wage theft, but was ignored.

C.      Unlawful Deductions.

61.     Defendants charged all TTC employees a non-discretionary meal fee for every shift worked regardless of whether the employees ate TTC restaurant food.

62.     The meal fees were automatically deducted from all TTC employees' wages without their consent. Ariz. Rev. Stat. § 23-352 ("No employer may withhold or divert any portion of an employee's wages unless . . . [t]he employer has prior written authorization from the employee.").

D.   Unlawful Retention of Bonuses Owed to General Managers.

63.   TTC's three general managers were told when they were hired that they would receive quarterly bonuses. Their offer letters do not state they must meet specific sales goals to qualify for these bonuses.

64.   Sometime in October 2015, TODD and SHERRY unilaterally decided that bonuses would be paid annually, not quarterly. And for the first time, Defendants disclosed sales targets that general managers must meet that are impossibly unattainable.

E.   Violation  of Fair Labor Standards Act's Overtime Pay Requirements.

65.   TTC's general managers are employees whose job duties and responsibilities are not exempt from the requirements to pay overtime under the Fair Labor Standards Acts ("*FLSA*").

66.   Defendants improperly classified, and continue to classify, these employees as exempt for the purpose of overtime compensation eligibility under the FLSA without reference to the types of duties those workers perform.

67.   Plaintiff observed the general managers customarily and regularly perform non-exempt physical or manual work. That is, the primary duties of the general managers consist and/or consisted of handling food and beverage items, busing tables, operating cash registers, cleaning, stocking, receiving and storing of products and supplies and serving TTC customers and patrons.

68.   The general managers rarely, if ever, exercise true discretionary powers in connection with matters of significance.

69.   The general managers are seldom authorized to make substantive decisions regarding hiring or firing nor are they relatively free from supervision in connection with matters of significance.

70.   Defendants seldom, if ever, disclose TTC's financial information to the general managers that they would need to perform high-function duties of greater responsibility.

71.     The general managers routinely and regularly work in excess of forty (40) hours per workweek without being paid overtime wages.

72.     Plaintiff is informed and believes that Defendants are, or should be, aware that state and federal law require TTC to pay its employees performing non-exempt duties overtime wages for hours worked in excess of forty per week.

73.     Plaintiff is informed and believes that Defendants are aware, or should be aware, that the general managers customarily and regularly perform non-exempt physical or manual work consisting of handling food and beverage items, busing tables, operating cash registers, cleaning, stocking, receiving and storing of products and supplies and serving TTC customers and patrons and rarely exercise true discretionary powers in connection with matters of significance and were not and are not relatively free from supervision in connection with matters of significance.

74.     Consequently, the general managers do not fall within the "administrative, executive, or professional" exemptions from the overtime requirements. Nor do they fall within any other exemption from the obligation to pay overtime compensation under state and federal law.

75.     Plaintiff is informed and believes that Defendants' failure to pay the general managers overtime wages for their work in excess of forty (40) hours per week is willful and without justification.

76.     Plaintiff is informed and believes that SHERRY for years computed overtime wages for non-exempt TTC staff based on an expanded eighty (80) hour pay period rather than a forty (40) hour workweek to avoid paying overtime.

77.     As a result of Defendants' unlawful acts, Plaintiff is informed and believes that TTC employees have been deprived of wages, and are entitled to recover these unpaid wages, plus liquidated damages, interest, attorneys' fees, and costs.

F. **Violation of Arizona's Consumer Fraud Act.**

78.     Arizona's Consumer Fraud Act makes it illegal for companies to misrepresent that goods or services are of a particular standard or quality if they are not, and falsely advertise goods or services with intent not to sell them as advertised. This public policy of the State of Arizona is designed to protect consumers and the community at large from fraudulent business practices. *Madsen v. Western Am. Mortgage Co.*, 143 Ariz. 614 (1985) ("The term 'deceptive' has been interpreted to include representations that have a 'tendency and capacity' to convey misleading impressions to consumers even though interpretations that would not be misleading also are possible. The meaning and impression are to be taken from all that is reasonably implied, not just from what is said, and in evaluating the representations, the test is whether the least sophisticated reader would be misled. Technical correctness of the representations is irrelevant if the capacity to mislead is found.").

79.     TTC engages in deceptive marketing schemes intended to mislead consumers, in violation of Arizona's Consumer Fraud Act. Ariz. Rev. Stat. § 44-1522 (A) ("The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false promise, misrepresentation, or concealment, suppression or omission, of any material fact with intent that others rely upon such . . . is declared to be an unlawful practice.").

