MELISSA MARTIN McBEATH
3463 E. TERRA ALTA BLVD.
TUCSON, AZ 85716
Ph:  (520) 449-9753
*mel.mcbeath@cox.net*

Pro Se

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA, TUCSON DIVISION

| | |
|---|---|
| MELISSA MARTIN McBEATH,<br>   an individual,<br><br>              Plaintiff,<br><br>     v.<br><br>TUCSON TAMALE COMPANY,<br>   an Arizona corporation,<br><br>                   Defendant. | Case No. CV 16-462-TUC-DCB (BPV)<br><br>**PLAINTIFF'S MOTION FOR LEAVE<br>TO AMEND THE COMPLAINT**<br>_____<br><br>[Fed. R. Civ. P. 15(a)]<br><br>Assigned to Hon. David C. Bury<br><br>Complaint filed:  July 11, 2016 |

10366.1

# LEGAL ARGUMENT

Plaintiff Melissa Martin McBeath requests leave to amend her complaint so that she may add claims for (i) retaliatory discharge in violation of Arizona's Employment Protection Act; (ii) fraud in the inducement; (iii) negligent misrepresentation; (iv) failure to pay bonuses in violation of Arizona's Wage Act, (v) breach of employment agreement; and (vi) restitution / unjust enrichment.

Fed. R. Civ. P. 15(a) governs amendments to pleadings and provides that, absent stipulation, after a responsive pleading has been filed subsequent amendments are permitted only with leave of the court. Under Rule 15(a), "[t]he court should freely give leave when justice so requires." The United States Supreme Court and the Ninth Circuit repeatedly have reaffirmed that leave to amend is to be granted with "extreme liberality." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987).

In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962).

The additional claims that Plaintiff wishes to add are Arizona state law claims currently pending before the Pima County Superior Court. When Plaintiff filed this federal action in July 2016, she did not know that she could join her state law claims with her federal claims.

Defendant Tucson Tamale Company has complained that having two parallel proceedings is costly and burdens strained judicial resources. Plaintiff agrees that it would be best to consolidate all her claims in one forum. Because she prefers to litigate her case in federal court, Plaintiff respectfully requests that

1  she be allowed to join her Arizona statutory and common law claims to the

2  federal claims currently pending before this Court, as permitted under 28 U.S.C. §

3  1367(a).

4       Plaintiff requests leave to amend because Defendant Tucson Tamale

5  Company refused to stipulate to the filing of the proposed Second Amended

6  Complaint attached as Exhibit A.

7

8  Dated:  March 9, 2017                    Respectfully submitted,

9

10       *Melissa Martin McBeath*

11       Melissa Martin McBeath

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MOTION FOR LEAVE
TO AMEND THE COMPLAINT

CV-16-462-TUC-DCB(BPV)

EXHIBIT  A

MELISSA MARTIN McBEATH
3463 E. TERRA ALTA BLVD.
TUCSON, AZ 85716
Ph:  (520) 449-9753
*mel.mcbeath@cox.net*

Pro Se

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA, TUCSON DIVISION

|  |  |
|---|---|
| MELISSA MARTIN MCBEATH, —an individual, <br><br> Plaintiff, <br><br> v. <br><br> TUCSON TAMALE COMPANY, —an Arizona corporation; TODD RUSSELL MARTIN; an individual; SHERRY MARTIN, an individual; and LISA MARTIN, an individual, <br><br> Defendants. | Case No. CV 16-462-TUC-DCB (BPV) <br><br><br> **SECOND AMENDED COMPLAINT** |

**THE PARTIES**

1.      MELISSA MARTIN MCBEATH (*"Plaintiff"*) brings this action against her former employer and the three individual defendants identified below for (i) discrimination based on age, (ii) discrimination based on national origin, race and ancestry; (iii) retaliatory discharge in violation of Arizona's Employment Protection Act; (iv) fraud in the inducement; (v) negligent misrepresentation; (vi) failure to pay bonuses in violation of Arizona's Wage Act, (vii) breach of employment agreement; and (viii) restitution / unjust enrichment. Plaintiff seeks general, special, compensatory and punitive damages, attorneys' fees, costs, interest, and other appropriate relief.

2.      Plaintiff is an individual who resides in Pima County, Arizona.

3.      TUCSON TAMALE COMPANY (*"TTC"*), is and, at all times mentioned in this verified Complaint, was authorized to operate by the State of Arizona and qualified to do business in Pima County, Arizona. *See* AZ Corporation Commission File No. 14604539. TTC has a place of business and offices located at 2550 N. Dragoon Street, Suite 120, Tucson, Arizona 85745.

4.      Defendant TODD RUSSELL MARTIN (*"Todd"*) is a co-founder and, at all times relevant to this Second Amended Complaint, has been TTC's President and Chief Executive Officer. He resides and does business in Pima County, Arizona.

5.      Defendant SHERRY MARTIN (*"Sherry"*) is a co-founder and, at all times relevant to this Second Amended Complaint, has been TTC's Secretary. She resides and does business in Pima County, Arizona.

~~3.~~      Defendant LISA MARTIN (*"Lisa"*) is and, at all times relevant to this Second Amended Complaint, is individual that TTC employs to provide "global oversight" and "leadership development." She does business in Pima County, Arizona.

6.      Todd, Sherry, Lisa and TTC are referred to collectively as *"Defendants"* in this Second Amended Complaint.

7.      Todd and Sherry are co-founders of the following three companies authorized to operate by the State of Arizona and qualified to do business in Pima County:

       a.     Tucson Tamale Company Oracle, LLC

       b.     Tucson Tamale Company Tanque Verde, LLC

       c.     Tucson Tamale Wholesale Company, LLC

     8.     Plaintiff is informed and believes that each Defendant was associated or affiliated with one or more of the other Defendants in connection with matters and conduct sued upon herein.

     9.     Plaintiff is informed and believes that, at all times relevant to this Second Amended Complaint, each Defendant acted with one or more of the other Defendants under a common scheme, course of action, enterprise or conspiracy and each Defendant is liable to Plaintiff for the events, happenings and damages alleged.

