# FARHANG & MEDCOFF

4801 E. Broadway Boulevard, Suite 311
Tucson, Arizona 85711
T: 520.790.5433

Ali J. Farhang (#019456)
afarhang@fmazlaw.com

Roberto C. Garcia (#026246)
rgarcia@fmazlaw.com

Travis L. Tufts (#029373)
ttufts@fmazlaw.com

Attorneys for Defendants / Counterplaintiff

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Melissa Martin McBeath, an individual,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>Tucson Tamale Company, an Arizona corporation; Todd Russell Martin, an individual; Sherry Martin, an individual; and Lisa Martin, an individual,<br><br>　　　　Defendants. | NO. CV 16-462-TUC-DCB (BPV)<br><br>**OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS TUCSON TAMALE COMPANY'S COUNTERCLAIMS IV, V, & VI**<br><br>Assigned to Judge David C. Bury and Hon. Bernardo P. Velasco |
| Tucson Tamale Company, an Arizona corporation,<br><br>　　　　Counterplaintiff,<br><br>　v.<br><br>Melissa Martin McBeath and John/Jane Doe Martin McBeath, husband and wife,<br><br>　　　　Counterdefendants. | |

00317461.2

1    Plaintiff Melissa Martin McBeath's ("McBeath") legal strategy, both in this action
2 and in her recently-stayed Pima County Superior Court case, has been to manufacture any
3 basis whatsoever to justify vexatious motion practice. Like her recently filed motion for
4 summary judgment (Doc. No. 52-1) – filed without taking depositions of *any adverse*
5 *witnesses* and in willful disregard of written discovery responses creating, at a minimum,
6 questions of fact – McBeath's Motion to Dismiss (the "Motion") lacks merit, and not just
7 because it contorts TTC's factual allegations and ignores persuasive or controlling case law.

8    This Court should deny the Motion because, without limit, McBeath improperly flips
9 the rule that all well-pled allegations in a complaint (or counterclaim) must be taken as true
10 and asks this Court to accept as true her self-serving, exonerating statements made outside
11 the pleadings. For example, McBeath argues, without acknowledging the well-pled
12 allegations in the Counterclaims, that TTC is not a facility through which an electronic
13 communications service is provided and that, even if it was, she was nonetheless authorized
14 to misappropriate TTC's confidential information. These fact-driven arguments are not
15 proper or persuasive in a motion to dismiss.

16    The crux of Counterplaintiff Tucson Tamale Company's ("TTC") Counterclaims
17 relates to McBeath's unauthorized access to confidential information *stored in an off-site*
18 *electronic communications server* and her subsequent disclosure to unauthorized parties –
19 namely, her friend Ehud Gavron, ex-husband Ernesto Chavez, and the disbarred attorney
20 "secretly"[1] representing her, Francisco X. Marquez. Accepting such allegations as true, as
21 the Court must, the Stored Communications Act ("SCA") unequivocally provides a cause
22 of action against trespassers, like McBeath, who exceed the scope of their authorized access
23 and convert stored communications for their own benefit.

24    TTC adequately pled its SCA, conspiracy, and aiding and abetting claims.
25 Accordingly, TTC, by and through undersigned counsel, hereby opposes Plaintiff's Motion

---

[1] In its Opposition to McBeath's Motion for a Protective Order (Doc. No. 48), TTC alluded to Marquez's knowledge of relevant facts as well as its belief Marquez operates as shadow counsel assisting McBeath in her pursuit to exhaust TTC's legal resources. (See generally Opp. Motion Prot. Order, Doc No. 48.) On April 5, 2017, among other instances, Marquez confirmed TTC's suspicions when he directly contacted undersigned counsel on behalf of McBeath regarding an ongoing discovery dispute. See Ex. A, F. Marquez E-mail, Apr. 5, 2017.

