1

2

3

FARHANG & MEDCOFF

4801 E. Broadway Boulevard, Suite 311
Tucson, Arizona 85711
T: 520.790.5433

4

5

Ali J. Farhang (#019456)
afarhang@fmazlaw.com

6

7

Roberto C. Garcia (#026246)
rgarcia@fmazlaw.com

8

Travis L. Tufts (#029373)
ttufts@fmazlaw.com

9

10

Attorneys for Defendants / Counterplaintiff

11

**IN THE UNITED STATES DISTRICT COURT**

12

**FOR THE DISTRICT OF ARIZONA**

13

14

Melissa Martin McBeath, an individual,

15

Plaintiff,

16

v.

17

18

19

Tucson Tamale Company, an Arizona
corporation; Todd Russell Martin, an
individual; Sherry Martin, an individual;
and Lisa Martin, an individual,

Defendants.

20

21

22

23

Tucson Tamale Company, an Arizona
corporation,

Counterplaintiff,

24

v.

25

26

Melissa Martin McBeath and John/Jane
Doe Martin McBeath, husband and wife,

27

Counterdefendants.

28

NO. CV 16-462-TUC-DCB (BPV)

**COMBINED OPPOSITION TO
COUNTERDEFENDANT'S
PARTIAL SUMMARY JUDGMENT
MOTION AND
COUNTERPLAINITFF'S CROSS-
MOTION FOR PARTIAL
SUMMARY JUDGMENT**

Assigned to Judge David C. Bury and
Hon. Bernardo P. Velasco

00319716.1

Contrary to the supposed undisputed facts in her sham declaration (Doc No. 52-2, the "Declaration") submitted in support of her Partial Summary Judgment Motion (Doc. No. 52, the "Motion"), Plaintiff/Counterdefendant Melissa Martin McBeath ("McBeath") testified during her recent deposition that she violated the plain language of her Confidentiality Agreement ("Agreement") entered into with Counterplaintiff/Defendant Tucson Tamale Company ("TTC").  Her admitted breach, coupled with a documented history of disclosing sensitive information confided in her as an employee, unequivocally establishes McBeath trampled not only upon TTC's contractual rights, but the fiduciary obligations she owed to TTC as her employer.  Because of this, and for the reasons set forth herein, TTC, not McBeath, is entitled to partial summary judgment.

McBeath breached the Agreement and her employment-related fiduciary obligations to TTC when, among other things, she shared without authorization, to an unknown extent and for unknown reasons, TTC's profit and sales data with an individual hostile to TTC, McBeath's ex-husband Ernesto Chavez ("Chavez").  McBeath also violated her obligations when she without authorization provided Ehud Gavron ("Gavron")–an individual known by TTC to assist McBeath with cheating on regulatory liquor license trainings–with passwords and unfettered access to TTC's systems.  The extent of Gavron's access and his reasons for connecting to TTC's systems remains unknown to date because of McBeath's strained claim that Gavron, a fact witness, is now conveniently a purported expert who is not subject to TTC's discovery efforts.  Further, McBeath violated her obligations to TTC when she disclosed its confidential information to Francisco X. Marquez ("Marquez")–a supposed expert in the law despite disbarment for unscrupulous behavior by the Supreme Court of California–in connection with his unauthorized provision to her of legal services *both during and after her employment with TTC*.  These foregoing facts alone establish that McBeath is not, as she claims, entitled to summary judgment and preclude the relief McBeath seeks in the Motion.

This Cross-Motion for Partial Summary Judgment (the "Cross-Motion"), on the other hand, faces no similar fatal confrontation with the facts.  Rather than use self-serving

00319716.1

1   declaration statements to prove up its entitlement to partial summary judgment, as McBeath

2   does, TTC's Cross-Motion establishes by clear, admissible documentary evidence and

3   McBeath's deposition testimony that McBeath violated her obligations to TTC and caused

4   it substantial damages.  As the Court will note, this Cross-Motion relies on established facts

5   (disputable only by McBeath contradicting herself again and again) rather than on

6   conclusory statements and hollow avowals presented through a disbarred attorney

7   unlawfully representing McBeath from the shadows.

8        McBeath's purported bases for sharing TTC's confidential information, outlined in

9   the Motion, do not excuse her breaches and, at best, create genuine issues of material fact

10  precluding summary judgment in her favor.  For example, McBeath tries to allay TTC's

11  concerns and wholly sweep her violations under the rug by noting, apparently blind to the

12  irony and absurdity of her statements, that this Court and TTC should simply trust her and

13  her friends:

> "The two persons that TTC accuses of having received TTC's
> trade secrets did not receive such confidential information
> from McBeath that she and they were not authorized to see …
> Whatever information they did receive, *they have never
> distributed to any third parties nor have they exploited this
> information in any way for personal gain or to TTC's
> detriment*."

19  Motion, 6:16-22 (emphasis added).  McBeath's statement, a tacit admission of her

20  wrongdoing and strong support for further discovery by TTC to reveal the entirety of its

21  damages, are of no comfort and are of no legal consequence in a determination that McBeath

22  violated her obligations to TTC.  This statement, however, creates a roadblock on

23  McBeath's path to summary judgment that she simply cannot surmount.

24        As such, TTC respectfully requests that the Court deny McBeath's Motion and that

25  it grant this Cross-Motion.  In the unlikely event this Court is inclined to grant any of the

26  relief requested by McBeath in the Motion, TTC requests Rule 56(d) relief so that it can

27  obtain discovery from, among others, Chavez, Gavron, and Marquez on whom McBeath

28  has to date vigorously and without legal basis resisted discovery.  In support of its requested

00319716.1

relief, TTC submits the following Memorandum of Points and Authorities, the contemporaneously submitted Controverting Statement of Facts ("CSOF") and Separate Statement of Undisputed Facts (the "SOF"), the pleadings and papers on file with the Clerk of this Court, and the pleadings and papers on file with the Clerk of the Arizona Superior Court (Pima County), Case No. C20161794,[1] all of which TTC incorporates herein by this reference.

