FARHANG & MEDCOFF
4801 E. Broadway Boulevard, Suite 311
Tucson, Arizona 85711
T: 520.790.5433

Ali J. Farhang (#019456)
afarhang@fmazlaw.com

Roberto C. Garcia (#026246)
rgarcia@fmazlaw.com

Travis L. Tufts (#029373)
ttufts@fmazlaw.com

Attorneys for Defendants / Counterplaintiff

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Melissa Martin McBeath, an individual,<br><br>Plaintiff,<br><br>v.<br><br>Tucson Tamale Company, an Arizona corporation; Todd Russell Martin, an individual; Sherry Martin, an individual; and Lisa Martin, an individual,<br><br>Defendants.<br><br>———<br><br>Tucson Tamale Company, an Arizona corporation,<br><br>Counterplaintiff,<br><br>v.<br><br>Melissa Martin McBeath and John/Jane Doe Martin McBeath, husband and wife,<br><br>Counterdefendants. | NO. CV 16-462-TUC-DCB (BPV)<br><br>**COUNTERPLAINTIFF'S CONTROVERTING STATEMENT OF FACTS IN SUPPORT OF ITS OPPOSITION TO COUNTERDEFENDANT'S PARTIAL SUMMARY JUDGMEMT MOTION AND ITS CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Assigned to Judge David C. Bury and Hon. Bernardo P. Velasco |

00319979.1

Defendant/Counterplaintiff Tucson Tamale Company ("TTC"), by and through undersigned counsel, hereby submits the following Controverting Statement of Facts in Support of Its Opposition to Melissa Martin McBeath's ("McBeath") Partial Summary Judgment Motion ("Motion") and Its Cross-Motion for Partial Summary Judgment ("Cross-Motion").

**TTC'S CONTROVERTING STATEMENT OF FACTS**

TTC responds to Plaintiff's Separate Statement of Undisputed Facts in Support of Partial Summary Judgment Motion (Counterclaims – Counts I, II & III) ("PSOF") as follows:

1. TTC objects to this statement of fact as being compound and raising immaterial facts. Specifically, McBeath's purported reasons for sharing TTC's confidential information are irrelevant in determining she breached her Confidentiality Agreement ("Agreement"). Without waiving objection, TTC admits it can point to McBeath's e-mails as evidence of her unauthorized disclosure of confidential information to Ehud Gavron and Ernesto Chavez. Defendants deny remainder of PSOF #1. Neither TTC, nor its principals, gave Plaintiff permission to contact these individuals on their behalf. See Statement of Facts ("SOF"), *infra*, at ¶¶ 25, 29.

2. TTC objects to this statement of fact as being compound, raising immaterial facts, and because the facts have not been adequately developed at this stage of discovery. Specifically, whether McBeath accessed another's e-mail account, hacked, or copied e-mails is not material to TTC's breach of contract or breach of fiduciary duties claims. See generally id. ¶¶ 12-38. As discussed more fully in TTC's Opposition and Cross-Motion, TTC has not had an adequate opportunity to develop discovery sufficient to enable them to admit or deny the breadth of McBeath's misconduct. Without waiving objections, TTC denies it did not provide training or education to its employees or that it otherwise failed to take reasonable measures to protect its confidential and proprietary data. See id. at ¶¶ 35-39; (see also J. Cooper Decl., Doc. No. 52-3, at ¶ 12.). TTC denies the remaining statements

00319979.1

1   are material, but are without information to admit or deny at this stage of discovery, and
2   therefore deny the remaining allegations.

3       3.    TTC denies this statement. Ivankovich admitted to TTC staff that he acted
4   on behalf of his mother's interest when he accessed, among other things, TTC's payroll
5   data, business operations information, and data and sales history. See Ex. A, Decl. S. Martin
6   at ¶ 21.

7       4.    TTC objects to this statement as being compound and because the facts have
8   not been adequately developed at this stage of discovery. As discussed more fully in TTC's
9   Opposition and Cross-Motion, TTC has not had an adequate opportunity to develop
10  discovery sufficient to enable them to admit or deny the breadth of Ivankovich's
11  misconduct. Without waiving objection, TTC admits it produced video clips of Ivankovich
12  printing documents and that the video itself does not reveal the contents of the documents.
13  TTC denies it has not produced evidence of what Ivankovich accessed, either on the date of
14  the video or otherwise. See id. TTC is without knowledge at this stage of discovery to
15  admit or deny the remaining statements related to information accessed by Ivankovich, nor
16  has McBeath produced any evidence to enable TTC to make the admission, and therefore
17  TTC denies the remaining statements.

