# Exhibit A

## DECLARATION OF SHERRY MARTIN

**SHERRY MARTIN** declares as follows:

1. I am at least 18 years old, am competent to make this Declaration, and have personal knowledge of the facts asserted below.

2. I am an owner and Director of Tucson Tamale Company ("TTC"), am authorized to act on behalf of TTC, and am authorized to make decisions on TTC's behalf.

3. Between April 20, 2015 and February 22, 2016, TTC employed Melissa Martin McBeath ("McBeath") as its restaurant Area Manager. During the course of her employment, McBeath was responsible for, among other things, managing and overseeing the operations of TTC's three local restaurants.

4. In connection with the duties and responsibilities of Area Manager, McBeath had access to TTC's confidential and proprietary data. In consideration for her employment, TTC and McBeath entered into that certain Confidentiality Agreement ("Agreement").

5. I am a witness qualified to attest to the records of TTC and am authorized to certify the records. I have diligently and thoroughly searched all TTC records, and all records known to exist related to the Agreement. A true and accurate copy of the Agreement is attached to TTC's Controverting Statement of Facts in Support of Its Opposition to Counterdefendant Melissa Martin McBeath's Partial Summary Judgment Motion and Its Cross-Motion for Summary Judgment ("SOF") as Exhibit D. In addition to maintaining TTC's records, I also have personal knowledge that Exhibit D is a true copy of the Agreement signed by McBeath. I presented the Agreement to McBeath to sign and she returned it to me upon execution.

6. McBeath's Agreement was kept in the normal course of TTC's business. TTC customarily requires its executive management and general managers with access to TTC's confidential information to execute a confidentiality agreements similar to the Agreement. Among other things, the confidentiality agreements are executed in the normal course of TTC's business to supplement TTC's Zero Tolerance Policy regarding Proprietary and Confidential Information, discussed *infra*, and to protect from unauthorized disclosure TTC's confidential information including, but not limited to, its recipes, business processes and operations, and sales data. TTC stores copies of all such confidentiality agreements in its regularly maintained business records at or near the time of the execution. Shortly after McBeath executed her Agreement on March 19, 2015, I stored the Agreement with these records and attest Exhibit D attached to the SOF is an accurate copy from TTC's business records.

7. After McBeath's employment with TTC was terminated, I personally conducted a review of McBeath's TTC email account, mel@tucsontamalecompany.com, to determine if McBeath shared, without authorization, TTC's confidential or proprietary information during her employment with TTC.  McBeath's e-mail account contains tens-of-thousands of e-mails sent and received during the course of nearly one year of employment.

8. I spent approximately 30 hours reviewing McBeath's email account to determine the scope of confidential and proprietary information[1] McBeath disclosed during the course of her employment.  After reviewing McBeath's e-mail account and discovering her communications with certain third-parties, Todd Martin and I consulted and paid attorneys, on behalf of TTC, to identify TTC's legal rights and remedies.  The entire investigation was outside of my day-to-day responsibilities, which include running the day-to-day operations of three restaurants and a wholesale tamale production facility, business planning and long-term development, and expanding TTC's business opportunities nationwide.

9. On December 9, 2015, without my consent or knowledge, McBeath sent an email to Ernesto Chavez ("Chavez") attaching TTC's Sales Summary for its Tanque Verde restaurant.  A true and accurate copy of the email with attachment, redacted to preserve confidentiality[2], are attached to TTC's SOF as Exhibit F.  I am familiar with the Sales Summary contains and attest that it is an accurate reflection of sales and profits figures from TTC's Tanque Verde establishment from December 8, 2015 to December 9, 2015.

10. On December 10, 2015, without my consent or knowledge, McBeath sent an email to Chavez with a screenshot of TTC sales and profits figures.  A true and accurate copy of the email and screenshot, redacted to preserve confidentiality, are attached to TTC's SOF as Exhibit G. The screenshot contains sales and profits data including gross and net sales, discounts, cash and payments received. Based on my experience with Revel Point of Sale System ("Revel") utilized by TTC to store its profits, sales information, and internal operations data, among other things, I know that these sales and profits figures are compiled and stored on Revel and access to this information is restricted by username and password.  McBeath had to utilize her username and password to access the data.

---

[1] This information includes, but is not limited to, TTC's recipes, internal business processes, operations, sales and profits data, customer lists, relationships with contractors, customers, or suppliers, and opportunities for new or developing business.

[2] TTC has disclosed, and McBeath is in possession, of the unredacted copies of the communications and information discussed in Paragraphs 9-12. TTC produced unredacted copies pursuant to and subject to the Pima County Superior Court, Case No. 20161794, Protective Order entered December 8, 2016.

11. On January 14, 2016, without my consent or knowledge, McBeath sent an email to Chavez and attached a copy of TTC's Revel Dashboard. A copy of the email and screenshot, redacted to preserve confidentiality, are attached to TTC's SOF as Exhibit H. The attachment sent to Chavez contains operational data from TTC's Broadway restaurant including sales and profits figures including gross and net sales, discounts, cash and payments received. Based on my experience with Revel, I know that these sales and profits figures are compiled and stored on Revel and access to this information is restricted by username and password. McBeath had to utilize her username and password to access the data.

12. On October 21, 2015, without my consent or knowledge, McBeath sent an email to Gavron regarding TTC's Revel system. McBeath e-mailed Gavron to inquire about TTC's Uniform Resource Locator ("URL") for Revel, apparently related to an invoice ticket processed at TTC's restaurants. I believe Gavron would need access to Revel in order to respond to McBeath's request and believe that, by asking Gavron this question, Gavron had probably accessed Revel previously using McBeath's credentials. Gavron did not have my permission or TTC's permission, orally or in writing, to access Revel nor do I know what his true motivation was in accessing Revel. A true and accurate copy of the email and screenshot are attached to TTC's SOF as Exhibit J.

13. Over the course of her employment, McBeath sent several dozen e-mails to Gavron from her TTC address. She shared with Gavron, among other things, private details regarding TTC and its owners' financial obligations, implementation of TTC's processes in Revel, and intimate details involving employee misconduct and/or corrective decisions. A true and accurate copy of the referenced e-mails are attached to TTC's SOF as Exhibits L, M, and N, and the disclosure statement attaching disclosing hundreds of e-mails McBeath sent and received from Gavron is attached as Exhibit O.

14. I do not know Gavron or Chavez personally or professionally. Neither of them are affiliated with TTC. I never authorized McBeath to contact Gavron or Chavez on TTC's behalf and never authorized McBeath to share TTC's confidential and proprietary information with them. Such disclosures by McBeath were unprofessional and inappropriate.

15. McBeath alluded to speaking with an accountant in e-mail correspondence, attached to TTC SOF as Exhibit S and T. I was not aware of the identity of the accountant she spoke with or the scope of information shared with him until I discovered McBeath's communications with Chavez in the course of TTC's investigation. I would not have authorized McBeath to share TTC's sales and profits data with Chavez.

16. All employees, including McBeath, are subject to TTC's workplace policies and procedures. Among those policies is a Zero Tolerance Policy related to Proprietary and Confidential Information (the "Policy"). The Policy expressly prohibits disclosure of TTC's proprietary processes and recipes and warns of potential legal action if found in violation of the Policy. A true and accurate copy of the Policy is attached to TTC's SOF as Exhibit Y.

17. TTC restricts access to its confidential information with usernames, passcodes, and permission-based file access. The permission-based files include TTC's accounting records. Further, access to TTC's overall sales and profits figures are restricted to executive management. Certain data, like payroll information, is even restricted from certain upper-level management, like McBeath. Finally, TTC commonly binds employees with access to TTC's confidential information to confidentiality agreements. I firmly believe the measures TTC takes to protect its confidential and proprietary information are reasonable and appropriate under the circumstances.

18. TTC's breach of contract, breach of fiduciary duties, trade secret, and secondary liability claims are predicated on McBeath's unauthorized disclosure of TTC's information to third parties, including Chavez, Gavron, and Francisco X. Marquez ("Marquez") – a disbarred attorney who McBeath consulted with during her employment with TTC based on uncovered e-mails and a known individual assisting McBeath in her legal claims against TTC – as well as McBeath's insistence her son remove information from TTC's systems shortly after her employment terminated.

19. Because of the nature of the communications exchanged between McBeath, Gavron, and Chavez (*supra* at ¶¶ 9-13), as well as the conduct of McBeath's son, Maximillian Ivankovich ("Ivankovich") and the known involvement of Marquez while McBeath was employed at TTC, I believe McBeath, Gavron, Chavez, Ivankovich, and Marquez have possession of TTC's confidential and proprietary information.

20. Based on McBeath's communications with Gavron and my review of the documents he produced responsive to a subpoena, I believe the full extent of Gavron's knowledge regarding TTC's confidential and proprietary information has not been fully developed. Gavron did not produce e-mails he exchanged with McBeath during the course of her employment or any e-mails preceding the filing of her lawsuit. I know that McBeath communicated with Gavron during the course of her employment about TTC's Revel system, yet Gavron produced no information related to his knowledge of TTC's Revel system. I also know that Gavron has been communicating with McBeath in support her litigation efforts against TTC. Gavron inadvertently e-mailed McBeath's former TTC e-mail address, copying Marquez on the communication. Therein, Gavron indicated he maintains a spreadsheet with

relevant discovery deadlines and provides interpretations of procedural rules. It is also my understanding that Gavron has withheld documents based on an argument he is a privileged consulting expert in this case. Because McBeath shared TTC's confidential information related to Revel, because he did not produce any evidence disclosing the confidential information obtained from McBeath, and because he appears to be evading full discovery utilizing a privilege argument, TTC has not been able to develop the scope of confidential and proprietary disclosures made to Gavron. I believe that further discovery from Gavron will identify the extent of confidential and proprietary information McBeath shared, without authorization, during the course of her employment as well as the confidential and proprietary information shared with Gavron to enable him to assist her in this lawsuit.

21. I believe additional discovery from Ivankovich will identify the scope of confidential and proprietary information he removed from TTC to aid McBeath's lawsuit. Between February 22, 2016 and March 17, 2016, Ivankovich was seen on closed-circuit surveillance utilizing TTC's computer networks to access, copy, print, and remove TTC's Confidential Information. He immediately took the information printed to his car and then returned to work. Later, on March 17, 2016, Ivankovich admitted to a general manager during the course of a workplace investigation that he accessed, among other things, TTC's payroll data, business operations information and data and sales history. Ivankovich stated he was prepared to access, copy, print, and remove additional confidential and proprietary information to help McBeath pursue a lawsuit against TTC. I am informed and believe that the full extent of information accessed by Ivankovich has not been fully disclosed in this lawsuit and that TTC has not been able to take his deposition because McBeath refused to consent to Ivankovich's deposition. I believe that further discovery from Ivankovich will identify the extent of confidential and proprietary information McBeath asked him to remove from TTC, both orally and in writing, including TTC's processes and proprietary information that could help her in her lawsuit.

