# Exhibit Y

# Table of Contents

**Welcome**                                                              **4**

**Our Masa Mission**                                                     **5**

**Values**                                                               **5**

**About Our Business**                                                   **6**
    **Our Way of Doing Business**                     **6**

**Standards of Conduct**                                                 **7**

**Employment Policies**                                                  **8**
    **Equal Opportunity Employment**                  **8**
    **Non-Discrimination**                            **8**
    **Age Requirements**                              **8**
    **Alcohol Serving Policy**                        **9**
    **Cell Phones**                                   **9**
    **Cell Phones in Company Vehicles**               **9**
    **Social Media, Social Networking and Online Etiquette**  **10**
    **Company Computer Use**                          **10**
    **"Hot Tamales"**                                 **10**
    **Parking**                                       **10**
    **Personal Information**                          **11**
    **Team Member Communication**                     **11**

**Zero Tolerance Policies**                                              **12**
    **Proprietary and Confidential Information**      **12**
    **Harassment in the Workplace**                   **12**
    **Sexual Harassment**                             **12**
    **Violence in the Workplace**                     **13**
    **Restraining Orders**                            **13**
    **Substance Abuse**                               **13**

**Employee Experience**                                                  **15**
    **Orientation Period**                            **15**
    **Review Process**                                **15**

| | |
|---|---|
| **Progressive Discipline** | **15** |
| **Schedules and Time Keeping** | **16** |
| Schedule | 16 |
| Availability | 16 |
| Change of Address or Phone Number | 16 |
| Calling Out | 16 |
| Time Off | 16 |
| Timekeeping | 17 |
| Time Card Adjustments | 17 |
| Holidays | 17 |
| Resignations | 18 |
| Breaks | 18 |
| Smoking and Smoke Breaks | 18 |
| **Compensation, Pay and Perks** | **19** |
| Meals | 20 |
| Discount | 21 |
| Friends and Family | 21 |
| Catering | 21 |
| **Dress Code and Appearance** | **22** |
| Company Issued Uniform | 22 |
| U of A Game Days | 22 |
| Non-Slip Shoes | 22 |
| Hats | 22 |
| Team Member Appearance Standards | 23 |
| Front of House | 23 |
| Back of House | 23 |
| Piercing and Tattoos | 24 |
| **Guest Service** | **25** |
| Guest Feedback | 26 |
| Telephone Courtesy | 26 |
| **Safety** | **27** |
| Reporting Injuries and Worker's Compensation | 27 |

**Sanitation**      **28**

**Crime and Robbery**      **29**

**Risk Minimization**      **29**

**Fire Protection**      **30**

# Welcome

Welcome To Our Team!

We are happy to welcome you to The TUCSON TAMALE Team!  We have been "Unwrapping Happiness" since November 2008.

We believe that each and every team member helps to create an awesome guest experience!  We want you to enjoy your time here and are committed to helping you succeed.

This handbook sets out expectations. It will answer some of the questions that you may have about your employment at TUCSON TAMALE.

We hope you find your time with us to be an enjoyable and rewarding experience.

Once again, welcome to TUCSON TAMALE!


Sincerely,

Todd and Sherry Martin

# Our Masa Mission

Tamales are an ancient and treasured tradition shared by cultures across the globe. We celebrate those traditions in our modern world by creating delicious, healthy, honest, affordable food that honors the people and places from which they came.

# Values

**People:**  We make food to make people happy; plain and simple. So people – our team members and our guests – are at the core of what we do. We celebrate people with respect and kindness. Happy people make a happy world.

**Quality:**  We figure it's not worth doing, unless it's done right. So we source non-GMO corn, buy organic when we can, and celebrate great ingredients with outstanding preparation. We measure quality at every point of the process.

**Detail:**  Love is in the details. The little things always add up to the big things. Details, details, details, make it work. It's a short distance between "good" and "great" and the details make all the difference in the world.

**Do The Right Thing:** Do the right thing because doing the right thing is always the best thing.

**Community:**  We work to make our community a better place. Our community is often as small as those currently dining in our restaurant, as personal as our city, and as big as the entire food industry. We do everything in our power to make it all a better place.

# About our Business

We have three distinct businesses at Tucson Tamale. A successful team member will understand how their job supports these three separate but complementary businesses.

**E-Commerce:**   We sell and ship our tamales to tamale lovers all over the United States. We ship 2nd Day FedEx to anywhere in the country. This is the easiest and fastest way to serve our guests who do not live locally.

**Wholesale:**  Our tamales are also sold at retailers in Arizona and soon to other states.  Customers can find our tamales in Sprouts, Trader Joe's, Whole Foods, AJ's, and many Co-ops. We also sell our tamales to the Food Service industry. Our tamales are served in many restaurants both casual to fine dining.

**Restaurants:**   And have three fast-casual restaurans that offer dine-in and take out of our hot or frozen tamales. We serve breakfast, lunch, and dinner.  We also provide catering for group events.  In addition to our tamales, we also sell burritos, quesadillas, and empanadas.  We have our own organic line of hot sauces.  We support other local food businesses by offering their product in our restaurants. These include Dick's Premium Margarita Mix, Iron John's Brewery, and Isabella's Ice Cream. We are also proud to support our resident artist, Melo Domingo.

## Our Way of Doing Business

At Tucson Tamale we believe that every team member has a hand in the success of our business and the experience of our guests.  We work every day to get better. We are committed to making a great product and providing a great experience to both our guests and our team members. This is what we stand for:

- We believe in providing an amazing service and amazing products. Our goal is to make each and every guest interaction so great that they tell their friends, family, and the world.
- We believe that we can always get better.  We never stop trying to do it better, no matter how good we are. We constantly strive to raise the bar.
- We believe in helping each other get better.   We respect each other and work as a tight team.  We encourage team members to share their input.
- We believe in helping our team members be the best they can be.  We will give our team members the training and tools to deliver a great experience
- We believe in honesty and trust. We work to build trust with others in each and every interaction. We recognize that honesty and trust form the bond that holds organizations and relationships together.
- We believe in doing business in a professional and orderly manner. We take pride in having good systems, standardized procedures, and being organized.
- We believe in being responsible to others and to ourselves. We do what we say we are going to do when we say we are going to do it. We believe in personal accountability. We avoid blaming others when things do not turn out as planned.

TTC 000066

# Standards of Conduct

In general, we expect all team members to be professional and treat our guests and other team members with respect. Here are our expectations:

1. Tell the truth
2. If you make a mistake, own it.
3. Show up for your shift on time, in full uniform, and ready to work.
4. If you cannot make your shift, you must call in.
5. Do not clock another team member in or out. Do not have someone else clock you in or out.
6. Work your entire scheduled shift, leaving early only with a Manager's permission.
7. Only check off items on a checklist that you have personally completed.
8. Keep conversations appropriate. Absolutely no use of foul or abusive language in the front of the house.
9. Do not steal from the restaurant, guests, or other team members.
10. Treat all guests and other team members with decency and respect.
11. Do not come to work under the influence of drugs or alcohol.
12. Respect Tucson Tamale property and equipment.
13. Do not share Tucson Tamale confidential information.
14. Do not smoke within 20 feet of any entrance. Your Manager will inform you of where the designated smoking area is for your location. Smoking elsewhere is grounds for termination.
15. Do not post to any social media site anything that is mean, hurtful, rude, creepy, gross, or disgusting about Tucson Tamale, our team members, or our guests.

# Employment Policies

Tucson Tamale believes in treating team members equally, fairly, and with respect. We expect our team members to treat each other with respect. We work in a fast-paced environment with limited space. We understand there will be bantering and joking between team members. These policies are not intended to create a stiff and sterile environment. If a team member offends you in any way, it is your responsibility to tell the team member that you were offended. If you are uncomfortable going directly to the team member, go to the manager so the manager can communicate to the team member that you were offended. If you do not say anything, the assumption is that you approve of the behavior or comments. We want to promote a comfortable work environment and all team members must take a part in creating it.

## Equal Opportunity Employment
Tucson Tamale is an equal opportunity employer. We will not tolerate discrimination based on age, citizenship status, color, disability, gender, race, national origin, religion, sexual orientation, or veteran status. We do not discriminate when it comes to hiring, promoting, and terminating team members. We will follow state and federal laws that protect people from discrimination.

We will attempt to reasonably accommodate individuals with known disabilities unless doing so would create an undue hardship on Tucson Tamale. Any qualified applicant or team member with a disability who requires an accommodation in order to perform the essential functions of their job should inform company management to request an accommodation.

## Non-Discrimination
Tucson Tamale is an equal opportunity employer. We will not tolerate discrimination based on age, citizenship status, color, disability, gender, race, national origin, religion, sexual orientation, or veteran status. Employment decisions such as hiring, promotion, compensation, training, and discipline will be made only for legitimate business reasons based upon qualifications and other nondiscriminatory factors.

## Age Requirements
All front of house staff should be at least 19 years of age. This is because the law requires that anyone who takes orders for or serves alcohol must be 19 years of age. Any team member under the age of 19 cannot take orders for alcohol. They cannot enter the sale of alcohol in the POS, cannot take payment for an order including alcohol, cannot deliver alcohol to a guest's table, and cannot stock alcohol. Employees under the age of 19 must comply with all federal wage and hour guidelines, no exceptions.

TTC 000068

**Alcohol Serving Policy**

As a restaurant that sells alcoholic beverages, we are committed to sensible, socially responsible consumption of alcohol. We help to ensure our guests' and other members of the community's safety by educating our team members on responsible service and management of alcohol. We want our customers to enjoy alcoholic beverages in moderation, but if a customer shows signs of overindulging, a manager should be informed immediately.

Team members who serve customers, must abide by Tucson Tamale policies on alcoholic beverage service:

1. We will not knowingly allow anyone on our staff that is under the legal drinking age to sell, serve, or dispense alcoholic beverages.
2. We will not serve alcoholic beverages to an intoxicated person.
3. We will not knowingly serve a person under the legal drinking age alcoholic beverages. It is our policy to card anyone who appears to be under 30 years of age.
4. We will offer non alcoholic alternatives such as soft drinks, coffee, water, etc.
5. Tucson Tamale will provide free taxi service for intoxicated customers.

**Cell Phones**

Team members may only use their cell phones before their shift, after their shift, or while on an approved break.

Team members may not keep their cell phones on their person unless they are the acting Manager on Duty or have an approved and explicit business need.

Any team members observed in person or on camera not adhering to cell phone policy may be subject to accountability and required to leave their cell phone in their vehicle or at home.

In the event of an emergency, team members may be reached at their location's landline number. In rare and approved cases, team members may have their cell phone on them with a Manager's approval and permission.

**Cell Phones in Company Vehicles**

Tucson Tamale is aware that team members may need to use their cell phones when driving company vehicles. All cell phone use should be limited to hands-free communication only. Tucson Tamale strictly prohibits texting, web-browsing, email correspondence and any other use of a cell phone that may lead to distracted driving. If it is necessary to perform any of these tasks in the service of our guests or the business, team members must park the vehicle in a manner consistent with traffic safety standards before proceeding.

TTC 000069

## Social Media, Social Networking, and Online Etiquette

Tucson Tamale understands the prevalence of Social Media and Social Networking today. These digital channels of communication can drive business and engage guests. These same channels can also lead to loss of business and can compromise Tucson Tamale's reputation when used carelessly or irresponsibly.

While team members' rights to free speech protect online activity conducted on personal social network accounts, it is important to note that if your account or profile can be linked to Tucson Tamale in any way, personal activities, opinions, pictures, and videos should not be attributed to Tucson Tamale and expressed as the individual's own opinion.

Any material posted online is public domain and may be considered when performing individual accountability. This applies whether material was posted on or off the clock and on or off Tucson Tamale premises. This also includes activities that may not pertain to Tucson Tamale specifically but could be linked to the company through association with your profile.

Online posts should never reveal proprietary or confidential information. They should never compromise the safety or well-being of our business, team members, or guests. Posting material that casts a negative light on our business, team members, or guests is grounds for consequences up to and including termination.

## Company Computer Use

Company computers are for business use only. Do not download or install any files. Do not visit inappropriate websites or websites that might compromise the security of company computers.

## "Hot Tamales"

This is our battle cry! It lets team members know that you are moving in the restaurant with hot, possibly dangerous product. It lets guests know that they we are committed to serving fresh, hot food throughout the day and that they have been here longer than their food has.

If you are removing fresh, hot tamales from the steamer, it is your responsibility to shout, "Hot Tamales!" while bringing them to the line.

If you hear another team member shout, "Hot Tamales!" it is your responsibility to shout "Hot Tamales!" back to let them know you have heard them and are aware of movement in the restaurant.

## Parking

Each Tucson Tamale location has a designated team member parking area. Your Manager will explain the Parking Policy for your individual store.

## Personal Information

Never give out private information or personal contact information for our guests or team members. This applies to inquiries in-person, online, and over the phone. This information includes but is not limited to email address, phone numbers, and work schedules. Legitimate inquiries should always ask to speak to a Manager on Duty.

## Team Member Communication

All team members are required to read through their location's communication book. This communication book relays important information that all team members must know. Some communication is time-based - such as a special or discount - some communication is information-based or policy-based.  You are required to implement and adhere to any communication that is in the book. Staying current and informed on Tucson Tamale policies is your responsibility.

# Zero Tolerance Policies

## Proprietary & Confidential Information

It is illegal to steal, copy, communicate, or transmit a former or current employer's confidential or proprietary information. Proprietary information is defined as "the whole or any part of any scientific or technical information, design, process, procedure, formula, or improvement that has value and that the owner has taken measures to prevent from becoming available to persons other than those selected by the owner to have access for limited purposes."

Our internal business practices, procedures and recipes are of great value to Tucson Tamale. Team Members are not to disclose any proprietary processes or recipes to any person unless directed to by Tucson Tamale Managers or Owners. Tucson Tamale will institute civil action against anyone who violates this policy.

## Harassment in the Workplace

Harassment is not only illegal and wrong, but also demoralizing for everyone involved. Such harassment is a violation of Tucson Tamale policy prohibiting any and all forms of discrimination.