80.     Genetically modified organisms (GMOs) are prohibited in organic products. To entice customers to purchase TTC food products, TTC's marketing materials repeatedly use the term "organic" to describe several of its products in a manner intended to mislead consumers into believing that *__all__* of its products are non-GMO and organic.

81.     Only TTC tamales are made from non-GMO masa and the ingredients *__in__* nearly all of the tamales are not organic. Masa is made from white or blue corn meal.

82. Plaintiff is informed and believes that **_less than 1% of TTC's food products may be classified as being 100% organic._**

83. Defendants intended to commit acts that were deceptive and/or fraudulent, namely, to market, sell and distribute TTC food products as "organic" or "non-GMO" when, in fact, they are not. For example, the most popular product, the vegetarian Green Corn Tamale, TTC describes as follows:

> A Sonoran tradition, organic sweet corn and organic white corn make a moist and creamy masa. We fill the tamales with roasted green chiles and Cheddar and Monterey Jack Cheese.

> _https://tucsontamale.com/store/all-tamales/green-corn-tamale.html_

84. Green Corn Tamales are not made from "green corn" or "organic sweet corn and organic white corn." They are made from the same masa as all the other tamales that TTC sells. The green chiles and cheese are not organic.

85. The deceptive marketing scheme concerning TTC products violates Arizona's Consumer Fraud Act, because, among other things, Defendants:

a. knowingly conceal, suppress, or omit material information regarding the ingredients of products that customers are led to believe are made entirely from non-GMO organic ingredients, but are not; and

b. market, promote, and advertise products in a manner that leads customers to believe that all TTC food products are made from non-GMO organic ingredients.

86. Plaintiff overheard TTC restaurant patrons comment to staff how glad they were to eat at TTC because all the food is organic. Defendants made clear to TTC's employees not to correct or to disabuse customers who mistakenly believe that all of TTC's food products are organic and non-GMO.

87. Plaintiff is informed and believes that sometime in the fall of 2014, TTC ran a promotion through the popular website "LivingSocial.com"—an

internet company with a business model similar to Groupon. Customers purchase coupons for products sold at a significant discount. Customers then redeem the coupons at the place of business within a certain period of time set by the sponsoring merchant.

88.    Plaintiff is informed and believes that SHERRY instructed all TTC staff to tell the customers that they had to provide their email addresses to redeem their coupon, a condition not disclosed at the time the customers purchased the coupons. Had this requirement been disclosed, many customers would not have proceeded with the purchase.

89.    When Plaintiff oversaw a similar promotion the following year when she was the Area Manager, she instructed staff not to lie to the customers, but to ask them politely if they wished to be placed on the company's mailing list. That year, only about 30% of the customers gave their email addresses.

90.    At a management meeting in October 2015, SHERRY turned beet-red angry at the staff for the low number of email addresses collected and when the general managers told her they had ceased lying to customers as she had instructed them to do the prior year. She stomped her feet and pounded the table as she screamed and ranted at Plaintiff and the general managers for nearly half an hour, hurtling insults and offensive epithets in rapid succession.

91.    Never in her entire professional career had Plaintiff seen such rage and abuse directed at employees. But the general managers stood their ground. They refused to lie again to customers, and two of them even threatened to resign on the spot.

92.    Since December 2015 until Plaintiff was terminated, TODD and SHERRY for months posted signs and instructed staff to tell TTC patrons that the popular "pico de gallo" salsa is not available because TTC has had to reject the tomatoes provided by its vendors because they do not meet TTC's high standard of quality for freshness. This is not true.

93.     TODD purchased a machine to dice tomatoes that either does not function properly because it mashes the tomatoes, or more likely, TODD simply selected the wrong machine.

94.     Because of hubris, TODD and SHERRY prefer to lie to TTC's customers than admit the truth. In the meantime, TTC staff must uncomfortably mislead restaurant patrons with excuses to cover their petty lie.

95.     Defendants' concealment, suppression, omissions, deceptions, mis-representations, and/or unconscionable practices have the tendency, capacity, and likelihood to deceive TTC customers.