## JURISDICTION AND VENUE

     10.     At Plaintiff's request, the Equal Employment Opportunity Commission issued a right-to-sue letter on November 2, 2016, in connection with Plaintiff's complaint that the acts of discrimination alleged below violate the Age Discrimination in Employment Act (29 U.S.C § 621 *et seq.*) or Title VII (42 U.S.C. § 2000e-5(f)(3)).

     11.     The Court has jurisdiction over the federal discrimination claims under 28 U.S.C. § 1331.

     12.     With respect to Plaintiff's Arizona statutory and common law claims, the Court has supplemental jurisdiction over these claims under 28 U.S.C. § 1367(a).

     13.     The demand in controversy, exclusive of interest and costs, exceeds the minimum jurisdictional requirements.

     ~~4.~~14.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because all the events and omissions that gave rise to the claims occurred in Arizona. ~~Plaintiff waited more than 60 days after she filed her discrimination complaint with the EEOC before commencing this civil action, as required under 29 U.S.C. § 626(d). *See* 29 CFR § 1626.18(c).~~

**FACTUAL BACKGROUND**

5.15.   Todd Russell Martin and Sherry Martin (husband and wife) are the principals and officers of TTC. They own three restaurants in Tucson, Arizona and operate a tamale wholesale sale and distribution business from a separate production facility.

6.   Lisa Martin is Todd's sister and is employed by TTC. [1]

16.

7.   Plaintiff began the interview process with Todd, Sherry and Lisa in February 2015. Todd, Sherry and Lisa met with Plaintiff at least six times over the course of several weeks, and talked for hours about the business and the vision they had to grow TTC's tamale wholesale and retail business. They expressed to Plaintiff that she was not the right fit for the Area Manager position, but she would be ideally suited for the position of Business Development Manager because of her close to twenty years' experience in wholesale sales and distribution. The sole focus of the person who assumed this position would be to grow and to manage TTC's expanding wholesale business.

8.17.   Todd, Sherry and Lisa explained to Plaintiff that they were actively searching for a production facility to lease and therefore were not yet ready to hire her as a Business Development Manager.

9.18.   Plaintiff made clear that she was not interested in the Area Manager position permanently. Even so, Todd, Sherry and Lisa pleaded with Plaintiff to temporarily assume the Area Manager position ($45,000 annual salary) to oversee their three other affiliated restaurant and food service businesses until the production facility was operational. Plaintiff stated that she needed an annual base salary of $75,000.

10.19.   Todd and Sherry assured Plaintiff that after she completed the

---

[1]   To avoid confusion, Todd Russell Martin, Sherry Martin and Lisa Martin are referred to by their first name. While Plaintiff shares a similar name with these individuals, she is not related to them in any way.

90-day probationary period, her annual salary would be reviewed and increased to at least $50,000, based on performance. They told her this salary would be temporary, pending the opening of the new production facility. At that point, Plaintiff would transition into the new role of Business Development Manager at an increased annual salary.

~~11.~~20.   Todd, Sherry and Lisa unequivocally represented to Plaintiff that the new position of Business Development Manager would ~~allow~~ offer her an opportunity to ~~make~~ earn more money.

~~12.~~21.   Todd, Sherry and Lisa further assured Plaintiff that she would not remain in the Area Manager position ~~for more than six months~~ permanently at the lower annual salary of $50,000, and would transition to the Business Development Manager as soon as the production facility was operational.

~~13.~~22.   During the interview process, Todd, Sherry and Lisa informed Plaintiff that TTC did not offer health benefits yet, but would shortly make them available.

~~14.~~23.   In light of the promises made to her regarding the terms of her employment, Plaintiff agreed to join TTC.

~~15.~~24.   Plaintiff turned down a more lucrative job offer she had received because she looked forward to the exiting and promising opportunities for professional growth at TTC that Todd, Sherry and Lisa described to her.

~~16.~~25.   Plaintiff started working for TTC on April 20, 2015.

~~17.~~26.   Plaintiff was made a part of TTC's "executive management team" and in that capacity reported to Todd, Sherry, and Lisa. Plaintiff oversaw monthly sales of over $400,000 (approximately $5,000,000 annually) and managed a team of over 30 TTC employees.

~~18.~~27.   Todd, Sherry and Lisa further told Plaintiff, and put in her offer letter, that she would be paid up to $2,500 under TTC's quarterly incentive plan. Plaintiff would be eligible to participate in the incentive plan after 90 days.

~~19.~~28.   After Plaintiff successfully completed the 90-day probationary period, she

1   requested the salary review as promised and inquired about the health benefits she was

2   also promised. She was told to wait.

3       ~~20.~~29.  In a written evaluation titled "90 Day Assessment," dated September 1,

4   2015, Plaintiff received glowing reviews in every area of responsibility because she

5   performed her job in an an exceptionally professional and exemplary manner. This

6   evaluation should have been conducted in July 2015.

7       ~~21.~~30.  In September 2015, her annual salary was finally raised to $50,000, two

8   months after the promised review and was not prorated to July 2015.

9       ~~22.~~31.  Plaintiff's first quarterly bonus was due by October 22, 2015. When

10  Plaintiff asked Todd and Sherry in an email when she would be paid the bonus, they

11  responded that the bonus would be paid as soon as they finalized "the industry metrics

12  used to evaluate performance." This was a new condition that Defendants imposed on

13  Plaintiff without prior notice.

14      ~~23.~~32.  Plaintiff asked about the payment of her bonus~~es~~ several times over the

15  next few weeks but was told to wait until after the holidays because Todd and Sherry

16  were too busy to be bothered with what was obviously not a priority to them.

17      ~~24.~~33.  In November 2015, Plaintiff began to report solely to Sherry due to an

18  internal TTC restructuring of management roles.

19      ~~25.~~34.  When TTC senior staff was notified about the change in roles, one of the

20  general managers, Meaghan Anderson, expressed great concern to Plaintiff. Having

21  worked with Sherry for several years, ~~this general manager~~ Ms. Anderson lamented to

22  Plaintiff in tears:  "You won't last long. She [Sherry] runs all the good people off."

23      ~~26.~~35.  At the end of January 2016, when the second quarterly bonus was due,

24  Todd, Sherry and Lisa failed even to acknowledge that Plaintiff was owed this money.

25      ~~27.~~36.  Refusing to wait any longer, Plaintiff confronted Sherry via email on

26  February 15, 2016, and insisted that she and Todd address her promised bonuses,

27  compensation and Business Development Manager position before the end of the week.