00317461.2

to Dismiss Counterclaims III, IV, and V.  The following Memorandum of Points and Authorities, the pleadings and papers on file with the Clerk of this Court and on file with the Clerk of the Arizona Superior Court (Pima County), case no. C20161794 (which TTC requests the Court take judicial notice of), all of which TTC incorporates herein by this reference, support this Opposition.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   WELL-PLED FACTUAL ALLEGATIONS

"In the course of her employment with TTC, McBeath had access to, among other things, TTC's private, confidential, and/or proprietary information, which includes, without limit, trade secrets, processes, sales and profit information, customer lists, contractor and supplier lists, current and anticipated client preferences, methods of operation, and business development data (collectively, the "Confidential Information")."  (TTC Countercl. at ¶ 10, Doc. No. 45.)   "As part of its day-to-day operations, *TTC collects, stores, and transmits* Confidential Information via electronic communications or electronic storage on its 'Protected Computer' network (as defined in 18 U.S.C. §§ 2510 and 2711) (hereinafter 'Protected Computer[s]')."[2]  (Id. at ¶ 19 (emphasis added).)  "TTC's Protected Computer systems are used in and/or affect interstate commerce or communication. (Id. at ¶ 21.) "For example, TTC uses its Protected Computer systems *to communicate, coordinate, and/or operate with clients and business associates* located outside the State of Arizona." (Id. (emphasis added).)

The Confidential Information is subject to substantial efforts to maintain its secrecy, including limitations on the individuals who can access the Confidential Information, password protections, and contractual and legal obligations to maintain secrecy.  (See, e.g., id. at ¶¶ 18, 20.)  Indeed, in consideration for her employment, McBeath entered into a Confidentiality Agreement with TTC on March 19, 2015.  (See id. at ¶ 24.)  Among other things, McBeath agreed she would not remove or copy TTC's Confidential Information except in the scope of her employment or with TTC's written permission, she would not

---

[2] Notably, the defined term "Protected Computer[s]" in TTC's Counterclaims refers to the "'Protected Computer' network" as a whole, not just the protected computers themselves.

00317461.2

- 3 -

disclose TTC's Confidential Information to third parties, and she would not assist others in obtaining TTC's Confidential Information.  (See id. at ¶ 25.)

"On or about October 21, 2015, McBeath utilized TTC's Protected Computers to provide Confidential Information, including, but not limited to, TTC's passwords, data and sales history, financial and payroll data, to an unaffiliated third-party."  (Id. at ¶ 29.) "*McBeath's actions were in violation of her fiduciary duties and without written permission from TTC.*"  (Id. (emphasis added).)  "On or about December 9, 2015, McBeath utilized TTC's Protected Computers to provide Confidential Information, including, but not limited to, TTC's data and sales history, business operating reports, financial and payroll data, to an unaffiliated third-party *without written permission*.  (See id. at ¶ 30.)  On January 14, 2016, McBeath utilized TTC's Protected Computers to provide Confidential Information including TTC's business operations reports to an unaffiliated third party *without written permission*.  (See id. at ¶ 31.)  "Upon information and belief, McBeath accessed, copied, printed, and removed additional Confidential Information, including…TTC's recipes and food-making techniques and/or processes, payroll records, tax records, customer lists, and employee records, for her own benefit and use.  McBeath's actions were in violation of her fiduciary duties and without written permission from TTC."  (Id. at ¶ 32.)

Shortly after TTC lawfully terminated McBeath's employment, McBeath and her son, Maximilian Ivankovich ("Ivankovich) – then a Shift Lead at TTC (see id. at ¶ 27) – entered into an agreement to engage in a scheme or artifice to access, copy, print, and remove TTC's Confidential Information stored on TTC's Protected Computers.  (See id. at ¶ 38.)  Among other things, McBeath aided, encouraged, and directed her son to access the Confidential Information to increase her leverage in connection with her wrongful termination lawsuit and to impugn the character of TTC's business and owners in the community.  (See id. at ¶¶ 42-43.)  In furtherance of their scheme, between February 22, 2016 and March 17, 2016, Ivankovich exceeded the scope of his employment by accessing, copying, printing, and removing TTC's Confidential Information for McBeath's use and benefit.  (See id. at ¶ 39).  Indeed, on March 17, 2016, Ivankovich admitted to a TTC

00317461.2

1 supervisor that he already accessed TTC's payroll data, business operations information and 2 data and sales history and that he was prepared to access more information. (See id. at ¶ 3 40.) That same day, Ivankovich utilized TTC's Protected Computers to print and remove 4 TTC's Confidential Information. (See id. at ¶ 42.)