## I.   FACTUAL BACKGROUND

### A.   McBeath's Employment History and Confidentiality Agreement

Between April 20, 2015 and February 22, 2016, TTC employed McBeath as its restaurant Area Manager.  In the course and scope of her employment as Area Manager, McBeath had access to TTC's confidential and proprietary data.  See SOF at ¶ 12.  On or about March 19, 2015, in consideration for her employment at TTC, McBeath executed a Confidentiality Agreement (the "Agreement").  Id. at ¶ 13.  Therein, McBeath acknowledged TTC may disclose or give her confidential information during her employment and agreed, among other things, that "the confidential information includes [TTC's] trade secrets, *sales and profit figures*, customer lists, relationships with contractors, customers, or suppliers, and opportunities for new or developing business" (the "Confidential Information").  Id. at ¶ 14.  McBeath agreed "[she] will not use or disclose to any other person or entity any confidential information or materials (either written or unwritten) *except when I am required to do so as required by law*."  Further, "[she] will not, except in performing [her] duties, remove or copy any confidential information or materials or assist anyone in doing so *without [TTC]'s written permission*."  Id. at ¶ 15.  McBeath admitted she entered the Agreement before she was hired, that her signature appears on the Agreement, that she signed it without duress, and that the Agreement was reasonable and necessary.  Id. at ¶ 16.  In other words, McBeath agrees the contract TTC seeks to enforce through this Cross-Motion exists and is enforceable.

/ / / /

---

[1] TTC requests the Court take judicial notice of all such pleadings and papers.

### B. __McBeath's Misappropriation and Violation of Her Agreement__

After TTC terminated McBeath's employment for cause,[2] Defendants Todd Russell Martin, Sherry Martin, and Lisa Martin (collectively, the "Martins") engaged in an exhaustive review of McBeath's TTC e-mail account to determine whether McBeath shared TTC's Confidential Information without permission. Id. at ¶ 17. Collectively, the Martins spent at least 55 hours reviewing tens-of-thousands of communications in McBeath's e-mail account, then, armed with the results of their investigation, the Martins spent additional time and money on behalf of TTC to identify its legal rights and remedies. Id. at ¶ 18. The investigation was outside what the Martins do as a matter of course and diverted them from other matters including the proper running of their business. Id. at ¶ 19.

The Martins discovered numerous e-mails by which McBeath disclosed TTC's Confidential Information without authorization. Between December 9, 2015 and January 9, 2015, McBeath shared TTC's sales and profits figures with Chavez on at least three separate occasions. Id. at ¶ 20. Specifically, McBeath shared TTC's Sales Summaries from its Tanque Verde restaurant and an Operations Report related to TTC's Broadway restaurant. Id. at ¶ 21.

The Martins also identified e-mails between McBeath and Gavron by which McBeath *again* shared TTC's Confidential Information. Id. at ¶ 22. Specifically, McBeath e-mailed Gavron asking him to access TTC's Revel Point of Sale system ("Revel")–a system utilized to aggregate, compile, and track TTC's sales, profits, and operations data. Id. at ¶ 23. Gavron needed McBeath's TTC username and password to access Revel, which she provided. Id. at ¶ 24. TTC never authorized Gavron's access to Revel and to this date is unaware of what he accessed or what his true ends were in accessing TTC's system containing Confidential Information. Id. at ¶ 25. Over the course of her employment, McBeath shared hundreds of e-mails with Gavron including, among other things, internal

---

[2] As one example of the many contradictions between her sham declaration and her deposition testimony, McBeath stated TTC terminated her employment "because [she] asked [TTC] to pay the bonuses that TTC owed [her] and the other restaurant general managers." (Declaration at 1:8-11.) In her deposition, however, McBeath denied TTC terminated her employment because she asked TTC to pay her a bonus. SOF at ¶ 40.

1   practices and policies like TTC and its owners' financial obligations, implementation of

2   TTC's processes in Revel, and intimate details involving employee misconduct and

3   corrective action, none of which should have been discussed outside the workplace, as

4   provided by TTC's workplace policies. Id. at ¶ 26.

5       McBeath agrees Chavez and Gavron are third-parties, unaffiliated with TTC. Id. at

6   ¶ 27.   She agrees the Sales Summaries and Operations Report contain TTC's sales and

7   profits data. Id. at ¶ 28. Unambiguously, she knew the information was confidential. Id.

8   Neither TTC nor the named Defendants authorized McBeath's disclosure of this

9   information to Chavez or Gavron, either orally or in writing. Id. at ¶ 29. Because they do

10  not exist, McBeath is not aware of any writing memorializing permission for her to disclose

11  Confidential Information to Chavez or Gavron. Id. at ¶ 30.  The two communications

12  alluding to McBeath's communications with Chavez, which McBeath believes exonerate

13  her, notably and (presumably) purposefully omit any reference to Chavez, his relationship

14  with McBeath, or the breadth of information she shared with him. Id. at ¶ 31. Indeed, the

15  Martins were not contemporaneously aware of the scope of Confidential Information shared

16  with Chavez based on McBeath's communication, and they did not ratify McBeath's

17  conduct. See id. at ¶ 32. Further, as is now obvious, McBeath was not required by law to

18  share the Confidential Information with Chavez or Gavron. Id. at ¶ 33.