18      5.    TTC denies this statement. See SOF ¶ 35 – 39.
19      6.    TTC denies these statements. See id.
20      7.    TTC denies this statement. See id.

21      8.    TTC objects to this statement because it misstates the issue, is misleading,
22  and because the facts have not been adequately developed at this stage of discovery.
23  McBeath relies on TTC's Superior Court disclosure statement and an estimate of damages
24  provided during early stages of discovery. TTC's damage claims are not limited to the lost
25  profits. See, e.g., id. at ¶¶ 17-19. Further, as discussed more fully in TTC's Opposition and
26  Cross-Motion, TTC has not had an adequate opportunity to develop discovery sufficient to
27  enable them to identify the full scope of confidential and proprietary information
28  misappropriated by McBeath to enable it to completely identify its damages. Without

00319979.1

1  waiving objection, Defendants are without knowledge at this stage of discovery to admit or deny the full extent of damages incurred, including attorneys' fees, resulting from McBeath's misconduct, nor has McBeath fully produced evidence to enable TTC to make the admission, and therefore TTC denies this statement.

9.  TTC objects to this statement because it raises immaterial facts and because the facts have not been adequately developed at this stage of discovery.  TTC's success despite McBeath's misconduct is not relevant in determining whether she breached her Agreement, fiduciary obligations, or violated the Arizona Uniform Trade Secrets Act, nor does it establish an absence of damages.  Without waiving objection, TTC admits Tucson Weekly awarded TTC the "Best Tamales" in town recognition in 2015 and 2016.  TTC without knowledge at this stage of discovery to admit or deny the full extent of damages incurred, including attorneys' fees, resulting from McBeath's misconduct, and therefore denies the remaining statements.  See id. at ¶¶ 17-19.

10.  TTC objects to this statement because it raises immaterial facts.  McBeath's performance reviews are not relevant in determining whether she breached her Agreement, fiduciary obligations, or violated the Arizona Uniform Trade Secrets Act, nor does it establish an absence of damages.  Without waiving objection, TTC admits Plaintiff received performance reviews but deny such reviews were positive or relevant, as reflected by, among other things, the undisputed fact TTC terminated her employment.  (See TTC Answer to Am. Compl. at ¶¶ 39; see also TTC Countercl. at ¶ 34.)

11.  TTC denies this statement.  See, e.g., SOF at ¶¶ 20-33.

**SEPARATE STATEMENT OF FACTS ("SOF")**

Defendants submit the following Separate Statement of Facts in support of its Cross-Motion:

12.  In the course and scope of her employment as Area Manager, McBeath had access to TTC's confidential and proprietary data.  See Ex. A, Decl. S. Martin at ¶¶ 3-6; see also Ex. B, Decl. T. Martin at ¶¶ 3-4; Ex. C, Decl. L. Martin at ¶¶ 3-4.

00319979.1

13. On or about March 19, 2015, in consideration for her employment at TTC, McBeath executed a Confidentiality Agreement (the "Agreement"). See Ex. A at ¶¶ 3-6; see also Ex. B at ¶¶ 3-4; Ex. C at ¶¶ 3-4; Ex. D, Confidentiality Agreement; see also Ex. E, M. McBeath Dep. Tr.[1] at p. 233-234.

14. Therein, McBeath acknowledged TTC may disclose or give her confidential information during her employment and further agreed, among other things, that "the confidential information includes [TTC's] trade secrets, *sales and profit figures*, customer lists, relationships with contractors, customers, or suppliers, and opportunities for new or developing business" (the "Confidential Information"). See Ex. D; see also Ex. E.

15. McBeath agreed "[she] will not use or disclose to any other person or entity any confidential information or materials (either written or unwritten) *except when I am required to do so as required by law*." Further, "[she] will not, except in performing [her] duties, remove or copy any confidential information or materials or assist anyone in doing so *without [TTC]'s written permission*." See Ex. D; see also Ex. E.

16. McBeath admitted she entered the Agreement before she was hired, that her signature appears on the Agreement, that she signed it without duress, and that the Agreement was reasonable and necessary. See, e.g., Ex. E.

17. After TTC terminated McBeath's employment, Defendants Todd Russell Martin, Sherry Martin, and Lisa Martin (collectively, the "Martins") engaged in an exhaustive review of McBeath's TTC e-mail account to determine whether McBeath shared TTC's Confidential Information without permission. See Ex. A at ¶¶ 7-8; see also Ex. B at ¶¶ 5-6; Ex. C at ¶¶ 5-6.