22. I believe additional discovery from Marquez will identify the scope of confidential and proprietary data McBeath provided to him during her employment and to aid McBeath's lawsuit. McBeath used her TTC e-mail account to contact Marquez during her employment, ostensibly about matters related to TTC. McBeath was not authorized to contact Marquez on behalf of TTC or to resolve TTC issues based upon his advice. I believe McBeath shared with Marquez information about TTC's internal practices based on subsequent communications with McBeath about potential legal issues. Shortly after filing her lawsuit, I learned that Marquez, together with Gavron, are assisting McBeath in the pursuit of her lawsuit. I am informed and believe that the full extent of information shared with Marquez has not been fully disclosed in this lawsuit and that TTC has not been able to reach Marquez with their discovery or disclosure efforts. I believe that further discovery

with Marquez information about TTC's internal practices based on subsequent communications with McBeath about potential legal issues. Shortly after filing her lawsuit, I learned that Marquez, together with Gavron, are assisting McBeath in the pursuit of her lawsuit. I am informed and believe that the full extent of information shared with Marquez has not been fully disclosed in this lawsuit and that TTC has not been able to reach Marquez with their discovery or disclosure efforts. I believe that further discovery from Marquez will reveal his communications with McBeath related to TTC, the extent of confidential and proprietary information McBeath shared with him without authorization, and the scope of information McBeath provided to Marquez to enable him with her pursuit of legal claims against TTC.

23. I believe additional discovery from Chavez will identify the scope of confidential and proprietary information he removed from TTC to aid McBeath's lawsuit. To my knowledge, Chavez was subpoenaed but did not produce any of the prior communications he exchanged with McBeath containing TTC's confidential information. It is also my understanding that Chavez has not been required to sit for a deposition yet. I believe that further discovery from Chavez will reveal the full extent of confidential and proprietary information McBeath provided to him during the course of her employment with TTC including the information outlined in paragraphs 9-11, above.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS MADE IN THIS DECLARATION ARE TRUE AND CORRECT.**

Sherry Martin

Date: 4·26·17

# Exhibit B

## DECLARATION OF TODD RUSSELL MARTIN

**TODD RUSSELL MARTIN** declares as follows:

1. I am at least 18 years old, am competent to make this Declaration, and have personal knowledge of the facts asserted below.

2. I am an owner and Director of Tucson Tamale Company ("TTC"), am authorized to act on behalf of TTC, and am authorized to make decisions on TTC's behalf.

3. Between April 20, 2015 and February 22, 2016, TTC employed Melissa Martin McBeath ("McBeath") as its restaurant Area Manager. During the course of her employment, McBeath was responsible for, among other things, managing and overseeing the operations of TTC's three local restaurants.

4. In connection with the duties and responsibilities of Area Manager, McBeath had access to TTC's confidential and proprietary data. In consideration for her employment, TTC and McBeath entered into that certain Confidentiality Agreement ("Agreement").

5. After TTC terminated McBeath's employment, I personally conducted a review of McBeath's TTC email account, mel@tucsontamalecompany.com, to determine if McBeath shared, without authorization, TTC's confidential or proprietary information during her employment with TTC. McBeath's e-mail account contains tens-of-thousands of e-mails sent and received during the course of nearly one year of employment.

6. I spent approximately 15 hours reviewing McBeath's email account to determine the scope of confidential and proprietary information McBeath disclosed during the course of her employment. After reviewing McBeath's e-mail account and discovering her communications with certain third-parties, Sherry Martin and I consulted and paid attorneys, on behalf of TTC, to identify TTC's legal rights and remedies. The entire investigation was outside of my day-to-day responsibilities, which include running the day-to-day operations of three restaurants and a wholesale tamale production facility, business planning and long-term development, and expanding TTC's business opportunities nationwide.

7. Review of McBeath's e-mail account revealed she shared TTC's confidential information with Ehud Gavron ("Gavron") and Ernesto Chavez ("Chavez"), including TTC's profits and sales information as well as internal operations data stored on its Revel POS system. I do not know Gavron or Chavez and never authorized McBeath, orally or in writing, to contact them on TTC's behalf or to

share her Revel credentials with either. McBeath never informed me that she shared TTC's confidential information with either individual.

8. All employees, including McBeath, are subject to TTC's workplace policies and procedures. Among those policies is a Zero Tolerance Policy related to Proprietary and Confidential Information (the "Policy"). The Policy expressly prohibits disclosure of TTC's proprietary processes and recipes and warns of potential legal action if found in violation of the Policy.

9. TTC restricts access to its confidential information with usernames, passcodes, and permission-based file access. The permission-based files include TTC's accounting records. Further, access to TTC's overall sales and profits figures are restricted to executive management. Certain data, like payroll information, is even restricted from certain upper-level management, like McBeath. Finally, TTC commonly binds employees with access to TTC's Confidential Information to confidentiality agreements. I firmly believe the measures TTC takes to protect its confidential and proprietary information are reasonable and appropriate under the circumstances.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS MADE IN THIS DECLARATION ARE TRUE AND CORRECT.**

Todd Russell Martin

Date: 4-25-17

# Exhibit C

## DECLARATION OF LISA MARTIN

**LISA MARTIN** declares as follows:

1. I am at least 18 years old, am competent to make this Declaration, and have personal knowledge of the facts asserted below.

2. I am an employee of Tucson Tamale Company ("TTC") and am authorized to make this declaration.

3. Between April 20, 2015 and February 22, 2016, TTC employed Melissa Martin McBeath ("McBeath") as its restaurant Area Manager. During the course of her employment, McBeath was responsible for, among other things, managing and overseeing the operations of TTC's three local restaurants.

4. In connection with the duties and responsibilities of Area Manager, McBeath had access to TTC's confidential and proprietary data. In consideration for her employment, TTC and McBeath entered into that certain Confidentiality Agreement ("Agreement").

5. After TTC terminated McBeath's employment, I personally conducted a review of McBeath's TTC email account, mel@tucsontamalecompany.com, to determine if McBeath shared, without authorization, TTC's confidential or proprietary information during her employment with TTC. McBeath's e-mail account contains tens-of-thousands of e-mails sent and received during the course of nearly one year of employment.

6. I spent approximately 10 hours reviewing McBeath's email account to determine the scope of confidential and proprietary information McBeath disclosed during the course of her employment. The investigation was outside of my day-to-day responsibilities, which include employee relations, marketing and operations development, and leadership development across TTC.

7. Review of McBeath's e-mail account revealed she shared TTC's confidential information with Ehud Gavron ("Gavron") and Ernesto Chavez ("Chavez"), including TTC's profits and sales information as well as internal operations data stored on its Revel POS system. I do not know Gavron or Chavez and never authorized McBeath, orally or in writing, to contact them on TTC's behalf or to share her Revel credentials with either. McBeath never informed me that she shared TTC's confidential information with either individual.

8. All employees, including McBeath, are subject to TTC's workplace policies and procedures. Among those policies is a Zero Tolerance Policy related to Proprietary

and Confidential Information (the "Policy"). The Policy expressly prohibits disclosure of TTC's proprietary processes and recipes and warns of potential legal action if found in violation of the Policy.

9. TTC restricts access to its confidential information with usernames, passcodes, and permission-based file access. The permission-based files include TTC's accounting records. Further, access to TTC's overall sales and profits figures are restricted to executive management. Certain data, like payroll information, is even restricted from certain upper-level management, like McBeath. Finally, TTC commonly binds employees with access to TTC's Confidential Information to confidentiality agreements. I firmly believe the measures TTC takes to protect its confidential and proprietary information are reasonable and appropriate under the circumstances.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS MADE IN THIS DECLARATION ARE TRUE AND CORRECT.**

Lisa Martin

Date: 4/26/17

# Exhibit D

# Confidentiality Agreement

This agreement is between Tucson Tamale Company, an Arizona Corporation and Melissa McBeath .    Melissa McBeath agrees as follows:

## 1. Agreement Not to Disclose Confidential Information

I, Melissa McBeath, acknowledge that Tucson Tamale Company may disclose to me or give me access to confidential information. I agree that the confidential information includes Tucson Tamale company's trade secrets, sales and profit figures, customer lists, relationships with contractors, customers or suppliers, and opportunities for new or developing business. The confidential information may be contained in written materials such as computer hardware and software, disks, documents, files, drawings and product specifications. It may also consist of unwritten knowledge, including ideas, research, processes, practices or know-how. At any point in time, I will not use or disclose to any other person or entity any confidential information or materials (either written or unwritten) except when I am required to do so as required by law.

Information in the public domain, information generally known in the trade and information that I acquire completely independently is not considered to be confidential.

## 2. Return of Confidential Information

At any time, I will not, except in performing my duties, remove or copy any confidential information or materials or assist anyone in doing so without Tucson Tamale Company's written permission. At any time Tucson Tamale Company requests it, I will immediately return all confidential information and materials to Tucson Tamale Company.

## 3. Reasonableness

I acknowledge that the restrictions in this agreement are reasonable and necessary to protect Tucson Tamale Company and its confidential information.

## 4. Entire Agreement

This is the entire agreement between the parties. It replaces any and all oral agreements between the parties, as well as any prior writings.

## 5. Governing Law

This agreement will be governed by and construed in accordance with the laws of the state of Arizona.

Dated: 3|19|15

By: _____

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Melissa Martin McBeath,            )
                                   )
            Plaintiff,             )
                                   ) No.
vs.                                ) 4:16-CV-00462
                                   ) TUC-DCB (BPV)
Tucson Tamale Company,             )
                                   )
            Defendants.            )
_____

VIDEOTAPED DEPOSITION OF:  MELISSA MCBEATH

Tucson, Arizona

March 22, 2017

Patricia Gerson, RMR
Certified Court Reporter #50429
KATHY FINK & ASSOCIATES
COURT REPORTERS
2819 East 22nd Street
Tucson, Arizona  85713
(520) 624-8644

Page 233

1      Q.    And you've been asked to produce any documents

2  that you have regarding your perceived discrimination on

3  the basis of Lindsey Welch's hiring.  You haven't produced

4  any personal notes, memorandums, e-mails to your personal

5  account, e-mail accounts, identifying your perception that

6  you've been discriminated against?

7      A.    No, I've produced everything that I had in my

8  possession.  And, again, I'm still awaiting discovery.

9      Q.    Showing you what we'll mark as Exhibit 21.

10         (Exhibit 21 marked for identification.)

11  BY MR. TUFTS:

12     Q.    Do you recognize this document?

13     A.    Sure.

14     Q.    What is it?

15     A.    Standard confidentiality agreement that I signed

16  before I was hired.