**Sexual Harassment** – defined as unwelcome sexual advances, requests for sexual favors, and other verbal, visual, or physical contact of a sexual nature.
Harassment includes verbal or physical conduct that disrespects or shows hostility toward another team member because of their age, citizenship status, color, disability, gender, race, national origin, religion, sexual orientation, veteran status, or any other characteristic protected by law. This type of harassment can interfere with an individual's work performance by creating an intimidating, hostile, or offensive work environment.

It is the responsibility of everyone at Tucson Tamale, not just the management, to prevent and eliminate destructive behaviors.

If you feel that you have experienced or witnessed harassment of any kind, you should immediately notify your direct supervisor, another supervisor, or any member of management. Team members may report to the member of leadership they feel is most appropriate, regardless of chain-of-command.

Bringing to management a report of inappropriate conduct does not necessarily validate the complaint. Confidentiality will be maintained throughout the process of investigating the complaint consistent with adequate investigation and appropriate corrective action.

## Violence in the Workplace

Tucson Tamale believes team members should display common sense, good judgment, and a high regard for the rights and interests of others if we are to provide a safe and productive work environment. Accordingly, team members are required to adhere to reasonable standards of personal conduct at all times. In all cases, determinations of discipline are reserved by, and remain the decision of, management regardless of whether the behavior constitutes violence.

Any team member who engages in behavior that violates this policy will be subject to disciplinary action, up to and including termination of their employment.

All incidents involving violence in the workplace must be reported to management. Team Members that witness, receive, or have been told of another person who has witnessed or received harassment involving violence must report it to management immediately. Even without an actual threat, team members should also report any behavior that is threatening or violent when that behavior is job-related or might be carried out on site. **Bottom line – anyone that witnesses, receives, or hears about violence in the workplace is obligated to report it.**

Tucson Tamale will not tolerate any retaliation against anyone who reports violence in the workplace.  Retaliation is a serious act. Retaliation can include but is not limited to remarks, threats, physical or verbal abuse, and undesirable job assignments.

This policy applies to all team members, vendors, and guests.

## Restraining Orders

All individuals who obtain a protective or restraining order which lists Tucson Tamale, directly or indirectly, as being a protected area must provide to management a copy of any temporary protective or restraining order which is granted, and a copy of any protective or restraining order which is made permanent. Tucson Tamale understands the sensitivity of the information requested and will maintain the highest degree of confidentiality possible. Tucson Tamale will share information only as necessary.

## Substance Abuse

Tucson Tamale acknowledges the problem of drug and alcohol abuse in our society. Furthermore, we see drug abuse as a serious threat to our staff and our guests.

It is essential that all team members be alert and on top of their game when working. This policy against Substance Abuse is necessary to protect the safety of our team members, our workplace, and our guests. No team member may report to work or remain on duty while using, being under the influence of, or impaired by alcohol or an illegal drug, intoxicant, or controlled substance. No team member may possess, sell, or distribute alcohol or an illegal drug, intoxicant, or controlled substance while on

TTC 000073

company property or on company time. Drinking alcoholic beverages or use of other illegal drugs, intoxicants, or controlled substances during working hours, during breaks, or during lunch is prohibited. Failure to comply with this policy may result in immediate termination.

We reserve the right to test team members for substance abuse. Refusal to take a drug test may result in termination. When requested, the team member shall be transported to a collection facility selected by Tucson Tamale for urine sample testing. If the first test is positive, the sample will be tested a second time by another reliable method that is specific for the substance detected. If an individual tests positive or refuses to be tested, the individual will be subject to applicable disciplinary action, up to and including termination of their employment.

The use of prescription drugs and/or over-the-counter drugs may also affect team member job performance and seriously impair team members' ability to perform their job duties.  Any team member who is using prescription or over-the-counter drugs that may impair his or her ability to safely perform the job or may affect the safety of others must submit a physician's statement that the prescription drug will not affect job safety or the ability to perform their job. Team members are not required to identify the medication or underlying illness. Various federal, state, and local laws protect the rights of individuals with disabilities and others with regard to the confidentiality of medical information, medical treatment, and the use of prescription drugs and substances taken under medical supervision. Nothing contained in this policy is intended to interfere with our team members' individual rights under these laws.

# Employee Experience

## Orientation

We want you to succeed.  During the first 30 days we will teach you your cored job and cross train you where appropriate.  It is important that you take ownership in learning the job you were hired for.  If you do not understand something, ask questions for clarity.  After 30 days, you will receive a review.  During this review we will determine if we are a good fit or if we need to part ways.

## Review Process

Team Members will receive a formal review at 90 days of their employment.  During this review, there will be an opportunity for a wage increase.  If a team member has not displayed the skills and behavior to merit a raise at 90 days, a formal Performance Improvement Plan will be put in place.

Team members will be evaluated approximately every six months.

## Progressive Discipline

Tucson Tamale uses progressive discipline approach to support team members to improve and grow in their job performance. There are egregious infractions in which immediate termination will occur. For infractions that do not fall into this category, the following progressive discipline process will be used.

Step 1 - counseling/coaching for any minor infractions. Noted in communication log for management team to all be on same page.

Step 2 - verbal warning. Noted in communication log.

Step 3 - 1st written warning. Written warnings are reviewed as cumulative, not incident specific.

Step 4 - Additional written warnings - these should be reviewed by manager to determine the level of severity and the next steps to be taken.

# Schedules and Time Keeping

**Schedule**
Our staffing needs vary based on the time of year and special events. The work week at Tucson Tamale is Monday through Sunday.  Schedules are posted every Thursday for the following week.

**Availability**
Hours are delegated based on performance and availability. We understand that your availability may change and we will do our best to accommodate your new availability. Significant changes in availability may affect the amount of hours you are able to be scheduled. Schedules are written in consideration of guest traffic and rhythm, not team member availability.

If your availability changes, you **must** fill out a new availability sheet and submit it to your manager.  Verbally communicating availability is not considered recorded.

Availability is an important factor in the hiring decision. The availability you are hired with must remain unchanged for the first 90 days of your employment.

**Change of Address or Phone Number**
If you change your address or phone number, please fill out a new Team Member Contact Sheet. Our payroll provider will directly mail your W-2 to the address listed on file. If a team member's address or contact information is not complete or up-to-date, it may result in a delay in receiving their W-2 to file income taxes at the end of the year.

**Calling Out**
**You are solely responsible for knowing and working your complete scheduled shift.** If you know you will not be able to work your shift, first try to get it covered. All shift trades must be submitted in writing on a Shift Trade Approval Form to management. Submitting a form does not guarantee approval. You can only switch shifts with someone who is proficient in the job and shift you are trading.

Calling out on the day of your shift creates a burden for your team.  Please call in as early as possible so we can cover your shift. Always call your location's land line first. If it is before or after business hours, call your manager directly. If you call in sick, you may be asked to present a doctor's note releasing you back to full duty before you can be scheduled again.

**Time Off**
Requests for time off should be made on the Time Off Request Calendar. Your manager will show you where this is at your specific location. If multiple people request a specific day off, the day may be closed to additional requests. Putting a request in

early is preferred. **We cannot guarantee time off.** We will do our best to accommodate. For this reason, we ask that you obtain approval for time off before purchasing accommodations, airfare, or event tickets.

**November and December are our busy season. Late October and Early January may also see increased production periods. Requests for time off are restricted during this time.**

### Timekeeping
Every team member will be given an ID number.   Please do not share your team member ID with other employees.

Only you can clock yourself in or out. No exceptions. You are expected to clock in on time, in full uniform. Unless instructed by a manager, you cannot clock in more than five minutes before your scheduled shift. Never clock another employee in or out.

### Time Card Adjustments
You are responsible for clocking in and out of your shift. If you forget to clock in or out, you must fill out a Time Card Adjustment Form and have a manager sign it.

Tampering, altering, or falsifying time records or recording time on another team member's ID number is not allowed. It is considered time card fraud and theft and may result in disciplinary action up to and including termination.

### Holidays
Tucson Tamale is closed on the following holidays:  Easter, Thanksgiving, Christmas. These holidays are unpaid for hourly employees.

TTC 000077

## Resignations

We ask that you give a two-week-notice when you plan to leave. This is an industry standard that any new employer should be accommodating of. In cases with extenuating circumstances management can approve a shorter notice. If you fail to give a notice, your employment record will reflect this action. Consequences may include being ineligible for rehire or referral.

Any team member who does not give two-weeks-notice or does not complete all of their scheduled shifts for the duration of their notice will not be eligible for the tip pool.

## Breaks

Team members working a shift that is six hours or less are entitled to one 15 minute break.  Team members working a shift that is more than six hours are entitled to two 15 minute breaks or one 30 minute break. These breaks are paid. You do not need to clock in or out from breaks unless you leave the building – this includes leaving the building to smoke.  Because these are paid breaks, you may be asked to cut your break short to help out if need.  Because these are paid breaks and you are still considered on-the-clock, team members must remain on premises for breaks and lunches.

Breaks for all team members, regardless of position or role, must be coordinated with a manager. All breaks are as-business-permits and should never interfere with giving our guests the best possible service.

Break times are start to finish. If you know you will be having food that takes time to prepare it is acceptable to place an order before your break and begin your break when your order is ready. It is not acceptable to stop working your role to prepare your own food and then begin a break after you have finished.

Not adhering to break times and policies may be considered time fraud or could lead to disciplinary action.

## Smoking and Smoke Breaks

Tucson Tamale is a smoke-free environment. There is absolutely **NO SMOKING** within 20 feet of any Tucson Tamale door at any location. An official break is the only time you are permitted to smoke. You cannot take an "unofficial break" or "multi-task" by incorporating a smoking break into tasks performed outside the restaurant. This includes but is not limited to cleaning work vehicles, receiving deliveries, taking phone calls, and taking out trash.

Employees must clock out if they go outside to smoke.

Aside from violating local Health Code, smoking on the job can put some of our most loyal guests with allergies or sensitivities at-risk.

Do not leave cigarette butts on Tucson Tamale property. Allowing team members to smoke on-site is a privilege. All Tucson Tamale company vehicles are smoke-free. Any team member not able to adhere to the smoking policy is subject to disciplinary action up to and including termination.

# Compensation, Pay, and Perks

Paydays are every other Friday.  The pay period is Monday through Sunday of the following week.  Payday is the first Friday after the last Sunday of the payroll period.

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|--------|--------|---------|-----------|----------|--------|----------|
|  | 1 | 2 | 3 | 4 | 5 ☆ | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 ○ | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 ☆ | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 ○ | 27 |
| 28 | 29 | 30 |  |  |  |  |

You have two options when choosing how you would like to receive your pay. The first and preferred method is direct deposit into your personal account. This is the easiest and fastest way to receive your paycheck. The second option is a pay card issued through our payroll provider.

In accordance with Federal Minimum Wage Law, team members are paid overtime when they work more than 40 hours in one week. Hourly team members are paid at one and one-half times their basic straight time rate for all overtime hours worked.

**Tips**
Some customers leave Tips for the employee.  Many fast casual restaurants do not have a tip jar – we do.  Tips are divided among employees proportional to hours worked during the pay period.  Tucson Tamale deducts 3% of all credit card tips from the tip

TTC 000079

pool to cover the cost Tucson Tamale is charged from the credit card processer.  Tips are included in the bi-weekly paycheck.

## Meals

Team members can purchase Tucson Tamale food while on your shift at a 50% discount.  Everything must be rung up by a manager.  Any food found in an employee area that is not rung up is not allowed.  Employees can enjoy fountain drinks at no charge during your shift.  Any bottled beverage must be rung up at 50% discount.

All Team Member Meals must be rung up at the POS. Your manager will train you on the proper method of recording your Team Member Meal. Never ring up your own meal - or any other personal purchase - through the POS yourself.

Failure to record your Team Member Meal and other personal purchases could be considered theft and may be subject to disciplinary action up to and including termination.

All team member drinks must have a date, name, lid, and straw and should be kept out of guest view on a bottom shelf away from ready-to-serve product.

Bottled beverages, brownies, guacamole, and ice cream are not included in the Team Member Meal policy but may be purchased under the regular Team member Discount policy.

Team members cannot purchase or consume any alcoholic beverages while on duty.

## Discount

Hot, prepared food and drink purchased for the team member while not on duty will be discounted 50%, up to $20. **This does not include alcohol**. Team members cannot ring up their own purchases. If you want to ship tamales as a gift, tamales will be discounted 50%, up to 14 packs, once per month. Team members are responsible for all shipping costs.

## Friends & Family

We are proud of our product and want you to be, too! Friends and family of team members receive a 10% discount when the team member is dining in with friends and family or when friends and family come in while the team member is working. **This does not include alcohol**. Team members may not ring up their own friends and family members.

## Catering

Team Members receive 10% off of caterings for personal events.

TTC 000081

# Dress Code and Appearance

Tucson Tamale Dress Code Policy takes into account our brand, sanitation, and team member safety. Failure to comply with this policy may result in being sent home from your shift.

The following standards are non-negotiable. It is very important that we maintain the highest standards of cleanliness, safety, and sanitation. Dress Code Policy is strictly enforced at all times.

## Company Issued Uniform

Team members will be issued one Tucson Tamale T-shirt.  Team members are also able to provide their own approved shirt to be embroidered with the Tucson tamale logo. Embroidery is covered by Tucson Tamale at no charge to the team member.

Team members will be issued one Tucson Tamale hat.  Team members must label their hat for identification purposes. Team members are also able to provide their own approved hat to be embroidered with the Tucson tamale logo. Embroidery is covered by Tucson Tamale at no charge to the team member.

Additional Tucson Tamale T-Shirts and hats may be purchased at a Team Member discount of $10 each. This amount may be deducted directly from your paycheck.

## UofA Game Days

Team members may wear either a University of Arizona T-Shirt or Hat on game days for the Men's Basketball and Football teams. The apparel can not contain any offensive material or advertisements. Either a Tucson Tamale Hat or T-Shirt must be worn as well. For example, if a team member chooses to wear a U of A Wildcats T-shirt on game day, they must wear a Tucson Tamale hat.

## Non-Slip Shoes

For your safety all employees are required to wear non-slip shoes at all times. Failure to wear non-slip shoes could result in employee being sent home from their shift. As we do not require a specific style or brand of non-slip shoe, team members are responsible for providing this portion of the uniform.