## MANAGEMENT SILENCE EMPLOYEES WHO
## SPEAK OUT AGAINST UNETHICAL BUSINESS PRACTICES

96.     During the time that Plaintiff was employed by TTC, she tried to set in place business processes and procedures consistent with industry standards. In fact, part of her written job description specifically states that one of her roles was to ***"ensure the working environment is positive and free of drama, drugs and dingbats."***

97.     Plaintiff tried to do whatever she could to ensure that TTC did not continue to violate state and federal law.

98.     Plaintiff further tried to do whatever she could to ensure that TTC did not continue to breach its duty to exercise reasonable care in hiring, training and supervising employees as necessary to conduct TTC's business operations so that the public generally, and TTC employees specifically, would not be negligently harmed, which duty Defendants failed.

99.     Plaintiff tried to change TTC's oppressive management style, which adversely affects employee morale, but was thwarted by SHERRY at every turn because of her uncompromising refusal to collaborate, even though Plaintiff was a member of the company's executive management team.

100.    In the months that Plaintiff worked at TTC, she could not pierce through SHERRY's obsession with how things appear to others, even to the point of believing that outward image is more important than underlying reality. SHERRY was condescending, self-satisfied, self-important, pretentious, ego-absorbed, and always thought she was right. She was inconsistent and applied different rules in similar circumstances; she was habitually secretive and withheld information to control the narrative.

101.    SHERRY set unreasonable expectations. At times she inserted herself into matters not within her purview or outside of established process, either from a desire to feel involved, or from an unfounded belief that staff is not competent to make the right decisions.

102.    Plaintiff sensed that SHERRY knew that to prevent others from discovering the disturbing truth about her lack of knowledge or skill in a certain area, or about her character, SHERRY fabricated an image of competence, integrity, teamwork and leadership. And, of course, the most telltale sign of insecurity:  she cannot tolerate people who publicly stand up to her and challenge her ideas or suggestions.

103.    SHERRY's punitive and autocratic management style thwarted every effort Plaintiff made to ensure that TTC complied with the law and did not engage in unethical business practices because:

a.    SHERRY micro-manages TTC employees. Plaintiff heard SHERRY speak to and of employees with contempt, disdain, condescension, and hostility. She adopts one-way communication; she does not consult with employees or give them a chance to provide their opinions, no matter the potential benefit of such input.

b.    SHERRY involves herself in detailed day-to-day activities, and rarely delegates or empowers subordinates.

c. SHERRY assumes that employee motivation comes not through empowerment, but by creating a structured set of rewards and punishments.

d. SHERRY gets work done by issuing threats and punishments and evoking fear.

e. SHERRY is short-sighted and concerns herself mostly with dealing with the work at hand and not on developmental activities.

104. When confronted, SHERRY was evasive and denied responsibility. She misled people by omitting significant information that would explain a situation and reveal the underlying truth about what happened. When others countered with a fact-based explanation, she misstated and belittled that person's viewpoint. When facts were not on her side, she misquoted others, or misrepresented their meaning, then claimed they supported her ideas. She rewrote history if she had to, and made herself believe it.

105. SHERRY brags about herself, and exaggerates her own importance. She tries to look as powerful as possible by telling stories that highlight her cleverness and accomplishments. She portrays herself as highly adept and skilled by claiming superior knowledge and experience on most topics. Of course, she seldom admits mistakes and never apologizes.

106. SHERRY is duplicitous and Machiavellian in her political machinations to get her way, no matter who she harms along the way to further her agenda. She lies, dissembles, and twists the truth.

107. In short, SHERRY creates a toxic workplace for TTC employees. Her avarice prevents her from caring about anything but money.

108. SHERRY's obsession with the bottom line overrides any concern for protecting TTC employees, providing accurate information to customers regarding the ingredients of TTC's products, or even complying with basic state wage laws.

# COUNT I

## RETALIATORY DISCHARGE IN VIOLATION
## OF THE EMPLOYMENT PROTECTION ACT

**Ariz. Rev. Stat. § 23-1501**

**(Against All Defendants)**

109.    Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Verified Complaint.

110.    An employer's traditional right to discharge an at-will employee is subject to limits imposed by public policy, in light of an employee's right to exercise statutory or constitutional rights or privileges. Whenever the basis of the discharge contravenes a fundamental public policy, such public policy must inure to the benefit of the public at large and must be grounded in some statutory or constitutional provision.

111.    Under Arizona's Employment Protection Act, it is unlawful to terminate an employee in retaliation for the employee's reasonable disclosure of the employer's violation of Arizona law. Ariz. Rev. Stat. § 23-1501 (A)(3)(c).

112.    At all times relevant to this Verified Complaint, it was the public policy of the State of Arizona, as codified, expressed and mandated by Arizona's Income Tax Act of 1978, Ariz. Rev. Stat. § 43-401(A) that: "Every employer at the time of the payment of wages, salary, bonus or other emolument to any employee whose compensation is for services performed within this state shall deduct and retain from the compensation an amount prescribed by tables adopted by the department."