28  In response, Sherry scheduled a meeting at the TTC corporate office on Friday,

February 19, 2016.

28.37.  The meeting did not go well. Sherry snidely asked Plaintiff: "Do you think you deserve your bonuses?" The tone of her voice clearly communicated to Plaintiff that TTC had no intention of paying her this money. Plaintiff revisited the issue of TTC's obligation to pay not just her bonuses, but also the overdue bonuses owed to the general managers at the time.

29.38.  Finally, Plaintiff expressed her dismay that TTC Defendants did not honor their promise to make her the Business Development Manager for the wholesale business, which was the reason she had agreed to work at TTC in the first place. Instead, TTC gave offered the position to someone much younger and who had none of the experience required to do the job.

30.39.  On Monday, February 22, 2016, three days after they met, Todd and Sherry terminated Plaintiff's employment. The only reason they gave:  **_Our definition of success is different than yours._"**

31.40.  The remark reminded Plaintiff of something Sherry once said when Plaintiff informed her that TTC was going to purchase an inexpensive rod and curtain to give some privacy to a nursing mother, returning to work, who needed to express milk postpartum:  "I'm not fucking paying for that! If she wants to pay for it, that's up to her." Plaintiff purchased the rod and curtain at her own expense.

32.41.  Todd and Sherry's definition of success apparently means that not only will they refuse their employees even the smallest of professional courtesies if it will cost them anything, but they will lie, cheat and steal from their employees to avoid paying them even the wages they've earned, deserve and were promised.

42.    In Plaintiff's case, Todd and Sherry reneged on their promise to give her the higher-paying Business Development Manager position because they preferred someone younger, attractive and white like them.

43.    TTC offered a discretionary severance payment of $6,250 to Plaintiff that is the precise amount of the bonuses (prorated to the week) that TTC owes to Plaintiff.

The severance payment was conditioned on Plaintiff signing a Release of Claims and Separation Agreement (**"Release"**).

44.     The Release is essentially a take-it-or-leave-it contract of adhesion that is unlawful under Arizona law because:

a.     The Release [Paragraph VI (I)] has a non-solicitation restriction that is too broad because it forbids soliciting or accepting any business from "Business Affiliates" that encompasses any "person, company, corporation, or other entity with whom TTC and/or the TTC Group has or had a relationship, on the Resignation Date or during the six (6) months prior, with respect to the sale or servicing of any property, casualty, life, disability, homeowners, automobile, bonds, medical insurance, and/or related insurance products or services."

b.     TTC is in the food industry. TTC does not have a protectable commercial interest related to the motley businesses identified in the Release's non-solicitation restriction. *See Olliver/Pilcher Ins. v. Daniels*, 148 Ariz. 530, 532 (1986) (holding that with respect to customers, employees, and independent contractors, a non-solicitation restriction may only protect against solicitation of those individuals with whom the employer has formed a meaningful business relationship); *Amex Distrib. Co., Inc. v. Mascari*, 150 Ariz. 510 (1986) (holding that restrictive covenants that "tend to prevent an employee from pursuing a similar vocation after termination of employment are disfavored" and are strictly construed against the employer).

c.     The 24-month, boundaryless non-solicitation restriction is invalid because it is unreasonable in time and geographic scope. *Amex Distrib. Co. v. Mascari*, 150 Ariz. 510, 518 (1986) ("When the restraint is for the purpose of protecting customer relationships, its duration is reasonable only if it is no longer than necessary for the employer to put a new man on the job and for the new employee to have a reasonable opportunity to demonstrate his effectiveness to the customers."); *Olliver/Pilcher Ins. v. Daniels*, 148 Ariz. 530, 532 (1986) (holding that the geographic scope of a restrictive covenant must be reasonably necessary to protect the employer's business and may not

1    unreasonably restrict the right of the employee to work in her chosen occupation).

d.     The Release [Paragraph VI (H)] states that the Restricted Period may be 24, 18, 12 or 6 months, depending on what a "court of competent jurisdiction determines." Because under Arizona law restrictive covenants are strictly construed, this vague language of TTC's non-solicitation restriction regarding the duration of the Restricted Period makes the restriction procedurally and substantively unconscionable. An employee should not be forced to sue an employer in court to find out how long the restrictive covenant applies.

45.     Plaintiff declined to sign the unlawful Release.

**TUCSON TAMALE COMPANY'S UNLAWFUL AND**

**UNETHICAL BUSINESS PRACTICES**

46.     Shortly after Plaintiff assumed her position as Area Manager, she became aware that TTC (and its three affiliated businesses) engaged in unlawful and unethical business practices.

A.     Failure to comply with state and federal withholding laws.

47.     TTC did not withhold the proper taxes from employees' tips, and did so partly to artificially inflate employees' wages so that they would not insist on wage increases.

48.     Tips were pooled and illegally distributed to restaurant employees who are not part of the "chain of customer service," such as managers, back-of-the-house employees, and even their office manager and a "gopher" employee—all who did not serve the patrons who paid the tips, in further violation of state and federal law.

49.     TTC does not take a "tip credit." *See* AZ Admin. Code R20-5-1207(B)(4) (allowing only employers who take a tip credit to enforce tip-sharing with employees not in the chain of customer service); *Oregon Rest. & Lodging Ass'n v. Perez,* 2016 U.S. App. LEXIS 3119, 26 Wage & Hour Cas. 2d (BNA) 10 (9th Cir. Feb. 23, 2016) (upholding the more restrictive federal regulation that prohibits tip-sharing with employees not part of the chain of service irrespective of whether the employer takes a tip credit).

50.     Until November 2015, a production team of "tamale rollers" and prep cooks worked at the restaurant located at 2545 E. Broadway, Tucson, AZ 85716. This production team made tamales exclusively for TTC's wholesale and retail shipping orders placed online, and occasionally for catering orders placed as this location.

51.     Defendants required the other two TTC non-production restaurants to contribute out of their tipping pool per pay period and distributed these tips to the production team who did not service the patrons who paid the tips.