## II. LAW AND ANALYSIS

### a. Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

The Court must accept as true the factual allegations of the complaint and indulge all reasonable inferences to be drawn from them, construing the complaint in the light most favorable to the plaintiff. See, e.g., Smith v. Jackson, 84 F.3d 1213, 1217 (9th Cir. 1996); NL Industries, Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986); Dodd v. Spokane County, 393 F.2d 330, 334 (9th Cir. 1968). "A complaint should not be dismissed under Rule 12(b)(6) unless it appears beyond a doubt that the non-moving party can prove no set of facts in support of its claim which would entitle it to relief." AlliedSignal, Inc. v. City of Phoenix, 182 F.3d 692, 695 (9th Cir. 1999).

### b. The Stored Communications Act

"Like the tort of trespass, the Stored Communications Act protects individuals' privacy and proprietary interests. The [SCA] reflects Congress's judgment that users have a legitimate interest in the confidentiality of communications in electronic storage *at a communications facility*. Just as trespass protects those who rent space from a commercial storage facility to hold sensitive documents…the [SCA] protects *users whose electronic*

00317461.2

*communications are in electronic storage with an ISP or other electronic communications facility*." Theofel v. Farey-Jones, 359 F.3d 1066, 1072 (9th Cir. 2004) (emphasis added).

The SCA "provides a cause of action *against anyone* who 'intentionally accesses without authorization a facility through which an electronic communication service is provided…and thereby obtains alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage.'" See id. (citing 18 U.S.C. §§ 2701(a)(1), 2707(a)) (emphasis added). Liability accrues under the SCA against anyone who "*intentionally exceeds an authorization* to access that facility…and thereby obtains…access to a wire or electronic communication while it is in electronic storage." 18 U.S.C. § 2701 (emphasis added).

An "electronic communication service" is "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C.A. § 2510(13). "Electronic communication[s]" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce…" 18 U.S.C. 2510(12).

### c. **TTC States a Valid Claim Under the SCA.**

#### i. McBeath Misstates TTC's SCA claim.

After numerous verbal and written communications as well as two formal opposition papers, McBeath continues to misstate the nature of TTC's claim to support her Motion. TTC does not allege, as McBeath suggests, that it is "a facility through which an electronic communication service is provided." (See Motion at 5:15-18.) Rather, TTC alleges McBeath *intentionally accessed, without authorization, a communications facility* where TTC stores electronic communications and data. (See, e.g., TTC Countercl. at ¶¶ 74-76 (emphasis added).) The SCA expressly provides a private cause of action–regardless of the party's status as a communications facility–against anyone who *impermissibly accesses* third-party facilities where communications are stored. See Theofel, 359 F.3d at 1072-1073

("the [SCA] protects users whose electronic communications are in electronic storage with an ISP or other electronic communications facility.") (emphasis added).  Thus, it is irrelevant whether TTC operates a "facility" under the SCA.  TTC's cause of action arises from McBeath's intentional access of third-party facilities where TTC stored communications, data, and Confidential Information–information expressly protected by the SCA.  As discussed further, *infra*, those facilities include TTC's cloud-based Google mail service ("Gmail") and Revel Point of Sale system ("Revel POS").

McBeath's first argument in support of dismissal – that TTC is not a facility through which electronic communications services are provided – fails to establish a basis for dismissal.