19      TTC believes, but has been unable to show due to improper discovery-evading

20  tactics, that McBeath shared TTC Confidential Information with Marquez.   Given

21  admissions by McBeath that Marquez serves as her counsel (see SOF ¶ 34), it stands to

22  reason Marquez reviewed all information and documents at issue in this case. Because no

23  attorney-client or expert privilege can attach to McBeath's communications with Marquez,

24  McBeath's disclosures to him are violations of the Agreement per se.  Even though TTC

25  has already established McBeath's violation of the Agreement, TTC is entitled to discover

26  any additional violations not only to prove liability, but to further establish the scope of its

27  damages.

28  / / / /

### C. **TTC's Efforts to Maintain Secrecy of its Confidential Information**

TTC makes various efforts to preserve its Confidential Information, proprietary data, and trade secrets.  All employees, including McBeath, are subject to TTC's workplace policies and procedures.  Id. at ¶ 35.  Among those policies is a Zero Tolerance Policy related to Proprietary and Confidential Information (the "Policy").  The Policy expressly prohibits disclosure of TTC's proprietary processes and recipes and warns of potential legal liability if found in violation of the Policy.  Id. at ¶ 36.

TTC reasonably restricts access to Confidential Information with usernames, passcodes, and permission-based file access.  Id. at ¶ 37.  Indeed, the permission-based files include TTC's accounting records.  Id.  Access to TTC's overall sales and profits figures are restricted to executive management.  Id. at ¶ 38.  Certain data, like payroll information, is even restricted from certain upper-level management, like McBeath.  Id.  Finally, TTC commonly binds employees with access to TTC's Confidential Information to confidentiality agreements similar to the Agreement.  Id. at ¶ 39.

## II.   LAW AND ANALYSIS SUPPORTING TTC'S CROSS-MOTION FOR SUMMARY JUDGMENT

### A. **Summary Judgment Legal Standard**

TTC is entitled to summary judgment, and McBeath is not, because the undisputed material facts establish McBeath breached the Agreement and her fiduciary duties, causing damages.  See Fed. R. Civ. P. 56.  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims *or defenses*…"  Celotex Corp. v. Catrett, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (emphasis added).  "[T]he mere existence of *some* factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (emphasis in original).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

00319716.1

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but…must set forth specific facts that there is a genuine issue for trial.'" Id. (internal citations omitted).  The nonmoving party cannot overcome summary judgment "without 'any significant probative evidence tending to support the [claim].'" Id. (internal citations omitted).  "When the nonmoving party relies only on its own affidavits to oppose summary judgment, *it cannot rely on conclusory allegations unsupported by factual data* to create an issue of material fact." Hansen v. United States, 7 F.3d 137, 138 (9th Cir. 1993) (emphasis added).

### B. Elements of a Contract and Contract Interpretation Legal Standard

In Arizona, "the plaintiff has the burden of proving the existence of the contract, its breach and the resulting damages." Graham v. Asbury, 112 Ariz. 184, 185, 540 P.2d 656, 657 (1975).  A general principle of contract law is that when parties bind themselves by a lawful contract the terms of which are clear and unambiguous, a court must give effect to the contract as written. Grubb & Ellis Mgmt. Services, Inc. v. 407417 B.C., L.L.C., 213 Ariz. 83, 86, ¶ 12, 138 P.3d 1210, 1213 (Ct. App. 2006).  "'Where the intent of the parties is expressed in clear and unambiguous language, there is no need or room for construction or interpretation and a court may not resort thereto.'"  Grosvenor Holdings, L.C. v. Figueroa, 222 Ariz. 588, 593, ¶ 9, 218 P.3d 1045, 1050 (Ct. App. 2009) (internal citations omitted).

### i.  No genuine issue of fact precludes a finding McBeath breached the Agreement.

Application of the undisputed material facts to the plain language of the Agreement leads to the inescapable conclusion that McBeath violated the Agreement when she shared TTC's sales and profits data with Chavez.[3]  The Agreement provides only two circumstances whereby McBeath was authorized to disclose TTC's Confidential Information to third-parties: (1) "when…required to do so as required by law"; or (2) with "TTC's written permission," neither of which apply here.  McBeath agrees she was not

---

[3] Again, McBeath does not dispute the existence of the Agreement or that TTC's sales and profits figures are expressly defined as Confidential Information.  See, e.g., SOF at ¶ 16.

legally required to disclose TTC's Confidential Information to Chavez.  See SOF ¶ 33.

Further, as McBeath admits, there is no pre-disclosure *written permission* to disclose

Confidential Information to Chavez.  See, e.g., SOF ¶ 30.

McBeath's conclusory statement she "had authority" to disclose the Confidential

Information fails to raise a genuine issue of fact as a matter of law.  McBeath suggests she

"informed Defendant Sherry Martin that [she] contacted Chavez…and [Sherry] did not

object."  Declaration at ¶ 9.  The statement fails to present a genuine issue of fact for two

reasons.  First, the statement is wholly conclusory and insufficient, as it has no tangible

support or documents on which to rely.  See Hansen, 7 F.3d at 138 (the nonmoving party

"cannot rely on conclusory allegations unsupported by factual data").  Second, even if

accepted as true, McBeath nonetheless failed to observe the straightforward language of the

Agreement, defeating her defense.  The Agreement unambiguously requires that permission

be provided *in writing*.  Thus, if "Sherry did not object," that non-objection or ratification

of McBeath's conduct *had to be in writing*.  McBeath cannot identify written permission to

disclose Confidential Information despite full knowledge of the communications she had

with TTC representatives and ample opportunities to inspect TTC's e-mail production.  See

SOF at ¶ 41.  McBeath breached the Agreement, plain and simple.