18. Collectively, the Martins spent at least 55 hours reviewing tens-of-thousands of communications in McBeath's e-mail account, then, armed with the results of their investigation, the Martins spent additional time and money on behalf of TTC to identify its legal rights and remedies. See Ex. A at ¶¶ 7-8; see also Ex. B at ¶¶ 5-6; Ex. C at ¶¶ 5-6.

---

[1] McBeath's deposition transcript is hereinafter cited as "Dep. Tr."

1  19. The investigation was outside what the Martins do as a matter of course and
2  diverted them from other matters including the proper running of their business. See Ex. A
3  at ¶¶ 7-8; see also Ex. B at ¶¶ 5-6; Ex. C at ¶¶ 5-6.

4  20. Between December 9, 2015 and January 9, 2016, McBeath shared TTC's
5  sales and profits figures with Chavez on at least three separate occasions. See Ex. A ¶¶ 9-
6  11; see also Ex. F, Chavez E-mail and Attach., December 9, 2015; Ex. G, Chavez E-mail
7  and Screenshot, December 10, 2015 (redacted); Ex. H, Chavez E-mail and Revel
8  Dashboard, January 14, 2016 (redacted); Ex. I, Dep. Tr. at 242:3-22, 252:20 – 253:10;
9  256:14-20.

10  21. Specifically, McBeath shared TTC's Sales Summaries from its Tanque Verde
11  restaurant and an Operations Report related to TTC's Broadway restaurant. See Ex. A ¶¶
12  9-11; see also Ex. F, G, H, & I.

13  22. In the course of the Martins' review, they also identified e-mails between
14  McBeath and Ehud Gavron ("Gavron") wherein McBeath *again* shared TTC's Confidential
15  Information. See Ex. A at ¶ 12.

16  23. McBeath e-mailed Gavron asking him to access TTC's Revel Point of Sale
17  system ("Revel") – a system utilized to aggregate, compile, and track TTC's sales, profits,
18  and operations data. See id. at ¶ 10-12; see also Ex. J, Gavron E-mail, Oct. 21, 2015; Ex.
19  K, Dep. Tr. at 250:13-20.

20  24. Gavron needed McBeath's TTC username and password to access Revel,
21  which she provided. See Ex. A at ¶ 12.

22  25. TTC never authorized Gavron's access to Revel and to this date is unaware
23  of what he accessed or what were his true ends in accessing a system with sensitive
24  Confidential Information. See Ex. A at ¶ 12; see also Ex. B at ¶ 7; Ex. C at ¶ 7.

25  26. Over the course of her employment, McBeath shared hundreds of e-mails
26  with Gavron including, among other things, internal practices and policies like TTC and its
27  owners' financial obligations, implementation of TTC's processes in Revel, and intimate
28  details involving employee misconduct and corrective action, none of which should have

00319979.1

1  been discussed outside the workplace, as provided by TTC's workplace policies.  See Ex.
2  A. at ¶ 13; see also Ex. L, McBeath E-mail, Aug. 30, 2015 (financial obligations) (redacted);
3  Ex. M, McBeath E-mail, December 4, 2015 (implementation of Revel processes); Ex. N,
4  McBeath E-mail, Aug. 26, 2015 (employee misconduct and corrective action); Ex. O, Defs'
5  Supp. Discl. Stmnt. at 11:11-12 (e-mails to/from Gavron).

27.   McBeath agrees Chavez and Gavron are third-parties, unaffiliated with TTC. See Ex. P, Dep. Tr. at 237:1-5; 263:25 – 264:2.

28.   McBeath agrees the Sales Summaries and Operations Report contain TTC's sales and profits data.  See Ex. Q, Dep. Tr. at 241:25 – 242:15; see also Ex. I. Unambiguously, she knew this information was confidential.  See Ex. Q at 257:13-21.

29.   Neither TTC nor the named Defendants authorized McBeath's disclosure of this information to Chavez or Gavron, either orally or in writing.  See Ex. A at ¶¶ 9-14; Ex. B at ¶ 7; Ex. C at ¶ 7.

30.   Because they do not exist, McBeath is not aware of any writing memorializing permission for her to disclose Confidential Information shared to Chavez or Gavron.  See, e.g., Ex. R, Dep. Tr. at 244:5-19; 246:14 – 247:9; 253:24 – 254:1; see also Ex. P at 263:25 – 264:2.

31.   The two communications alluding to her communications with Chavez, omits any reference to Chavez or the breadth of information McBeath shared with him.  See Ex. S, M. McBeath E-mail, Dec. 9, 2015; see Ex. T, M. McBeath E-mail, Jan. 14, 2016.