17     Q.    Okay.  You're also aware that Tucson Tamale, in

18  addition to this confidentiality agreement that you

19  signed, has a policy in their employment manual that has

20  a -- that indicates their zero tolerance for sharing

21  confidential information?

22     A.    Sure.

23     Q.    And you don't dispute that it's your signature at

24  the bottom of Exhibit 21?

25     A.    I do not.

1    Q.   And you don't claim that you signed that under

2  duress; do you?

3    A.   No.

4    Q.   In this agreement you agree that the restrictions

5  are reasonable and necessary, in number three; correct?

6    A.   Yes.

7    Q.   You also agree that you will not disclose

8  confidential information given or disclosed to you by

9  Tucson Tamale, in paragraph one?

10   A.   Yes.

11   Q.   And you agree that that confidential information

12 includes company's trade secrets, sales and profits

13 figures, customer lists, relationships with customers,

14 contractors, or suppliers, and opportunities for new or

15 developing business; right?

16   A.   Yes.

17   Q.   I'm going to show you some documents which we

18 labeled as confidential and subject to protective order in

19 the state court, and will take the same position in this

20 court.

21       The documents I'm showing you don't have the

22 label, but --

23   A.   That's okay.

24   Q.   I believe you know what that --

25   A.   Absolutely.

# Exhibit F



Mel McBeath <mel@tucsontamalecompany.com>

## question for your accountant brain
1 message

**Mel McBeath** <mel@tucsontamalecompany.com>                        Wed, Dec 9, 2015 at 12:56 PM
To: echavezcpa@msn.com

I'll call you but you need to be able to see the attachment.

M

Melissa Martin McBeath | *Area Manager*
2545 E Broadway | Tucson, AZ 85716
Tel: (520) 449-9753
Tucson (🌶) Tamale

   

📄  **sales_summary_2015-12-08_00-00_to_2015-12-09_00-00.pdf**
    5K

# Sales Summary

TTC 000054

Exhibit G


## Tucson Tamale
COMPANY

**Mel McBeath <mel@tucsontamalecompany.com>**

---

## (no subject)
1 message

---

**Mel McBeath <mel@tucsontamalecompany.com>**          Thu, Dec 10, 2015 at 11:09 AM
To: Ernesto Chavez <echavezcpa@msn.com>

more - maybe this will make more sense?

Melissa Martin McBeath | *Area Manager*
2545 E Broadway | Tucson, AZ 85716
Tel: (520) 449-9753
Tucson Tamale

   

---


**Screenshot (9).png**
369K

TTC 000055

ard   ×   M Payments Reconciliation   D Screenshot (8) | DocHub   D sales_summary_2015-12

//ttc.revelup.com/reports/operations/#{"show_opened":1,"show_unpaid":1,"show_opened":1,"show_irregular":1,"range_from":"12/08/2015 00:00","ran

# Exhibit H



Tucson Tamale
C O M P A N Y

**Mel McBeath <mel@tucsontamalecompany.com>**

# (no subject)
3 messages

**Mel McBeath <mel@tucsontamalecompany.com>**                    Thu, Jan 14, 2016 at 2:06 PM
To: eachavezcpa@msn.com

If you could print this out and let me know when you have a few minutes to talk I would greatly appreciate it!

Thanks!

Mel

Melissa Martin McBeath | *Area Manager*
2545 E Broadway | Tucson, AZ 85716
   Tel: (520) 449-9753
    Tucson  Tamale

  🐦 f 📷 g+

---

 **Revel Systems Dashboard.pdf**
136K

---

**Mail Delivery Subsystem <mailer-daemon@googlemail.com>**            Thu, Jan 14, 2016 at 2:06 PM
To: mel@tucsontamalecompany.com

Delivery to the following recipient failed permanently:

   eachavezcpa@msn.com

Technical details of permanent failure:
Google tried to deliver your message, but it was rejected by the server for the recipient domain msn.com by
mx1.hotmail.com. [207.46.8.167].

The error that the other server returned was:
550 Requested action not taken: mailbox unavailable

—— Original message ——

DKIM-Signature: v=1; a=rsa-sha256; c=relaxed/relaxed;
        d=tucsontamalecompany-com.20150623.gappssmtp.com; s=20150623;
        h=mime-version:date:message-id:subject:from:to:content-type;
        bh=Amuy4tldbW7Lb9+xUO++nHXyO8SKWbPprOlFbCheqW4=;
        b=GVlQI1CkFso1qCnY6BAgrxz3Oe/saiVLFo3HM0RykTkuxcQvv32qiy5GsW+tmuiPMV
        /bXEqEteH2xt1KwHY8rU1Z2zrS1XOnOuODeD87+XSPDiRtVXvFnJ1SOmMQarwqtlv70E
        BOlHdxy0UWlz7G7kjeM+y12irrAok8F5ZPb3JnuP8leMy++ZfnPd2f02uTgJ6667vSzX
        eE3y1ld4SsRpQxtdPh4B2zHZYUX+LsRz850Kbui4lJfEL0Jsl6LmMlSg3rK1aoWpTiCK
        bnd2q0a4pywEESyziThZluS3aeZ4l47eOMlf53EEMR8cv0nlctT2Ub1sB/iQ3uw/JM2k
        4Vfg==
X-Google-DKIM-Signature: v=1; a=rsa-sha256; c=relaxed/relaxed;
        d=1e100.net; s=20130820;
        h=x-gm-message-state:mime-version:date:message-id:subject:from:to

TTC 000057

:content-type;
bh=Amuy4tIdbW7Lb9+xUO++nHXyO8SKWbPprOIFbCheqW4=;
b=bsZDS7d2gpBVZRA65XYSHAXYYeNL/d9e8obLs56AuAkDnaVM3kE5hkhpDnvewhRZt5
11F/KbTUhxzJPGVh2E+pmN2GK5xIV2m9pjCar23gELHQtL84fjhibXC48saohQWF2xZb
UOWCmX8EggJa9FLgYBTX16/MwtdrHyqCz3LRLg+PVmTeZ3Aj5A6+pamNZW8gRYxCZBzr
faBTqI/8Khp4S/TvEVpKDQUIJ9PGY6p2YT5r9jFokmuxYgeePsstPc/Ztg3CqETO34GU
ezrQydrkBV4ikgtWYp+mibZFnNc3820Er86SeurYwVsKZvHBHVqRktimpJ9Ld1Nl3jNN
JSYA==
X-Gm-Message-State: ALoCoQntH/tdL1kxRQJ6Ugmm+wavl5xCuLJVLrHsgbxUJz+IldOIC29O6NGRe/
gKGGt0vJmZaikXOhd6p6DwGodTlf35bUShog==
MIME-Version: 1.0
X-Received: by 10.140.27.202 with SMTP id 68mr8513583qgx.4.1452805588615; Thu,
 14 Jan 2016 13:06:28 -0800 (PST)
Received: by 10.55.179.194 with HTTP; Thu, 14 Jan 2016 13:06:28 -0800 (PST)
X-Originating-IP: [174.18.33.34]
Date: Thu, 14 Jan 2016 14:06:28 -0700
Message-ID: <CAMs7MjxQ1HMXmXtOOC029oKEBpOJ47_+iA1SFY-7xXYxzECPiA@mail.gmail.com>
Subject:
From: Mel McBeath <mel@tucsontamalecompany.com>
To: eachavezcpa@msn.com
Content-Type: multipart/mixed; boundary=001a11c150200a04ea052951a90c

If you could print this out and let me know when you have a few minutes to
talk I would greatly appreciate it!

Thanks!

Mel


Melissa Martin McBeath *|* *Area Manager*
   2545 E Broadway | Tucson, AZ 85716
          Tel: (520) 449-9753
           <http://www.tucsontamale.com/>
           <https://twitter.com/tucsontamale>
<https://www.facebook.com/TucsonTamaleCompany>
<https://instagram.com/tucsontamale/>
<https://plus.google.com/101126136854573847093>

_____

**Mel McBeath** <mel@tucsontamalecompany.com>                    Thu, Jan 14, 2016 at 2:19 PM
To: Ernesto Chavez <echavezcpa@msn.com>



Melissa Martin McBeath | *Area Manager*
   2545 E Broadway | Tucson, AZ 85716
         Tel: (520) 449-9753
      Tucson (∅) Tamale

   

[Quoted text hidden]

_____

 **Revel Systems Dashboard.pdf**
      136K

TTC 000058

1/14/2016                                     Revel Systems Dashboard

TTC 000059

1/14/2016

Revel Systems Dashboard

# Exhibit I

Page 242

1    front of you but not labeled as exhibits.

2        A.    Perfect.

3        Q.    You sent an e-mail to Ernesto Chavez to review a

4    sales summary; did you not?

5        A.    Yes.

6        Q.    Where you attached TTC 00054 to that e-mail;

7    correct?

8        A.    Yes.

9        Q.    And what's reflected -- well, let me back up.

10            You didn't copy Todd, Sherry, or Lisa Martin on

11   this e-mail that you sent to Ernesto Chavez; did you?

12       A.    No.

13       Q.    And what's reflected in TTC 00054, are sales

14   summary from the Tanque Verde restaurant; correct?

15       A.    Yes.

16       Q.    Okay.  According to the plain language of your

17   confidentiality treatment, isn't this a breach of your

18   confidentiality agreement, by sharing sales and profits

19   data with a non-TTC employee?

20       A.    No.  Because Ernesto is also bound by

21   confidentiality.  And so I, obviously, did not feel it was

22   a breach of my contract.

23       Q.    But the contract doesn't say that you can share

24   TTC's sales and profits with third parties, so long as

25   some accruing privilege arises; does it?

Page 252

1   reversed.

2        Q.   He didn't have to go in and plug in any numbers

3   to figure out why --

4        A.   Oh, no.

5        Q.   -- the voids were resulting in --

6        A.   No.

7        Q.   -- a certain figure --

8        A.   No.

9        Q.   -- versus another?

10       A.   No, no, no.  No, this was enough for us to figure

11  it out.  Well, actually he.  He gave us the key.

12       Q.   Show you what we'll mark as Exhibit 24.

13       A.   Okay.

14       Q.   This is a confidential document.  Let me remove

15  the exhibit label.

16       A.   Oh, sure.

17       Q.   I don't want to admit this yet.

18            What was the last?

19       A.   23.

20       Q.   23.  Okay.  Take a look at what I've handed you

21  as TTC Bates label 55 and 56.

22       A.   Uh-huh.

23       Q.   Okay.  Do you recognize this as an e-mail you

24  sent Ernesto Chavez?

25       A.   Yes.

Page 253

1    Q.   And what you attached to that e-mail is a screen

2    shot of the Revel data; correct?