Acceptable forms of non-slip shoes will be close-toed and fully cover the heel. Affordable options may be found for around $20 at Payless Shoe Source and Wal-Mart.

## Hats

All team members are required to wear a Tucson Tamale hat at all times during their shift. The only exception is if you are wearing a U of A hat on an approved game day. Hats must be worn with the bill facing forward and all hair tucked inside and behind the

ears, away from the face. If you forget your hat or lose it, you may purchase a hat for $10. Taking hats and T-shirts without paying is considered theft and could result in disciplinary action up to and including termination.

## Team Member Appearance Standards
- No gum chewing while on duty.
- No straws, toothpicks, or other foreign objects in the mouth while on duty.
- Hair should be clean. Hair longer than shoulder length must be in a tight braid or bun.
- Long hair must be pulled back tight. No stray strands should be visible.
- Cologne, fragrance, and perfume are not permitted.
- Fingernails must be neat and trimmed. Fingernails and hands must be clean.
- Nail polish cannot be worn off or chipped. If wearing nail polish, hands must be gloved when handling food.
- Facial make-up should not be excessive.
- No excessive body odor.
- No visible bra straps.
- All clothing must be free of rips and tears and should be in good repair.
- Clothing should not have chains, cut outs, or straps.
- Maintain good personal hygiene at all times.

## Front of House
- Non-slip shoes
- Tucson Tamale T-Shirt in presentable condition.
- Tucson Tamale hat.
- Shorts or skirts must be at least as long as the end of your fingertips when your arms are at your side.
- Leggings are allowed as long as they are in a neutral color and are not transparent. Please make sure the shirt is thigh length.
- No break-away pants, mesh shorts, or sweatpants are permitted.
- Modest jewelry is permissible.

## Back of House
- Non-slip shoes
- Tucson Tamale T-Shirt in presentable condition is the standard. However, a plain T-shirt with no designs, logos, or text is also acceptable.
- Hair must be pulled back tight in a Tucson Tamale hat. U of A hats are acceptable when appropriate.
- Shorts or skirts must be at least as long as the end of your fingertips when your arms are at your side.
- If nail polish is worn, kitchen staff and tamale rollers must use gloves when handling food.
- **No bracelets, earrings, facial piercings, or necklaces may be worn by Back of House or food production team members. Simple or plain wedding bands may be worn only when the hand is wearing a glove.**

TTC 000083

## Piercings and Tattoos

We understand that body modification, piercings and tattoos are an important and personal form of self expression. While we wish to respect - and even encourage - individuality, it is also important that we put the comfortability and safety of our team members and guests first.

Piercings should follow dress code and adhere to the specifications of your individual role. Tattoos that could be considered offensive or in poor taste should be covered with clothing or high visibility bandages when necessary.

You were approved for hire with the piercing and tattoos that you currently have. If you decide to get a new body modification, piercing, or tattoo, these will be subject to Tucson Tamale Dress Code Policy.

Management reserves the final decision on what is and what is not acceptable for our brand, our guests, and our team.

Failure to comply with the Dress Code Policy may result in being sent home from your shift.

# Guest Service

Taking care of guests is the number one priority for each and every team member. Guests must be greeted immediately upon arrival. Back of house staff should smile and engage customers during interactions. Every guest should also be thanked when leaving our restaurant. Guests are never an interruption. They are our lifeline!

We believe deeply in providing excellent guest service. You will be trained on how to provide great guest service. This training is on-going. This is an area that we can help each other out. Peer accountability is important as we are all responsible for great guest service. You should feel comfortable coaching your fellow employees on how an interaction could have gone better. Always give feedback with dignity and respect. Never be condescending or harsh.

## Guest Feedback

Our guests share with us and others about their experience. Occasionally, a guest may not have a stellar experience and may reach out to us to share input. Sometimes, a guest may be angry or irritated. Guest feedback is an opportunity for us to step up our game and improve our business – own it, internalize it, learn from it, and make adjustments as necessary.

First, don't be defensive. Really listen to the guest. Let them tell their whole story before interrupting or trying to solve the issue. Take the time to align with the guest by acknowledging and apologizing for their experience. "I understand how that can be disappointing," or, "I'm sorry we let you down". Find out what we can do to make it right and do so in a reasonable way. You are empowered to do what is right for a guest, within reason.  If you need assistance from a manager, do not hesitate to ask.

People are passionate about food and we are passionate about guest service. If you feel yourself getting frustrated and determine that the guest needs help from a different team member, politely excuse yourself and have another team member or manager assist the guest. When handing over a guest issue, always do so with respect to the guest and your peers.

Sometimes a guest has already had their issue addressed on a previous visit, over the phone, or through email correspondence. In these instances they may be here to pick up product or receive a refund or other compensation.

## Telephone Courtesy

Promptly answering phone calls is vital to our business. When guests call the restaurant it important that they be treated with the same respect and diligence as in-house guests.

Never interrupt an in-person interaction to answer an incoming call. For example, if the phone is ringing and there are only two team members on the line, the team member making an order should drop what they are doing to answer the call. The team member taking the order at the POS should only excuse themselves from a live guest interaction as a last resort when no one else is available. When this is necessary, always apologize to the guest you are currently helping and request permission to excuse yourself to answer the phone. Once permission is received, answer the call and request permission to place them on hold. The next available team member, regardless of role, should answer the guest on hold as soon as possible.

The appropriate greeting is:

"Thank you for calling Tucson Tamale at (specific location).  This is (name), how may I help you?"

## You must identify yourself!

Anyone answering the phone should be proficient in taking orders including catering, cold and hot pick-ups, and shipping.

Familiarize yourself with your store's location information, including cross streets, directions, and landmarks. Know the cross streets of locations you do not work at. Ensure that the guest knows which location they are calling and that it is the appropriate location for them.

Respond to any questions that you are absolutely certain of. If you are uncertain, request permission to put the guest on hold for a moment and quickly refer the call to someone on staff who can answer with certainty. Prior to handing the caller off, please be sure to obtain their name (and pass the name on) and thank the guest before handing off.

# Safety

Tucson Tamale is committed to maintaining a safe workplace for all of our team members. The time to be conscious about safety is before an accident happens. Safety is everyone's responsibility and is a regular, on-going part of everyone's job. You will receive more specific, detailed information and training on safety issues as an on-going part of your employment. Here are some basic guidelines and safety rules to always keep in mind:

- Wipe up spills immediately.
- Never run, always walk carefully. Even when it is busy, take small steps and pay attention.
- Non-slip shoes are required.
- Report defective equipment or tools to a manager immediately.
- Never operate equipment unless you have been trained how to use it properly.
- Never try to catch a falling knife. Knives are easier to replace than fingers.
- When carrying a knife, always handle it blade down, at your side and close to your body. When rounding a corner or nearing another team member state that you have a knife by saying, "KNIFE," loudly and clearly.
- Never toss dirty knives into a sink. Place them with the blade facing away from people in an obviously visible area.
- Let people know when you are carrying anything hot. Don't be shy, yell out something like, "HOT," or "BEHIND." When transferring tamales from the steamer to the service line, shout, "HOT TAMALES!"
- Use proper lifting techniques. Never lift too much. If it is uncomfortable or awkward to handle, ask for assistance, make multiple trips, or use a speed rack or flat cart. Remember to always bend at the knees and lift with your legs, not your back.
- Use the right tool and use it appropriately. This includes immersion blenders, kitchen equipment, knives, ladders, oven mitts, step stools, and more. If you have not been trained on the use of a specific piece of equipment, ask a Manager on Duty for further instruction and training.

## Reporting Injuries and Worker's Compensation

Tucson Tamale has arranged to obtain Worker's Compensation coverage for team members with job related illnesses or injuries. Creating a safe workplace, free of accidents, is everyone's concern and responsibility.

If you get hurt on the job, you must immediately report it to the Manager on Duty. Your MOD will complete the appropriate accident report form(s), which must be submitted to the appropriate Worker's Compensation representative immediately following the illness or injury. Medical care will be provided as required by applicable Worker's

Compensation laws. If you fail to report an accident or illness and that incident increases in severity, it may be difficult to obtain Worker's Compensation benefits. When in doubt, **report it!**

Report all accidents, no matter how minor they seem, to the Manager on Duty. In the event of an emergency, like an apparent serious injury or choking situation, notify a manager immediately and call 911

You should be aware that Worker's Compensation insurance does not cover the payment of Worker's Compensation benefits for any injury that occurs from voluntary participation in any off-duty athletic, recreational, or social activities that are not a required part of your work-related duties. Any injury that occurs while on company property and/or company time may require the team member to submit for a drug test.

## Sanitation

Health Department regulations, as well as our own value system, dictate that we be obsessed with sanitation and food safety. **Due to the nature of the restaurant business, it is absolutely essential that everyone follows safe food handling procedures.** There is no compromising on these standards. Never take shortcuts on food handling and safety. Every day we are entrusted with the health - and even lives - of our guests. This is a huge responsibility; one that we must never take lightly!

While you will receive additional and ongoing training on food safety issues, the following are some of the basic rules we always follow and enforce:

- Keep your hands washed. Always wash your hands after coughing, eating, smoking, sneezing, touching your face or hair, and using the restroom. When using gloves, change them frequently.
- Sanitize everything. Besides maintaining clean hands, use sanitizing solution to constantly keep counters, cutting surfaces, and utensils sterile. This helps to keep food handling areas and preparation tools free of bacteria.
- Prevent cross-contamination. Cross-contamination occurs when raw meat or temperature-sensitive or ingredient-sensitive food comes in contact with other food that will be served without further cooking. For example, never place raw chicken on a cutting board and then cut vegetables for an uncooked product like Organic Green Salad on the cutting board without washing and sanitizing it first. When possible, use a completely different cutting board for meats and fruit and vegetables. The same procedure stands for utensils like knives and portioning tools - always wash and sanitize them after every use.
- Keep food at the proper temperatures. Potentially hazardous foods like dairy, fish, meat, and poultry should always be stored below 40°. Food that is cooking or in holding should always be above 140°. Bacteria count on food grows rapidly between 45° and 140° so it's imperative that our food products spend a minimum amount of time in the "temperature danger zone."

- When reheating tamales, sides, and other previously handled food, ensure that they reach an internal temperature of 165°.
- Do not place hot food directly into walk-in refrigerators or freezers. Use a two part cooling process. Bring the food temperature down to 70° within two hours before covering it, labelling it, and placing it in a walk-in.
- Do not leave temperature and time sensitive food and ingredients on counters. When working on large orders, break the process down into smaller, more manageable batches. Temperature and time sensitive food left out of refrigeration for more than four hours should be weighed, logged, and discarded.
- Store food correctly. Raw meat should always be stored below cooked or prepared food. Raw poultry is always placed on the bottom shelf of the walk-in. Keep chemicals and cleaning products away from food products.

**Crime and Robbery**

If you are ever involved in a robbery, DO NOT RESIST. Statistics show that people, who resist, are three times more likely to be injured than people who do not resist. The safety of you, your fellow team members, and guests are our highest priority.

Avoid eye contact unless instructed differently. If possible try to note identifying attributes such as tattoos, glasses, or even shoes.

Do not be a hero, always cooperate fully and do not resist!

**Risk Minimization**

An important part of safety is prevention. The following procedures are meant to minimize risk:

- Back doors should remained locked at all times.
- Notify the Manager on Duty when the cash drawer has an excessive amount of bills $20 and larger. There should always be enough bills to make change for $100 bill. Anything over this could be considered excessive. Confirm your location's guidelines with your Manager.
- Only a Manager on Duty should ever unlock the back door to admit team members or deliveries.
- None of us leave until all of us leave. When closing, everyone helps each other out, regardless of individual role or position. Not only does this maintain morale and our Value of Doing the Right Thing, it also ensures everyone's safety. The Manager on Duty should first ensure that every team member makes it to their vehicle safely and then be the last to leave.
- Note any suspicious persons or vehicles in team member parking areas after business hours. Record makes, models, and license plates of vehicles as necessary.
- If leaving before the end of business, you have the right to request an escort to your vehicle.

- Do not take trash out alone after dark. Trash may be staged at the back door and taken together when everyone leaves.

## Fire Protection

All team members must know the specific location and operation of fire protection in the restaurant. The restaurant is equipped with many fire-extinguishing systems in the ducts, hood, over the stoves, and other cooking equipment that contains a dry chemical. They can be set off immediately by pulling the ring attached to each system. We also maintain handheld $CO_2$ systems (fire extinguishers) behind the bar, in the kitchen, etc.

Be very specific before setting off a fire alarm or notifying someone to take action.

If the fire alarm sounds, assist guests to the nearest fire exit and out of the building immediately. Tell them the restaurant is under "Fire Alarm Status" and it is their responsibility to leave the restaurant through the nearest exit.

This Team Member Handbook is not a contract and does not affect the employment relationship between Tucson Tamale and its team members. Employment is on an "at-will" basis. This means that the employment relationship may be ended at the choice of either party, with or without notice, and with or without cause, at any time.

# Exhibit Z

Page 164

1  concerns that you had?

2      A.   No, not yet.  Because my first -- our style

3  there, my style, too, is bring it up first in person, then

4  let's talk about it.  Usually we get action on things.  So

5  rather than the formality of an e-mail and saying

6  something like that.

7          I was, again, understand there were so many

8  things that everyone was trying to accomplish.  But I

9  wanted to make sure that these were not getting lost in

10  the fray.

11     Q.   Did you reduce your concern to writing sometime

12  after November and December?

13     A.   No.  Also, keep in mind that I had no access to

14  payroll information.  I did not see paychecks.  Sherry

15  handled all of that offsite.  So I had no access to any

16  kind of software that would show payroll.

17         So it took me a little bit longer to figure out

18  that no withholding was happening.

19     Q.   How did you learn, in November or December, that

20  there were withholding issues, if you didn't have access

21  to any of that information?

22     A.   An employee had a problem with their paycheck,

23  their hours weren't correct.  So they came to me to -- as

24  a concern, and asked me to, you know, go and look at their

25  hours to help them with their paycheck issue.

# Exhibit AA

Page 124

1    them, what I -- the projects that I was already working

2    on, that I was committed to, and what my future meant

3    there.

4           Because I had no intention of being an area

5    manager for a fast casual company with three locations for

6    the next five years.

7           So I was asking for time to have an honest

8    conversation with her about that.