113.    At all times relevant to this Verified Complaint, it was the public policy of the State of Arizona, as codified, expressed and mandated by Arizona's Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522 (A) that: "The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false promise, misrepresentation, or concealment, suppression or omission, of

1   any material fact with intent that others rely upon such. . . . is an unlawful

2   practice." This public policy of the State of Arizona is designed to protect

3   consumers and the community at large from fraudulent business practices.

4       114.    Plaintiff complained to Defendants that their willful failure to

5   withhold, account for, and pay withholding taxes from tips paid by TTC

6   customers to employees was illegal. *See generally* Ariz. Admin. Code R20-5-1210

7   (General Recordkeeping Requirements).

8       115.    Plaintiff complained to Defendants that it was illegal for TTC to

9   require its employees to share tips with all restaurant employees, including

10  managers who did not serve the restaurant patrons who paid the tips.

11      116.    Plaintiff complained to Defendants that they were willfully

12  committing wage theft because:

13          a.      TTC may not force employees to forfeit tips earned if they quit

14  without giving at least two weeks' notice or miss a scheduled shift.

15          b.      TTC may not unilaterally change the terms and conditions of

16  employment for the general managers by setting unattainable sales goals that

17  were never disclosed to the general managers when they received their written

18  offer letters.

19          c.      TTC may not charge employees for meals if they did not eat

20  TTC's restaurant food.

21      117.    Plaintiff expressed her concerns regarding Defendants' business

22  practice of marketing, selling and distributing TTC food products in a manner

23  intended to mislead consumers into believing that *__all__* TTC food products are

24  organic when, in fact, that is not true.

25      118.    TTC violated Plaintiff's statutory rights when TTC terminated her

26  employment because she objected to the Defendants' illegal and unethical

27  business practices.

28      119.    TTC further violated Plaintiff's rights when Defendants conditioned

the payment of severance benefits on the signing of a Release that contains an illegal non-solicitation restriction that violates Arizona law for the reasons explained above.

120. Defendants either knew, or in the exercise of reasonable care, should have known that their conduct was unlawful.

121. Defendants' policies, practices and customs described above have resulted in unjust enrichment and an unfair business advantage over businesses that routinely adhere to the strictures of state and federal laws.

122. Unless restrained by this Court, Defendants will continue to engage in the unlawful conduct alleged above.

123. Plaintiff is informed and believes that she was tortiously retaliated against in contravention of the substantial public policy not to commit fraud or to engage in illegal and unfair business practices. Accordingly, Defendants' retaliation against Plaintiff on the grounds alleged and described in this Verified Complaint were wrongful and in contravention and violation of the express public policy of the State of Arizona and Arizona's Employment Protection Act.

124. As a direct, foreseeable and proximate result of Defendants' wrongful acts, Plaintiff has suffered substantial damages, including lost salary, benefits, bonuses, loss of employment-related opportunities for growth, humiliation, and embarrassment, all in an amount according to proof at time of trial.

125. Defendants' acts were committed maliciously, fraudulently, or oppressively with the intent to injure Plaintiff, and/or with a willful and conscious disregard of Plaintiff's right to work in an environment free from retaliation. Because these acts were carried out by managerial employees in a despicable, deliberate and intentional manner, Plaintiff is entitled to recover punitive damages in a sum sufficient to punish and deter future such conduct.

126. An award of punitive damages will serve to punish Defendants and set an example to other companies who may be in similar violations of state law.

**COUNT II**

**FRAUD IN THE INDUCEMENT**

**(Against All Defendants)**

127.    Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Verified Complaint.

128.    The elements of fraudulent inducement are the functional equivalent of fraud:  (a) a representation, (b) its falsity, (c) its materiality, (d) the speaker's knowledge of its falsity or ignorance of its truth, (e) the speaker's intent that the information should be acted upon by the hearer and in a manner reasonably contemplated, (f) the hearer's ignorance of the information's falsity, (g) the hearer's reliance on its truth, (h) the hearer's right to rely thereon, and (i) the hearer's consequent and proximate injury. *Taeger v. Catholic Family & Cmty. Servs.*, 196 Ariz. 285 (1999); *American Pepper Supply Co. v. Federal Ins. Co.*, 205 Ariz. 465 (2003).