52.     The production team was also included in the Broadway restaurant's tipping pool.

53.     When Plaintiff brought this illegal tip-sharing practice to Defendants' attention shortly after she joined the company, Sherry angrily responded, "If we can't give them those tips, how the hell am I supposed to make that up?" In other words, she had no intention of making up the difference in hourly wage that TTC had to pay and the artificially inflated "hourly wage" that resulted from adding the earned tips.

54.     Plaintiff explained to Sherry that the proper and legal thing to do was to increase the wages of the members of the production team and not to use the hard-earned tip money of other TTC employees to subsidize the wages of staff who are not legally entitled to receive any part of those tips. Plaintiff even provided a copy of the relevant IRS tax rules regarding this issue. Plaintiff told Defendants to cease this unlawful practice as recently as December 2015, but Sherry disregarded Plaintiff's advice. The unlawful practice continued through January 2016.

B.     Unlawful Refusal to Pay Tips Earned.

55.     TTC had a written policy that expressly warned employees that they would forfeit tips earned if they quit without giving at least two weeks' notice or missed a scheduled shift.

56.     Tips are paid out in cash every 14 days.

57.     Plaintiff repeatedly told Defendants that they had to stop these blatantly unlawful practices tantamount to wage theft, but was ignored.

C.      Unlawful Deductions.

        58.      Defendants charged all TTC employees a non-discretionary meal fee for every shift worked regardless of whether the employees ate TTC restaurant food.

        59.      The meal fees were automatically deducted from all TTC employees' wages without their consent. Ariz. Rev. Stat. § 23-352 ("No employer may withhold or divert any portion of an employee's wages unless . . . [t]he employer has prior written authorization from the employee.").

D.      Unlawful Retention of Bonuses Owed to General Managers.

        60.      TTC's three general managers were told that they would receive quarterly bonuses. Their offer letters do not state they must meet specific sales goals to qualify for these bonuses.

        61.      Sometime in October 2015, Todd and Shery unilaterally decided that bonuses would be paid annually, not quarterly. And for the first time, Defendants disclosed sales targets that general managers must meet that are impossibly unattainable.

E.      Violation of Overtime Pay Requirements.

        62.      TTC's general managers are employees whose job duties and responsibilities are not exempt from the requirements to pay overtime under the Fair Labor Standards Acts ("FLSA").

        63.      Defendants improperly classified these employees as exempt for the purpose of overtime compensation eligibility under the FLSA without reference to the types of duties those workers perform.

        64.      Plaintiff observed the general managers customarily and regularly perform non-exempt physical or manual work. That is, the primary duties of the general managers consist and/or consisted of handling food and beverage items, busing tables, operating cash registers, cleaning, stocking, receiving and storing of products and supplies and serving TTC customers and patrons.

65.     The general managers rarely, if ever, exercise true discretionary powers in connection with matters of significance.

66.     The general managers are seldom authorized to make substantive decisions regarding hiring or firing nor are they relatively free from supervision in connection with matters of significance.

67.     Defendants seldom, if ever, disclose TTC's financial information to the general managers that they would need to perform high-function duties of greater responsibility.

68.     The general managers routinely and regularly worked in excess of forty (40) hours per workweek without being paid overtime wages during the time that Plaintiff worked for TTC.

69.     Plaintiff is informed and believes that Defendants are, or should be, aware that state and federal law require TTC to pay its employees performing non-exempt duties overtime wages for hours worked in excess of forty per week.

70.     Plaintiff is informed and believes that Defendants are aware, or should be aware, that the general managers customarily and regularly perform non-exempt physical or manual work consisting of handling food and beverage items, busing tables, operating cash registers, cleaning, stocking, receiving and storing of products and supplies and serving TTC customers and patrons and rarely exercise true discretionary powers in connection with matters of significance and were not and are not relatively free from supervision in connection with matters of significance.

71.     Consequently, the general managers do not fall within the "administrative, executive, or professional" exemptions from the overtime requirements. Nor do they fall within any other exemption from the obligation to pay overtime compensation under state and federal law.

72.     Plaintiff is informed and believes that Defendants' failure to pay the general managers overtime wages for their work in excess of forty (40) hours per week was willful and without justification.

73.     Plaintiff is informed and believes that Sherry for years computed overtime wages for non-exempt TTC staff based on an expanded eighty (80) hour pay period rather than a forty (40) hour workweek to avoid paying overtime.

74.     As a result of Defendants' unlawful acts, Plaintiff is informed and believes that TTC employees have been deprived of wages, and are entitled to recover these unpaid wages, plus liquidated damages, interest, attorneys' fees, and costs.

F.     Violation of Arizona's Consumer Fraud Act.

75.     Arizona's Consumer Fraud Act makes it illegal for companies to misrepresent that goods or services are of a particular standard or quality if they are not, and falsely advertise goods or services with intent not to sell them as advertised. This public policy of the State of Arizona is designed to protect consumers and the community at large from fraudulent business practices. *Madsen v. Western Am. Mortgage Co.*, 143 Ariz. 614 (1985) ("The term 'deceptive' has been interpreted to include representations that have a 'tendency and capacity' to convey misleading impressions to consumers even though interpre-tations that would not be misleading also are possible. The meaning and impression are to be taken from all that is reasonably implied, not just from what is said, and in evaluating the representations, the test is whether the least sophisticated reader would be misled. Technical correctness of the representations is irrelevant if the capacity to mislead is found.").

76.     TTC engages in deceptive marketing schemes intended to mislead consumers, in violation of Arizona's Consumer Fraud Act. Ariz. Rev. Stat. § 44-1522 (A) ("The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false promise, misrepresentation, or concealment, suppression or omission, of any material fact with intent that others rely upon such . . . is declared to be an unlawful practice.").

77.     In September 2016, the U.S. Department of Agriculture ordered TTC to recall approximately 995 pounds of beef tamale products because TTC failed to abide by the USDA's federal inspection procedures. The USDA advised the public not to

1    consume any of these tamales.  *See* www.fsis.usda.gov/wps/portal/fsis/topics/recalls-

2    and-public-health-alerts/recall-case-archive/archive/2016/recall-081-2016-release.

3        78.    Genetically modified organisms (GMOs) are prohibited in organic

4    products. To entice customers to purchase TTC food products, TTC's marketing

5    materials repeatedly use the term "organic" to describe several of its products in a

6    manner intended to mislead consumers into believing that *all* of its products are non-

7    GMO and organic.

8        79.    TTC tamales are made from non-GMO masa and the remaining

9    ingredients in nearly all of the tamales are not organic. Masa is made from white or blue

10   corn meal.