> ii. <u>McBeath intentionally accessed or exceeded her authorization to access a facility through which an electronic communication service is provided.</u>

Contrary to McBeath's view and apparent disregard of statutory text and Ninth Circuit law cited in her own Motion, the SCA provides a cause of action against individuals, like McBeath, who intentionally access *or exceed their authorization* to access a communications facility.  McBeath unavailingly argues that TTC authorized her misappropriation of its Confidential Information.  (<u>See generally</u> <u>Motion</u> at 8-9). McBeath's reference to <u>LVRC Holdings LLC v. Brekka</u> in support of this conclusion, however, is misleading and disingenuous. In <u>Brekka</u>, the Court interpreted the scope of the phrase "without authorization" under the Computer Fraud and Abuse Act ("CFAA"), not the SCA. <u>See</u> 581 F.3d 1127, 1135 (9th Cir. 2009).  In citing <u>Brekka</u>, McBeath conveniently ignores the holding of <u>Theofel</u>, wherein the Court interpreted the meaning of "authorization" *under the SCA*. In <u>Theofel</u>, the Court found that a party acts without authorization when they procure access to a stored communication *by trespass* or "by exploiting a known mistake that relates to the essential nature of his access." 359 F.3d at 1073.

TTC adequately alleges McBeath intentionally accessed or, at a minimum, exceeded her authorization by exploiting TTC's misplaced trust, in violation of the SCA.

1  Specifically, on at least four separate occasions, McBeath accessed electronic
2  communications on TTC's network, obtained Confidential Information, then shared it with
3  unrelated third-parties.  (See, e.g., TTC Countercl. at ¶¶ 28-32.)  Further, McBeath accessed
4  the information beyond scope of her employment, without permission, or authority to share
5  it with third-parties without authorization.  (See id. at ¶¶ 10, 23-25, 28-32.)  Despite her
6  self-serving claims of innocence to the contrary, McBeath's statements are outside the
7  pleadings, and TTC's allegations must be accepted as true for purposes of this Motion.  See,
8  e.g., Smith, 84 F.3d at 1217.

9  Simply, a party who exploits a known mistake about the nature or quality of the
10  invasion – i.e. trespasses – is liable under the Ninth Circuit's interpretation of
11  "authorization" in the SCA.  While a claim may not lie based on these circumstances under
12  the CFAA,[3] as McBeath suggests, the SCA expressly permits a cause of action against
13  anyone who, like McBeath, trespasses beyond her authority to obtain data stored in a
14  facility.  See Theofel, 359 F.3d at 1072.

15  McBeath failed to present any additional authority or argument not disposed of
16  herein to support her Motion.  As such, this Court should deny her Motion.

17              iii.   McBeath accessed a facility through which an electronic communication
                       service is provided to obtain communications in electronic storage.
18

19  Assuming *arguendo* McBeath presents a sufficient argument challenging the
20  sufficiency of TTC's SCA claim, TTC pled sufficient facts to establish McBeath trespassed
21  into a communications facility and obtained communications contained in electronic
22  storage.  While arguing TTC does not operate a facility under the SCA, McBeath suggests
23  TTC's claim is based on her use of a "personal computer" (see Motion at 6:22 – 7) rather
24  than her impermissible access to third-party facilities.  The plain language of the

---

[3] In this Motion, as well as a similar motion filed in her Pima County Superior Court action, McBeath relies heavily on case law interpreting the Computer Fraud and Abuse Act ("CFAA"). She claims it "is directly relevant to the analysis under the SCA because the CFAA is a statutory scheme similar to the SCA…" See Mot. at 8:14-18. TTC, however, did not file a claim against McBeath under the CFAA. Moreover, McBeath cannot dispute that the Ninth Circuit's decision in Theofel – analyzing the sufficiency of pleadings stating a cause of action *under the SCA* – would be more relevant and indeed binding. McBeath conflates the two statutes to avoid the inescapable conclusion that she unquestionably trespassed into TTC's protected servers to obtain confidential information. In doing so, she violated the SCA.

00317461.2

Counterclaims, however, clearly refutes this contention. TTC alleges McBeath used a computer <u>to access</u> its third-party facility where Confidential Information is stored and transmitted. (<u>See</u>, <u>e.g.</u>, <u>TTC Countercl.</u> at ¶¶ 10, 19, 21.) Indeed, McBeath effectively admits in her Motion her awareness of TTC's network and that the network includes third-party facilities she accessed remotely throughout the course of her employment. (<u>See</u> <u>Motion</u> at 2:9-13 ("When McBeath joined TTC, she received a laptop computer *and was given access to TTC's computer network, which she was permitted to access remotely via the Internet*.").) That she used a laptop computer is not the crux of TTC's claim. Rather, that she exceeded the scope of her authorization when she used it to access communications facilities and obtain information impermissibly.