Assuming, *arguendo*, McBeath's conclusory statement she "had authority"

generates a dispute, it is not a genuine dispute.  McBeath must produce *some* probative

evidence enabling a reasonable juror to find in her favor.  The existing probative evidence,

however, completely undermines her defense.  Not only is there an absence of documentary

evidence supporting her defense, but the Martins expressly deny her conclusory claim.  See

SOF at ¶¶ 25, 29.  Further, had McBeath actually obtained *any* permission whatsoever prior

to disclosure, surely she would have copied TTC's owners or management on the

communications to Chavez.  Tellingly, she did not.  See SOF at ¶ 20.  When McBeath

purportedly "informed" Defendants of her communications *after-the-fact*, she notably

failed to identify Chavez as "the accountant" she consulted and failed to mention she shared

TTC's sales data with Chavez to aid his "problem solving."  No reasonable juror would

00319716.1

1    agree with McBeath; these cursory communications do not raise a genuine dispute

2    supporting McBeath's claims that TTC authorized her improper disclosures.

3         Further, this Court should not consider McBeath's proffered extrinsic evidence to

4    supplement the terms of the Agreement.  As a matter of law, the Agreement's clear and

5    unambiguous terms do not require further interpretation or the application of rules of

6    construction.  See, e.g., Grosvenor Holdings, L.C., 222 Ariz. at 593, 218 P.3d at 1050.  The

7    plain language authorizes only two circumstances justifying disclosure of TTC's

8    Confidential Information, neither of which apply here.  Notwithstanding, McBeath argues

9    her interpretation of the Agreement–one which she admits is not supported by the text of

10   the Agreement–authorized her to disclose Confidential Information to Chavez because he

11   is a CPA and "is also bound by confidentiality."[4]  See SOF at ¶ 42.  Even if such a privilege

12   does apply, it does not excuse McBeath's breach.

13        Use of extrinsic evidence is not only improper because of the Agreement's clear

14   terms, but because the Agreement is not reasonably susceptible to McBeath's proffered

15   interpretation.  See, e.g., Long v. City of Glendale, 208 Ariz. 319, 328, 93 P.3d 519, 528

16   (Ct. App. 2004) (if the writing is not "reasonably susceptible" to the interpretation suggested

17   by the proponent, the Court should not admit extrinsic evidence to alter the language of the

18   writing).  Had the parties intended to allow disclosure to third-parties like accountants,

19   lawyers, or other professionals protected by privilege, they could have expressly done so.

20   Tellingly, nothing in the Agreement even contemplates McBeath's utilization of

21   Confidential Information with professionals.    Furthermore, McBeath's proffered

22   interpretation defeats the parties' intent.   By restricting disclosure of Confidential

23   Information to two distinct scenarios, the parties intended TTC would have knowledge of

24   any disclosures of Confidential Information whether it be in connection with a legal

25   proceeding or upon express written consent.  Were McBeath authorized to disclose the

26   Confidential Information *if* a privilege *might* accrue to shield that communication as she

---

[4] Despite her belief a privilege would accrue to her communications with Chavez, TTC did not sign *any* agreement with Chavez memorializing or ensuring the confidentiality of its employees' communications.  See SOF at ¶ 46.

00319716.1

1    suggests, the bargained-for limitations on disclosure would be completely undermined.

2    McBeath violated the plain terms of the Agreement and cannot through unsubstantiated

3    statements unsupported by any evidence create a genuine issue of fact precluding a

4    determination she is liable to TTC for damages.

5          ii.    **TTC has been damaged by McBeath's unauthorized disclosure of**

6                 **Confidential Information.**

7          There is no dispute TTC suffered two tangible forms of damages stemming from

8    McBeath's breaches.  That TTC has not been able to fully develop its damages because of

9    McBeath's interference with the discovery process, as discussed *infra* at Sec. IV, does not

10   preclude a finding that it has been damaged.  In Arizona, "'certainty in amount' of damages

11   is not essential to recovery when the [f]act of damage is proven." HTS, Inc. v. Boley, 954

12   F. Supp. 2d 927, 951 (D. Ariz. 2013) (internal citations omitted).  Any damage resulting

13   from a breach of contract must either "arise naturally from the breach itself or ... [must]

14   reasonably be supposed to have been within the contemplation of the parties at the time they

15   entered the contract." Fid. & Deposit Co. of Maryland v. Bondwriter Sw., Inc., 228 Ariz.

16   84, 92, 263 P.3d 633, 641 (Ct. App. 2011).