32.   The Martins were not contemporaneously aware of the scope of Confidential Information shared with Chavez based on McBeath's communication nor did they ratify McBeath's conduct.  See Ex. A at ¶ 14-15; see also Ex. B at ¶ 7; Ex. C at ¶ 7.

33.   McBeath was not required by law to share the Confidential Information with Chavez or Gavron.  See Ex. U, Dep. Tr. at 244:5-7.

34.   McBeath agrees that Marquez serves as her counsel in this matter.  See Ex. V, Dep. Tr. at 136 – 141; see also Ex. W, M. McBeath Litigation Hold Letter ("I have retained advisory counsel"); Ex. X, E. Gavron E-mail, June 27, 2016 (copying Marquez).

00319979.1

35. All employees, including McBeath, are subject to TTC's workplace policies and procedures. Among those policies is a Zero Tolerance Policy related to Proprietary and Confidential Information (the "Policy"). See Ex. A at ¶ 16; see also Ex. B at ¶ 8; Ex. C. at ¶ 8; Ex. Y, Employee Handbook, at TTC 000072.

36. The Policy expressly prohibits disclosure of TTC's proprietary processes and recipes and warns of potential legal action if found in violation of the Policy. See Ex. Y.

37. TTC reasonably restricts access to Confidential Information with usernames, passcodes, and permission-based file access. Indeed, the permission-based files include TTC's accounting records. See Ex. A at ¶ 17; Ex. B at ¶ 9; (see also J. Cooper Decl., Doc. No. 52-3, at ¶¶ 9, 15.)

38. Access to TTC's overall sales and profits figures are restricted to executive management. Certain data, like payroll information, is even restricted from certain higher-level management, like McBeath. See Ex. A at ¶ 17; Ex. B at ¶ 9; Ex. Z, M. McBeath Dep. Tr. at 164:11-18 (regarding payroll information); (see also J. Cooper Decl., Doc. No. 52-3, at ¶¶ 9, 15.)

39. TTC commonly binds employees with access to TTC's Confidential Information to confidentiality agreements similar to the Agreement. See Ex. A at ¶¶ 6, 17; Ex. B at ¶ 9; (see also J. Cooper Decl., Doc. No. 52-3, at ¶¶ 9, 15.)

40. McBeath, under oath, denied TTC terminated her employment because she asked TTC to pay her a bonus. See Ex. AA, Dep. Tr. at 124:18-24; 126:1-4.

41. McBeath cannot identify written permission to disclose Confidential Information despite full knowledge of the communications she had with TTC representatives and ample opportunities to inspect TTC's email production. See Ex. BB, TTC's Resp. Request Production and TTC's Supp. Resp. Request Production.

42. McBeath argues her interpretation of the Agreement, which she admits is not consistent with its plain text, authorized her to disclose TTC's Confidential Information to Chavez because he is a CPA and is "also bound by confidentiality." See Ex. CC, Dep. Tr. at 243:14-18; 244:13-21; 242:16-21.

00319979.1

43. Marquez has avoided TTC's numerous efforts to serve a subpoena upon him and, though a process server perfected service upon him, he has disregarded his obligations to respond. See Ex. DD, Marquez Subpoena Service Attempts and Marquez Proof of Service.

44. Gavron evaded service until the Superior Court intervened. See Ex. EE, Order Granting Mot. Alternative Service and Gavron Proof of Service.

45. McBeath refused to consent to the depositions of Gavron, Chavez, and her son Maximillian Ivankovich ("Ivankovich"), which precluded TTC from taking their depositions under the Arizona Rules of Civil Procedure absent court intervention. See Ex. FF, T. Tufts E-mail dated Feb. 3, 2017 and M. McBeath Objection dated Feb. 7, 2017.

46. TTC did not enter any agreement with Ernesto Chavez regarding the confidentiality of communications of TTC representatives with him. See Ex. GG, Dep. Tr. at 253:21-23.

DATED this 26th day of April, 2017.

FARHANG & MEDCOFF

By /s/ Travis L. Tufts
   Ali J. Farhang
   Roberto C. Garcia
   Travis L. Tufts

Attorneys for Defendants / Counterplaintiff

00319979.1

# **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed electronically with the Clerk of the United States District Court for the District of Arizona, with notice of case activity generated and sent electronically this 26th day of April, 2017 to:

Melissa Martin McBeath
3463 E. Terra Alta Blvd.
Tucson, Arizona 85716
mel.mcbeath@cox.net

/s/ Letitia Wright

00319979.1