3    A.   Yes.

4    Q.   Okay.  From that screen shot you can see gross

5    product sales, discounts, payments, cash summaries, things

6    of that nature; correct?

7    A.   Yes.

8    Q.   By sharing this information with Mr. Chavez,

9    aren't you sharing Tucson Tamale's sales profits data?

10   A.   Yes.

11   Q.   Okay.  And doesn't the plain language of your

12   confidentiality agreement prohibit you from sharing this

13   information with Mr. Chavez?

14   A.   As I stated previously, I felt that because he,

15   as a certified public accountant, has to adhere to

16   confidentiality ethics and standards in his profession, I

17   felt it was appropriate to reach out for his help on this.

18        Because I, at no time, felt any fear or concern

19   that this would be shared, or that the confidentiality

20   would be breached in any way.

21   Q.   Did you sign an agreement with Mr. Chavez which

22   would protect the confidentiality?

23   A.   No, I didn't have to.

24   Q.   And you didn't get permission from Todd, Sherry,

25   or Lisa, before you contacted Ernesto Chavez?

# Exhibit J



**Tucson Tamale**
C O M P A N Y

**Mel McBeath <mel@tucsontamalecompany.com>**

---

## [Ticket #340273] Response to "invoice template"

**Mel McBeath <mel@tucsontamalecompany.com>**                    Wed, Oct 21, 2015 at 6:55 PM
To: gavron@wetwork.com

What or where would I go to get my 'establishment ' s URL'?

# feelingdumb

M

Melissa Martin McBeath
Area Manager
Tucson Tamale Company
520.449.9753

[Quoted text hidden]

# Exhibit K

Page 250

1      A.    No, I don't think that I would have.

2            I simply needed to show him how the sales voids

3      and comps were hitting the discount versus gross sales.

4      Q.    **But didn't the Revel system contribute or**

5      **attribute to some process in the Revel system how the**

6      **numbers hit that sales summary, and that's what you needed**

7      **help from him for, was figuring out how to adjust that**

8      **number?**

9      A.    Say that again, please.

10     Q.    **Didn't -- doesn't the Revel POS system generate**

11     **all of -- or copy -- let me strike that.**

12     A.    Okay.

13     Q.    **The Revel POS system stores the sales and profits**

14     **data at TTC; right?**

15     A.    It stores it in the cloud, yes.

16     Q.    **Not on TTC's local computers?**

17     A.    No.

18     Q.    **So when you access the Revel POS system, you**

19     **access basically a cloud where the data is stored; right?**

20     A.    Yes.  At different levels of authorization.

21     Q.    **Okay.  And didn't you need Mr. Chavez's help to**

22     **figure out why Revel -- why data was appearing the way**

23     **that it was appearing in the Revel system, as it relates**

24     **to the voids and comps issues?**

25     A.    Yes.

# Exhibit L

**Archived:** Tuesday, March 7, 2017 4:10:40 PM
**From:** Mel McBeath
**Sent:** Sun, 30 Aug 2015 18:46:25
**To:** Ehud Gavron
**Subject:** Re: Fwd: RE: Thanks !!! / Commerce bank
**Importance:** Normal

Ok...
You get that they signed a multi-million dollar loan, though, with Commerce on Thursday?

M

Melissa Martin McBeath
Area Manager
Tucson Tamale Company
520.449.9753

On Aug 30, 2015 6:22 PM, "Ehud Gavron" <gavron@wetwork.net> wrote:
```
Ok, I'm caught up -- confused, but caught up :)
E
```

On 08/30/2015 05:16 PM, Mel McBeath wrote:

Kinda feeling a little large that I can write an email comfortably to the president of Commerce Bank.
(Todd and Sherry just signed a life-changing loan with them on Thursday afternoon to make the new production facility happen.)
It was crazy that Sherry and I were on the phone early Friday before he came in and she shared the details with me. Normally we only talk high level at our standing Monday/Friday p.m.'s. Otherwise, I would have had no idea why he was in store and asking for owners.
I happened to be at BW and the team knows to go to me or Shawn when anyone asks for an owner.
Kinda proud of us. Ok maybe a lot proud.
After you read the thread lmk and I'll send you the email I just wrote to T & S outlining why he keeps referencing Ernesto!

I am so grateful I can share this kind of stuff with you and never have to worry about op sec or judgment. :-)


Melissa Martin McBeath
Area Manager
Tucson Tamale Company
520.449.9753

---------- Forwarded message ----------

# Exhibit M

**Archived:** Tuesday, March 7, 2017 4:09:07 PM
**From:** Mel McBeath
**Sent:** Fri, 4 Dec 2015 18:54:52
**To:** Ehud Gavron
**Subject:** Fwd: Re: AMAZING REVEL INVENTORY NINJAS
**Importance:** Normal

---

3 months me planning..
One week my team executing...
Big finish line today.

I take in all victories and celebrate them.
Híjuela, have we had some awful crap between us this week.

But this is so good.
Wanted to share with you.

Xxoo

Melissa Martin McBeath
Area Manager
Tucson Tamale Company
520.449.9753

---------- Forwarded message ----------
From: "Mel McBeath" <mel@tucsontamalecompany.com>
Date: Dec 4, 2015 6:05 PM
Subject: Re: AMAZING REVEL INVENTORY NINJAS
To: "Delaney Hare" <delaney@tucsontamalecompany.com>
Cc: "Sherry Martin" <sherry@tucsontamalecompany.com>, "Shawn Kaylor" <shawn@tucsontamalecompany.com>, "Meaghan Anderson"
<meaghan@tucsontamalecompany.com>

We are pretty fierce. Big besos!

M

Melissa Martin McBeath
Area Manager
Tucson Tamale Company
520.449.9753

On Dec 4, 2015 5:17 PM, "Delaney Hare" <delaney@tucsontamalecompany.com> wrote:
I couldn't agree with Meaghan more you have helped us all so much and I couldn't appreciate it more. I wouldn't be able to do it without you! Love you all so
much and love that you all are there for anything.

On Friday, December 4, 2015, Meaghan Anderson <meaghan@tucsontamalecompany.com> wrote:

You are the friggin best without you I'm sure we would have had a lot more bumps to ride over. Thank you for always having our backs and truly caring about
our success not only as a team but as individuals also. You are a phenom and an amazing role model I'm grateful we found our ways into each others live. I
love you.

On Dec 4, 2015 5:06 PM, "Mel McBeath" <mel@tucsontamalecompany.com> wrote:
Hi Rockstars -

As we come to the end of the business week, I wanted to personally say thank you to all three of you for being so incredible the last 5 days!
We introduced some tremendously important and critical processes into Revel and into your management responsibilities, starting with doing your end of
month inventories, training on PO's, and ordering differently.  We also had some challenges with 86's and hanging in there with the production team as they are
working out their kinks as fast as they possibly can.  Also, the personal challenges that Todd and Sherry faced had our hearts heavy.

TTC 000442

Not only did we sail through it with zero defects, everyone solved for their own issues in amazing ways and stayed close to me in communication. I am extremely impressed with our execution.
Extremely. Impressed.
Shawn in particular had a HUGE change in his processes - and is still tweaking things as he goes - but also moved his crew through it all with humor, grace and a lot of motivating!! Well done, Sir.

A personal thank you for keeping the volume down for Todd and Sherry and trusting me through it all. It's a pleasure to work with you guys and I am so grateful for all of you and your leadership.

Big thanks and big deep breaths - we done good team.

XO -

Mel

Melissa Martin McBeath | *Area Manager*
2545 E Broadway | Tucson, AZ 85716
Tel: (520) 449-9753
Tucson 🌵 Tamale

(y) (f) (◙) (g+)


--
Delaney Hare | *General Manager*
7159 E Tanque Verde | Tucson, AZ 85710
Tel: (520) 906-5194
Tucson 🌵 Tamale

(y) (f) (◙) (g+)

TTC 000443

# Exhibit N

**Archived:** Tuesday, March 7, 2017 4:09:14 PM
**From:** Mel McBeath
**Sent:** Wed, 26 Aug 2015 06:08:06
**To:** Ehud Gavron
**Subject:** Fwd: Re: FB message
**Importance:** Normal

---

Start at the bottom...

Grrrrrr. ..

M

Melissa Martin McBeath
Area Manager
Tucson Tamale Company
520.449.9753

---------- Forwarded message ----------
From: "Mel McBeath" <mel@tucsontamalecompany.com>
Date: Aug 26, 2015 5:58 AM
Subject: Re: FB message
To: "Meaghan Anderson" <meaghan@tucsontamalecompany.com>
Cc:

After much thought, I am going to reiterate what I said. This expectation is not negotiable.

We do NOT 86 product because it's half hour to close.

Beans and rice can be wrapped for next day.
Also, you can reheat to order in a saute pan on the burners if you get in a pinch.
We have much to discuss when I see you tomorrow. Our level of hospitality here was really unacceptable.
I know you want to make our customers happy, so I'm wondering what was in your heart that night and ongoing that there's so much justification.
We say 'yes' to our customers 99.9% of the time and make every effort to 'wow' them, no matter what it takes.

That is what sets us apart.

We'll speak more about this...

M

Melissa Martin McBeath
Area Manager
Tucson Tamale Company
520.449.9753

On Aug 24, 2015 7:55 AM, "Meaghan Anderson" <meaghan@tucsontamalecompany.com> wrote:
  We do because if we had reheated that close we would have closed with a ton of waste. We had no idea how to predict that it would be a burrito quesa
  empanada kind of night either after a super slow day. Also I think the empanada thing is not worth it all together in lots of ways our turbo chef has never had
  anyone actually set up the timers outside of Aileen and I playing with it trying to get it set up I bet it would help alot if someone who actually understands or
  works with that machine could come or teach us how to set it properly. You have to adjust heat wave temps all that and more. Maybe that could fix our dark
  empanadas. I would love to solve for all of these issues and it really wasn't that god awful of an incident but I understand his perception is his reality. It sucks he
  ended up unhappy we never want that we always aim for our guest to leave smiling no matter how they walked in it just didn't work with this one in particular.

*Meaghan Anderson | General Manager*
7286 N. Oracle Rd. | Tucson, AZ 85704
Tel: (520) 403-1888
Tucson 🌶 Tamale
 

On Mon, Aug 24, 2015 at 7:47 AM, Mel McBeath <mel@tucsontamalecompany.com> wrote:

We have a lot to solve for.
We cannot 86 because it's 30 mins to close.
And if that's how the empanadas are all coming out, we need to change the process.
We'll talk after I get some feedback from Todd and Sherry.

Thanks for filling me in on the incident.