9           And, unfortunately, that conversation did not

10   take place until late February.

11   Q.   **After this e-mail is sent to Sherry Martin, there**

12   **was nothing restricting her ability to terminate your**

13   **employment; correct?**

14   A.   Correct.

15   Q.   **Or restricting Todd, Lisa, or Tucson Tamale's**

16   **ability to terminate your employment?**

17   A.   Correct.

18   Q.   **And you claim that Tucson Tamale terminated your**

19   **employment because were you following up about bonuses;**

20   **right?**

21   A.   No.  No.  I claim that they terminated my

22   employment because I think Sherry finally -- I had

23   exhausted her patience with calling out illegalities and

24   irregularities in their business practices.

25   Q.   **Okay.**

Page 126

1    Q.   Is the basis of your claim that you were

2  terminated in retaliation for following up with Tucson

3  Tamale about a bonus that was owed to you?

4    A.   No.

5        MR. TUFTS:  This is probably a good time to break

6  for lunch.  Okay?

7        THE WITNESS:  Sure.

8        MR. TUFTS:  We'll take a half an hour and meet

9  back here.

10       THE WITNESS:  Sure.

11       THE VIDEOGRAPHER:  Please stand by.

12       This ends media number two.  We're off the record

13  at 11:46.

14       (Break from 11:46 a.m. until 12:34 p.m.)

15       THE VIDEOGRAPHER:  This is the beginning of media

16  three of our ongoing deposition.  We're back on the record

17  at 12:34.

18  BY MR. TUFTS:

19    Q.   One of the issues that you raised with Tucson

20  Tamale when you worked for them as the area manager was

21  their tip pool policy; correct?

22    A.   Yes.

23    Q.   And it was your belief that the tip pool policy

24  violated Arizona law; is that correct?

25    A.   Yes.

# Exhibit BB

1

FARHANG & MEDCOFF

2
4801 E. Broadway Boulevard, Suite 311
Tucson, Arizona 85711

3
T: 520.790.5433

4
Ali J. Farhang (#019456) (PAN 65507)
afarhang@fmazlaw.com

5
Roberto C. Garcia (#026246) (PAN 66152)
rgarcia@fmazlaw.com

6
Travis L. Tufts (#029373) (PAN 89943)
ttufts@fmazlaw.com

7

8
Attorneys for Defendants

9
**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

10
**IN AND FOR THE COUNTY OF PIMA**

11

12
MELISSA MARTIN MCBEATH, an
individual,

13

No. C20161794

14
Plaintiff,

**DEFENDANT TUCSON TAMALE COMPANY'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION**

15
v.

16
TUCSON TAMALE COMPANY, an
Arizona corporation; TODD RUSSELL
MARTIN, an individual; SHERRY
MARTIN, an individual; and LISA
MARTIN, an individual,

17

Assigned to the Hon. Gus Aragon

18

19
Defendants.

20
TUCSON TAMALE COMPANY, an
Arizona corporation,

21

22
Counterclaimant,

23
v.

24
MELISSA MARTIN MCBEATH, an
individual; JOHN DOE MCBEATH, an
individual; WHITE CORPORATIONS
I-X; BLACK LIMITED LIABILITY
COMPANIES I-X; GRAY
PARTNERSHIPS I-X; and JOHN DOES
I-X and JANE DOES I-X,

25

26

27
Counterdefendants.

28

*FARHANG & MEDCOFF*

1  Defendant Tucson Tamale Company ("TTC"), by and through undersigned counsel

2  and pursuant to Arizona Rule of Civil Procedure 34, hereby submits its objections and

3  responses to Plaintiff's First Set of Requests for Production ("Requests") as follows:

**RESERVATION OF RIGHTS**

5  1.  TTC responds to Plaintiff's Requests to the best of its present knowledge,

6  information, and belief.  TTC continues to investigate the matters that are the subject of this

7  litigation.  The responses set forth herein are at all times subject to supplementation to the

8  extent additional responsive information and/or documents are revealed through discovery

9  or further investigation.

10  2.  Nothing herein shall be construed as an admission or waiver of (i) objections

11  regarding admissibility, competency, relevance, privilege, materiality, or authenticity or (ii)

12  TTC's right to object to the use of any document or other information during any subsequent

13  proceeding, including the trial of this or any other action.

**GENERAL OBJECTIONS**

15  1.  TTC objects to these requests for production as being overly broad, unduly

16  burdensome, and not reasonably calculated to lead to admissible evidence.  Plaintiff seeks

17  discovery of "any and all" communications that reference or relate to Plaintiff over the

18  course of nearly two years, including communications with non-party employees and

19  ambiguous third parties.  The request requires Defendants to quell tens of thousands of e-

20  mails in their native form, copy them, and produce them for Plaintiff irrespective of their

21  relevancy and the costs associated with reviewing and preserving objections on thousands

22  of e-mails and/or communications.

23  2.  TTC further objects to these requests for production as being vexatious and

24  harassing.  Plaintiff is unquestionably aware of the volume of e-mails falling within the

25  scope of her requests.  Despite numerous requests for specificity, Plaintiff has not, and

26  apparently cannot, identify specific communications she believes elicit evidence reasonably

27  calculated to lead to admissible evidence in support of her claims.  Further, her requests not

28  only ask for information about third-party individuals or entities who are not parties to this

FARHANG & MEDCOFF

00286758.1

- 2 -

1   suit, her requests implicate disclosure of these individuals' private, personal, and

2   confidential information, creating the need for Defendants to review for privilege thousands

3   of e-mails and communications with non-parties. Furthermore, the issues at stake, amount

4   in controversy, and parties' resources simply do not justify a boundless fishing expedition

5   completely disproportionate to the needs of the case. See 2016 Ariz. Ct. Order 0019 (C.O.

6   0019) (adopting the Federal Rules of Civil Procedure's "proportionality" limitation on the

7   scope of discovery, effective January 1, 2017). Plaintiff earned $50,000 per year when her

8   employment was terminated by TTC. That she now claims she is entitled to over ten times

9   that sum is bemusing, but also ignores the value of Defendants/Counterclaimants' claims

10  offsetting her claimed damages.

11          3.      Subject to the foregoing objections, which are incorporated herein by

12  reference, and any other objections including, but not limited to, attorney-client privilege,

13  work product privilege, Ariz. R. Civ. P. 26(b)(3), and privileged confidential or protected

14  information, TTC will produce its e-mail server for inspection. Because the inspection

15  requires producing a computer and involves granting access to TTC's computer servers,

16  exposure to passwords, confidential, and/or privileged information, in addition to security

17  concerns producing this at an individual's residence and the ability to monitor the inspection

18  properly, TTC objects to production of the server for inspection at the Plaintiff's address of

19  record. TTC will make a computer and server available for Plaintiff to inspect on December

20  16, 2016[1] from 1 p.m. to 5 p.m. at 4801 E. Broadway Blvd., Suite 311, Tucson, Arizona

21  85711, with a facility for copying available to Plaintiff should she request copies of

22  documents which are not otherwise confidential or subject to privilege. Defendants reserve

23  the right to seek reimbursement pursuant to Rule 34.

---

24  [1] After TTC served its Requests for Production to Plaintiff on August 2, 2016, Plaintiff did not
25  provide written responses within the presumptive limit provided by the Rules of Civil Procedure.
    Plaintiff still has not served her responses or documents responsive to TTC's requests. She
26  nonetheless has indicated it is time consuming for her to put together comprehensive responses.
    The responses are now 87 days overdue. December 16, 2016 – the date of inspection – is 87 days
27  after Plaintiff served her Requests for Production on TTC. As Plaintiff will understand, quelling
    tens of thousands of e-mails is time consuming. Further, permitting inspection 87 days after the
28  requests were propounded is fair timeframe for production in light of onerous task of quelling tens
    of thousands of e-mails for inspection.

FARHANG & MEDCOFF

00286758.1

FARHANG & MEDCOFF

## TTC's RESPONSES TO REQUESTS FOR PRODUCTION

**REQUEST NO. 1:** DOCUMENTS used, identified, or referred to in preparation of YOUR responses to all written discovery (e.g., interrogatories and request for admissions) that Plaintiff has served on YOU to date.

**RESPONSE:** TTC refers Plaintiff to TTC 000001 – 000291, disclosed in their Initial Disclosure Statement and supplemental disclosure statements.

**REQUEST NO. 2:** DOCUMENTS that relate to COMMUNICATIONS between Sherry Martin, Lisa Martin and/or Todd Russell Martin that RELATE to Plaintiff between January 2015 through the date that YOU respond to this request for production of documents.

**RESPONSE:** TTC incorporates its objections, *supra*. Without waiving objections and subject thereto, Plaintiff may inspect the computer and server on December 16, 2016.

**REQUEST NO. 3:** DOCUMENTS that relate to COMMUNICATIONS between persons that YOU employ (or employed) that RELATE to Plaintiff between January 2015 through the date that YOU respond to this request for production of documents.

**RESPONSE:** TTC incorporates its objections, *supra*. Without waiving objections and subject thereto, Plaintiff may inspect the computer and server on December 16, 2016.

**REQUEST NO. 4:** DOCUMENTS that relate to COMMUNICATIONS between any third party that RELATE to Plaintiff between January 2015 through the date that YOU respond to this request for production of documents.

**RESPONSE:** TTC incorporates its objections, *supra*. Without waiving objections and subject thereto, Plaintiff may inspect the computer and server on December 16, 2016.

**REQUEST NO. 5:** DOCUMENTS that relate to COMMUNICATIONS between any third party that RELATE to Plaintiff between January 2015 through the date that YOU respond

00286758.1

1    to this request for production of documents.

2    **RESPONSE**:  TTC incorporates its objections, *supra*.  Without waiving objections and

3    subject thereto, Plaintiff may inspect the computer and server on December 16, 2016.

4

5    **REQUEST NO. 6:**  DOCUMENTS that relate to confidential information that YOU

6    contend Plaintiff misappropriated.

7    **RESPONSE**:   TTC objects to this request as being vexatious, seeking personal and

8    confidential information, and not reasonably calculated to lead to discoverable information.

9    TTC will produce this information pursuant to a stipulated or Court ordered Protective

10   Order.  Without waiving objections, TTC previously disclosed TTC 000047 – 000060 and

11   TTC 000286 with their Initial Disclosure Statement.

12

13   **REQUEST NO. 7:**  All emails that have the terms "Mel" or "Melissa":

14        (a)    To and from Todd Russell Martin, Sherry Martin and Lisa Martin; and

15        (b)    To and from Lindsay Welch, Alejandra Valenzuela, Shawn Kaylor, Delaney

16               Hare, Meaghan Anderson and Joshua Cooper.

17   **RESPONSE**:  TTC incorporates its objections, *supra*.  Without waiving objections and

18   subject thereto, Plaintiff may inspect the computer and server on December 16, 2016.

19

20

21   **REQUEST NO. 8:**  All content in the mailbox for mel@tucsontamalecompany.com **in its**

22   **native form** and its archival or backup to include all dates of Plaintiff's employment (i.e.,

23   all emails Plaintiff sent or received to/from this email address).

24   **RESPONSE**:  TTC incorporates its objections, *supra*.  Without waiving objections and

25   subject thereto, Plaintiff may inspect the computer and server on December 16, 2016.

26

27

28

FARHANG & MEDCOFF

00286758.1

- 5 -

1        DATED this 31st day of October 2016.

2                                        FARHANG & MEDCOFF

3

4                             By /s/ Travis L. Tufts

                               Ali J. Farhang

5                                Roberto C. Garcia

                               Travis L. Tufts

6

7

8 COPY of the foregoing served

    First-Class U.S. Mail this 31st day

9 of October 2016 upon:

10

    Melissa Martin McBeath

11 3463 E. Terra Alta Blvd.

    Tucson, AZ 85716

12 mel.mcbeath@cox.net

    *Pro Se*

13 /s/Letitia L. Wright

14

00286758.1

1

## FARHANG & MEDCOFF

2

4801 E. Broadway Boulevard, Suite 311
Tucson, Arizona 85711
T: 520.790.5433

3

4

Ali J. Farhang (#019456)
afarhang@fmazlaw.com

5

6

Roberto C. Garcia (#026246)
rgarcia@fmazlaw.com

7

Travis L. Tufts (#029373)
ttufts@fmazlaw.com

8

9

Attorneys for Defendants / Counterplaintiff

10

11

**IN THE UNITED STATES DISTRICT COURT**

12

**FOR THE DISTRICT OF ARIZONA**

13

14

Melissa Martin McBeath,

15

Plaintiff,

16

v.

17

Tucson Tamale Company, an Arizona
corporation; Todd Russell Martin, an
individual; Sherry Martin, an individual;
and Lisa Martin, an individual,

18

19

Defendants.

20

21

22

Tucson Tamale Company, an Arizona
corporation,

23

Counterplaintiff,

24

v.

25

Melissa Martin McBeath and John/Jane
Doe Martin McBeath, husband and wife,

26

27

Counterdefendants.

28

NO. CV-16-00462-TUC-DCB (BPV)

**DEFENDANT'S SUPPLEMENTAL
AND AMENDED OBJECTIONS
AND RESPONSES TO
PLAINTIFF'S FIRST SET OF
REQUEST FOR PRODUCTION OF
DOCUMENTS**

Assigned to Judge David C. Bury and
Hon. Bernardo P. Velasco

**(Cumulative Format – Additions in
bold, deletions in strikethrough)**

00321565.1

1        Defendant Tucson Tamale Company ("Defendant") by and through undersigned

2    counsel and pursuant to Fed. R. Civ. P. 34, hereby objects and responds to Plaintiff Melissa

3    Martin McBeath's ("Plaintiff") First Set of Request for Production of Documents.

4    **RESERVATION OF RIGHTS**

5        1.    Defendant responds to Plaintiff's Requests to the best of its present

6    knowledge, information, and belief.  Defendant continues to investigate the matters that are

7    the subject of this litigation.  The responses set forth herein are at all times subject to

8    supplementation to the extent additional responsive information and/or documents are

9    revealed through discovery or further investigation.

10        2.    Nothing herein shall be construed as an admission or waiver of (i) objections

11    regarding admissibility, competency, relevance, privilege, materiality, or authenticity or (ii)

12    Defendant's right to object to the use of any document or other information during any

13    subsequent proceeding, including the trial of this or any other action.