129.    Defendants knowingly and willfully conspired and agreed among themselves to harm Plaintiff by engaging in a pattern of intentional, willful, and malicious misrepresentations regarding the terms of her employment.

130.    Defendants committed actual fraud and fraudulently induced Plaintiff not to pursue or explore other employment so that she would agree to work at TTC, and continued to commit fraud and fraudulently induced Plaintiff to continue her employment with TTC and to continue working on the projects assigned to her by representing that employment with TTC would be more profitable, with the promise of future salary increases, bonuses and professional development.

131.    Plaintiff was induced to become an employee of TTC, not to seek positions elsewhere, and to share her knowledge and expertise with Defendants who leveraged her name, experience, and credibility, with current and prospective customers, clients, and employees. Plaintiff has lost income and

income opportunities.

132. Defendants knew at the time they induced Plaintiff to accept TTC's offer of employment that they would not honor the promises upon which Plaintiff relied not to accept another, more lucrative offer of employment, and which Plaintiff relied on to remain and to continue her employment with TTC until she was wrongfully terminated.

133. In September 2015, TODD asked Plaintiff to meet and to interview the person he intended to hire as the business development manager for TTC's expanded wholesale business. This was the position that Defendants had promised to Plaintiff when they interviewed her and the only reason why Plaintiff agreed to temporarily assume the restaurant Area Manager position for TTC at a lower salary. Defendants filled the business development manager position in September 2015 with a candidate who had absolutely no wholesale or restaurant experience.

134. Defendants designed, and intended to design, a scheme and artifice to defraud Plaintiff by making promises, misrepresentations, and misstatements that Defendants knew they had no intention of keeping or knew were false and misleading, or in the alternative, by making such misrepresentations and misstatements with disregard for their truth, veracity, or misleading nature with the desire and intent to defraud Plaintiff and to avoid payment of due compensation.

135. The misrepresentations, misstatements and omissions were material misrepresentations, misstatements and omissions of past or existing facts, or false promises to do some act in the future on which Defendants intended Plaintiff to rely, or on which Defendants induced Plaintiff to take further actions. Plaintiff relied on the misrepresentations to her detriment and injury.

136. As a direct, foreseeable and proximate result of Defendants' wrongful acts, Plaintiff has suffered substantial damages, including lost salary,

benefits, bonuses, loss of employment-related opportunities for growth, humiliation, and embarrassment, all in an amount according to proof at time of trial.

137.    Defendants' acts were committed maliciously, fraudulently, or oppressively with the intent to injure Plaintiff, and/or with a willful and conscious disregard of Plaintiff's right to work in an environment free from fraud and retaliation. Because these acts were carried out by managerial employees in a despicable, deliberate and intentional manner, Plaintiff is entitled to recover punitive damages in a sum sufficient to punish and deter future such conduct.

## COUNT III

## NEGLIGENT MISREPRESENTATION

### (Against All Defendants)

138.    Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Verified Complaint.

139.    Alternatively, if Defendants' representations and omissions regarding the terms and conditions of Plaintiff's employment were not made with the intent to defraud, they were negligently made. Plaintiff reasonably relied on those misrepresentations and has been damaged as a result.

140.    Plaintiff is entitled to recover all actionable damages (including general, consequential, incidental and special damages, lost wages, lost opportunities and other damages) sustained as a proximate cause of Defendants' negligent misrepresentations.

## COUNT IV

## BREACH OF EMPLOYMENT AGREEMENT

### (Against Tucson Tamale Company)

141.    Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Verified Complaint.

142.    During the period of Plaintiff's employment with TTC, there existed an express and implied in fact employment contract that set forth the terms and

conditions of PLAINTIFF's employment relationship with TTC.

143.    The total employment contract was evidenced by an offer letter and written and oral representations Defendants made to Plaintiff.

144.    TTC breached the employment agreement by failing to provide the wage increase, bonuses and benefits that Defendants promised to Plaintiff.

145.    TTC's refusal to perform its duties under the employment agreement was unlawful, without justification and/or excuse, and constituted a total and material breach of the agreement between the parties.

146.    As a direct, foreseeable and proximate result of TTC's breach of the employment agreement, Plaintiff has suffered substantial damages, including lost salary, benefits, bonuses, and loss of employment-related opportunities for growth, all in an amount according to proof at time of trial. Plaintiff has sought to mitigate wage-related damages.