11       80.    Plaintiff is informed and believes that *less than 1% of TTC's food products*

12   *may be classified as being 100% organic.*

13       81.    Defendants intended to commit acts that were deceptive and/or

14   fraudulent, namely, to market, sell and distribute TTC food products as "organic" or

15   "non-GMO" when, in fact, they are not. For example, the most popular product, the

16   vegetarian Green Corn Tamale, TTC describes as follows:

17       A Sonoran tradition, organic sweet corn and organic white corn make a
         moist and creamy masa. We fill the tamales with roasted green chiles
18       and Cheddar and Monterey Jack Cheese.
19

20       https://tucsontamale.com/store/all-tamales/green-corn-tamale.html

21       82.    Green Corn Tamales are not made from "green corn" or "organic sweet

22   corn and organic white corn." They are made from the same masa as all the other

23   tamales that TTC sells. The green chiles and cheese are not organic.

24       83.    The deceptive marketing scheme concerning TTC products violates

25   Arizona's Consumer Fraud Act, because, among other things, Defendants:

26       a.    knowingly conceal, suppress, or omit material information

27   regarding the ingredients of products that customers are led to believe are made

28

entirely from non-GMO organic ingredients, but are not; and

        b.    market, promote, and advertise products in a manner that leads customers to believe that all TTC food products are made from non-GMO organic ingredients.

        84.    Plaintiff overheard TTC restaurant patrons comment to staff how glad they were to eat at TTC because all the food is organic. Defendants made clear to TTC's employees not to correct or to disabuse customers who mistakenly believe that all of TTC's food products are organic and non-GMO.

        85.    Plaintiff is informed and believes that sometime in the fall of 2014, TTC ran a promotion through the popular website *LivingSocial.com*—an internet company with a business model similar to Groupon. Customers purchase coupons for products sold at a significant discount. Customers then redeem the coupons at the place of business within a certain period of time set by the sponsoring merchant.

        86.    Plaintiff is informed and believes that Sherry instructed all TTC staff to tell the customers that they had to provide their email addresses to redeem their coupon, a condition not disclosed at the time the customers purchased the coupons nor a condition of redemption imposed by *LivingSocial.com*. Had this requirement been disclosed, many customers would not have proceeded with the purchase.

        87.    When Plaintiff oversaw a similar promotion the following year when she was the Area Manager, she instructed staff not to lie to the customers, but to ask them politely if they wished to be placed on the company's mailing list. That year, only about 30% of the customers gave their email addresses.

        88.    At a management meeting in October 2015, Sherry turned beet-red angry at the staff for the low number of email addresses collected and when the general managers told her they had ceased lying to customers as she had instructed them to do the prior year. She stomped her feet and pounded the table as she screamed and ranted at Plaintiff and the general managers for nearly half an hour, hurtling insults and offensive epithets in rapid succession.

89.     Never in her entire professional career had Plaintiff seen such rage and abuse directed at employees. But the general managers stood their ground. They refused to lie again to customers, and two even threatened to resign on the spot.

90.     Since December 2015 until Plaintiff was terminated, Todd and Sherry for months posted signs and instructed staff to tell TTC patrons that the popular "pico de gallo" salsa is not available because TTC has had to reject the tomatoes provided by its vendors because they do not meet TTC's high standard of quality for freshness. This is not true.

91.     Todd purchased a machine to dice tomatoes that either does not function properly because it mashes the tomatoes, or more likely, Todd simply selected the wrong machine.

92.     Because of hubris, Todd and Sherry prefer to lie to TTC's customers than admit the truth. In the meantime, TTC staff must uncomfortably mislead restaurant patrons with excuses to cover their petty lie.

93.     Defendants' concealment, suppression, omissions, deceptions, mis-representations, and/or unconscionable practices have the tendency, capacity, and likelihood to deceive TTC customers.

## MANAGEMENT SILENCES EMPLOYEES WHO
## SPEAK OUT AGAINST UNETHICAL BUSINESS PRACTICES

94.     During the time that Plaintiff was employed by TTC, she tried to set in place business processes and procedures consistent with industry standards. In fact, part of her written job description specifically states that one of her roles was to ***"ensure the working environment is positive and free of drama, drugs and dingbats."***

95.     Plaintiff tried to do whatever she could to ensure that TTC did not continue to violate state and federal law.

96.     Plaintiff further tried to do whatever she could to ensure that TTC did not continue to breach its duty to exercise reasonable care in hiring, training and

supervising employees as necessary to conduct TTC's business operations so that the public generally, and TTC employees specifically, would not be negligently harmed, which duty Defendants failed.

33.97.  Plaintiff tried to change TTC's oppressive management style, which adversely affects employee morale, but was thwarted by Sherry at every turn because of her uncompromising refusal to collaborate, even though Plaintiff was a member of the company's executive management team.

98.     In the months that Plaintiff worked at TTC, she could not pierce through Sherry's obsession with how things appear to others, even to the point of believing that outward image is more important than underlying reality. Sherry was condescending, self-satisfied, self-important, pretentious, ego-absorbed, and always thought she was right. She was inconsistent and applied different rules in similar circumstances; she was habitually secretive and withheld information to control the narrative.

99.     Sherry set unreasonable expectations. At times she inserted herself into matters not within her purview or outside of established process, either from a desire to feel involved, or from an unfounded belief that staff is not competent to make the right decisions.

100.    Plaintiff sensed that Sherry knew that to prevent others from discovering the disturbing truth about her lack of knowledge or skill in a certain area, or about her character, Sherry fabricated an image of competence, integrity, teamwork and leadership. And, of course, the most telltale sign of insecurity:  she cannot tolerate people who publicly stand up to her and challenge her ideas or suggestions.

101.    Sherry punitive and autocratic management style thwarted every effort Plaintiff made to ensure that TTC complied with the law and did not engage in unethical business practices because:

a.      Sherry micro-manages TTC employees, involves herself in detailed day-to-day activities, and rarely delegates or empowers subordinates. Plaintiff heard her speak to and of employees with contempt, disdain, condescension, and hostility.