Although the allegations do not explicitly identify the third-party facilities McBeath unlawfully accessed, it is reasonable to infer that TTC's "network" includes a communications facility within the meaning of the SCA. <u>See</u> <u>Ashcroft</u>, 556 U.S. at 678 ("a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"); <u>see also</u> 18 U.S.C. §2510(15) ("electronic communication services" are defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications."). Two factors strongly support the reasonableness of the inference. First, McBeath herself implicitly acknowledges her awareness of TTC's network and her access to that network over the Internet. Surely, McBeath drew her inference from the factual allegations in the Counterclaims.

And second, the plain meaning of a network furthers the inference that TTC sufficiently pled its SCA claim. By its plain meaning, a "network," as defined by Merriam-Webster, is "a system of computers, peripherals, terminals, and *databases connected by communications lines*" (emphasis added). TTC's reference to its network coupled with allegations that it stores and transmits data gives ample notice that the network McBeath impermissibly accessed includes a communications facility. Rule 8 simply does not require a more detailed description identifying the full scope of TTC's network to support its claim

00317461.2

for relief. See Ashcroft, 556 U.S. at 678 (the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned…accusation").

Having established that McBeath exceeded her authorization by accessing a communications facility, TTC adequately pled the remaining element of an SCA claim; that McBeath obtained electronic communications and data contained *in electronic storage*. The Counterclaims are not only replete with language indicating TTC *stores* significant data on its network, but TTC expressly identifies the Confidential Information that it collects, transmits and stores on its network. (see, e.g., Countercl. at ¶¶ 10-21, 73-77.) By obtaining the transmitted and stored Confidential Information without authorization, McBeath violated the SCA. See generally Theofel, 359 F.3d at 1072.

TTC's pleadings satisfy the basic factual allegations required to provide McBeath with notice of the nature of its claim. As a result, her Motion should be denied.

### d. TTC States Viable Claims for Conspiracy and Aiding and Abetting.

In her attempt to dismiss the civil conspiracy and aiding and abetting claims, McBeath relies on distinguishable federal law. In support of her claim that the SCA does not permit a secondary liability claim, she cites Freeman v. DirectTV, Inc., claiming the issue before the court was "whether the SCA 'provide[d] for a private cause of action against those who aid and abet, or conspire with, electronic communications providers in unlawfully disseminating the contents of electronic storage.'" (Mot. at 11:12-18 (partially citing Freeman, 457 F.3d 1001).) In Freeman, the Ninth Circuit Court considered whether secondary liability accrued to those individuals *who conspire with electronic communications service providers*. See 457 F.3d at 1001. TTC does not claim McBeath conspired with Google or Revel – i.e. TTC's electronic communications service providers. Rather, it claims she impermissibly accessed TTC's protected computer network, including Google and Revel facilities, and unlawfully obtained data and communications stored on the network. Her conduct amounted to a trespass – a tort that can be aided and abetted by

00317461.2

third-parties. See, e.g., Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund, 201 Ariz. 474, 485, 38 P.3d 12, 23 (2002), as corrected (Apr. 9, 2002) ("aiding and abetting liability is based on proof of a scienter ... the defendants must know that the conduct they are aiding and abetting is a tort."); Koepnick v. Sears Roebuck & Co., 158 Ariz. 322, 330-331, 762 P.2d 609, 617-18 (Ct. App. 1988) ("the tort of trespass to a chattel may be committed by intentionally dispossessing another of the chattel or using or intermeddling with a chattel in the possession of another."); Hale v. Brown, 84 Ariz. 61, 73, 323 P.2d 955, 963 (1958) (explaining the "well-established and deeply rooted legal principle that a person has the right to vindicate any trespass upon his legal rights by an action in tort for at least nominal damages.") (emphasis added). Additionally, the claims in Freeman arose under a separate provision of the Electronic Communications Privacy Act; 18 U.S.C. § 2702. That section proscribes certain conduct by electronic communication service providers. TTC's claims arise under the SCA–18 U.S.C. § 2701–which bars unlawful access to stored communications by individuals. McBeath does not point to any Ninth Circuit case law prohibiting conspiracy and aiding and abetting claims based on substantive violations of § 2701.