17         McBeath cannot dispute TTC has been damaged and that its damages flow from

18   McBeath's breach of the Agreement.  For example, as a result of her misconduct, the

19   Martins expended at least 55 hours investigating the full scope of McBeath's

20   misappropriation.  The time and effort expended by TTC's owners and its employee–time

21   spent away from their day-to-day responsibilities–is susceptible to valuation.  Thus, even

22   assuming the lost business opportunities and opportunity costs cannot be identified with

23   reasonable certainty or accuracy at this stage of discovery, there is no dispute McBeath's

24   breach caused TTC to pay the Martins while performing an investigation into McBeath's

25   misconduct.  Nor would a reasonable juror disagree that, to discover whether a party has

26   breached a confidentiality agreement like McBeath's, some degree of time and effort is

27   required to discover the extent of wrongdoing and that the time and effort expended is

28   economically valuable.  Indeed, but for their investigation into e-mails McBeath sent using

00319716.1

1  TTC's systems, the Martins would not have discovered the unauthorized disclosures.

2          TTC not only lost the benefit of its owners' efforts, but it incurred recoverable

3  monetary damages as a result of McBeath's breach.  After conducting its investigation, TTC

4  consulted *and paid* its attorneys to review and advise TTC of its legal rights and remedies.

5  Arizona law expressly provides for recovery of the fees and costs TTC incurred

6  investigating McBeath's wrongdoing.  See Desert Mountain Properties Ltd. P'ship v.

7  Liberty Mut. Fire Ins. Co., 225 Ariz. 194, 209, 236 P.3d 421, 436 (Ct. App. 2010), aff'd,

8  226 Ariz. 419, 250 P.3d 196 (2011) ("[W]hen one party's breach of contract places the other

9  in a situation that makes it necessary to incur expenses to protect his interest, such costs and

10 expenses, including attorneys' fees, should be treated as the legal consequences of the

11 original wrongful act and may be recovered as damages.").  TTC has established it incurred

12 damages despite ongoing discovery.  No genuine issues of material fact preclude a finding

13 TTC has been damaged, that such damages include, without limit, the time and effort

14 expended by TTC to discover McBeath's breaches, and that TTC is entitled to recover the

15 full scope of its damages, which remains the subject of ongoing discovery.

16          **C.  <u>No genuine issues of fact preclude finding McBeath breached her fiduciary</u>**
17     **<u>obligations.</u>**

18          McBeath not only violated the Agreement when she undisputedly shared TTC's

19 Confidential Information with Chavez without permission, but, together with her

20 communications with Gavron, she also violated her fiduciary obligations to TTC.  In

21 Arizona, an employee or agent owes his or her employer or principal a fiduciary duty.  See

22 McCallister Co. v. Kastella, 170 Ariz. 455, 457, 825 P.2d 980, 982 (Ct. App. 1992). (citing

23 Restatement (Second) of Agency § 2 (1958)).  One of the specific duties owed to an

24 employer is the obligation to "not to use or to communicate information confidentially given

25 [to the agent] by the principal or acquired by [the agent] during the course of or on account

26 of [the] agency.  See Restatement (Second) of Agency § 395 (1958); see also Lerner v.

27 DMB Realty, LLC, 234 Ariz. 397, 404, 322 P.3d 909, 916 (Ct. App. 2014) ("In the absence

28 of contrary Arizona authority, [Arizona] follow[s] the Restatement of the Law").

00319716.1

Other than her unsubstantiated, self-serving Declaration, McBeath cannot produce a single shred of evidence disputing the fact she shared TTC's Confidential Information with third-parties without permission. McBeath knew TTC's sales and profits data were confidential, yet she disclosed that information to Chavez. She was not only contractually prohibited from doing so, but her duties of loyalty to the company prohibited her from sharing that information. Because she violated TTC's confidence, and because no reasonable juror could find otherwise, she is liable for breach of her fiduciary obligations.

McBeath also undisputedly violated her fiduciary obligations vis-à-vis her communications with Gavron. By providing Gavron unfettered access to Revel, McBeath effectively gave Gavron the keys to the kingdom, and gave him free reign to peruse and potentially misappropriate TTC's Confidential Information stored on Revel systems. Additionally, McBeath violated numerous confidences and the express language of TTC's employment Policy through her communications with Gavron. Indeed, McBeath shared TTC's implementation of internal Revel processes and TTC's owners' financial obligations–both unquestionably internal business practices and procedures subject to non-disclosure. Even if TTC were to accept McBeath's claim that she and her friends have not *yet* exploited the breach of TTC's confidences, McBeath was prohibited *from communicating* the information to Gavron *ab initio* and is therefore liable for breaching her fiduciary obligations. See Restatement (Second) of Agency § 395 (1958).

For the reasons outlined *supra* at II.B.ii., TTC has been damaged and continues to be damaged by McBeath's breach of her fiduciary obligations. The balance of damages resulting from her breach are yet to be fully identified, primarily because of the evasive and improper conduct McBeath and her friends have engaged in to shield themselves from discovery, as discussed *infra*.

### III.  MATERIAL ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT IN MCBEATH'S FAVOR

#### A.  <u>The facts preclude summary judgment for McBeath on TTC's breach of contract and fiduciary duties claims.</u>

00319716.1

McBeath agrees with TTC on the material facts; her shadow counsel simply reaches the wrong conclusion.  The unambiguous language of the Agreement expressly prohibited the unauthorized disclosure of TTC's sales and profits figures.  McBeath agrees she sent the sales and profits figures to Chavez *even though she knew the data constituted Confidential Information* barred from disclosure under the plain language of the Agreement.  She was not required by law to disclose the information nor can she point to *any* evidence reflecting TTC's written consent to disclose the Confidential Information.  As a matter of law, no other conclusion can be reached.  McBeath violated the terms of her Agreement without justification and, accordingly, is not entitled to summary judgment exonerating her breach.