M

Melissa Martin McBeath
Area Manager
Tucson Tamale Company
520.449.9753

On Aug 24, 2015 7:11 AM, "Meaghan Anderson" <meaghan@tucsontamalecompany.com> wrote:
I am happy he shared this privately as well since it was taken completely out of context. He came in bout a half hour till close and caught us at that akward time of if you run out of something even if you put it in the steamer to cook it won't be done until you close so after having our late dinner rush which consisted mainly of burritos which we all know will destroy your pintos and rice we had run out and hit that time of no more heat ups. When they came in I informed them of this and even cracked a joke with him about it. I cooked the empanada myself and it came out just like all the others I have ever done and as a matter of fact there was a family in the corner at that exact time eating empanadas i had just cooked. I always thought they came out dark myself but the empanda ladies were the ones that taught me and said the egg wash will always give them a darker outside. If his hadn't of been like that they would still be frozen inside. Of course when he brought them back I didn't go all into the explanation but simply said I am sorry that is how they all come out to which he got ready to argue. Instead of indulging in any back and forth he may have wanted I simply said well let me refund the meal sir and thank you have a good night. Even when Sammy interacted with him he was aggressive. Maybe he was having a bad night and we didn't help but whatever the case may be we stayed positive and polite and refunded him for everything drinks tamales the whole meal with no questions or hesitations. I told the girls when he left there would be a negative response of some sort from him you could just feel the vibe nothing was gonna do it for him.

*Meaghan Anderson | General Manager*
7286 N. Oracle Rd. | Tucson, AZ 85704
Tel: (520) 403-1888
Tucson 🌶 Tamale
🐦 f 📷 g+

On Sun, Aug 23, 2015 at 10:09 PM, Mel McBeath <mel@tucsontamalecompany.com> wrote:

I am utterly speechless.

M

Melissa Martin McBeath
Area Manager
Tucson Tamale Company
520.449.9753

---------- Forwarded message ----------
From: "Laura Adams" <laura@storytellerpr.com>
Date: Aug 23, 2015 8:14 PM
Subject: FB message
To: "Todd Martin" <todd@tucsontamalecompany.com>, "Sherry Martin" <sherry@tucsontamalecompany.com>, "Mel McBeath" <mel@tucsontamalecompany.com>
Cc:

Hi all-
Here's a private message I just received on Facebook. It was really nice of them to make this private, and not a public post. Please see the photo attached. I'm going to ask them which location this was. Other than apologizing and offering to compensate them for the meal, is there anything else I should say to them? - Laura

Sent from my iPhone

TTC 000448

# Exhibit O

FARHANG & MEDCOFF
4801 E. Broadway Boulevard, Suite 311
Tucson, Arizona 85711
T: 520.790.5433

Ali J. Farhang (#019456)
afarhang@fmazlaw.com
Roberto C. Garcia (#026246)
rgarcia@fmazlaw.com
Travis L. Tufts (#029373)
ttufts@fmazlaw.com

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| Melissa Martin McBeath, | NO. 4:16-cv-00462-DCB-BPV |
|---|---|
| Plaintiff, | **TUCSON TAMALE COMPANY'S FIRST SUPPLEMENTAL DISCLOSURE STATEMENT** |
| v. | |
| Tucson Tamale Company, | **(Supplemental information appears in bold; deletions in strikethrough)** |
| Defendant. | |

Defendant Tucson Tamale Company ("TTC"), by and through undersigned counsel and pursuant to FED. R. CIV. P. 26(a), hereby submits its **First Supplemental** Disclosure Statement. TTC makes this disclosure based on the information currently known and reasonably available. TTC reserves the right to amend, modify, or supplement this disclosure, pursuant to FED. R. CIV. P. 26(e), as discovery or circumstances may warrant.

TTC makes this disclosure subject to, and without waiving its right to protect from disclosure, (a) all communications protected from disclosure by the attorney-client privilege or other applicable privilege, and (b) all work product of its attorneys including the mental impressions, conclusions, opinions, or legal theories of its attorneys or representatives. Further, TTC provides this disclosure without waiving its right or opportunity to assert a defense, at any time in this civil action, to information contained in all documents

00313632.1

1    2016, copies attached as TTC 000292 - 000326;

2        21.    Records received from Café Poca Cosa in response to a Subpoena Duces

3    Tecum served in Pima County Superior Court case No. C20161794, dated September

4    13, 2016, copies attached as TTC 000327 - 000335;

5        22.    Records received from Ernesto A. Chavez in response to a Subpoena

6    Duces Tecum served in Pima County Superior Court case No. C20161794, dated

7    September 22, 2016, copies attached as TTC 000336 - 000338;

8        23.    Additional emails from Tucson Tamale Company reflecting, among

9    other things, Plaintiff's Facebook posts, her poor job performance, unauthorized

10   communications with third-parties, copies attached as TTC 000339 - 000405;

11       24.    Emails between Plaintiff and Ehud Gavron on Plaintiff's TTC email,

12   copies attached as TTC 000406 – 000629;

13       25.    Emails between Plaintiff and Todd and Sherry Martin prior to her

14   employment with TTC, copies attached as TTC 000630 - 000647;

15       26.    Email between Plaintiff and Ernesto Chavez dated December 9, 2015,

16   copy attached as TTC 000648;

17       27.    Emails Plaintiff sent from her TTC email to her personal Gmail account,

18   copies attached as TTC 000649 – 000761;

19       28.    Emails between Plaintiff and Francisco Marquez, copies attached as

20   TTC 000762 - 000764;

21       29.    Emails regarding Lindsay Welch, copies attached as TTC 000765 -

22   000787;

23       30.    Emails regarding Plaintiff's job performance while at TTC, copies

24   attached as TTC 000788 - 000866;

25       31.    All pleadings and discovery responses from Plaintiff not otherwise objected

26   to by Defendant;

27       32.    All documents produced in discovery and/or through disclosure not otherwise

28   objected to by Defendant;

Exhibit P

Page 237

1    Q.   Mr. Chavez, your husband --

2    A.   Ex-husband.

3    Q.   I'm sorry, ex-husband, has never worked for

4  Tucson Tamale Company?

5    A.   No.

6    Q.   He's not their CPA; right?

7    A.   No.

8    Q.   Not their investment broker?

9    A.   No.

10    Q.   Isn't it true that you disclosed to your

11  ex-husband, Mr. Chavez, March 31st, 2016, you have assets

12  totaling a hundred thousand dollars?

13    A.   No.

14    Q.   Show you what we'll mark as Exhibit 22.

15        (Exhibit 22 marked for identification.)

16        THE WITNESS:  What is this?  Oh.  No, that's

17  incorrect.  That's absolutely incorrect.

18  BY MR. TUFTS:

19    Q.   Well, before you start talking, let me know

20  whether you've had a chance to review this document.  I

21  have follow-up questions for you.

22    A.   I'm reviewing it.  But that's incorrect.

23    Q.   Do you recognize this document?

24    A.   Yes.

25    Q.   This is a document that Mr. Chavez produced

Page 263

1  Q.   And you never, until Tucson Tamale filed their

2  counterclaims, there was no reason for you to retain a

3  consulting expert that -- you know, such as Mr. Gavron,

4  based on his experience?

5  A.   Correct.

6  Q.   Can Mr. Gavron answer your question here, what or

7  where do I go to get my systems URL, if he doesn't have

8  your access credentials to access Revel?

9  A.   He did.

10  Q.   How did he do that?

11  A.   I can't remember.  I think he walked me through

12  where I might look for that, over the phone.

13  Q.   Okay.  But he didn't go and --

14  A.   No.

15  Q.   -- discover it for you?

16  A.   No, never.

17  Q.   So as you're going over it on the phone with him,

18  you're walking him through what you're seeing; right?

19  A.   I don't recall.  I probably wouldn't have --

20  probably he would have -- he would have maybe said find

21  out if there's a settings feature or something.  It

22  wouldn't have been super specific.

23       It wouldn't have been anything that would have

24  compromised Tucson Tamale's system, that's for sure.

25  Q.   And you agree Mr. Gavron was a third party who

1  wasn't entitled to the information stored on Revel; right?

2      A.    Yeah.  Agreed.

3      Q.    I'll show you what's marked as Exhibit 25.

4            (Exhibit 25 marked for identification.)

5            THE WITNESS:  Oh, yeah, okay.

6  BY MR. TUFTS:

7      Q.    This is an e-mail that you sent to Mr. Gavron on

8  or about August 12, 2015; correct?

9      A.    Yes.

10     Q.    Any reason to believe that this is not an e-mail

11  that you sent to him?

12     A.    No.

13     Q.    And in this e-mail, you asked Mr. Gavron to help

14  you circumvent Arizona liquor license training; correct?

15     A.    To circumvent, no.  I was asking if there was a

16  way to not have the 30-second wait time between screens in

17  that program.

18     Q.    Okay.  Where in this e-mail does it say, I don't

19  want to wait for a 30-second screen between -- or, I don't

20  want to wait for a 30-second period between moving on?

21     A.    Oh, because I had already expressed to him that I

22  had logged on and there's a 30-second wait.  Then I

23  thought, maybe the next day or a few days later, I

24  thought, I'll --

25     Q.    So you had already talked to Mr. Gavron, before

# Exhibit Q

Page 241

1     Q.    -- terminated your employment?

2     A.    I did.

3     Q.    Did you receive those benefits?

4     A.    Yes.

5     Q.    Did you apply for any other unemployment

6  benefits, during the course of unemployment?

7     A.    No.

8     Q.    How long were you unemployed after Tucson Tamale?

9     A.    I want to say four months, four or five months.

10    Q.    So, in four or five months, you exhausted the

11  liquid assets of $25,000 that you had?

12    A.    I exhausted quite a bit of it.  There's very

13  little left, is what I'm trying to tell you.

14          THE VIDEOGRAPHER:  Pardon me.  Approximately five

15  minutes left on our videotape.

16  BY MR. TUFTS:

17    Q.    Let's go back to, I believe it's Exhibit 21.

18    A.    Okay.

19    Q.    The e-mail that you sent Ernesto Chavez?

20    A.    No, 21 is the confidentiality agreement, sorry.

21    Q.    Oh, 22, my mistake.

22    A.    Oh, you didn't number it, remember?

23    Q.    Oh, non-exhibit.

24    A.    I'm following.

25    Q.    Let's go to TTC 0053 and 0054, which I've put in

Page 242

1    front of you but not labeled as exhibits.

2        A.    Perfect.

3        Q.    You sent an e-mail to Ernesto Chavez to review a

4    sales summary; did you not?

5        A.    Yes.

6        Q.    Where you attached TTC 00054 to that e-mail;

7    correct?

8        A.    Yes.

9        Q.    And what's reflected -- well, let me back up.

10            You didn't copy Todd, Sherry, or Lisa Martin on

11   this e-mail that you sent to Ernesto Chavez; did you?