14    **OBJECTION TO REPRODUCTION OF DOCUMENTS**

15        On or about October 07, 2016, Plaintiff propounded Requests for Production ("State

16    Court Requests") in Pima County Superior Court Case No. C20161794 ("State Court

17    Matter").  The State Court Matter is based on similar facts and virtually identical causes of

18    action now pending in this Court.  The State Court Requests called for substantially similar

19    e-mail production from Defendant's e-mail server.  <u>Compare</u> State Court Requests at pp. 3-

20    4 <u>with</u> District Ct. Requests Production at pp 3-5.  Importantly, the State Court Requests

21    simply asked for e-mails "*in their native form.*"  <u>See</u> State Court Requests at 2:14-15.

22        On or about December 19, 2016, Defendant produced those e-mails in a .pst format

23    – an acceptable native format – for a fact-based inspection.  <u>See</u> Def's. Resp. State Court

24    Requests.[1]  Defendant produced the e-mails in this format due to limitations in their Google

25    Legacy e-mail subscription.  Defendant utilized, and continues to utilize, a grand-fathered

26

27

28

---

[1] To avoid an anticipated motion to compel from Plaintiff, Defendants undertook production of the documents and communications requested by M. McBeath despite the overbreadth and burden. Due to the time consuming nature of responding to Plaintiff's request, including the production of the documents and a pre-inspection privilege review, the inspection did not take place until December 19, 2016.

00321565.1

1   free-version of Google Legacy that limits the ability to perform e-discovery functions

2   directly from Google's server.  In order to preserve the metadata Plaintiff seeks even though

3   she cannot identify a relevant basis for seeking that data (discussed *infra*), Defendant

4   employed a consulting expert who utilized Microsoft Outlook and a third-party application

5   – IMAP – to access Defendant's server and copy the inboxes of the individuals requested

6   by Plaintiff.   The consulting expert performed the copying without interference from

7   Defendant.  Critically, the copies preserved all the metadata from the Google e-mail server.

8        Plaintiff brought her "consulting information technology expert"[2] – Ehud Gavron

9   ("Gavron") – with her to the fact inspection on December 19, 2016.  Rather than identify

10   the e-mails that purportedly support the bases for her claims, Plaintiff and her **supposed**

11   information technology expert instead examined the data underlying the production (i.e. the

12   use of Microsoft Outlook and IMAP) in addition to searches for attorney-client privileged

13   communications.  See generally M. McBeath Ltr., Dec. 21, 2016.  Apparently deciding that

14   the production itself did not meet their subjective expectations, Plaintiff and Gavron left the

15   inspection without consulting Defendant's counsel to clarify any issues with production,

16   their supposed inability to navigate Microsoft Outlook, or any other difficulties searching

17   through the 50,000 plus e-mails produced in response to the State Court Requests.  Shortly

18   thereafter, Plaintiff demanded unfettered access to Defendants' e-mail server so that she

19   and her supposed consulting expert could run scripts and quell whatever communications

20   they unilaterally dictated as relevant.  See id.

21        In a telling effort to remedy the ambiguity in the format of production underlying

22   her State Court Requests for production, Plaintiff's Requests for Production in this Court

23   explicitly request the production be in "native G-mail format."   Importantly, the copy

24   already produced by Defendant and available for inspection preserved that format for

25   review.  Moreover, Defendant expended substantial hours initially quelling responses to her

26   State Court Requests, hired a consulting expert *at their own expense*, and performed an

27
28   [2] Ehud Gavron's purported status as a consulting expert, his communications with Plaintiff during
     the course of her employment, and his subsequent involvement in this case are the subject of
     Plaintiff's Motion for a Protective Order (Doc. No. 39) and Defendants' Opposition (Doc. No. 48).

1   extensive review to remove privileged communications.

2          Plaintiff admitted in her deposition that she seeks native G-mail format only to

3   confirm that e-mails were actually sent and that communications were not fabricated after

4   her employment termination to support Defendant's defenses.  As indicated, the format

5   already produced enables her to confirm these facts.  Apart from seeking verification,

6   however, Plaintiff admitted she has no basis to believe that Defendant did not send the e-

7   mails produced throughout the case or that any grounds exist to believe Defendant

8   fabricated communications.  Indeed, the only basis provided at her deposition to support the

9   demand is Plaintiff's subjective belief the Defendant is not trustworthy.  This subjective

10  belief, however, exists in every litigation.  This lawsuit, like others, creates an adversarial

11  relationship whereby neither party trusts the other.  There are numerous mechanisms for

12  impeaching or questioning a party's credibility, but it is unreasonable and overly

13  burdensome to demand the reproduction of 50,000 plus e-mails based on nothing more than

14  a groundless claim your opponent cannot be trusted.

15         Hoping to avoid another motion to compel, Defendant conducted an investigation

16  into the time, costs, and resources necessary to reproduce the information in native G-mail

17  format as belatedly requested by Plaintiff.  **Defendants initially believed such** a process

18  would require Defendant to upgrade its Google e-mail services suite from a free grand-

19  fathered service to one requiring a subscription costing $6.67 per user per month (as an

20  introductory rate), increasing to $10 after 18 months.  Defendants currently maintain

21  approximately 47 active accounts and will need to activate additional e-mail accounts from

22  inactive users to respond to Plaintiff's demand.  This would result in ongoing costs to

23  Defendant in the approximate amount of $500/month or $6,000 per year, in addition to all

24  the reproduction costs.  Even assuming the cost of upgrading and the burden imposed upon

25  Defendant to reproduce e-mails and performing another privilege review were reasonable,

26  which it is not, the upgrade will not preserve any e-mails that may have been deleted by the

27  respective account holders prior to the upgrade.

28         **Defendants investigated further and learned that, even though they are not able**

00321565.1

1    to use Google's e-discovery functions to address Plaintiff's supposed concerns without

2    incurring the aforementioned costs, they are able to obtain the emails requested by

3    Plaintiff in .mbox (Gmail native) format.  Despite already producing the information

4    sought by Plaintiff and without waiving any objection, Defendants, after receiving

5    agreed-upon Gmail search queries from Plaintiff, and after conducting yet another

6    privilege/confidentiality review, will produce for inspection the resulting emails from

7    Todd Martin's, Sherry Martin's, Lisa Martin's, and any other relevant individual's

8    TTC email account at a time mutually convenient for the parties.

9           Without waiving any objection, Plaintiff's Tucson Tamale emails sent and

10   received during her employment with Defendant are available for inspection at the

11   undersigned's office at a time mutually convenient for the parties.   Defendant,

12   however, will not allow Plaintiff to run any program or script on the Defendant's

13   production system unless Defendant vets and approves the script/program and the

14   parties agree to a protocol beforehand.

15   ~~Plaintiff's salary at the time of her employment termination was $50,000.  There is~~

16   ~~ample evidence of after-acquired evidence of wrongdoing, including the violation of her~~

17   ~~Confidentiality Agreement, which severely restricts Plaintiff's potential damages even~~

18   ~~assuming she can prove any of her claims.  The burden or expense to reproduce the e-mails~~

19   ~~and review them for privilege anew, coupled with the expenses already incurred to make~~

20   ~~the initial production, are excessive in proportion to the claims stated.  Further, there are no~~

21   ~~legitimate or worthwhile benefits that would result from the substantial cost in reproducing~~

22   ~~materials in McBeath's preferred format.  The .pst production preserves the metadata sought~~

23   ~~by Plaintiff.  Therefore, the burden of reproduction from Google itself produces no~~

24   ~~additional benefits to Plaintiff.  Equally persuasive, McBeath cannot identify the relevant~~

25   ~~evidence she has a reasonable belief will be shown from the metadata.  Defendant should~~

26   ~~not be burdened with reproducing the entirety of e-mails including, but not limited to, e-~~

27   ~~mails mentioning "Mel" over the course of two plus years having absolutely nothing to do~~

28   ~~with the underlying claims.~~

1     ~~Defendant will produce for inspection the e-mail boxes previously produced on~~

2     ~~December 19, 2017.   Defendant will make such email boxes available at the office of~~

3     ~~undersigned counsel—4801 E. Broadway Boulevard, Suite 311, Tucson, Arizona 85711~~

4     ~~on April 15, 2017 from 1:00 p.m.—5:00 p.m.   Defendant will consider reasonable~~

5     ~~alternatives to the proposed inspection.~~

6     ~~As a further alternative, at Plaintiff's expense, Defendant will upgrade its Google~~

7     ~~services suite, perform its privilege review, and reproduce the e-mails.~~

8     **REQUEST NO. 1**: DOCUMENTS used, identified, or referred to in preparation of YOUR

9     responses to all written discovery (e.g., interrogatories and request for admissions) that

10    Plaintiff has served on YOU to date.

11    **RESPONSE**: Defendant incorporates its Objection to Reproduction of Documents, *supra*.

12    Additionally, Defendant objects to this request for production as being overly broad and

13    vague. Plaintiff propounded written discovery in the State Court Matter and in this Court.

14    It is unclear whether Plaintiff seeks "DOCUMENTS" used, identified, or referred to in

15    preparation of written discovery in the State Court Matter or in this Court. Without waiving

16    objections and subject thereto, Defendant refers Plaintiff to TTC 000001 – 000866,

17    disclosed in their Initial Disclosure Statement and supplemental disclosure statements in the

18    State Court Matter, for documents responsive to this request.

19    **REQUEST NO. 2:** DOCUMENTS that relate to COMMUNICATIONS between Sherry

20    Martin, Lisa Martin and/or Todd Russell Martin that RELATE to Plaintiff between January

21    2015 through the date that YOU respond to this request for production of documents.

22    **RESPONSE**: Defendant incorporates its Objection to Reproduction of Documents,

23    *supra*. Additionally, Defendant objects to this request for production as being overly broad,

24    unduly burdensome, irrelevant, and not proportional to the needs of the case, the issues at

25    stake in the action, the amount in controversy, and the parties' resources. Plaintiff seeks

26    discovery of "any and all" communications that reference or relate to Plaintiff over the

27    course of over two years, including communications with ambiguous third-parties and/or

28    parties with information not relevant to prove the claims asserted by Plaintiff.   Over the

00321565.1

1   course of Plaintiff's employment, the named parties exchanged numerous e-mails daily

2   related to the operation of Defendant's three local restaurants, its confidential and

3   proprietary data, and their own personal and private information.  Additionally, Plaintiff

4   was included on e-mail chains with numerous third-party individuals who are not parties to

5   this suit, implicating disclosure of these individuals' private, personal, and confidential

6   information.  Many, if not all, of the communications subject to this request have nothing

7   to do with the factual bases underlying her claims.

8        In total, this request calls for production of tens of thousands of e-mails irrespective

9   of their relevancy, thereby burdening Defendant with the costs associated with reviewing

10  for confidentiality, privilege, and any attendant objections to the thousands of e-mails

11  and/or communications.  The issues at stake, amount in controversy, and parties' resources

12  simply do not justify a boundless fishing expedition completely disproportionate to the

13  needs of the case.  Plaintiff earned $50,000 per year when her employment was terminated

14  by Defendant.   That she now claims she is entitled to over ten times that sum is bemusing,

15  but also ignores the value of Defendant's counterclaims offsetting her claimed damages in

16  addition to its defenses of after-acquired evidence of wrongdoing.

17  ~~Without waiving objections and subject thereto, Plaintiff may inspect Defendant's~~

18  ~~e-mail server on April 15, 2017.  The boxes in the e-mail server will contain all information~~

19  ~~responsive to this request except privileged communications. Plaintiff may inspect and~~

20  ~~identify the e-mails she believes are relevant and label them for formal production.~~

21  ~~Thereafter Defendant will review and produce those e-mails subject to a privilege and~~

22  ~~confidentiality review.~~  **Without waiving any objection, as noted above, Defendant will**

23  **make available for inspection the emails resulting from an agreed-upon search query**

24  **run in the target account, in .mbox format, once Defendant completes its privilege and**

25  **confidentiality review.  Defendant awaits the receipt of a proposed query to be run in**

26  **the target accounts and of a proposed protocol for inspection.**

27  **REQUEST NO. 3:**  DOCUMENTS that relate to COMMUNICATIONS between persons

28  that YOU employ (or employed) that RELATE to Plaintiff between January 2015 through

00321565.1

1    the date that YOU respond to this request for production of documents.

2        **RESPONSE**:  Defendant incorporates its Objection to Reproduction of Documents,

3    *supra*.  Additionally, Defendant objects to this request for production as being overly broad,

4    unduly burdensome, irrelevant, and not proportional to the needs of the case, the issues at

5    stake in the action, the amount in controversy, and the parties' resources.  Plaintiff seeks

6    discovery of "any and all" communications that reference or relate to Plaintiff over the

7    course of over two years, including communications with non-party employees or prior

8    employees.  Plaintiff sent numerous e-mails on a daily basis related to the day-to-day

9    operations of Defendant's three local restaurants, including communications related to

10   Defendant's confidential and proprietary data as well as the personal and private

11   information of the third-party employees.  Many, if not all, of the communications subject

12   to this request have nothing to do with the factual bases underlying her claims.

13       In total, this request calls for production of tens of thousands of e-mails irrespective

14   of their relevancy, thereby burdening Defendant with the costs associated with reviewing

15   for confidentiality, privilege, and any attendant objections to the thousands of e-mails

16   and/or communications.  The issues at stake, amount in controversy, and parties' resources

17   simply do not justify a boundless fishing expedition completely disproportionate to the

18   needs of the case.  Plaintiff earned $50,000 per year when her employment was terminated

19   by Defendant.   That she now claims she is entitled to over ten times that sum is bemusing,

20   but also ignores the value of Defendant's counterclaims offsetting her claimed damages in

21   addition to its defenses of after-acquired evidence of wrongdoing.