147.    Plaintiff is entitled to recover her attorneys' fees and costs under Ariz. Rev. Stat. §§ 12-341 and 12-341.01.

## COUNT V

## FAILURE TO PAY EARNED WAGES

## IN VIOLATION OF ARIZONA'S WAGE ACT

### Ariz. Rev. Stat. § 23-350 *et seq.*

### (Against Tucson Tamale Company)

148.    Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Verified Complaint.

149.    After the 90-day probationary period expired, TTC failed to pay the promised increased salary and bonuses that Plaintiff accrued through the date of her termination. To date, TTC has failed and refused, and continues to fail and refuse, to pay the wages due.

150.    By the acts and omissions set forth above, including by failing to pay all bonuses due to Plaintiff, TTC violated Arizona's Wage Act.

151. As a result of TTC's violations of Ariz. Rev. Stat. § 23-351, Plaintiff has been harmed, has suffered substantial losses and has been deprived of compensation. Plaintiff is therefore entitled to an award of the unpaid wages, with prejudgment interest, and treble the amount of such wages, together with attorneys' fees and costs pursuant to Ariz. Rev. Stat. § 23-355.

## COUNT VI

## CONVERSION

## (Against All Defendants)

152. Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Verified Complaint.

153. Plaintiff performed labor and services for TTC, at Defendants' request, as described above. Defendants' committed wage theft because they have wrongfully and unlawfully converted Plaintiff's wages by deliberately failing to pay the promised increased salary, bonuses and benefits.

154. By failing to pay the wages and benefits owed, and retaining the sums earned by Plaintiff, Defendants wrongfully exercised dominion over Plaintiff's property. Once Defendants intentionally applied these monies for their own use and benefit, the conversion was complete.

155. Plaintiff is informed and believes that Defendants withheld her wages owed and failed to provide the promised benefits as a means of decreasing overhead costs and increasing their profits, and to increase monies directly or indirectly flowing to Defendants.

156. As a result of Defendant's conversion, Plaintiff has been damaged in an amount to be proven at trial.

157. Defendants' acts were committed maliciously, fraudulently, or oppressively with the intent to injure Plaintiff, and/or with a willful and conscious disregard of Plaintiff's rights. Because these acts were carried out by managerial employees in a despicable, deliberate and intentional manner,

Plaintiff is entitled to recover punitive damages in a sum sufficient to punish and deter future such conduct.

## COUNT VII

## RESTITUTION / UNJUST ENRICHMENT

### (Against All Defendants)

158.    Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Verified Complaint.

159.    Defendants benefited unjustly from their actions in wrongfully and unlawfully failing to pay wages owed to Plaintiff.

160.    Defendants were under a duty to comply with Arizona's wage laws.

161.    Defendants have unjustly retained Plaintiff's wages.

162.    Defendants' unjust enrichment was conscious, deliberate, intentional and/or malicious.

163.    Plaintiff is informed and believes that as a result of Defendants' wrongful acts, they have been unjustly enriched in the amount to be proven at trial.

### DEMAND FOR JURY TRIAL

*Plaintiff Melissa Martin McBeath hereby demands trial of this matter by jury.*

# PRAYER FOR RELIEF

Plaintiff Melissa Martin McBeath prays for judgment as follows:

1.     General, special and compensatory damages;

2.     Punitive damages;

3.     All statutory damages;

4.     Reasonable attorneys' fees due pursuant to contract and according to all attorney-fee statutes found by the Court to apply to the facts presented at trial;

5.     Pre-judgment and post-judgment interest on all damages awarded;

6.     Costs of suit incurred; and

7.     For such other and further relief as the Court deems just and proper.


Dated:  April 15, 2016

/s/ *Melissa Martin McBeath*
Melissa Martin McBeath

10105.1

# VERIFICATION

MELISSA MARTIN McBEATH, being first duly sworn, upon her oath deposes and says:

I am the plaintiff in this matter. I have read and know the contents of the foregoing:

VERIFIED COMPLAINT:

1.      Retaliatory Discharge in Violation of the Employment Protection Act

2.      Fraud in the Inducement

3.      Negligent Misrepresentation

4.      Breach of Employment Agreement

5.      Failure to Pay Earned Bonuses in Violation of Arizona's Wage Act

6.      Conversion

7.      Unjust Enrichment

The facts alleged in the Verified Complaint are within my own knowledge and I know those facts to be true, except as to those matters stated upon my information and belief, and as to those matters I also believe them to be true.

I declare (or certify, verify or state) under penalty of perjury under the laws of the State of Arizona that the foregoing is true and correct. Executed on April 15, 2016.

/s/ *Melissa Martin McBeath*

Melissa Martin McBeath