1    She adopts one-way communication; she does not consult with employees or give them

2    a chance to provide their opinions, no matter the potential benefit of such input.

3           b.     She assumes that employee motivation comes not through

4    empowerment, but by creating a structured set of rewards and punishments.

5           102.    Sherry is duplicitous and Machiavellian in her political machinations to

6    get her way, no matter who she harms along the way to further her agenda. She lies,

7    dissembles, and twists the truth.

8           34.103.       In short, Sherry creates a toxic workplace for TTC employees. Her

9    avarice prevents her from caring about anything but money. Her obsession with the

10   bottom line overrides any concern for protecting TTC employees, providing accurate

11   information to customers regarding the ingredients of TTC's products, or even

12   complying with basic state wage laws.

# FIRST CAUSE OF ACTION

## Violation of the Age Discrimination in Employment Act

### (Against Tucson Tamale Company)(29 U.S.C. § 621 *et seq.*)

~~35.~~104.        Plaintiff realleges the preceding paragraphs and incorporates them by reference as though fully set forth ~~herein~~ this Second Amended Complaint.

~~36.~~105.        Plaintiff is a member of a protected class in that she is over the age of 40 years.

~~37.~~106.        In or around September 2015, TTC hired Lindsay Welch (she is white and in her early 30s) for the position of Business Development Manager that had been promised to Plaintiff.

~~38.~~107.        Lindsay Welch had no experience with:

      (a)    wholesale distribution

      (b)    wholesale sales

      (c)    wholesale supplier management

      (d)    restaurant management and operations

      (e)    supply chain management and logistics

      (f)    food production

      (g)    catering sales

~~39.~~108.        In fact, Lindsay Welch had no experience whatsoever operating any for-profit business because all her experience was in the non-profit sector.

~~40.~~109.        Plaintiff has experience working in every aspect of wholesale sales and distribution. She previously owned her own three-tier wholesale distribution company (based in Phoenix, Arizona) that sold highly sought-after and top-rated consu~~m~~mable products throughout Arizona.

~~41.~~110.        Plaintiff had direct contact and strong relationships with wholesale restaurant and grocery retail vendors locally and nationally in the course of her entire career spanning two decades, and particularly when she was growing her own small business.

42.111.        Plaintiff was prepared and ready to leverage her extensive network of long-term vendor partners to launch TTC into new markets and channels to which Todd, Sherry and Lisa had no way of accessing and Lindsay Welch had even less.

112.    Plaintiff is more qualified than Lindsay Welch to be TTC's Business Development Manager, but was denied the position because of Plaintiff's age and Hispanic national origin, race and ancestry.

43.113.        TTC never posted the Business Development Manager position internally or externally and therefore Plaintiff had no idea that Defendants had decided to hire someone else for the position until they announced that Lindsay Welch was coming on board. When Ms. Welch was first introduced to TTC employees, Defendants said she was going to serve as a catering sales manager and corporate gifting marketing manager. In fact, that was her sole focus for two months until Defendants decided uninlaterally to make her the Business Development Manager without regard to the agreement they had made with Plaintiff. This happened right at the time that TTC's production facility became operational.

44.114.        As a direct, foreseeable and proximate result of TTC's discrimina-tion, Plaintiff has suffered substantial damages, including lost salary, benefits, bonuses, loss of employment-related opportunities for growth, humiliation, and embarrassment, all in an amount according to proof at time of trial.

**SECOND CAUSE OF ACTION**

**National Origin, Race and Ancestry Discrimination**

**(Against Tucson Tamale Company)**(42 U.S.C. § 2000e-2(a))

45.115.        Plaintiff realleges the preceding paragraphs and incorporates them by reference as though fully set forth herein this Second Amended Complaint.

46.116.        Plaintiff is Mexican American and bilingual (she speaks English and Spanish fluently).

47.117.        Plaintiff is informed and believes that her national origin, race or ancestry national origin played a substantial role in TTC's willingness to discriminate

against her.

118.    During the course of Plaintiff's employment, Plaintiff was subjected to employment discrimination based on her national origin, race or ancestry.

119.    Sherry became visibly agitated and annoyed when she happened to overhear Plaintiff speaking Spanish to employees who do not speak English fluently. Sherry resented Plaintiff for engaging with fellow Latino employees, whom Sherry considers beneath her class and often criticized for not being "able to get their shit together." Sherry also forbade employees at the production facility (most of them Latino) from listening to their Mexican music at work because she found it culturally repugnant. Sherry posted a sign that chastised the employees not to play music at work because they did not work at a "rap club."

48.  Todd was equally dismissive of Latino employees.  One employee recounted to Plaintiff with shocked disbelief a brief civil conversation he had with Todd, who had ignored him entirely during the two years he had worked for TTC.

120.    Defendants fostered a culture of disdain and second-guessing TTC's Latino employees, but not its few white employees.

49. 121.        TTC's conduct constitutes unlawful discrimination based on Plaintiff's national origin, race and ancestry in violation of  Title VII Civil Rights Act of 1964.

122.    As a direct, foreseeable and proximate result of TTC's wrongful acts, Plaintiff has suffered substantial damages, including lost salary, benefits, bonuses, loss of employment-related opportunities for growth, humiliation, embarrassment, and mental and emotional distress and discomfort, all in an amount according to proof at time of trial.

50.

123.    TTC's acts as herein described were committed maliciously, fraudulently, or oppressively with the intent of injuring Plaintiff, and/or with a willful and conscious disregard of Plaintiff's right to work in an environment free from retaliation. Because

1  these acts were carried out by managerial employees in a despicable, deliberate and

2  intentional manner, Plaintiff is entitled to recover punitive damages in a sum sufficient

3  to punish and deter future such conduct.

### THIRD CAUSE OF ACTION

### RETALIATORY DISCHARGE

### (Against All Defendants)

124.   Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Second Amended Complaint.

125.   An employer's traditional right to discharge an at-will employee is subject to limits imposed by public policy, in light of an employee's right to exercise statutory or constitutional rights or privileges. Whenever the basis of the discharge contravenes a fundamental public policy, such public policy must inure to the benefit of the public at large and must be grounded in some statutory or constitutional provision.