Equally important, TTC does not sue McBeath's conspirators or aiders and abettors, yet, nor are TTC's claims limited to McBeath's violations of the SCA. (See Countercl. at ¶¶ 79-89.) The basis supporting TTC's aiding and abetting and conspiracy counts involve a scheme or artifice to violate McBeath's contractual obligations and fiduciary obligations. (See id.) These civil conspiracy and aiding and abetting claims rely on Arizona state law and remain viable under controlling authority. See Wells Fargo Bank, 201 Ariz. at 489-99, 38 P.3d at 36-37; see also Dawson v. Withycombe, 216 Ariz. 84, 102, 163 P.3d 1034, 1052 (Ariz. Ct. App. 2007) (stating the elements of a claim for aiding and abetting tortious conduct). Even assuming the SCA does not permit private causes of action for secondary liability, TTC's civil conspiracy and aiding and abetting claims extend beyond violations of the SCA. McBeath does not address the propriety of the non-SCA conspiracy and aiding and abetting claims in her Motion. Those viable claims should not be dismissed.

00317461.2

Defendants pled allegations sufficient to withstand a motion to dismiss on the viability of conspiracy and aiding and abetting claims.

### III. CONCLUSION

McBeath relies on inapposite case law in support of her Motion. The SCA and the Ninth Circuit's decision in Theofel expressly provide a cause of action against an individual, like McBeath, who exploits her limited authority to access communications facilities then misappropriates communications and data stored in electronic storage. Further, nothing in the SCA prohibits secondary liability claims arising from McBeath and her son's scheme to violate the SCA, but even if it did, TTC's secondary liability claims extend beyond violations of the SCA. As such, TTC requests the Court deny the Motion.

### IV. REQUEST FOR LEAVE TO AMEND

In the alternative, if the Court finds TTC's pleadings are insufficient to state a claim under the SCA, TTC requests leave to amend the Counterclaims and supplement the facts establishing McBeath's liability. McBeath, without basis, asks the Court to dismiss the counterclaims with prejudice; that is, without leave to amend. (See Mot. at 1:10-11; 12:9-10.) Referencing the support McBeath provided in her separately filed Motion to Amend (Doc. No. 38), "[t]he court should freely give leave when justice so requires.' The United States Supreme Court and the Ninth Circuit repeatedly have reaffirmed that leave to amend is to be granted with 'extreme liberality.'" (Pl.'s Mot. Leave to Amend Complaint, Doc. No. 38 at 1:9-13 (citing DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir. 1987).) "In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave should, as the rules require, be 'freely given.'" (Pl.'s Mot. Leave to Amend Complaint at 1:14-19 (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

Despite her purported awareness of the grounds to deny leave to amend, McBeath cites no basis or authority to support her conclusory request that the Court grant her Motion

00317461.2

without leave for TTC to amend. Armed with ample knowledge of the grounds needed to support her conclusive request, McBeath should not be permitted to substantiate, in reply, grounds she failed to provide TTC an opportunity to rebut. As outlined throughout this Opposition, TTC has ample factual bases supporting leave to amend its Counterclaims should the Court find it has not plead the SCA claim with sufficient particularity.

RESPECTFULLY SUBMITTED this 10th day of April, 2017.

FARHANG & MEDCOFF

By /s/ Travis L. Tufts
Ali J. Farhang
Roberto C. Garcia
Travis L. Tufts

Attorneys for Defendants / Counterplaintiff

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed electronically with the Clerk of the United States District Court for the District of Arizona, with notice of case activity generated and sent electronically this 10th day of April, 2017 to:

Melissa Martin McBeath
Mel.McBeath@cox.net

/s/ Letitia L. Wright

00317461.2