McBeath cannot substantiate the razor-thin defense she relies on to reach the incorrect conclusion that she did not violate TTC's rights.  McBeath's admitted disclosure of TTC's Confidential Information is excusable *only if* she had permission from TTC.  Importantly, TTC's owners deny McBeath had permission to share Confidential Information with Chavez or Gavron, and McBeath cannot identify any written evidence substantiating her position.  Further, the relevant, available evidence clearly establishes McBeath's efforts to conceal her actions.  McBeath's failure to copy TTC's owners on her communications or identify the scope of her communications with Chavez or Gavron patently undercuts the sweeping conclusions proffered by McBeath to excuse her conduct.  Under these circumstances and by her own admission, McBeath simply cannot as a matter of law establish she had authority to disclose Confidential Information to Chavez or Gavron.  Accordingly, summary judgment in favor of TTC, not McBeath, is proper.

Because TTC's breach of fiduciary duties claim turns on similar facts, summary judgment on this claim in McBeath's favor is likewise improper.  No reasonable juror could disagree that McBeath violated TTC's confidences when she without authorization shared its Confidential Information with Chavez.  Her violation of TTC's trust, however, extended far beyond the expressly identified contractual obligations in the Agreement.  She trampled upon TTC's confidence that she would maintain as confidential TTC's internal business

00319716.1

practices and procedures when she shared confidential details about TTC's business with her friend Gavron.  McBeath did not and cannot produce evidence excusing her conduct, apart from her sham Declaration, leaving a reasonable juror to conclude TTC, not McBeath, is entitled to judgment based on the facts.

**B.  It is beyond dispute that TTC suffered damages due to McBeath's conduct.**

As established above, even if TTC cannot show the exact amount of damages suffered to date, largely due to McBeath's abusive exploitation of inapplicable litigation privileges, TTC demonstrated that it suffered damages as a result of McBeath's various breaches.  As the Martins' declarations prove, TTC undertook an extensive investigation to discover McBeath's wrongdoing at significant expense, setting aside their employment obligations to TTC, and by incurring out-of-pocket expenses.  See SOF, Ex. A-C.  Further, Arizona law expressly provides for the recovery of fees and costs incurred investigating the scope of a breach of contract.  See Desert Mountain Prop. Ltd. P'ship, 225 Ariz. at 209, 236 P.3d at 436.  Actual damages, like TTC's, are likewise recoverable in the context of a breach of fiduciary duties and trade secret misappropriation.  See Burkons v. Ticor Title Ins. Co. of California, 168 Ariz. 345, 355, 813 P.2d 710, 720 (1991) (breach of the fiduciary obligations may provide the basis for imposing tort damages); see also A.R.S. § 44-403 (actual damages recoverable for trade secret violations).  McBeath's request for summary judgment on the element of damages must be denied.

**C.  TTC presented material issues of fact precluding summary judgment for McBeath on TTC's trade secrets claims.**

TTC cannot presently meet its burden of showing McBeath misappropriated its trade secrets because, among other things discussed infra, McBeath has thwarted its discovery efforts thus far.  Notwithstanding, TTC has produced sufficient evidence to refute McBeath's assertion that TTC failed to take adequate steps to secure its trade secrets.  See, e.g., SOF Ex. B, T. Martin Decl., at ¶ 9 (the measures TTC takes to protect its confidential information are reasonable under the circumstances).

By McBeath and her "expert's" admissions, TTC took sufficient steps to protect its

00319716.1

trade secrets.  McBeath declares "TTC implemented virtually no security measures to protect its trade secrets, such as recipes and food-making techniques and/or processes." Motion, 5:17-19.  By "virtually no security measures," McBeath necessarily asks the Court to ignore her witness' admission that TTC utilizes "permission-based file access," "password protected…Excel documents," and trains its employees to understand TTC's computer equipment "was not for personal use."  See J. Cooper Declaration, Doc. No. 52-3, at ¶¶ 9, 10, & 12.  Bolstering the undisputed security measures employed by TTC are its Policy and contractual agreements, like McBeath's, utilized to protect against unauthorized disclosure.  A reasonable juror would agree that these levels of security, implemented to restrict access and unauthorized disclosure, reflect reasonable efforts to secure TTC's trade secrets.  Enter. Leasing Co. of Phoenix v. Ehmke, 197 Ariz. 144, 150, ¶ 22, 3 P.3d 1064, 1070 (Ct. App. 1999) ("the most important factor in gaining trade-secret protection is demonstrating that the owner has taken such precautions as are reasonable under the circumstances").  Accordingly, summary judgment on the element of reasonable security measure is improper.

Importantly, McBeath's required level of security is not reasonable in this context. See, e.g., SOF Ex. B at ¶ 9.  TTC's former Information Technology consultant declares he "was never asked" nor did he suggest TTC should encrypt its "recipes, business records or information."  As a result, McBeath argues the failure to encrypt results in a loss of the secret.  TTC operates three restaurants and, now, a wholesale production facility.  It does not deal in state secrets, fend off hackers regularly, or anticipate its employees will exploit their already restricted access for personal gain.  Of course, McBeath proved a telling lesson, but beforehand there was no need to engage in excessive, paranoid protectionism. At a minimum it is reasonable to infer based on TTC's operations that a heightened level of security was not necessary to protect its trade secrets adequately.