12       A.    No.

13       Q.    And what's reflected in TTC 00054, are sales

14   summary from the Tanque Verde restaurant; correct?

15       A.    Yes.

16       Q.    Okay.  According to the plain language of your

17   confidentiality treatment, isn't this a breach of your

18   confidentiality agreement, by sharing sales and profits

19   data with a non-TTC employee?

20       A.    No.  Because Ernesto is also bound by

21   confidentiality.  And so I, obviously, did not feel it was

22   a breach of my contract.

23       Q.    But the contract doesn't say that you can share

24   TTC's sales and profits with third parties, so long as

25   some accruing privilege arises; does it?

# Exhibit R

Page 244

1          THE VIDEOGRAPHER:  This begins media five of our

2    ongoing deposition.

3          We're on the record at 3:22.

4    BY MR. TUFTS:

5          Q.   Ms. McBeath, was there any legal reason why you

6    shared the sales summaries with Mr. Chavez?

7          A.   No.  But there was a good work reason why.

8          Q.   Okay.  You weren't required by law to share the

9    sales summary with Mr. Chavez; correct?

10         A.   Required by law?  I'm not sure I understand.

11         Q.   Right.  You were not under the impression you had

12   to share these sales summaries with Mr. Chavez as a result

13   of any legal proceedings?

14         A.   Oh, like a subpoena or something like that?

15         Q.   Right.

16         A.   Oh, no.  No, no, no.

17         Q.   Nothing by law compelled you to share this with

18   him?

19         A.   No.

20         Q.   It was purely for some reason connected with your

21   employment at Tucson Tamale?

22         A.   Yes.

23         Q.   Right?

24         A.   It was a great reason.  He was of tremendous help

25   to us.

Page 246

1    **termination, in and of itself?**

2        A.    The way you're -- the way you're taking it text

3    -- the text of it, yes, I would have to agree with that.

4    But at the -- I never -- I never understood it to mean

5    that.

6            I understood it to mean that this information

7    should always remain confidential.  And sharing it with

8    Ernesto, I was more than confident it would remain

9    confidential.

10       Q.    **Do you have any documents in your possession that**

11   **reflect or support your understanding that you're able to**

12   **share this information with Ernesto Chavez?**

13       A.    No.  Just simply my own interpretation.

14       Q.    **Do you have any documents in your possession**

15   **which reflect permission from Todd Martin, Sherry Martin,**

16   **or Lisa Martin, for you to share this information with**

17   **Ernesto Chavez?**

18       A.    Not prior to.  But after he helped me figure out

19   this very high level accounting -- it ended up being an

20   error in how Todd had set up our software system, I did

21   send her a follow-up e-mail, explaining to her that I

22   had -- that Ernesto was very helpful and here was the

23   solution.

24           And we had actually figured out a very

25   complicated, and something that was a big priority at the

Page 247

1   time.

2        And I had asked permission to speak to Donna

3   there, the bookkeeper at the time for Tucson Tamale

4   Company, because I had gotten to the point where I was not

5   understanding how the software applied discounts and

6   voids.

7        And she was -- I didn't -- I can't say I was

8   denied access to Donna, but she never offered me access to

9   Donna.

10       Q.    **So this e-mail you sent to Sherry Martin --**

11       A.    After I spoke to Ernesto.

12       Q.    **-- would have been sometime after December 9,**

13   **2015; right?**

14       A.    Yes.

15       Q.    **Do you remember what the subject line of that**

16   **e-mail would have been?**

17       A.    Maybe discount voids issue, or something to just

18   -- something to discount voids.

19       Q.    **Did you directly disclose that you had shared**

20   **sales summary information with Ernesto Chavez in that**

21   **e-mail?**

22       A.    I can't remember.

23            I know that your clients have yet to disclose

24   that e-mail to me.  And I know it exists.

25       Q.    **Well, I'm asking from your personal knowledge**

1    Q.   And what you attached to that e-mail is a screen

2    shot of the Revel data; correct?

3    A.   Yes.

4    Q.   Okay.  From that screen shot you can see gross

5    product sales, discounts, payments, cash summaries, things

6    of that nature; correct?

7    A.   Yes.

8    Q.   By sharing this information with Mr. Chavez,

9    aren't you sharing Tucson Tamale's sales profits data?

10   A.   Yes.

11   Q.   Okay.  And doesn't the plain language of your

12   confidentiality agreement prohibit you from sharing this

13   information with Mr. Chavez?

14   A.   As I stated previously, I felt that because he,

15   as a certified public accountant, has to adhere to

16   confidentiality ethics and standards in his profession, I

17   felt it was appropriate to reach out for his help on this.

18        Because I, at no time, felt any fear or concern

19   that this would be shared, or that the confidentiality

20   would be breached in any way.

21   Q.   Did you sign an agreement with Mr. Chavez which

22   would protect the confidentiality?

23   A.   No, I didn't have to.

24   Q.   And you didn't get permission from Todd, Sherry,

25   or Lisa, before you contacted Ernesto Chavez?

Page 254

1      A.    No.  As I stated before, no.

2            Also, I thought that this document, this one that

3      you just showed me, that's 055, this I sent to him,

4      thinking that this was enough for us to get the

5      conversation started about how we figure this out.  But it

6      wasn't.

7            I sent this one before, at 11:09.  I tried to

8      explain it to him over the phone and describe to him what

9      was happening.

10           And he said, I really need to look at how it's

11     hitting the general ledger.  So I thought this would

12     suffice.  But it wasn't.

13           Then I realized he really needed to see the

14     actual -- this.

15     Q.    **You indicated that you tried to speak with Donna;**

16     **right?**

17     A.    Yes.  Well, I asked for access to Donna.  I was

18     talking to Sherry about how far I had gotten in my

19     understanding of what was happening, where the error was

20     occurring.  And I said, perhaps I could set an appointment

21     with Donna to ask her to help me figure it out.

22     Q.    **Did you reduce that request to writing?**

23     A.    I believe I did.  I believe there may be an

24     e-mail about that somewhere.

25     Q.    **Okay.**

# Exhibit S

**Jamie Archibald**

**From:** Mel McBeath [mailto:mel@tucsontamalecompany.com]
**Sent:** Wednesday, December 9, 2015 6:36 PM
**To:** Sherry Martin <sherry@tucsontamalecompany.com>
**Subject:** Re: Payments Reconcillation

Delaney followed the process properly.  Revel expects us to reconcile invoices outside of the system with our accountant. Invoices are handled as an account receivable (and really, it's a little unorthodox what they do, but my accountant confirmed it all today.) and then when the payment is taken, it adds it as a sale.  That is why you see it as 'deposit applied' and reported as a liability, then it washes when it's marked paid.

Ultimately, per our previous discussion, we will use 'house account' functionality for these going forward. The bigger issue on the cash tills I did not get to today - shocking!  :-)

Melissa Martin McBeath | *Area Manager*
2545 E Broadway | Tucson, AZ 85716
Tel: (520) 449-9753



On Wed, Dec 9, 2015 at 9:36 AM, Mel McBeath <mel@tucsontamalecompany.com> wrote:

Yeah, I was just scratching my head as well. . .
Will look at all in depth when I get there.
The last one I know we all (you, me and Todd) discussed last summer and he mentioned it had to do with tills and banks. I wasn't at all familiar enough with Revel then to explore but now I am.
Thanks for the reminder on that piece.

Stay tuned.

M

Melissa Martin McBeath
Area Manager
Tucson Tamale Company
520.449.9753

On Dec 9, 2015 8:37 AM, "Sherry Martin" <sherry@tucsontamalecompany.com> wrote:

1

TTC 000968

Hi,

Yesterday, TV applied the          $$.   When it was "received and applied" in our system-- the payment was applied twice in our system reflecting payments of over $24,000 yesterday.

See this operations report: https://ttc.revelup.com/reports/operations/
Or, see the Overview from yesterday.

1.  Mel, when you get to TV today, can you document (in writing) what steps Delaney took exactly.  Was there a sale for both a house account and an invoice?

2.  The $ is noted as both a check and an applied deposit.  Which makes me think she reconciled both a house account and an invoice.

3.  Why was this sale untaxed?

4.  Mel, can you point us to the DRIVE where the invoice instructions are?

We need to get our arms around this asap.  Additionally, Mel, have you noticed the daily discrepancy on the Operations Report under Cash Summary?  The daily report we do off the daily report balances in DRIVE but something is whacky if we are consistently hundreds of $$ off on the Cash Summary listed in Operations Report.  I suspect there may not be a as tight when setting the till -- but just a suspicion.

Thanks
Sherry

--
Sherry Martin
Tucson Tamale Company
520.305.4760 work
520.247.2324 cell

TTC 000969

TTC 000970

M Payments Reconcilia   ✕   ⋮⋮ Happy Holidays TT   ✕   ⋮⋮ Home - Dropbox   ✕   🅂 Screenly | Playlists   ✕   R Revel Systems Dashb   ✕   Invoices & Deposits -   ✕

C   https://support.revelsystems.com/hc/en-us/articles/204303785-Invoices-Deposits

Get Started Today   1.415.744.1433

**Revel** ™ The iPad
SYSTEMS   Point of Sale Solution

POS Systems   Features   Testimonials   Hardware   Marketplace   Support   News   Contact

Sign in



### Day of Deposit

Total Payments   ʼ   10.00

When the Invoice is pulled up on the POS station and converted back into an order and payment is complete, the sales will appear on that day's Sales Summary, and any payments made will display in the Payment Summary. Some notes to make:

- If a payment was made while the order was still an Invoice, that deposit will show in the Payments section under Applied Deposits.

- If a payment was made after the Invoice was converted back to an Order, those whole payments will show in the Payments section under its respective payment type tendered.

- Accountants should subtract "Applied Deposits" from "Total Payments" to determine how much liability was used in that reporting purpose.

*Make sure you have Open orders checked off in the Sales Summary to view the Deposits under Liabilities, otherwise it will not be factored in the day's sales or payments.*



TTC 000971

Happy Holidays TT...mov   ʼ   Marisol FULL Subtitl...mov   ʼ   ⬇ Show all downloads...   ✕

**Tish Wright**

**From:** Sherry Martin [mailto:sherry@tucsontamalecompany.com]
**Sent:** Friday, January 15, 2016 9:36 AM
**To:** Mel McBeath <mel@tucsontamalecompany.com>
**Cc:** Lisa Martin <lisa@tucsontamalecompany.com>
**Subject:** Re: over/under Revel

# Yay!
# thanks for the update

On Thu, Jan 14, 2016 at 6:08 PM, Mel McBeath <mel@tucsontamalecompany.com> wrote:

Figured it out. *wipesbrow
I will show you when I see you as I printed out operations reports and have notes.
It has to do with not checking out the drawers at night. Our period is 3 a.m to 3 a.m. so if the day isn't closed out prior to 3 a.m., it pulls in the previous days sales.