22   ~~Without waiving objections and subject thereto, Plaintiff may inspect Defendant's~~

23   ~~e-mail server on April 15, 2017.  The boxes in the e-mail server will contain all information~~

24   ~~responsive to this request except privileged communications. Plaintiff may inspect and~~

25   ~~identify the e-mails she believes are relevant and label them for formal production.~~

26   ~~Thereafter Defendant will review and produce those e-mails subject to a privilege and~~

27   ~~confidentiality review.~~  **Without waiving any objection, as noted above, Defendant will**

28   **make available for inspection the emails resulting from an agreed-upon search query**

00321565.1

1  **run in a target account, in .mbox format, once Defendant completes its privilege and**
2  **confidentiality review.  Defendant awaits the receipt of a proposed query to be run in**
3  **the target accounts and of a proposed protocol for inspection.**

4  **REQUEST NO. 4:**  DOCUMENTS that relate to COMMUNICATIONS between any third
5  party that RELATE to Plaintiff between January 2015 through the date that YOU respond
6  to this request for production of documents.

7  **RESPONSE**:  Defendant incorporates its Objection to Reproduction of Documents, *supra*.
8  Additionally, Defendant objects to this request for production as being overly broad, unduly
9  burdensome, irrelevant, and not proportional to the needs of the case, the issues at stake in
10 the action, the amount in controversy, and the parties' resources.  Plaintiff seeks discovery
11 of "any and all" communications that reference or relate to Plaintiff over the course of over
12 two years.  Plaintiff was involved in numerous e-mail chains with third-parties related to
13 the day-to-day operations of Defendant's three local restaurants, including communications
14 related to Defendant's confidential and proprietary data.   Further, the requests seek
15 information about third-party individuals or entities who are not parties to this suit,
16 implicating disclosure of these individuals' private, personal, and confidential information.
17 Many, if not all, of the communications subject to this request have nothing to do with the
18 factual bases underlying Plaintiff's claims.    Additionally, these requests call for
19 communications between Defendant and third-parties made in anticipation of Plaintiff's
20 lawsuit and in preparation for trial.  See Fed. R. Civ. P. 26(b)(3) and (4).

21      In total, this request calls for production of tens of thousands of e-mails irrespective
22 of their relevancy, thereby burdening Defendant with the costs associated with reviewing
23 for confidentiality, privilege, and any attendant objections to the thousands of e-mails
24 and/or communications.  The issues at stake, amount in controversy, and parties' resources
25 simply do not justify a boundless fishing expedition completely disproportionate to the
26 needs of the case.  Plaintiff earned $50,000 per year when her employment was terminated
27 by Defendant.   That she now claims she is entitled to over ten times that sum is bemusing,
28 but also ignores the value of Defendant's counterclaims offsetting her claimed damages in

1   addition to its defenses of after-acquired evidence of wrongdoing.

2   ~~Without waiving objections and subject thereto, Plaintiff may inspect Defendant's~~

3   ~~e-mail server on April 15, 2017. The boxes in the e-mail server will contain all information~~

4   ~~responsive to this request except privileged communications. Plaintiff may inspect and~~

5   ~~identify the e-mails she believes are relevant and label them for formal production.~~

6   ~~Thereafter Defendant will review and produce those e-mails subject to a privilege and~~

7   ~~confidentiality review.~~ **Without waiving any objection, as noted above, Defendant will**

8   **make available for inspection the emails resulting from an agreed-upon search query**

9   **run in a target account, in .mbox format, once Defendant completes its privilege and**

10   **confidentiality review. Defendant awaits the receipt of a proposed query to be run in**

11   **the target accounts and of a proposed protocol for inspection.**

12   **REQUEST NO. 5:** DOCUMENTS that relate to COMMUNICATIONS between any third

13   party that RELATE to Plaintiff between January 2015 through the date that YOU respond

14   to this request for production of documents.

15   **RESPONSE**: Defendant incorporates its Objection to Reproduction of Documents, *supra*,

16   and its objections to No. 4, *supra*. Additionally, Defendant objects to this request as being

17   confusing. This appears to be the same request as No. 4.

18   **REQUEST NO. 6:** DOCUMENTS that relate to confidential information that YOU

19   contend Plaintiff misappropriated.

20   **RESPONSE**: Defendant incorporates its Objection to Reproduction, *supra*. Without

21   waiving objections and subject thereto, Defendant previously disclosed TTC 000047 –

22   000060, 000095 – 000098, 0000101, 000106 – 000108, 000226 – 000236, 000239, 000286

23   in the State Court Matter. Defendant reserve the right to supplement their responses as the

24   full extent of misappropriation is subject to ongoing discovery.

25   **REQUEST NO. 7:** All emails that have the terms "Mel" or "Melissa":

26         (a)    To and from Todd Russell Martin, Sherry Martin and Lisa Martin; and

27         (b)    To and from Lindsay Welch, Alejandra Valenzuela, Shawn Kaylor, Delaney

28                  Hare, Meaghan Anderson and Joshua Cooper.

00321565.1

1   **RESPONSE**:  Defendant incorporates its Objection to Reproduction of Documents, *supra*.

2   Additionally, Defendant objects to this request for production as being overly broad, unduly

3   burdensome, irrelevant, duplicative of requests Nos. 2-6, and not proportional to the needs

4   of the case, the issues at stake in the action, the amount in controversy, and the parties'

5   resources.   Plaintiff seeks discovery of "any and all" communications that reference or

6   relate to Plaintiff over the course of over two years.   Plaintiff and the named third-party

7   individuals exchanged numerous e-mails daily related to the operation of Defendant's three

8   local restaurants, communications related to Defendant's confidential and proprietary data.

9   The request also seeks information about third-party individuals or entities who are not

10   parties to this suit, implicating disclosure of these individuals' private, personal, and

11   confidential information.   Many, if not all, of the communications subject to this request

12   have nothing to do with the factual bases underlying her claims.

13        In total, this request calls for production of tens of thousands of e-mails irrespective

14   of their relevancy, thereby burdening Defendant with the costs associated with reviewing

15   for confidentiality, privilege, and any attendant objections to the thousands of e-mails

16   and/or communications.  The issues at stake, amount in controversy, and parties' resources

17   simply do not justify a boundless fishing expedition completely disproportionate to the

18   needs of the case.  Plaintiff earned $50,000 per year when her employment was terminated

19   by Defendant.   That she now claims she is entitled to over ten times that sum is bemusing,

20   but also ignores the value of Defendant's counterclaims offsetting her claimed damages in

21   addition to its defenses of after-acquired evidence of wrongdoing.

22   ~~Without waiving objections and subject thereto, Plaintiff may inspect Defendant's~~

23   ~~e-mail server on April 15, 2017.  The boxes in the e-mail server will contain all information~~

24   ~~responsive to this request except privileged communications. Plaintiff may inspect and~~

25   ~~identify the e-mails she believes are relevant and label them for formal production.~~

26   ~~Thereafter Defendant will review and produce those e-mails subject to a privilege and~~

27   ~~confidentiality review.~~  **Without waiving any objection, as noted above, Defendant will**

28   **make available for inspection the emails resulting from an agreed-upon search query**

00321565.1

1   **run in a target account, in .mbox format, once Defendant completes its privilege and**

2   **confidentiality review.  Defendant awaits the receipt of a proposed query to be run in**

3   **the target accounts and of a proposed protocol for inspection.**

4   **REQUEST NO. 8:**  All content in the mailbox for mel@tucsontamalecompany.com ***in its***

5   ***native form as stored by Gmail*** and its archival or backup to include all dates of Plaintiff's

6   employment (i.e., all emails Plaintiff sent or received to/from this email address).

7   **RESPONSE**:  Defendant incorporates its Objection to Reproduction of Documents, *supra*.

8   Additionally, Defendant objects to this request for production as being overly broad, unduly

9   burdensome, irrelevant, and not proportional to the needs of the case, the issues at stake in

10  the action, the amount in controversy, and the parties' resources.  Plaintiff seeks discovery

11  of all content in Plaintiff's former TTC e-mail mailbox.  Plaintiff exchanged numerous e-

12  mails on a daily basis for nearly one year of employment related to the operations of

13  Defendant's three local restaurants.  The request implicates disclosure of Defendant's

14  confidential information and third-party individuals' private and personal information

15  exchanged over the course of her employment.  Many, if not all, of the communications

16  subject to this request have nothing to do with the factual bases underlying her claims.

17       In total, this request calls for production of tens of thousands of e-mails irrespective

18  of their relevancy, thereby burdening Defendant with the costs associated with reviewing

19  for confidentiality, privilege, and any attendant objections to the thousands of e-mails

20  and/or communications.  The issues at stake, amount in controversy, and parties' resources

21  simply do not justify a boundless fishing expedition completely disproportionate to the

22  needs of the case.  Plaintiff earned $50,000 per year when her employment was terminated

23  by Defendant.   That she now claims she is entitled to over ten times that sum is bemusing,

24  but also ignores the value of Defendant's counterclaims offsetting her claimed damages in

25  addition to its defenses of after-acquired evidence of wrongdoing.

26  ~~Without waiving objections and subject thereto, Plaintiff may inspect Defendant's~~

27  ~~e-mail server on April 15, 2017.  The boxes in the e-mail server will contain all information~~

28  ~~responsive to this request except privileged communications.  Plaintiff may inspect and~~

00321565.1

1    ~~identify the e-mails she believes are relevant and label them for formal production.~~
2    ~~Thereafter Defendant will review and produce those e-mails subject to a privilege and~~
3    ~~confidentiality review.~~   **Without waiving any objection, Plaintiff's Tucson Tamale**
4    **emails sent and received during her employment with Defendant are available for**
5    **inspection, in .mbox format, at the undersigned's office at a time mutually convenient**
6    **for the parties.  Defendant, however, will not allow Plaintiff to run any program or**
7    **script on the Defendant's production system unless Defendant has an opportunity to**
8    **vet such script or program and the parties agree to a protocol beforehand.**

9    **REQUEST NO. 9**:  DOCUMENTS that RELATE to COMMUNICATIONS between
10   Sherry Martin, Lisa Martin and/or Todd Russell Martin on one hand and KOTY-LEAVITT
11   INSURANCE AGENCY, INC. and its management, employees and agents on the other
12   hand that RELATE to YOUR employment practices insurance policy between January 2015
13   through the date that YOU respond to this request for production of documents.

14   **RESPONSE**:  Defendant objects to this request because their communications with Koty-
15   Leavitt Insurance Agency, Inc. were made in anticipation of litigation and/or in preparation
16   for trial and are not relevant to Plaintiff's claims or proportional to the needs of Plaintiff's
17   case. See Fed. R. Civ. P. 26(b)(3) and (4). "Evidence that a person was or was not insured
18   against liability is not admissible to prove whether the person acted negligently or otherwise
19   wrongfully." See Fed. R. Evidence 411.  Further, the request implicates disclosure of
20   Defendant's confidential information and third-party individuals' private and personal
21   information provided in connection with securing employment practices insurance policy.
22   Defendant has already disclosed its insurance policy and the basis for changes in the policy
23   in Counterclaimant's Objections and Responses to Counterdefendant's Third Set of Non-
24   Uniform Interrogatories in the State Court Matter, which are hereby incorporated by
25   reference.  This request amounts to a fishing expedition for privileged communications
26   ultimately inadmissible at trial.

27   **REQUEST NO. 10**:  DOCUMENTS that RELATE to COMMUNICATIONS between
28   Sherry Martin, Lisa Martin and/or Todd Russell Martin on the one hand and KOTY-

1    LEAVITT INSURANCE AGENCY, INC. and its management, employees and agents on

2    the other hand that RELATE to Plaintiff between January 2015 through the date that YOU

3    respond to this request for production of documents.

4    **RESPONSE**:  Defendant objects to this request because its communications with Koty-

5    Leavitt Insurance Agency, Inc. were made in anticipation of litigation and/or in preparation

6    for trial and are not relevant to Plaintiff's claims or proportional to the needs of Plaintiff's

7    case.  "Evidence that a person was or was not insured against liability is not admissible to

8    prove whether the person acted negligently or otherwise wrongfully."  See Fed. R. Evidence

9    411.  Further, the request implicates disclosure of Defendant's confidential information and

10   third-party individuals' private and personal information provided in connection with

11   securing employment practices insurance policy.  Defendant has already disclosed its

12   insurance policy and the basis for changes in the policy in Counterclaimant's Objections

13   and Responses to Counterdefendant's Third Set of Non-Uniform Interrogatories in the State

14   Court Matter, which are hereby incorporated by reference.  This request amounts to a

15   fishing expedition for privileged communications ultimately inadmissible at trial.

16         DATED this 26th day of April, 2017.

17                        FARHANG & MEDCOFF

18

19                        By /s/Travis L. Tufts

20                            Ali J. Farhang
                             Roberto C. Garcia
21                            Travis L. Tufts

22                        Attorneys for Defendants/Counterplaintiff

23

24

25

26

27

28

00321565.1

- 14 -

1   ORIGINAL of the foregoing served via e-mail
    and First Class U.S. Mail this 26th day of April, 2017 to:
2

3   Melissa Martin McBeath
    3463 E. Terra Alta Blvd.
4   Tucson, AZ 85716
    mel.mcbeath@cox.net
5

6   /s/ Letitia L. Wright

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

00321565.1

# Exhibit CC

1     A.   No, it doesn't.  But I understand -- I understand

2  that I take a high level of ethic -- ethical approach to

3  sharing sales data with an outside entity.

4          And I certainly felt comfortable with a certified

5  public accountant, who would never share this data with

6  anyone --

7     **Q.   Well, irrespective of whether he will or will not**

8  **share the information with anybody else, your**

9  **confidentiality agreement says you are not allowed to**

10  **share sales and profits data with third parties.**

11    A.   I took that to mean with a third party that

12  wasn't part of any privilege.  I felt comfortable in how I

13  understood that.  I would never have shared it otherwise.

14    **Q.   But you agree with me, the language of your**

15  **confidentiality agreement does not contain that language,**

16  **this exception you're giving today, that you can share**

17  **with a third party, so long as a privilege accrues?**

18    A.   It doesn't have that language, no.  Yes.

19         MR. TUFTS:  Let's take a break.

20         THE WITNESS:  Okay.

21         THE VIDEOGRAPHER:  Please stand by.

22         This ends media number four of our ongoing

23  deposition.

24         We're off the record at 3:11.

25         (Break from 3:11 p.m. until 3:22 p.m.)

Page 244

1          THE VIDEOGRAPHER:  This begins media five of our

2    ongoing deposition.