126.   Under Arizona's Employment Protection Act, it is unlawful to terminate an employee in retaliation for the employee's reasonable disclosure of the employer's violation of Arizona law. Ariz. Rev. Stat. § 23-1501 (A)(3)(c). At all times relevant to this Second Amended Complaint, it was the public policy of the State of Arizona, as codified, expressed and mandated by Arizona's Income Tax Act of 1978, Ariz. Rev. Stat. § 43-401(A) that: "Every employer at the time of the payment of wages, salary, bonus or other emolument to any employee whose compensation is for services performed within this state shall deduct and retain from the compensation an amount prescribed by tables adopted by the department."

127.   At all times relevant to this Second Amended Complaint, it was the public policy of the State of Arizona, as codified, expressed and mandated by Arizona's Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522 (A) that: "The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false promise, misrepresentation, or concealment, suppression or omission, of any material fact with intent that others rely upon such. . . . is an unlawful practice."

128.   Plaintiff complained to Defendants that their willful failure to withhold, account for, and pay withholding taxes from tips paid by TTC customers to employees was illegal. *See generally* Ariz. Admin. Code R20-5-1210 (General Recordkeeping

1   Requirements).

2         129.   Plaintiff complained to Defendants that it was illegal for TTC to require its

3   employees to share tips with all restaurant employees, including managers who did not

4   serve the restaurant patrons who paid the tips.

5         130.   Plaintiff complained to Defendants that they were willfully committing

6   wage theft because TTC:

7               a.   TTC may not force employees to forfeit tips earned if they quit

8   without giving at least two weeks' notice or miss a scheduled shift;

9               b.   may not unilaterally change the terms and conditions of

10   employment for the general managers by setting unattainable sales goals that were

11   never disclosed to the general managers when they received their offer letters; and

12               c.   TTC may not charge employees for meals they did not eat.

13         131.   Plaintiff expressed her concerns regarding Defendants' business practice

14   of marketing, selling and distributing TTC food products in a manner that misleads

15   consumers into believing that *all* TTC's products are organic when that is not true. TTC

16   violated Plaintiff's statutory rights when TTC terminated her employment because she

17   objected to the Defendants' illegal and unethical business practices. TTC further

18   violated Plaintiff's rights when Defendants conditioned the payment of severance

19   benefits on the signing of a Release that is an unlawful contract of adhesion.

20         132.   Defendants either knew, or in the exercise of reasonable care, should have

21   known that their conduct was unlawful. Defendants' policies, practices and customs

22   described above have resulted in unjust enrichment and an unfair business advantage

23   over businesses that routinely adhere to the strictures of state and federal laws.

24         133.   Unless restrained by this Court, Defendants will continue to engage in the

25   unlawful conduct alleged above. Plaintiff is informed and believes that she was

26   tortiously retaliated against in contravention of the substantial public policy not to

27   commit fraud or to engage in illegal and unfair business practices. Accordingly,

28   Defendants' retaliation against Plaintiff on the grounds alleged and described in this

Second Amended Complaint were wrongful and in contravention and violation of the express public policy of the State of Arizona and Arizona's Employment Protection Act.

134.    As a direct, foreseeable and proximate result of Defendants' wrongful acts, Plaintiff has suffered substantial damages, including lost salary, benefits, bonuses, loss of employment-related opportunities for growth, humiliation, and embarrassment, all in an amount according to proof at time of trial.

135.    Defendants' acts were committed maliciously, fraudulently, or oppressively with the intent to injure Plaintiff, and/or with a willful and conscious disregard of Plaintiff's right to work in an environment free from retaliation. Because these acts were carried out by managerial employees in a despicable, deliberate and intentional manner, Plaintiff is entitled to recover punitive damages in a sum sufficient to punish and deter future such conduct. An award of punitive damages will serve to punish Defendants and set an example to other companies who may be in similar violations of state law.

# FOURTH CAUSE OF ACTION

# FRAUD

## (Against All Defendants)

136.    Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Second Amended Complaint.

137.    Defendants knowingly and willfully conspired and agreed among themselves to harm Plaintiff by engaging in a pattern of intentional, willful, and malicious misrepresentations regarding the terms of her employment. Arizona recognizes three classes of fraud:  fraudulent misrepresentation, nondisclosure, and fraudulent concealment. Defendants made false statements and failed to disclose material facts; these same allegations give rise to an inference of fraudulent concealment.

138.    Defendants committed actual fraud and fraudulently induced Plaintiff not to pursue or explore other employment so that she would agree to work at TTC, and continued to commit fraud and fraudulently induced Plaintiff to continue her employment with TTC and to continue working on the projects assigned to her by representing that employment with TTC would be more profitable, with the promise of future salary increases, bonuses and professional development.

139.    Plaintiff was induced to become an employee of TTC, not to seek positions elsewhere, and to share her knowledge and expertise with Defendants who leveraged her name, experience, and credibility, with current and prospective customers, clients, and employees. Plaintiff has lost income and income opportunities.

140.    Defendants knew at the time they induced Plaintiff to accept TTC's offer of employment that they would not honor the promises upon which Plaintiff relied not to accept another, more lucrative offer of employment, and which Plaintiff relied on to remain and to continue her employment with TTC until she was terminated.

141.    In September 2015, TODD asked Plaintiff to meet the person he had selected as the new catering and marketing manager. Once hired, and after the

production facility was completed, she was placed in the business development manager position for TTC's expanded wholesale business. This was the position that Defendants had promised to Plaintiff when they interviewed her and the only reason why Plaintiff agreed to temporarily assume the restaurant Area Manager position for TTC at a lower salary. In contrast to Plaintiff's experience, this new hire had absolutely no wholesale, restaurant or sales experience.

142.    Defendants designed, and intended to design, a scheme and artifice to defraud Plaintiff by making promises, misrepresentations, and misstatements that Defendants knew they had no intention of keeping or knew were false and misleading, or in the alternative, by making such misrepresentations and misstatements with disregard for their truth, veracity, or misleading nature with the desire and intent to defraud Plaintiff and to avoid payment of due compensation.

143.    The misrepresentations, misstatements and omissions were material misrepresentations, misstatements and omissions of past or existing facts, or false promises to do some act in the future on which Defendants intended Plaintiff to rely, or on which Defendants induced Plaintiff to take further actions. Plaintiff relied on the misrepresentations to her detriment and injury.