Despite McBeath's suggestion, TTC had no obligation to provide "training" about its trade secrets.  Id.  Nothing in the AUTSA or case law requires an employer to train its employees about trade secret protection.  Notwithstanding, TTC took reasonable measures

00319716.1

to inform its employees of its trade secrets.  Specifically, it implemented the Policy and required employees to execute confidentiality agreements to protect its interests.  The mere fact that TTC employees have access to trade secrets in the scope of their employment (see id. at ¶ 16) does not, as a matter of law, result in the relinquishment of protection under AUTSA.  See Emke, 197 Ariz. at 150, 3 P.3d at 1070 ("the owner of a trade secret does not relinquish its secret by disclosure to employees on a necessary basis…").  The totality of security measures were sufficient to protect against unauthorized access and misappropriation as a matter of law.  See Enterprise Leasing Co. of Phoenix, 197 Ariz. at 151, 3 P.3d at 1071 (finding the entity made reasonable efforts to safeguard secrets by "limit[ing] disclosure to those employees in need of the information to perform their duties and general directives regarding confidentiality…includ[ing] a confidentiality provision in the employment agreement for high-level managers…as well as in the employee policy handbook…") and SOF Ex. B, T. Martin Decl. at ¶ 9.

## IV.    MCBEATH AND HER FRIENDS' MYRIAD DISCOVERY ABUSES AND DELAYS JUSTIFY 56(d) RELIEF

Assuming, *arguendo*, the Court considers it proper to enter summary judgment against TTC in connection with TTC's claim to trade secrets *even though discovery is ongoing*, or finds that TTC has not established damages at this stage of discovery, TTC alternatively seeks Rule 56(d) relief, in part due to the evasive practices precluding full development of McBeath's wrongdoing.  56(d) relief is appropriate where, as here, a party "cannot present facts essential to justify its opposition."  See Fed. R. Civ. P. 26(d).  "A district court should continue a summary judgment motion upon a good faith showing by affidavit that the continuance is needed to obtain facts essential to preclude summary judgment." State of Cal., on Behalf of California Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 779 (9th Cir. 1998) (citing McCormick v. Fund Am. Companies, Inc., 26 F.3d 869, 885 (9th Cir. 1994)).  "[D]efendants must show (1) that they have set forth in affidavit form the specific facts that they hope to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are "essential" to resist the

00319716.1

1   summary judgment motion.   State of Cal., on Behalf of California Dept. of Toxic

2   Substances Control, 138 F.3d at 779.

3       At the core of McBeath's defense is her suggestion that TTC take her word that she

4   and her friends have not exploited TTC's proprietary information.   See Motion, 6:16-22.

5   She makes this request while her friends fail to confirm such supposed facts themselves,

6   evade TTC's discovery efforts, and masquerade as purported consulting experts immune

7   from discovery.   TTC has presented ample *prima facie* evidence of McBeath and her

8   friends' improper conduct.   Indeed, McBeath and her team's evasive conduct lends

9   credence to every assertion and allegation about the scope of their malfeasance.   More

10  importantly, while TTC knows and has presented evidence of misconduct, it is the unknown

11  misconduct that is more troubling.   McBeath and/or her friends could easily have

12  downloaded TTC's data, customer lists, and recipes onto a flash drive, hoping to use it as

13  leverage in this case or, more likely, waiting until the case culminates to exploit the

14  information, knowing that the misappropriation would shatter McBeath's efforts to paint

15  herself as a model employee.   That TTC should trust, without conducting discovery, a

16  disbarred attorney and a purported IT expert personally aligned with McBeath, is not only

17  absurd, but flies in the face of well-established procedural rules allowing a party to

18  substantiate its claims.

19      In the event TTC has not already outright defeated the Motion or presented genuine

20  issues of fact precluding its granting, various factors support delaying the decision on

21  McBeath's Motion.   TTC has not sat on its laurels in this case; rather, various efforts by

22  McBeath and her shadow counsel have shielded from discovery critical evidence needed to

23  substantiate TTC's Counterclaims and establish the full extent of its damages.   TTC's

24  breach of contract, breach of fiduciary duties, trade secret, and secondary liability claims

25  are predicated on McBeath's unauthorized disclosure of TTC's information to third-parties,

26  including Chavez, Gavron, and Marquez, as well as McBeath's insistence that her son

27  remove information from TTC's systems shortly after her employment terminated.   See

28  SOF Ex. A, S. Martin Decl. at ¶¶ 19-23; see also TTC Countercl. at ¶¶ 28 – 43.

00319716.1

The most abusive piece of gamesmanship employed to evade TTC's discovery is the subject of McBeath's pending Motion for a Protective Order (Doc. No. 39) and TTC's Opposition (Doc. No. 48), wherein McBeath seeks to shield her friends Marquez and Gavron from TTC's discovery.  As more fully briefed in TTC's Opposition, which TTC incorporates herein by reference, McBeath communicated and shared TTC's Confidential Information with both individuals during her employment.  Upon TTC's discovery of their ongoing involvement in McBeath's litigation efforts, McBeath manufactured an argument that these two are "consulting experts" relieved of any obligation to produce the trove of knowledge and documents McBeath shared with them about TTC's business, Confidential Information, and trade secrets.  See, e.g., TTC's Opp., Doc. No. 48.

Despite the known participation of Gavron and Marquez in McBeath's shadow legal team, both have deliberately evaded TTC's discovery attempts.  Marquez–a purported California resident despite being the named owner of a residence in Sahuarita–has completely avoided numerous efforts from TTC to serve a subpoena and, though a process server perfected service upon him, he has disregarded his obligations to respond.  See SOF at ¶ 43.  In a similar vein, Gavron evaded service until the Superior Court intervened.  See, SOF, at ¶ 44.  Gavron's ultimate subpoena production conveniently omitted dozens of e-mails he exchanged with McBeath during the course of her employment, not to mention the e-mails he has exchanged with McBeath following her employment termination and preceding her lawsuit.  See SOF Ex. A, S. Martin Decl. at ¶ 20.