I am having BW do checkout p.m. tonight and tomorrow, as I believe since we are a 'day' behind, so to speak, it will take two full days' banks to reset.

Shawn was a big help to me today in solving, but we had been mulling it over for a couple of months now. Critical 1 of a few - check.  :-0

M

Melissa Martin McBeath | *Area Manager*
2545 E Broadway | Tucson, AZ 85716
Tel: (520) 449-9753

  

--
Sherry Martin
Tucson Tamale Company
520.398.6282 work
520.247.2324 cell

1

TTC 000972

# Exhibit T

**Tish Wright**

**From:** Sherry Martin [mailto:sherry@tucsontamalecompany.com]
**Sent:** Friday, January 15, 2016 9:36 AM
**To:** Mel McBeath <mel@tucsontamalecompany.com>
**Cc:** Lisa Martin <lisa@tucsontamalecompany.com>
**Subject:** Re: over/under Revel

# Yay!
## thanks for the update

On Thu, Jan 14, 2016 at 6:08 PM, Mel McBeath <mel@tucsontamalecompany.com> wrote:

Figured it out. *wipesbrow
I will show you when I see you as I printed out operations reports and have notes.
It has to do with not checking out the drawers at night. Our period is 3 a.m to 3 a.m. so if the day isn't closed out prior to 3 a.m., it pulls in the previous days sales.

I am having BW do checkout p.m. tonight and tomorrow, as I believe since we are a 'day' behind, so to speak, it will take two full days' banks to reset.

Shawn was a big help to me today in solving, but we had been mulling it over for a couple of months now. Critical 1 of a few - check.  :-0

M

Melissa Martin McBeath | *Area Manager*
2545 E Broadway | Tucson, AZ 85716
Tel: (520) 449-9753

  

--
Sherry Martin
Tucson Tamale Company
520.398.6282 work
520.247.2324 cell

1

# Exhibit U

Page 244

1              THE VIDEOGRAPHER:  This begins media five of our

2     ongoing deposition.

3              We're on the record at 3:22.

4     BY MR. TUFTS:

5         Q.    Ms. McBeath, was there any legal reason why you

6     shared the sales summaries with Mr. Chavez?

7         A.    No.  But there was a good work reason why.

8         Q.    Okay.  You weren't required by law to share the

9     sales summary with Mr. Chavez; correct?

10        A.    Required by law?  I'm not sure I understand.

11        Q.    Right.  You were not under the impression you had

12    to share these sales summaries with Mr. Chavez as a result

13    of any legal proceedings?

14        A.    Oh, like a subpoena or something like that?

15        Q.    Right.

16        A.    Oh, no.  No, no, no.

17        Q.    Nothing by law compelled you to share this with

18    him?

19        A.    No.

20        Q.    It was purely for some reason connected with your

21    employment at Tucson Tamale?

22        A.    Yes.

23        Q.    Right?

24        A.    It was a great reason.  He was of tremendous help

25    to us.

# Exhibit V

Page 136

1    A.    Yes.

2    Q.    Which was the subject of TTC 762; correct?

3    A.    Uh-huh.   Yes.

4    Q.    And it says:   "Yays.  Heart you my cielo"?

5    A.    Yes.

6    Q.    And that's from you; right?

7    A.    Yes.

8    Q.    And below that is a response from somebody named

9    Francisco X. Marquez; do you see that?

10   A.    Yes.

11   Q.    Do you recognize this e-mail?

12   A.    I do.   Well, I don't recognize the e-mail, but

13   I'm surprised that --

14          I have no recollection of this, to be honest with

15   you.

16   Q.    FXM@Marquezlegal.com; do you know whose e-mail

17   address that is?

18   A.    Yes, as it says right there.

19   Q.    That's Francisco Marquez?

20   A.    Francisco Marques.

21   Q.    And it's at Marquezlegal.com; right?

22   A.    Yes.

23   Q.    What is Marquezlegal.com?

24   A.    A domain name.

25   Q.    That for a law firm?

Page 137

1    A.   At one time, it was.

2    Q.   **Was it in November of 2015, a law firm?**

3    A.   No.

4    Q.   **Is that a misleading advertisement there?**

5    A.   I'm not in charge of people's domain names, so I

6    just know that's an e-mail address that existed,

7    obviously, for him.

8    Q.   **You were e-mailing Mr. Marquez to meet with him;**

9    **right?**

10   A.   I can tell you right now that I never had a

11   meeting with Mr. Marquez, in person.  Certainly if I was

12   -- if we had set up a time to talk, it was as friends.

13   This is the first time I've seen this.  I certainly wasn't

14   contacting him for any legal advice.

15   Q.   **What is Mr. Marquez's full name?**

16   A.   Francisco Marquez.

17   Q.   **Does he have a middle name?**

18   A.   Xavier.

19   Q.   **Does he have any other surnames?**

20   A.   Not that I'm aware of.

21   Q.   **Mr. Marquez has a residence at 451 West Calle**

22   **Bolita, that in Sahuarita; doesn't he?**

23   A.   That's his mom's residence, if I'm not mistaken.

24   Q.   **Do you know if Mr. Marquez is listened as the**

25   **owner of that residence?**

Page 138

1      A.    I do not know that.

2      Q.    **Have you ever met Mr. Marquez at the residence?**

3      A.    Met him?

4      Q.    **Mm-hmm.**

5      A.    I have been to the residence for family events.

6      Q.    **What is your history with Mr. Marquez?**

7      A.    I have known him since we were 12 years old.

8      Q.    **Mr. Marquez resides in San Jose, California, or**

9   **has a residence there?**

10     A.    Yes.

11     Q.    **Mr. Marquez was delivering some of your papers**

12  **and pleadings in this lawsuit, initially; correct?**

13     A.    Yes.

14     Q.    **And he was using the pseudonym Xavier Molina;**

15  **isn't that correct?**

16     A.    Oh, right, yes.

17     Q.    **And he was using that pseudonym because he didn't**

18  **want us to discover his involvement in this case; correct?**

19     A.    Well, you're not entitled to discover any one of

20  my informal experts' identities, or what they do for me,

21  or anything.

22     Q.    **Is Mr. Marquez an attorney?**

23     A.    No.

24     Q.    **He formerly was an attorney; correct?**

25     A.    Yes.

Page 139

1    Q.    But he has been disbarred by the state of

2  California?

3    A.    Yes.

4    Q.    Are you aware of any other states Mr. Marquez is

5  licensed to practice?

6    A.    No.

7    Q.    Do you know when Mr. Marquez was disbarred?

8    A.    No.

9    Q.    Do you have any reason to believe that he was

10  licensed to practice law in November of 2015?

11    A.    Do I have -- I'm sorry, restate that.

12    Q.    Any reason to believe he was licensed to practice

13  law in November of 2015?

14    A.    No, he wasn't, at that time.

15    Q.    You would agree with me that no attorney-client

16  privilege exists between you and Mr. Marquez?

17    A.    How could an attorney-client privilege exist if

18  he's not an attorney?

19    Q.    So you agree with me, no attorney-client

20  privilege exists?

21    A.    I agree that I have privileges that exist for

22  expert consultants, that I consult informally, yes.

23          You're well aware of my position on FRC

24  26(b)(4)(B), so --

25    Q.    I appreciate that.  But I'm asking a very

Page 140

1    specific question, and that is, you do not have an

2    attorney-client privilege with Francisco Marquez; correct?

3        A.    Correct.

4        Q.    Which of your claims require testimony from an

5    expert with a background in law?

6        A.    Testimony?  I've never claimed that he was going

7    to be -- to testify as an expert.  I have people that I

8    consult informally who are experts on many, many areas of

9    my claims.

10       Q.    What areas does Mr. Marquez consult with you on?

11       A.    You're not entitled to know that.

12       Q.    Ms. McBeath, I'm entitled to know what

13   Mr. Marquez's involvement is in this case, and what

14   information that you have shared with him in connection

15   with this case.

16             And if you do not answer the questions that I'm

17   asking, be aware and be on notice that I will move the

18   court to compel you to respond to those questions.  And I

19   reserve the right to take your deposition again, should

20   you choose to refuse to respond to the questions I have

21   about Mr. Marquez.

22             Okay?

23       A.    Understood.

24       Q.    Oh.  What is the nature of the privilege that

25   exists between you and Mr. Marquez?

Page 141

1      A.    There are people that I consult informally as

2    experts, and I stand by what I've said before, you

3    understand my position, you're not entitled to know the

4    nature or scope of anything about my experts that I

5    consult informally.

6            And I'm not going to answer any questions today

7    about that, about anyone that I consult informally, and

8    what they do and the nature and scope.  I can consult with

9    a garbage man and you are not entitled to know that.

10   So --

11     **Q.    So if you consult with your neighbor about a**

12   **lawsuit that you have, who is a garbage man, you're able**

13   **to shield that neighbor --**

14     A.    Depends on what --

15     **Q.    -- from --**

16   **Let me finish my question.**

17     A.    It depends on what that person does.

18     **Q.    Let me finish my question.**

19   **You're able to shield that neighbor, the garbage**

20   **man, from discovery from the other party; is that right?**

21     A.    Yeah, just as much as I could have a spiritual

22   advisor or someone who's, you know, helping me manage the

23   stress of this.

24           Because simply I say that I'm involved in a

25   lawsuit, which is public record, with Tucson Tamale

# Exhibit W

# Melissa Martin McBeath

3463 E. Terra Alta Blvd, Tucson, AZ 85716 • 520.449.9753 • *mel.mcbeath@cox.net*

VIA E-MAIL ONLY
*Todd@TucsonTamaleCompany.com*
*Sherry@TucsonTamaleCompany.com*
*Lisa@TucsonTamaleCompany.com*

April 12, 2016

Todd Martin
Sherry Martin
Lisa Martin
Tucson Tamale Company
2550 N. Dragoon Street, Suite 12
Tucson, Arizona 85745

Re:  <u>Demand for Preservation of Evidence</u>

Dear Todd, Sherry and Lisa:

I have retained advisory counsel to assist me with the preparation of a lawsuit for wrongful discharge. That will be filed shortly in Pima County Superior Court.

In the meantime, I have been advised to serve on you this "litigation hold" letter. You should anticipate that much of the information subject to disclosure or responsive to discovery in my case is stored on the company's current and former computer systems and other media and devices (including personal digital assistants, voice-messaging systems, online repositories and cell phones). Inform Tucson Tamale staff immediately of their obligation of the anticipated litigation to preserve not only documents and tangible things, but also **_all_** electronically stored information including e-mails. In particular, you must not destroy unique, relevant information that might be useful to the case.