3          We're on the record at 3:22.

4    BY MR. TUFTS:

5       Q.   Ms. McBeath, was there any legal reason why you

6    shared the sales summaries with Mr. Chavez?

7       A.   No.  But there was a good work reason why.

8       Q.   Okay.  You weren't required by law to share the

9    sales summary with Mr. Chavez; correct?

10      A.   Required by law?  I'm not sure I understand.

11      Q.   Right.  You were not under the impression you had

12   to share these sales summaries with Mr. Chavez as a result

13   of any legal proceedings?

14      A.   Oh, like a subpoena or something like that?

15      Q.   Right.

16      A.   Oh, no.  No, no, no.

17      Q.   Nothing by law compelled you to share this with

18   him?

19      A.   No.

20      Q.   It was purely for some reason connected with your

21   employment at Tucson Tamale?

22      A.   Yes.

23      Q.   Right?

24      A.   It was a great reason.  He was of tremendous help

25   to us.

Page 242

1    front of you but not labeled as exhibits.

2        A.    Perfect.

3        Q.    You sent an e-mail to Ernesto Chavez to review a

4    sales summary; did you not?

5        A.    Yes.

6        Q.    Where you attached TTC 00054 to that e-mail;

7    correct?

8        A.    Yes.

9        Q.    And what's reflected -- well, let me back up.

10           You didn't copy Todd, Sherry, or Lisa Martin on

11   this e-mail that you sent to Ernesto Chavez; did you?

12       A.    No.

13       Q.    And what's reflected in TTC 00054, are sales

14   summary from the Tanque Verde restaurant; correct?

15       A.    Yes.

16       Q.    Okay.  According to the plain language of your

17   confidentiality treatment, isn't this a breach of your

18   confidentiality agreement, by sharing sales and profits

19   data with a non-TTC employee?

20       A.    No.  Because Ernesto is also bound by

21   confidentiality.  And so I, obviously, did not feel it was

22   a breach of my contract.

23       Q.    But the contract doesn't say that you can share

24   TTC's sales and profits with third parties, so long as

25   some accruing privilege arises; does it?

# Exhibit DD

# Liddy Legal Support Services

PO Box 2007, Phoenix, AZ 85001
63 E. Pennington St., #102, Tucson, AZ 85702
2700 Woodlands Village Blvd., #300-420, Flagstaff, AZ 86001
Phoenix 602-297-0676, Tucson 520-628-2824, Flagstaff 928-225-7737

Client File # 2546-1
Account   # 0607
Invoice    # 267775
Liddy      # 204372-1

### IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
### IN AND FOR THE COUNTY OF PIMA

**MELISSA MARTIN MCBEATH,**

| | |
|---|---|
| **Plaintiff(s),** | **AFFIDAVIT OF ATTEMPTED SERVICE** |
| **vs** | **BY PRIVATE PROCESS SERVER** |
| **TUCSON TAMALE COMPANY, et al.,** | Case No. C20161794 |
| **Defendant(s).** | |

STATE OF ARIZONA
Pima County

On 9/1/16 I received a Subpoena and Amended Notice of Deposition and in each instance I personally attempted to serve the documents listed on those named below, in the manner and at the time and place shown, that all attempts, except where noted, were made with Pima County, AZ.

Upon FRANCISCO X MARQUEZ at 451 W. Calle La Bolita, Sahuarita, AZ 85629; on 9/1/16 at 6:30pm, no answer; on 9/2/16 at 8:15am, no answer, plants watered, looks lived in; on 9/5/16 at 6:10pm, Dina Stoner, Sister, stated defendant lives in California at 855 N. 17th St., San Jose, CA 95112. I am returning the documents to the client.

Received from FARHANG & MEDCOFF, PLLC, ( TRAVIS TUFTS #029373 )

PROCESS SERVER: _Tracy Janiga #572_

The undersigned states: That I am a certified private process server in the county of Pima and am an Officer of the Court.

SIGNATURE OF PROCESS SERVER: _Tracy Janiga_                   Date: 9/9/2016

Subscribed and sworn before me on 9/9/2016

| Item | Amount |
|---|---|
| Mileage | $60.00 |
| Rush Charge Service | $30.00 |
| Affidavit/Notary | $10.00 |

_Vicki Rieffer_

Notary Public
My Commission Expires
June 10, 2018
Tax ID# 90-0533870

NOTARY PUBLIC
STATE OF ARIZONA
Pima County
VICKI RIEFFER
Commission Expires June 10, 2018

Total      $100.00

ORIGINAL

| | |
|---|---|
| TRAVIS L. TUFTS, ESQ. (520) 790-5433<br>FARHANG & MEDCOFF<br>4801 EAST BROADWAY, SUITE 311<br>TUCSON, AZ 85711<br>ATTORNEY FOR:  DEFENDANT/COUNTERCLAIMANT | FOR COURT USE ONLY |
| SUPERIOR COURT OF THE STATE OF CALIFORNIA<br>IN AND FOR THE COUNTY OF SANTA CLARA | |
| PLAINTIFF :<br>MELISSA MARTIN MCBEATH | |
| DEFENDANT :<br>TUCSON TAMALE COMPANY, ET AL. | |

| REFERENCE NO.:<br>916464416 | DECLARATION OF DILIGENCE | CASE NUMBER:<br>16CV300072 |
|---|---|---|

I am and was on the dates herein mentioned over the age of eighteen years and not a party to this action. My business address is 31 N. 2nd Street, Ste. 200, San Jose, CA 95113. I received the within process on **SEPTEMBER 19, 2016** and that after due and diligent effort I have been unable to effect personal service on the within name

**FRANCISCO X. MARQUEZ**

Residence address (H):  855 N. 17TH STREET, SAN JOSE, CA 95112

Business address (B):  UNKNOWN

Below is a list of dates, times and details regarding efforts to effect service.

09/19/2016 @ 4:50PM (H) - NO ANSWER. GARBAGE CAN OUT ON THE CURB. NO VEHICLES PRESENT. NO ACTIVITY. ATTEMPTED BY CHRISTOPHER ROMAN
09/21/2016 @ 8:55AM (H) - NO ANSWER. NO VEHICLES IN THE DRIVEWAY. NO ACTIVITY DETECTED. BLINDS OPEN TO THE LEFT OF THE DOOR. ATTEMPTED BY CHRISTOPHER ROMAN
09/23/2016 @ 4:19PM (H) - NO ANSWER. NO ACTIVITY. NO VEHICLES IN THE DRIVEWAY. ATTEMPTED BY CHRISTOPHER ROMAN
09/28/2016 @ 7:11PM (H) - NO ANSWER AT THE FRONT DOOR. NO CARS IN THE DRIVEWAY. THERE WERE LIGHTS ON INSIDE THE HOUSE. ATTEMPTED BY SAMUEL SAMANIEGO
10/01/2016 @ 8:55AM (H) - THERE WAS NO ANSWER AT THE FRONT DOOR WHEN THE SERVER KNOCKED.  SOME OF THE WINDOW BLINDS WERE OPEN, BUT NO ACTIVITY WAS DETECTED INSIDE THE HOUSE.  THERE WAS A SILVER HONDA PARKED IN THE DRIVEWAY. ATTEMPTED BY SAMUEL SAMANIEGO
10/04/2016 @ 5:45PM (H) - THE DOCUMENTS WERE SERVED VIA SUBSTITUTE SERVICE UPON ROBERT "DOE" (LAST NAME NOT PROVIDED) (CAUCASIAN MALE IN HIS 30'S, 5'11", 190 LBS., WITH BROWN HAIR & A BEARD). THE PROCESS SERVER APPROACHED THE CO-OCCUPANT AS HE WAS COLLECTING THE MAIL FROM THE MAIL BOX. THE CO-OCCUPANT DROVE A BLACK CHEVY VOLT THAT HE PARKED ACROSS THE STREET FROM THE HOUSE. SERVED BY SAMUEL SAMANIEGO



31 N. SECOND STREET
SUITE 200
SAN JOSE, CA 95113

(408) 291-5000

Registered in Santa Clara County
Registered California Process Server No. 1542

The fee for service was:
Declarant: SAMUEL SAMANIEGO
I am a registered California process server: INDEPENDENT CONTRACTOR
Registration No.: 1600
County: SANTA CLARA

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:   OCTOBER 4, 2016                    Signature: _____

SAMUEL SAMANIEGO

| TRAVIS L. TUFTS. ESQ.                                (520) 790-5433<br>FARHANG & MEDCOFF<br>4801 EAST BROADWAY, SUITE 311<br>TUCSON. AZ 85711<br>ATTORNEY FOR:  DEFENDANT/COUNTERCLAIMANT | FOR COURT USE ONLY |
|---|---|
| SUPERIOR COURT OF THE STATE OF CALIFORNIA<br>IN AND FOR THE COUNTY OF SANTA CLARA | |
| PLAINTIFF :<br>MELISSA MARTIN MCBEATH | |
| DEFENDANT :<br>TUCSON TAMALE COMPANY. ET AL. | |

| REFERENCE NO.<br>916464416 | **PROOF OF SERVICE** | CASE NUMBER:<br>16CV300072 |
|---|---|---|

At the time of service I was at least eighteen years of age and not a party to this action. and I served copies of the:

APPLICATION FOR DISCOVERY SUBPOENA IN ACTION PENDING OUTSIDE CALIFORNIA; DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS, ELECTRONICALLY STORED INFORMATION. AND THINGS IN ACTION PENDING OUTSIDE CALIFORNIA: SUBPOENA IN A CIVIL CASE

in the within action by personally delivering true copies thereof to the person served as follows:

| | | |
|---|---|---|
| Witness | : | FRANCISCO X. MARQUEZ |
| By serving | : | ROBERT "DOE" (LAST NAME NOT PROVIDED) (CAUCASIAN MALE IN HIS 30'S. 5'11". 190 LBS.. WITH BROWN HAIR & A BEARD). CO-OCCUPANT |
| Address | : | 855 N. 17TH STREET<br>SAN JOSE. CA 95112 |
| Date of Service | : | OCTOBER 4, 2016 |
| Time of Service | : | 5:45PM |
| Witness fees | : | WERE NOT DEMANDED OR PAID. |



31 N. SECOND STREET
SUITE 200
SAN JOSE, CA 95113

PACIFIC COAST
LEGAL SERVICES

(408) 291-5000

Registered in Santa Clara County
Registered California Process Server No. 1542

The fee  for service was:
Person serving:   SAMUEL SAMANIEGO
I am a registered California process server.
Registration No.: 1600
County: SANTA CLARA

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:   OCTOBER 4, 2016                    Signature:   _____

SAMUEL SAMANIEGO

# Exhibit EE

FILED
TONI HELLON
CLERK, SUPERIOR COURT
8/19/2016 2:23:03 PM
By: Victoria Soto

ARIZONA SUPERIOR COURT, PIMA COUNTY
HON. GUS ARAGON

CASE NO.   C20161794

COURT REPORTER:   Bonnie Gray
Courtroom - 814

DATE:        August 15, 2016

MELISSA MARTIN MCBEATH
    Plaintiff
VS.

In Proper Person

TUCSON TAMALE COMPANY,
TODD RUSSELL MARTIN,
SHERRY MARTIN,  and
LISA MARTIN
    Defendants

Travis L Tufts, Esq. and Robert C. Garcia, Esq.
- Counsel for Defendants

## M I N U T E   E N T R Y

**ORAL ARGUMENT:**

    Plaintiff is present.  Defendant is not present.

    As to the defendants' motion to strike,

    Mr. Tufts argues to the Court.

    The plaintiff argues to the Court in response.

    The Court directs the plaintiff and counsel to meet and confer.  The Court will defer ruling on this matter.

    As to the motion to dismiss,

    Mr. Tufts makes statements to the Court.

    IT IS ORDERED deferring consideration of the motion to dismiss pending any future amendments that may occur with respect to the complaint and those future amendments are yet to be determined.  The deferral of the motion to dismiss is without prejudice to reasserting it at a future date when it is more appropriate and timely.

    As to the plaintiff's motion to strike new argument,

    Mr. Garcia makes statements to the Court.

    The plaintiff makes statements to the Court in response.

    THE COURT FINDS that it is appropriate to defer ruling on the two motions to strike, one filed June 14, 2016 and one filed June 22, 2016.  Both motions deal with two separate topics, neither of which are timely.  Therefore, the Court will defer, without prejudice, to allowing the parties to reassert those motions if and when they become appropriate based upon any new set of pleadings that may exist.

                                   Victoria Soto
                                   Deputy Clerk

**M I N U T E   E N T R Y**

The Court notes another motion, filed June 30, 2016 is the plaintiff 's motion to compel response to interrogatories.

There being no objection to deferring this matter,

The Court will defer, at plaintiff's request, the motion to compel without prejudice to the motion being reasserted later on if it becomes more appropriate or timely.

The Court notes that plaintiff has the motion to take non-party depositions filed July 8, 2016.

The plaintiff makes statements to the Court regarding the motion as to the three individuals stated in court (Shawn Kaylor, Delaney Hare, Meaghan Anderson).

Mr. Garcia makes statements to the Court in response.

The Court will allow the depositions of the above-listed 3 individuals.

The Court informs the plaintiff that there is a statute that will require her to reimburse the defendant or employer for the time taken to take the depositions.

As to the three individuals mentioned,

IT IS ORDERED that the motion to preclude their depositions is DENIED.

The Court further informs the plaintiff that there are time limits with how long depositions can be and instructs the plaintiff to familiarize herself with those rules.

As to witness, Lindsey Welch, the plaintiff makes statements to the Court.

Mr. Garcia makes statements to the Court in response.

For the same reasons as stated with respect to the first three witnesses,

IT IS ORDERED  that plaintiff is permitted to take the deposition of Lindsey Welch.

As to Alejandra Valenzuela and Joshua Cooper,

The plaintiff makes statements to the Court.

Mr. Garcia defers to his previous argument.

Taking the prior arguments into account,

IT IS ORDERED that plaintiff is permitted to depose Alejandra Valenzuela.

As to Joshua Cooper,

The plaintiff argues to the Court.

Mr. Garcia argues to the Court in response.

The Court and counsel discuss the matter.