144.    As a direct, foreseeable and proximate result of Defendants' wrongful acts, Plaintiff has suffered substantial damages, including lost salary, benefits, bonuses, loss of employment-related opportunities for growth, humiliation, and embarrassment, all in an amount according to proof at time of trial.

145.    Defendants' acts were committed maliciously, fraudulently, or oppressively with the intent to injure Plaintiff, and/or with a willful and conscious disregard of Plaintiff's right to work in an environment free from fraud and retaliation. Because these acts were carried out by managerial employees in a despicable, deliberate and intentional manner, Plaintiff is entitled to recover punitive damages in a sum sufficient to punish and deter future such conduct.

**FIFTH CAUSE OF ACTION**

**NEGLIGENT MISREPRESENTATION**

**(Against All Defendants)**

146.    Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Second Amended Complaint.

147.    Alternatively, if Defendants' representations and omissions regarding the terms and conditions of Plaintiff's employment were not made with the intent to defraud, they were negligently made. Plaintiff reasonably relied on those misrepresentations and has been damaged as a result.

148.    Plaintiff is entitled to recover all actionable damages (including general, consequential, incidental and special damages, lost wages, lost opportunities and other damages) sustained as a proximate cause of Defendants' negligent misrepresentations.

**SIXTH CAUSE OF ACTION**

**FAILURE TO PAY EARNED WAGES**

**(Against Tucson Tamale Company)**

149.    Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Second Amended Complaint.

150.    After the 90-day probationary period expired, TTC failed to begin to pay starting on that date the promised increased salary and bonuses that Plaintiff accrued through the date of her termination. To date, TTC has failed and refused, and continues to fail and refuse, to pay the wages due. By the acts and omissions set forth above, including by failing to pay all bonuses due to Plaintiff, TTC violated Arizona's Wage Act.

151.    As a result of TTC's violations of Ariz. Rev. Stat. § 23-351, Plaintiff has been harmed, has suffered substantial losses and has been deprived of compensation. Plaintiff is therefore entitled to an award of the unpaid wages, with prejudgment interest, and treble the amount of such wages, together with attorneys' fees and costs pursuant to Ariz. Rev. Stat. § 23-355.

152.   Defendants' acts were committed maliciously, fraudulently, or oppressively with the intent to injure Plaintiff, and/or with a willful and conscious disregard of Plaintiff's rights. Because these acts were carried out by managerial employees in a despicable, deliberate and intentional manner, Plaintiff is entitled to recover punitive damages in a sum sufficient to punish and deter future such conduct.

### SEVENTH CAUSE OF ACTION

### BREACH OF EMPLOYMENT AGREEMENT

### (Against Tucson Tamale Company)

153.   Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Second Amended Complaint.

154.   During the period of Plaintiff's employment with TTC, there existed an express and implied in fact employment contract that set forth the terms and conditions of Plaintiff's employment relationship with TTC.

155.   The total employment contract was evidenced by an offer letter and written and oral representations Defendants made to Plaintiff.

156.   TTC breached the employment agreement by failing to provide the wage increase, bonuses and benefits that Defendants promised to Plaintiff.

157.   TTC's refusal to perform its duties under the employment agreement was unlawful, without justification and/or excuse, and constituted a total and material breach of the agreement between the parties.

158.   As a direct, foreseeable and proximate result of TTC's breach of the employment agreement, Plaintiff has suffered substantial damages, including lost salary, benefits, bonuses, and loss of employment-related opportunities for growth, all in an amount according to proof at time of trial. Plaintiff has sought to mitigate wage-related damages.

159.   Plaintiff is entitled to recover her attorneys' fees and costs under Ariz. Rev. Stat. §§ 12-341 and 12-341.01.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EIGHTH CAUSE OF ACTION**

**RESTITUTION / UNJUST ENRICHMENT**

**(Against All Defendants)**

160.    Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Second Amended Complaint.

161.    Alternatively, if Defendants are not found to have breached an employment agreement, as alleged in the Seventh Cause of Action, then Defendants benefited unjustly from their actions in wrongfully and unlawfully failing to pay wages owed to Plaintiff. Defendants were under a duty to comply with Arizona's wage laws.

162.    Defendants have unjustly retained Plaintiff's wages. Defendants' unjust enrichment was conscious, deliberate, intentional and/or malicious. Plaintiff is informed and believes that as a result of Defendants' wrongful acts, they have been unjustly enriched in the amount to be proven at trial.

**DEMAND FOR JURY TRIAL**

*Plaintiff Melissa Martin McBeath hereby demands trial of this matter by jury.*

**PRAYER FOR RELIEF**

Plaintiff Melissa Martin McBeath prays for judgment as follows:

1.      Back pay, front pay, and health benefits;

2.      Punitive damages;

3.      All statutory damages;

4.      Attorneys' fees;

5.      Pre-judgment and post-judgment interest on all damages awarded;

6.      Costs of suit incurred; and

7.      For such other and further relief as the Court deems just and proper.

Dated: _____, 2017      _____

                                    Melissa Martin McBeath

**VERIFICATION**

I, MELISSA MARTIN McBEATH, declare as follows:

I am the plaintiff in this matter. I have read and know the contents of the foregoing:

~~FIRST~~ SECOND AMENDED COMPLAINT

The facts alleged in the above complaint are within my own knowledge and I know those facts to be true, except as to those matters stated upon my information and belief, and as to those matters I also believe them to be true.

I declare under penalty of perjury, under the laws of the State of Arizona and the United States of America that the foregoing is true and correct.

Dated: _____, 2017          _____

                                               Melissa Martin McBeath

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that the above document was filed electronically with the Clerk of the United States District Court for the District of Arizona, and was served via hyperlink generated by the court's CM/ECF system, which was sent electronically to:

Roberto C. Garcia
*rgarcia@fmazlaw.com*
Travis L. Tufts
*ttufts@fmazlaw.com*
Farhang & Medcoff PLLC
4801 E Broadway Blvd., Ste. 311
Tucson, AZ 85711
520-790-5433

I declare under penalty of perjury, under the laws of the State of Arizona and the United States of America that the foregoing is true and correct.

Dated:  March 9, 2017                    *Melissa Martin McBeath*
                                          Melissa Martin McBeath