Due to limitations in the Arizona Rules of Procedure not existing in the Federal Rules of Civil Procedure, TTC could not take non-party depositions absent McBeath's consent or leave of Court.  McBeath refused to consent to the depositions of Gavron, Chavez, and her son Maximillian Ivankovich ("Ivankovich").  See SOF at ¶ 45.  Ivankovich–a former employee of TTC–admitted accessing TTC's protected computer network to aid McBeath's legal pursuits and was seen printing documents on closed-circuit surveillance.  See SOF Ex. A, S. Martin Decl. at ¶ 21.  TTC's request for leave to take these depositions was pending when McBeath filed her Second Amended Complaint in this Court.

1    Because similar restrictions do not apply in federal court, TTC will move forward

2    with these individuals' depositions shortly and expects to discover the trove of information

3    McBeath provided to Gavron and Marquez related to TTC's business, its Confidential

4    Information, and its trade secrets utilized to pursue this lawsuit or any other joint-venture

5    between them.  See SOF Ex. A, S. Martin Decl. at ¶¶ 20-23.  Equally important, TTC

6    expects Ivankovich will identify the full extent of documents removed from TTC, including

7    information about its processes, recipes, and business practices that will substantiate TTC's

8    AUTSA claim.  See id.  Until TTC can depose critical witnesses and discover the full scope

9    of Confidential Information and trade secrets shared with third-parties, this Court should

10   defer ruling on McBeath's premature Motion.

11   **V.    TTC IS ENTITLED TO STATUTORY ATTORNEYS' FEES, BUT**
            **MCBEATH IS NOT**
12

13   Because TTC is entitled to partial summary judgment on its breach of contract and

14   fiduciary obligations claims, it is also entitled to recover its fees under Ariz. Rev. Stat. §

15   12-341.01(A).  McBeath, on the other hand, is not entitled to attorneys' fees even if she

16   were to prevail.  "In Arizona, it is the rule that parties who represent themselves in a legal

17   action are not entitled to recover attorney fees."  Munger Chadwick, P.L.C. v. Farwest Dev.

18   & Const. of the Sw., LLC, 235 Ariz. 125, 126, 329 P.3d 229, 230 (Ct. App. 2014).

19   Assuming, as McBeath does, that the law does not apply to her, she cannot

20   substantiate the request for attorneys' fees in the Motion.  As Marquez's impending

21   deposition will unquestionably reveal, the attorney previously representing McBeath *in*

22   *Superior Court*, Ruchit Agrawal ("Agrawal"), was a mere straw person, unwittingly

23   affixing his signature to Marquez's work.  Apart from her conclusory statement, McBeath

24   cannot prove Agrawal contributed anything but a signature to her Superior Court motion or

25   that she had a genuine financial obligation to pay Agrawal's fees.  See Lisa v. Strom, 183

26   Ariz. 415, 419, 904 P.2d 1239, 1243 (Ct. App. 1995) (in order to be reimbursed for

27   attorney's fees, a party must have (1) an attorney-client relationship with counsel, and (2) a

28   genuine financial obligation to pay fees and expenses to such counsel).  Furthermore,

00319716.1

1   Marquez's fees are not recoverable because he is not engaged in the authorized practice of

2   law in Arizona.  McBeath cannot establish the fundamental element of an attorney-client

3   relationship to recover Marquez's fees or contributions to the Motion under § 12-341.01(A).

4   See id.

5       Similarly, McBeath utterly failed to substantiate her claim TTC brought its trade

6   secret claim in bad faith.  Again ignoring the very authority cited in her Motion, McBeath

7   proclaims, without more than her belief, that "TTC sued McBeath for misappropriation of

8   trade secrets solely to harass and to intimidate."  Motion at 13:3-4.  As TTC presented in

9   detail, *supra*, its claims are supported by ample factual bases, completely refuting

10  McBeath's misplaced conclusion and any supposed entitlement to attorneys' fees.

11  **VI.   CONCLUSION**

12      For the foregoing reasons, TTC requests that this Court grant TTC's Cross-Motion

13  and find that McBeath breached the Agreement (or particular elements of TTC's breach of

14  contract claim), that McBeath violated her fiduciary obligations (or particular elements of

15  TTC's breach of fiduciary obligations claim), and that McBeath is liable for TTC's damages

16  (including attorneys' fees and costs) arising from her breaches, the full extent of which will

17  be determined at trial or via subsequent filing.

18      TTC further requests that the Court deny the Motion in its entirety.  Finally, as less

19  preferred alternative to the denial of the Motion, TTC requests Rule 56(d) relief in the event

20  the Court believes TTC failed to substantiate any of its claims or damages at this stage of

21  the proceedings.

22      RESPECTFULLY SUBMITTED this 26th day of April, 2017.

23                      FARHANG & MEDCOFF

24

25                      By /s/ Travis L. Tufts
                            Ali J. Farhang
26                          Roberto C. Garcia
                            Travis L. Tufts
27
                        Attorneys for Defendants / Counterplaintiff
28

00319716.1

- 21 -

1

**CERTIFICATE OF SERVICE**

2
            I hereby certify that the foregoing document was filed electronically with the Clerk

3
of the United States District Court for the District of Arizona, with notice of case activity

4
generated and sent electronically this 26th day of April, 2017 to:

5
Melissa Martin McBeath

6
3463 E. Terra Alta Blvd.
Tucson, AZ 85716

7
mel.mcbeath@cox.net

8
/s/ Letitia L. Wright

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

00319716.1