You and Tucson Tamale have a duty to preserve information you know, or reasonably should know:

(i)  is relevant to the parties' claims or defenses or the subject matter involved in the lawsuit;

(ii)  is reasonably calculated to lead to the discovery of admissible evidence; or

(iii)  I am reasonably likely to request during discovery.

This duty to preserve extends to employees likely to have relevant information—the "key players" in the case. The duty encompasses items made by those key players that Tucson Tamale may use to support its defenses, and any such items made for them to the extent the items can be readily identified (*e.g.*, the "to" field in e-mails).

10100.1

Todd Martin
Sherry Martin
Lisa Martin
April 12, 2016
Page 2

<u>Litigation Hold</u>

Effective immediately, Tucson Tamale *must* suspend its routine information retention/ destruction/recycling policy and put in place a "litigation hold" to ensure the preservation of appropriate information. Ensure that, at a minimum, that you and staff take the following steps to comply with this demand:

1.   Immediately determine all sources of potentially relevant information and place them "on hold," and please communicate the details of that "hold" to me in writing.

2.   Immediately notify all the key players in writing that they must place on "hold" and preserve all information potentially relevant to this litigation.

3.   Please refrain from deleting the potentially relevant information of the key players from active files and transferring it to backup tapes or media *only*.

4.   In particular, regarding backup disks and media for electronically-stored information (including, but by no means limited to, e-mails), under the litigation hold, they *must* be identified, segregated, stored and preserved (*i.e.*, not recycled) separate and apart from other backup disks and media in two instances:

(i)   If they are "accessible" (*i.e.*, actively used for information retrieval);

(ii)   With respect to *all* backup disks or media—regardless whether they are "accessible" or "inaccessible" (*i.e.*, those typically maintained solely for the purpose of disaster recovery)—those disks or media storing relevant information of the key players.

Attached is a document titled "DEMAND FOR PRESERVATION OF EVIDENCE" that I request you provide to staff to ensure strict and full compliance with this demand. Please confirm *no later than April 22, 2016,* that all employees have been notified of this demand and have taken the steps outlined in this letter to preserve all information and tangible documents potentially relevant to the parties' claims and defenses.

Best regards,

Melissa Martin McBeath

10100.1

**DEMAND FOR PRESERVATION OF EVIDENCE**

Melissa Martin McBeath will be filing a lawsuit against Tucson Tamale Company, Todd Martin, Sherry Martin and Lisa Martin. In anticipation of litigation, the parties must preserve all information that they may need to assert their respective claims and defenses. Below is the demand she has made that we are required to follow by law. We request your cooperation in complying with this request.

For the purpose of this demand, "you" and "your" means Tucson Tamale's officers, directors, agents, attorneys, accountants, employees, partners and other persons occupying similar positions or performing similar functions. Electronically stored information ("ESI") should be afforded the broadest possible meaning and includes (by way of example and not as an exclusive list) potentially relevant information electronically, magnetically, optically or otherwise stored as:

- Digital communications (e-mail, voice mail, instant messaging, text messages)
- E-Mail Server Stores (e.g., Lotus Domino .NSF or Microsoft Exchange .EDB)
- Word processed documents (e.g., Word or WordPerfect files and drafts)
- Spreadsheets and tables (e.g., Excel or Lotus 123 worksheets)
- Accounting Application Data (e.g., QuickBooks, Money, Peachtree data)
- Image and Facsimile Files (e.g., .PDF, .TIFF, .JPG, .GIF images)
- Sound Recordings (e.g., .WAV and .MP3 files)
- Databases (e.g., Access, Oracle, SQL Server data, SAP);
- Contact and Relationship Management Data (e.g., Outlook, ACT!);
- Calendar and Diary Application Data (e.g., Outlook PST, blog entries);
- Online Access Data (e.g., Temporary Internet Files, History, Cookies);
- Presentations (e.g., PowerPoint, Corel Presentations)
- Network Access and Server Activity Logs;
- Computer Aided Design/Drawing Files; and
- Backup and Archival Files (e.g., Veritas, Zip, .GHO).

ESI resides not only in areas of electronic, magnetic and optical storage media reasonably accessible to you, but also in areas you may deem not reasonably accessible. You are obliged to preserve potentially relevant evidence from both sources of ESI, even if you do not anticipate producing such ESI.

**NOTHING IN THIS DEMAND FOR PRESERVATION OF ELECTRONICALLY STORED INFORMATION SHOULD BE UNDERSTOOD TO DIMINISH THE CONCURRENT OBLIGATION TO PRESERVE DOCUMENTS, TANGIBLE THINGS AND OTHER POTENTIALLY RELEVANT EVIDENCE.**

1

Preservation Requires Immediate Intervention

You must act immediately to preserve potentially relevant ESI, including, without limitation, information with the earlier of a Created or Last Modified date on or after January 3, 2015 through the date of this demand and concerning:

1.   Marketing, advertising, and sales materials regarding Tucson Tamale products.

2.   The tasks that Melissa Martin McBeath performed while she worked at Tucson Tamale.

3.   ESI that Melissa Martin McBeath may use to support claims for (and that you or Tucson Tamale may support your defenses against):

-   Retaliatory discharge in violation of Arizona's Employment Protection Act.

-   Fraud in the inducement regarding the terms of her employment.

-   Negligent misrepresentation regarding the terms of her employment.

-   Breach of the terms of her employment agreement as outlined in the offer letter and other written and oral representations made to her.

-   Failure to pay earned bonuses (wages) in violation of Arizona's Wage Act.

-   Conversion.

-   Restitution / unjust enrichment.

Adequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence. You must intervene to prevent loss due to routine operations or malfeasance and employ proper techniques and protocols to preserve ESI. Booting a drive, examining its contents or running any application may irretrievably alter the evidence it contains and constitute unlawful spoliation of evidence. Preservation requires action.

Suspension of Routine Destruction

You are directed to immediately initiate a litigation hold for potentially relevant ESI, documents and tangible things and to act diligently and in good faith to secure and audit compliance with such litigation hold. You are further directed to immediately identify and modify or suspend features of your information systems and devices that, in routine operation, operate to cause the loss of potentially relevant ESI.

Examples of such features and operations include:

•   Purging the contents of e-mail repositories by age, capacity or other criteria;

•   Using data or media wiping, disposal, erasure or encryption utilities or devices;

•   Overwriting, erasing, destroying or discarding backup media;

•   Re-assigning, re-imaging or disposing of systems, servers, devices or media;

2

- Running antivirus or other programs effecting wholesale metadata alteration;
- Releasing or purging online storage repositories;
- Using metadata stripper utilities;
- Disabling server, packet or local instant messaging logging; and
- Executing drive or file defragmentation or compression programs.

Act to Prevent Spoliation

You should take affirmative steps to prevent anyone with access to your data, systems and archives from seeking to modify, destroy or hide ESI on network or local hard drives and on other media or devices (such as by deleting or overwriting files, using data shredding and overwriting applications, defragmentation, re-imaging, damaging or replacing media, encryption, compression or the like).

Preservation in Native Form

All ESI, including but not limited to spreadsheets and databases, must be preserved in the form or forms in which it is ordinarily maintained (i.e., native form). Accordingly, you should preserve ESI in such native forms, and you should not employ methods to preserve ESI that remove or degrade the ability to search the ESI by electronic means or that make it difficult or burdensome to access or use the information. You should additionally refrain from actions that shift ESI from reasonably accessible media and forms to less accessible media and forms if the effect of such actions is to make such ESI not reasonably accessible.

Metadata

You must preserve system and application metadata. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location and dates of creation and last modification or access. Application metadata is information automatically included or embedded in electronic files, but which may not be apparent to a user, including deleted content, draft language, commentary, collaboration and distribution data and dates of creation and printing. For electronic mail, metadata includes all header routing data and Base 64 encoded attachment data, in addition to the To, From, Subject, Received Date, CC and BCC fields. Metadata may be overwritten or corrupted by careless handling or improper preservation, including by moving, copying or examining the contents of files.

Servers

With respect to servers used to manage e-mail (e.g., Microsoft Exchange, Lotus Domino) and network storage (often called a "network share"), the complete contents of each user's network share and e-mail account must be preserved.

Home Systems, Laptops, Online Accounts and Other ESI Venues

To the extent that you have sent or received potentially relevant e-mails or created or reviewed potentially relevant documents away from the office, you must preserve the contents of systems, devices and media used for these purposes (including not only potentially relevant data from portable and home computers, but also from portable thumb

drives, CD- R/DVD-R disks and the user's PDA, smart phone, voice mailbox or other forms of ESI storage.). Similarly, if you used online or browser-based e-mail accounts or services (such as Gmail, AOL, Yahoo Mail or the like) to send or receive potentially relevant messages and attachments, the contents of these account mailboxes (including Sent, Deleted and Archived Message folders) must be preserved.

<u>Ancillary Preservation</u>

You must preserve documents and other tangible items that may be required to access, interpret or search potentially relevant ESI, including logs, control sheets, specifications, indices, naming protocols, file lists, network diagrams, flow charts, instruction sheets, data entry forms, abbreviation keys, user ID and password rosters and the like. You must preserve passwords, keys and other authenticators required to access encrypted files or run applications, along with the installation disks, user manuals and license keys for applications required to access the ESI. You must preserve cabling, drivers and hardware, other than a standard 3.5" floppy disk drive or standard CD or DVD optical disk drive, if needed to access or interpret media on which ESI is stored. This includes tape drives, bar code readers, Zip drives and other legacy or proprietary devices.

<u>Paper Preservation of ESI is Inadequate</u>

As hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions. If information exists in both electronic and paper forms, you should preserve both forms.

<u>Agents, Attorneys and Third Parties</u>

Your preservation obligation extends beyond ESI in your care, possession or custody and includes ESI in the custody of others that is subject to your direction or control. Accordingly, you must notify any current or former agent, attorney, employee, custodian and contractor in possession of potentially relevant ESI to preserve such ESI to the full extent of your obligation to do so, and you must take reasonable steps to secure their compliance.

# Exhibit X

---------- Forwarded message ----------
From: **Ehud Gavron** <gavron@wetwork.net>
Date: Mon, Jun 27, 2016 at 9:09 PM
Subject: discovery/calendar
To: "Francisco X. Márquez" <fxm@marquezlegal.com>, Mel McBeath <mel@tucsontamalecompany.com>

6/13 we received the RFAs but not the UIs.  Calendar
spreadsheet shows UIs.

I don't want to "edit this out from under you" so please
advise if in the future if we see something like this to
correct it or TELL YOU so you can correct it.

Also they are late.  All inters due 6/24 and there's no
vay they snail-mailed them [because to effect Rule 4
service they'd have to Certified/Registered return-receipt...
and that obviates the agreement to electronic service]

E