\*\*\*

Victoria Soto
Deputy Clerk

**M I N U T E   E N T R Y**

Page  3                            Date:  August 15, 2016                            Case No.:   C20161794

IT IS ORDERED granting the protective order with respect to Joshua Cooper and the plaintiff will not be permitted to depose him.  The plaintiff may have leave to request that the issue be reconsidered if it becomes necessary down the road.

As to the defendant's motions for Rule 56(f) relief filed on July 20, 2016, (Defendant filed 2 such motions on the same date).

The Court and counsel discuss the matter.

IT IS ORDERED that any motions for summary judgment shall be deferred.  The Court will not rule on those motions until the parties send a joint report indicating that at least one of the parties feels as though the issue of summary judgment needs to be addressed.  In the mean time, the Rule 56(f) requests are moot because the urgency of Rule 56 motions has been removed.

As to the defendant's motion for alternative subpoena duces tecum service,

Mr. Garcia makes statements to the Court.

The plaintiff makes statements to the Court in response.

The Court and counsel discuss the matters.

IT IS ORDERED the request is GRANTED.

IT IS FURTHER ORDERED that the parties meet and confer, and if possible, arrive at a stipulation as to what Mr. Gavron is required to provide by way of response to the subpoena.  The defendant may serve Mr. Gavron by posting a physical copy of the document at the Gavron residence and  to his email.  The plaintiff is also directed to notify Mr. Gavron that he has been subpoenaed.

Mr. Garcia notes for the Court that plaintiff filed a motion for protective order for Gavron and Marquez, and further presumes that the motion for protective order is moot until we have further discussion.

The Court states it will not address any protective orders with respect to Gavron and Marquez until the parties have had a chance to structure the issues as to what they might provide information on.

IT IS ORDERED that at least at the current time, Mr. Gavron shall not be required to provide information or testimony about those things upon which he has been consulted  as an expert, unless he is disclosed as an expert on the topic upon which discovery is being shought.

The Court notes again that the parties should meet and confer to determine whether they can come to some understanding as to what each other's position is.

IT IS ORDERED that the parties take 15 minutes at this time to meet and confer on the issue of the re-structuring and rewording of the complaint.

Victoria Soto
Deputy Clerk

**M I N U T E   E N T R Y**

Page 4                Date:  August 15, 2016             Case No.:  C20161794

LATER IN COURT:

Same parties, counsel present.

Mr. Garcia informs the Court that they have reached some stipulations as stated on the record.

The plaintiff concurs with the agreements as stated by Mr. Garcia.

The Court notes that the parties have also stipulated to set a deadline for the plaintiff to submit a proposed amended complaint to the defendants by no later than August 23, 2016.  Defendants will provide their input on the proposed amended complaint by no later than August 26, 2016.  Thereafter the plaintiff will file the amended complaint

The Court further notes that the parties have agreed that at the end of this process, the plaintiff will file her amended complaint by no later than Friday, September 2, 2016.  There will be no need to file a motion to amend the complaint.  Plaintiff has been cautioned during the hearing that her current Complaint contains parts that are not in compliance with ARCP Rule 8 (short and plain statement of the claim); and that  her amended complaint should be significantly shorter.

Mr. Garcia informs the Court that the parties have also reached an agreement on the following: as to the subpoena for Mr. Gavron, the parties discussed and agree that Mr. Gavron will produce, and plaintiff will not object to, information throughout the entire relevant period both before and after the filing of the store communications act claims.  However, as to the plaintiff's claims that a witness privilege exists, the plaintiff and Mr. Gavron will withhold the information purportedly protected by this privilege and provide a privilege log.

The Court notes that the parties have stipulated as well that Mr. Gavron shall respond to the subpoena that has been discussed on the record and will produce documents generated  before and after a certain claim which the parties are calling the stored communications claim.  The parties further agree that Mr. Gavron or the plaintiff shall be permitted to withhold information that she claims is privileged.  The plaintiff shall follow the procedures set forth for a privilege log.

The parties have also agreed that the joint report under Rule 16(b) shall be due no later than September 16, 2016.

IT IS ORDERED that the parties submit along with the joint report, a proposed scheduling order for the Court's consideration by September 16, 2016.

IT IS FURTHER ORDERED that any motions that have not been ruled upon or stipulated to, and motions to which ruling has been deferred, are deemed withdrawn, with leave to reassert those motions at a later

Victoria Soto
Deputy Clerk

**M I N U T E   E N T R Y**

| Page 5 | Date: August 15, 2016 | Case No.:   C20161794 |

date.

    The parties shall  list  any motion that they feel still remains to be resolved  in the Rule 16(b) joint

report.

LATER IN CHAMBERS:

    Any motion that was not resolved this date and which is not listed as needing resolution in the Joint

Report shall be deemed denied.

cc:    Hon. Gus Aragon
       Robert C. Garcia, Esq.
       Travis L Tufts, Esq.
       Melissa Martin McBeath

                                                       Victoria Soto
                                                       Deputy Clerk

# Liddy Legal Support Services
PO Box 2007, Phoenix, AZ 85001
63 E. Pennington St., #102, Tucson, AZ 85702
2700 Woodlands Village Blvd., #300-420, Flagstaff, AZ 86001
Phoenix 602-297-0676, Tucson 520-628-2824, Flagstaff 928-225-7737

Client File # 2546-1
Account  # 0607
Invoice   # 266855
Liddy    # 203344-1

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF PIMA

MELISSA MARTIN MCBEATH,

                          Plaintiff(s),                    CERTIFICATE OF SERVICE
                                                       BY PRIVATE PROCESS SERVER
vs                                                         Case No. C20161794

TUCSON TAMALE COMPANY, et al.,

                          Defendant(s).

---

**ENTITY/PERSON TO BE SERVED:** Ehud Gavron

**PLACE OF SERVICE:**        7119 E. Lemmon Rock Place, Tucson, AZ 85718

**DATE OF SERVICE:** On the __23rd__ day of __August__, __2016__ at __8:40__ __AM__   County __Pima__

| | PERSONAL SERVICE | | Left a copy with a person authorized to accept service. | | At this usual place of abode, I left a copy with a person of suitable age and discretion residing therein. |

Name of Person Served and Relationship/Title    Posted documents per Order for Alternative Service.

on __8/22/2016__ we received the following documents for service:

Subpoena Duces Tecum, Affidavit of Custodian of Records, Minute Entry Motion/Order for Alternative Service, Letter

Received from FARHANG & MEDCOFF, PLLC, ( TRAVIS TUFTS #029373 )

PROCESS SERVER:    Shalann McNamara #522

The undersigned states: That I am a certified private process server in the county of Pima and am an Officer of the Court.

SIGNATURE OF PROCESS SERVER: _Shalann McNamara_    Date: 8/25/2016

| Item | Amount |
|------|--------|
| Posting | $16.00 |
| Mileage | $36.00 |
| Doc Prep Fee | $10.00 |

**Tax ID#** 90-0533870
I declare under penalty of perjury that the foregoing is true
and correct and was executed on this date.

# ORIGINAL

Total    $62.00

# Exhibit FF

**Tish Wright**

| | |
|---|---|
| **From:** | Travis L. Tufts |
| **Sent:** | Friday, February 3, 2017 3:35 PM |
| **To:** | Kumar Law |
| **Subject:** | McBeath v. Tucson Tamale |
| **Attachments:** | 2016 1216 Defendant's Second Set of Interrogatories to Plaintiff (003012....pdf; Proposed Scheduling Order (3) (00308343xC01F0).docx |

Hi Ruchit:

I hope you've been well and have had some time to get up to speed on this file.  I want to follow up on a few pending issues from the last hearing as well as other matters pending in the state and federal cases.

We need to submit a Scheduling Order prior to the hearing later this month.  I have attached my proposal.  I propose essentially the same scheduling order Defendants/Counterclaimants submitted to the Court initially.  However, I have extended the expert deadline and final supplemental disclosure deadline considering some of the deadlines as initially proposed expire in one week.

In connection with the scheduling order, I believe the Judge asked us to identify any motions that are ripe for decision at the next hearing.  If you are agreeable, I would like to arrange a time to discuss pending motions before resubmitting anything.  I am hopeful we can resolve some of the underlying issues without the need for reasserting the motions.  Here are Defendants/Counterclaimants pending/ripe motions that I would like to discuss before resubmitting:
    -Defendants' Motion to Dismiss claims for Retaliatory Discharge (Section II(b)), Breach of Employment Agreement (Section II(c)), and Failure to Pay Earned Wages (Section II(h)).
    -Motion to Quash Third-Party Subpoena (to Defendants employment practices liability insurance broker)
Please let me know what you believe is pending and/or ripe for decision on your end so that we can try to resolve the issues if possible.

In addition to the Scheduling Order, I need to get your client's deposition back on the calendar.   To accommodate your travel schedule, I propose to take her deposition the week of February 20th (any day that week), February 27, or March 1.

On the subject of depositions, we would like to take non-party depositions of Maximillian Ivankovich, Ehud Gavron, and Ernesto Chavez.  To the extent you aren't already aware, Maximillian is Ms. McBeath's son.  He was observed removing items from TTC on closed circuit surveillance after Ms. McBeath's employment termination.  The other two gentlemen are individuals with whom TTC alleges Ms. McBeath shared its confidential information.  Can we agree these depositions are permissible under the rules and to a convenient time to schedule these three depositions?

Finally, we have not received responses to the attached Non-Uniform interrogatories in the federal court matter.  They were served in mid-December and are overdue.  With respect to the discovery responses, I will provide an extension until 2/15/17.  If there is an issue or you will not be able to produce the responses by this deadline, please let me know.

Please let me know your position on the scheduling order, pending motions, and depositions.  If you prefer, I will be in the office all next week and available telephonically to address all of the issues discussed above.  Ultimately, as I mentioned, I'd like to have a phone conference to address the pending/ripe motions if nothing else.

Have a nice weekend.

Regards,

Travis

**FARHANG   MEDCOFF**
————— Attorneys —————

**Travis L. Tufts**
Profile ¦ vCard
4801 East Broadway Boulevard ¦ Suite 311 ¦ Tucson, Arizona 85711
General: 520.790.5433 ¦ Direct: 520.398.7466 ¦ Fax: 520.790.5736
www.fmazlaw.com



**KUMAR**LAW

Ruchit Kumar Agrawal
*ruchit@kumarlawsv.com*

Silicon Valley
408.601.0586

6525 Crown Blvd. #20072
San Jose CA 95160

Washington D.C.
202.807.6180

<u>SENT VIA E-MAIL ONLY</u>
*ttufts@fmazlaw.com*

February 7, 2017

Travis L. Tufts
Farhang & Medcoff
4801 E. Broadway, Suite 311
Tucson, Arizona 85711

Re:   <u>*Melissa Martin McBeath v. Tucson Tamale Company et al.*</u>
      Pima County Superior Court Case No. C20161794

Dear Travis:

I write to address each issue in the order discussed in your e-mail to me, dated February 3, 2017.

1.      We accept your proposed Scheduling Order as is. Please submit it to the Court at your earliest convenience.

2.      In my review of the docket, the pending motions ripe for decision are:

(a)    Plaintiff's Motion for Partial Summary Judgment

(b)    Plaintiff's Motion for a Protective Order to Shield Identity and Communications with Experts Consulted Informally

(c)    Plaintiff's Motion to Compel the Deposition of Lisa Martin

(d)    Defendants' Motion to Quash Third-Party Subpoena

(e)    Plaintiff's Motion to Compel Production of Documents and Supplemental Responses to Unanswered Written Discovery

3.      When do you anticipate filing Defendants' Motion to Dismiss?

Travis L. Tufts
February 7, 2017
Page 2 of 2

4.     Regarding Ms. McBeath's deposition, we're not ready to proceed just yet. We're still making our way through the hundreds of pages that comprise the pleadings, motions, correspondence, and extensive written discovery and related responses propounded to date. Let's revisit this issue at the end of the month.

5.     Defendants may proceed with the deposition of Ehud Gavron and Ernesto Chavez after Defendants *identify and produce* the e-mails, in native electronic form, that contain the confidential information that Ms. McBeath allegedly disclosed to these two witnesses without authorization.

6.     With respect to the deposition of Maximilian Ivankovich, our client declines to consent to his oral deposition at this time.

7.     Thank you for granting our client until February 15, 2017 to respond to Tucson Tamale Company's Second Set of Interrogatories in the federal action. Be advised that she has elected to continue to represent herself in the federal proceeding for the time being; Mr. Gallego will serve as advisory counsel as needed.

Going forward, I am happy to meet and confer with you about any matter in the state action. Ms. McBeath has instructed me, however, that we write or record our oral communications to ensure an accurate record. For telephone calls, I recommend using the service provided by *www.freeconferencecall.com*, which permits participants to record their conversation and then generates a link to the recording that can be easily downloaded and saved for future reference.

Lastly, please serve all documents via e-mail to ensure prompt delivery. We will reciprocate the same courtesy. It was a pleasure to meet you in person last month. I look forward to our continuing dialogue as we move this case forward.

Sincerely,

KUMARLAW

Ruchit Kumar Agrawal

cc:  Rafael F. Gallego (via e-mail only)
     Melissa Martin McBeath (via e-mail only)

10353.1

# Exhibit GG

Page 253

1     Q.    And what you attached to that e-mail is a screen

2     shot of the Revel data; correct?

3     A.    Yes.

4     Q.    Okay.   From that screen shot you can see gross

5     product sales, discounts, payments, cash summaries, things

6     of that nature; correct?

7     A.    Yes.

8     Q.    By sharing this information with Mr. Chavez,

9     aren't you sharing Tucson Tamale's sales profits data?

10    A.    Yes.

11    Q.    Okay.   And doesn't the plain language of your

12    confidentiality agreement prohibit you from sharing this

13    information with Mr. Chavez?

14    A.    As I stated previously, I felt that because he,

15    as a certified public accountant, has to adhere to

16    confidentiality ethics and standards in his profession, I

17    felt it was appropriate to reach out for his help on this.

18          Because I, at no time, felt any fear or concern

19    that this would be shared, or that the confidentiality

20    would be breached in any way.

21    Q.    Did you sign an agreement with Mr. Chavez which

22    would protect the confidentiality?

23    A.    No, I didn't have to.

24    Q.    And you didn't get permission from Todd, Sherry,

25    or Lisa, before you contacted Ernesto Chavez?