FARHANG & MEDCOFF
4801 E. Broadway Boulevard, Suite 311
Tucson, Arizona 85711
T: 520.790.5433

Ali J. Farhang (#019456)
afarhang@fmazlaw.com

Roberto C. Garcia (#026246)
rgarcia@fmazlaw.com

Travis L. Tufts (#029373)
ttufts@fmazlaw.com

Attorneys for Defendants / Counterplaintiff

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Melissa Martin McBeath, an individual,<br><br>    Plaintiff,<br><br>v.<br><br>Tucson Tamale Company, an Arizona corporation; Todd Russell Martin, an individual; Sherry Martin, an individual; and Lisa Martin, an individual,<br><br>    Defendants. | NO. CV 16-462-TUC-DCB (BPV)<br><br>**OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL (DOC. NO. 70)**<br><br>Assigned to Judge David C. Bury and Hon. Bernardo P. Velasco |
| Tucson Tamale Company, an Arizona corporation,<br><br>    Counterplaintiff,<br><br>v.<br><br>Melissa Martin McBeath and John/Jane Doe Martin McBeath, husband and wife,<br><br>    Counterdefendants. | |

00322632.1

1    After over one year of litigation and the production of nearly 1,000 pages of documents and records, Plaintiff Melissa Martin McBeath ("McBeath") still cannot identify with any degree of specificity the communications on Defendant Tucson Tamale Company's ("TTC") e-mail server that purportedly support her claims. Indeed, there is not a single reference in McBeath's latest Motion to Compel (Doc. No. 70, the "Motion") to an example or the specific e-mail communications TTC supposedly withheld from production, or the evidence McBeath expects to discover in the metadata relating to such e-mails. Consistent with McBeath's justifications for myriad discovery motions, she sweepingly suggests in her Motion that she is entitled to compel a third-party to produce "all relevant" e-mails in a native format. That she makes an argument claiming entitlement to over 50,000 e-mails without regard to relevance or proportionality, while simultaneously arguing Defendants must narrow the scope of an allegedly-overbroad subpoena, proves McBeath will manufacture any basis whatsoever to burden the Court with motion practice.

TTC undertook substantial measures to appease McBeath and accommodate her disproportionate electronically stored information ("ESI") demands. McBeath has had opportunity after opportunity to inspect TTC's e-mail production and identify the all-encompassing "relevant" information she supposedly seeks. Rather than take those opportunities, McBeath has employed her supposed consulting expert to pick nits with hyper technical production details having nothing to do with the relevant issues in this case. In a telling reflection of her vexatious motives, despite TTC's recent agreement to perform the native format production *McBeath specifically demanded months ago*, McBeath now demands TTC provide its consent to burden a third-party with a voluminous e-mail production and, apparently, a privilege review on behalf of Defendants. Fundamentally, a third-party should not be burdened with a task the parties hereto are capable of handling; that is, if only McBeath cooperated in good faith with Defendants and their counsel.

/ / /

/ / /

/ / /

00322632.1

McBeath and her shadow counsel, Francisco X. Marquez ("Marquez"), lack a good faith basis for seeking the remaining relief requested in the Motion. Confusingly, and without citing any legal authority, McBeath asks this Court to compel TTC to force its employee, Shawn Kaylor ("Kaylor"), to produce TTC e-mails in response to a subpoena served on Kaylor in his individual capacity. McBeath's ghostwriter/attorney, who is practicing law in this Court without authorization, suggests a non-party must produce e-mails "regardless of who is deemed to own them" – a view seemingly consistent only with Marquez's particular view on the property rights of others.[1]

McBeath's request that TTC destroy documents subpoenaed from her former employer also lacks merit. McBeath lied about her prior employment on her TTC employment application and then lied, during her deposition in this case and while under oath, about the reasons why her previous employer ended its relationship with her. Records of prior employment, especially those providing impeachment evidence, are unquestionably discoverable in employment-based cases like McBeath's. As a result McBeath's attempt to put the cat back in the bag, so to speak, has no support in law.

McBeath's Motion having no merit whatsoever, Defendants Todd Russell Martin, Sherry Martin, Lisa Martin, and Defendant/Counterclaimaint TTC (collectively, "Defendants"), by and through undersigned counsel, hereby submit this Opposition. The following Memorandum of Points and Authorities and the pleadings and papers on file with the Clerk of this Court and on file with the Clerk of the Arizona Superior Court (Pima County), Case No. C20161749 ("Superior Court Case"), which Defendants ask this Court take judicial notice of, support this Opposition and are incorporated herein by this reference.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

**A. McBeath's fluctuating ESI demands.**

McBeath's countless ESI demands began three days *after* Defendants produced their

---

[1] The California Supreme Court apparently disbarred Francisco X. Marquez for, among other things, misappropriating property. See http://members.calbar.ca.gov/fal/Member/Detail/172631.

1  initial disclosures in the Superior Court case. Despite the indisputable fact McBeath never
2  designated an ESI format prior to Defendants' Superior Court Case initial disclosures,
3  McBeath delivered a pre-drafted Motion to Compel seeking to compel ESI. See Ex. A, M.
4  McBeath E-mail, July 18, 2016 ("as a professional courtesy, I will not file this motion if
5  your clients produce all documents and electronically stored information that should have
6  been produced on July 15, 2016.") Because McBeath did not specifically indicate an ESI
7  format before Defendants' disclosures, Defendants asked McBeath to submit a request for
8  production specifically identifying the exhibits/e-mails she sought for reproduction. Ex. B,
9  T. Tufts E-mail Regarding Motion to Compel, Aug. 3, 2016 (discussing Defendants'
10 disclosure of documents before McBeath's ESI demand and requesting a specific request
11 for ESI).

12  After failing to obtain relief on her first motion to compel related to ESI, McBeath
13 propounded Requests for Production, as Defendants requested before she engaged in
14 motion practice. See Ex. C, Sup. Ct. Request for Production. Therein, McBeath requested,
15 simply, "e-mails in their native format." See id. at 2:14-16. McBeath's requests called for
16 effectively every e-mail ever sent or received on TTC's e-mail server referencing her (see,
17 e.g., id. at Request Nos. 1-7), amounting to well over 50,000 e-mails from 2015 to
18 September 2016. Defendants objected to the production of the entirety of the e-mails
19 because, among other things stated in their response, which is incorporated herein by
20 reference, the requests were overbroad, unduly burdensome, not reasonably calculated to
21 lead to discoverable evidence, and were disproportionate to the needs of her case because
22 of the innumerable irrelevant e-mails responsive to her requests and the costs associated
23 with reviewing and preserving objections to thousands of e-mails. See Ex. D, TTC
24 Responses to Request Production. Defendants nonetheless agreed to allow McBeath to
25 inspect TTC's e-mail server production, identify the e-mails and communications she
26 believed were relevant, and obtain copies subject to Defendants' privilege review. See id.
27 at 3:11-23.

28  Despite the inspection being a fact-based inspection, McBeath and her purported

00322632.1

- 4 -

consulting expert, Ehud Gavron ("Gavron"), appeared and inspected TTC's e-mail server on December 19, 2016. Instead of looking through the e-mail server, McBeath and Gavron instead researched the metadata underlying Defendants' e-mail production, drew assumptions about the production, and also looked through Defendants' privileged communications with their attorneys inadvertently included in the production. See Ex. E, M. McBeath Letter, Dec. 19, 2016 ("my expert's cursory search of the metadata…"); see also Ex. F, M. McBeath Letter, Dec. 21, 2016 ("I saw numerous exchanges between you and your clients."). Frustrated with what she found, McBeath left the inspection within 45 minutes, then demanded she be given unfettered access to the server, proposing Defendants "trust" she will not trespass into privileged documents and communications. See Ex. E at p. 3. Defendants rejected that offer – generating the second of three motions on ESI. See Ex. G, Motion to Compel Prod. Docs., Dec. 22, 2016.

Shortly after engaging in motion practice in the Superior Court Case, McBeath utilized her federal court action to propound new requests for production. Tellingly, she now specifically demanded e-mails in "in [their] native form as stored by Gmail." See Ex. H, M. McBeath Req. Prod., Feb. 24. 2017, p.4 (highlighting "in its native form as stored by Gmail" in red font color). Taking issue with technical issues underlying Defendants' prior production,[2] she later suggesting a procedure for quelling the e-mails. See Ex. I, M. McBeath Letter, Mar. 20, 2017, p.2 at No. 4 (suggesting using the Google Service "Vault" and performing .MBOX archiving).

Hoping to avoid another motion to compel, Defendants performed a preliminary investigation into McBeath's requested procedure, including a consultation with an IT professional. See, e.g., Ex. J, Defs.' Resp. Req. Prod. at 4:14-26. At first, it appeared that Defendants would need to upgrade their e-mail service at a cost of $6,000 per year. See id.

---

[2]McBeath, via Gavron, claims Defendants' production was technically problematic resulting in the corruption of certain files. Yet, she has not identified what relevant evidence was supposedly destroyed and Defendants have not corroborated this assertion. As more fully discussed in Defendants' responses to McBeath's Requests for Production (see Ex. J, 2:21 – 3:6.), limitations with Defendants Google e-mail subscription caused them to employ a consulting expert who utilized Microsoft Outlook and a third-party utility, IMAP, to copy the inboxes and the metadata underlying the Google e-mails. The e-mails were produced in a native format - .pst.

1  As more fully provided in Defendants Objection to Reproduction (see id. at 2:13 – 5:19),
2  Defendants objected to McBeath's suggested procedure for quelling e-mails but remained
3  willing to allow McBeath to inspect the e-mails previously produced. See id.

4  McBeath subsequently proposed Defendants provide their consent to Google so that
5  it could perform the search. See Ex. K, M. McBeath Letter, April 5, 2017. Defendants did
6  not object to the mechanism *per se*; rather, they simply requested McBeath provide
7  parameters for Google to perform the production so that there would be limitations on the
8  already expansive fishing expedition. See Ex. L, R. Garcia E-mail, April 7, 2017 ("[t]his
9  e-mail follows up on our meeting and discussion earlier today. Here's what we agreed
10 to…you will provide us at your earliest convenience the search phrase/terms that we will
11 use to capture your requested emails inside the Martins' email accounts (i.e. we want to be
12 able to copy and paste the search into the Gmail search bar to capture everything you
13 want).")

14 Shortly after requesting McBeath provide parameters, and before McBeath provided
15 any suggested parameters,[3] Defendants discovered and agreed to the e-mail mechanism
16 originally proposed. See Ex. M, T. Tufts Letter, April 27, 2017 ("we are now able to obtain
17 TTC e-mails in the .mbox format…given what we can accomplish together what you would
18 ask Google to do via subpoena, we do not believe it is worthwhile to burden yet another
19 third-party with discovery issues."). McBeath filed the Motion, her third motion to compel
20 on this issue, notwithstanding.

21 **B. McBeath's reaching subpoena served on TTC's employee.**

22 Hoping to gain access to TTC's e-mail systems by circumventing the discovery
23 processes set forth in the Rules, McBeath subpoenaed TTC's employee, Kaylor, on March
24 20, 2017. See Ex. N, M. McBeath Subpoena, (Doc. No. 42). McBeath served the subpoena
25 upon Kaylor in his individual capacity. See, e.g., id. at 2. Kaylor is not a statutory agent
26 for TTC. See Ex. O, Ariz. Corp. Commission Statutory Agent Information. Kaylor is not

---

[3] As McBeath's motion reflects, she has never provided the requested parameters and fails to identify with specificity the parameters she will utilize if Defendants are compelled to provide their consent to Google.

00322632.1

- 6 -

1  an officer or director of TTC. See id. Kaylor does not have an ownership interest in TTC
2  and he is not an agent of Defendants.

### C. McBeath's dishonesty regarding her employment with Alliance Beverage.

McBeath represented on her resume that she was employed with Alliance Beverage Distributing Company ("Alliance") when she applied to TTC. See Ex. P, M. McBeath E-mail, TTC 000630-631; see also id., M. McBeath Resume (indicating under Professional Experience employment with Alliance from "2010 to present"). Notwithstanding the representation, McBeath testified she was unemployed when she applied for work at TTC. See Ex. Q, M. McBeath Dep. Tr., 15:9-16. Further, she testified that her employment with Alliance was terminated because of a restructuring in the company's business goals, resulting in the elimination of her position on the fine wine sales team. See id. at 16:23 – 17:13 ("Well they were dismantling the fine wine team at that time, and there was a restructuring with the new vice president, and he was – he didn't see the value in the fine wine team that was in place at the time...").

Defendants subpoenaed Alliance shortly after McBeath's deposition and received Alliance's responses prior to McBeath's belated objection. See Ex. R, M. McBeath Letter, April 6, 2017; see also Ex. S, R. Garcia Resp., April 6, 2017. Alliance's records reveal that, consistent with TTC's reasons for terminating her employment, after numerous warnings McBeath "continually failed to follow management instruction, report to required meetings and work-with visits, and has failed to acknowledge communications from her manager and business partners." Ex. T, Alliance Notice of Corrective Action, TTC 000869. Alliance terminated McBeath's employment on September 30, 2014 – approximately five months before she first applied to TTC. See id. Clearly, McBeath's representations both during the interview process with TTC and in her resume, are at odds with the documentary evidence produced by Alliance. McBeath must account for such discrepancies at trial.

### D. McBeath's disegenuous request to narrow the Glenn Murphy subpoena.

McBeath alleges that she "turned down a more lucrative job offer she had received because she looked forward to the exiting [sic] and promising opportunities for professional

1    growth at TTC that Todd, Sherry, and Lisa described to her." (Sec. Am. Compl. ¶¶ 24; see
2    also id. at ¶¶ 137-140, 147.) McBeath testified at her deposition that, before February 2015
3    but possibly around September 2014,[4] she received a more lucrative job offer from a
4    company called Bar Fixer, owned and operated by Glenn Murphy ("Murphy"). See Ex. U,
5    M. McBeath Dep. Tr., 86:17 – 87:9. Additionally, after her employment with TTC ended,
6    McBeath contacted Murphy both casually and professionally, ostensibly to discuss both
7    temporary and long-term positions within Murphy's organization. See id. at 344:8-20.
8    McBeath has not produced any documents to substantiate her claim and denies possessing
9    any documents. See, e.g., id. at 87:18-22.

10         On March 30, 2017, Defendants issued a subpoena to Murphy – a California resident
11   – seeking, among other things, all documents and employment records relating to McBeath,
12   job applications, offer letters, actual or potential compensation history and information, and
13   communications between McBeath and Murphy. (See Notice of Intent to Serve Subpoena,
14   Doc. No. 54.); see also Ex. V, G. Murphy Subpoena Req. at Ex. A.

15         Defendants' counsel met with McBeath on April 7, 2017 to address McBeath's
16   concerns with the scope of the subpoena. During that meeting the parties agreed to a
17   temporal limitation on the scope of the subpoena in an effort to avoid a discovery dispute.
18   Specifically, the parties agreed to narrow the scope of documents and communications to
19   those occurring between January 1, 2015 and December 31, 2016. See Ex. L ("we will
20   serve a new subpoena on Glenn Murphy limiting the requested period to January 1, 2015
21   through December 31, 2016).

22         Because Defendants had been trying to serve Murphy and were in contact with
23   Murphy directly to arrange service, they did not reissue a subpoena before Murphy was
24   served on April 13, 2017. See Ex. W, Certificate of Service. Defendants intended instead
25   to follow up directly with Murphy and, knowing that McBeath had also been in contact with
26   him, assumed he had been alerted that his subpoena responses would be limited after

---

[4] McBeath began the interview process in February 2015. (See Sec. Am. Compl. at ¶ 17.) She claims her communications with Murphy about a potential position started "when [Murphy] knew [she] was no longer with Alliance." See Ex. U, 88:14-25. Assuming the truth of McBeath's statements, she received the job offer between September 2014 and February 2015.

00322632.1

consultation between the parties. In fact, Defendants' counsel's office called to follow up with Murphy after the agreement reached with McBeath, but Murphy summarily stated "you'll get your response" and hung up the phone.

On April 21, 2017 McBeath followed up with counsel about Murphy's subpoena, now asking the subpoena to be further limited to two sources of documents she deemed appropriate. See Ex. X, M. McBeath Letter, April 21, 2017 ("I request that the subpoena that will be served on Mr. Murphy be limited only to documents that relate to (i) the job offer he made to me, and (ii) Tucson Tamale Company.") Because this contradicted the agreement reached with McBeath, Defendants declined to renegotiate the limitations on Murphy's subpoena, which resulted in McBeath's Motion.

## II.     LAW AND ANALYSIS

### A. **Defendants' should not be compelled to provide consent to Google to disclose their private information.**

Good cause exists to protect Defendants from McBeath's fishing expedition. The Court may protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. Fed. R. Civ. P. 26(c). "Rule 26(c)(1) provides that the court may, for good cause, issue an order to protect a party or person from 'undue burden;' the court's ability to issue such an order is not limited to circumstances in which the burdened party is the party 'from whom discovery is sought.'" Blotzer v. L-3 Communications Corp., 287 F.R.D. 507, 510 (D. Ariz. 2012). "'If the sought-after documents are not relevant, nor calculated to lead to the discovery of admissible evidence, then any burden whatsoever imposed would be by definition 'undue.''" RQ Const., Inc. v. Ecolite Concrete U.S.A., 09-CV-2728-BEN WVG, 2010 WL 3069198, at *1 (S.D. Cal. Aug. 4, 2010) (citing Compaq Computer Corp. v. Packard Bell Elec., Inc., 163 F.R.D. 329, 335–36 (N.D.Cal.1995). Discovery may be denied or narrowly tailored to balance the needs of the case against a party's reasonable expectations of privacy." Id.

McBeath lacks a compelling basis to burden a third-party to produce the e-mails. The Defendants agreed to McBeath's suggested production mechanism, enabling

1  Defendants to produce what McBeath seeks from third-party Google.  Because Defendants
2  can perform a production that meets McBeath's stated approval, there is no need to burden
3  a third-party with this exercise or compel Defendants to consent to third-party production.
4  Moreover, by permitting the Defendants to perform the production, the risk McBeath will
5  invade Defendants' privileged communications, as she is known to do, or utilize private and
6  irrelevant information to harass Defendants will be mitigated.  See, e.g., Ex. F (McBeath
7  acknowledges looking at privileged communications); (see also Sec. Am. Compl. (Doc No.
8  44), ¶¶ 34, 40-44, 53, 88-99, 91-93, 98-103 (vexatious and unnecessary personal attacks
9  against Defendants).)

10  McBeath's Motion asks Defendants to provide their consent to discovery far
11 exceeding the scope of Rule 26.  McBeath's Motion fails to identify with any specificity
12 the scope of consent she seeks from Defendants and accordingly is overbroad on its face.

13  Based on McBeath's history of ESI demands and assuming she seeks to compel a
14 similar trove of e-mails previously requested, McBeath's request remains overbroad and
15 unduly burdensome.  McBeath effectively asks Defendants to consent to the release of *any*
16 e-mails that reference her, irrespective of the nature of those communications or their
17 relevance to her wrongful termination or discrimination claims.  See, e.g., Ex. H (Doc. Req.
18 No. 8, 4:18-22).  As a matter of law, Defendants are not obligated to participate in an unduly
19 burdensome, overbroad fishing expedition encompassing *any* e-mail referencing her name,
20 among other irrelevant communications.  See, e.g., Blotzer, 287 F.R.D. at 510; see also RQ
21 Const., Inc. v. Ecolite Concrete U.S.A., 2010 WL 3069198, at *1.

22  Because McBeath's requested relief is overbroad and unduly burdensome as a matter
23 of law, the Court should deny the relief sought.  Alternatively, Defendants remain willing
24 to engage in the production mechanism McBeath specifically requested provided she
25 submits search parameters that narrow the scope of her wide-reaching e-mail demands.

26  **B. Shawn Kaylor produced documents in his possession, custody, and control.**
27  McBeath's perfunctory request the Court compel TTC to force Kaylor to respond to
28 her subpoena suffers from numerous fatal flaws.

00322632.1

1    Fundamentally, McBeath fails to identify *any* authority suggesting that Kaylor is obligated to produce TTC's property. As McBeath invariably admits, her primary motive for serving a subpoena on Kaylor was to circumvent TTC's possessory interest in the documents and communications stored on TTC's e-mail server – e-mails she has broadly sought for a year (<u>see</u> *supra* at II.A.). However, Kaylor cannot produce items that are outside his possession, custody, or control; i.e. the e-mails *on TTC's server*. Those e-mails are the sole property of TTC's business. <u>See</u>, <u>e.g.</u>, Ex. Y, <u>TTC Company Computer Use Policy</u>, TTC 000070 ("Company computers are for business use only"). At its core, Kaylor cannot produce property that is not his own and McBeath failed to provide any authority suggesting otherwise.

McBeath misconstrues TTC's statements about Kaylor's production as an untimely objection. TTC did not timely object to the subpoena because it did not need to. (<u>See</u> Mot. Compel, 4:2-13 (arguing Defendants did not timely object to the subpoena).) McBeath unequivocally served her subpoena on a non-party employee. TTC did not have any concerns he possessed their private and confidential information outside the scope of his employment and accordingly did not need to object.

**C. <u>Defendants cannot be compelled to destroy evidence critically damaging McBeath's case.</u>**

McBeath's belated objection to the Alliance subpoena is insufficient to justify the destruction of relevant evidence. McBeath disingenuously suggests Alliance produced documents "before [she] could have time to meet and confer with defense counsel." (Motion at 5:1-2.) Defendants served the subpoena on March 22, 2017 (<u>see</u> Doc. No. 47). McBeath waited until April 6, 2017 to assert an objection – over two weeks after service. McBeath provides no support for her conclusory statement that she was unable to assert her objection in this timeframe. Accordingly, her objection should be considered waived as untimely. <u>See</u> Fed. R. Civ. P. 45(d)(3); <u>see also</u> <u>Berrey v. Plaintiff Inv. Funding LLC</u>, CV-14-00847-PHX-BSB, 2014 WL 6908525, at *3 (D. Ariz. Dec. 9, 2014) (finding a party waives untimely objections absent unusual circumstances and good cause).

00322632.1

- 11 -

1  Even assuming McBeath did not waive her objection, the evidence obtained from Alliance fell within the scope of permissible discovery and is clearly relevant to Defendants' affirmative defenses. Defendants served Alliance in part to substantiate its after-acquired evidence of wrongdoing defense. As a matter of law, former employment records are relevant to the after-acquired evidence defense in cases alleging Title VII discrimination, like McBeath's. See Guitron v. Wells Fargo Bank, N.A., C 10-3461 CW MEJ, 2011 WL 4345191, at *2 (N.D. Cal. Sept. 13, 2011) ("Former employment records are relevant to the after-acquired evidence defense available in Title VII employment discrimination cases."). Indeed, Defendants' subpoena was narrowly tailored to produce documents related to McBeath's prior employment with Alliance, including documents evidencing her hiring and employment termination.

Furthermore, McBeath placed her prior employment history directly at issue with her contradicting representations to the Defendants, rendering the subpoena within the scope of permissible discovery. See id. (stating that "some lower courts have held that the after-acquired evidence defense cannot be used to pursue discovery in the absence of some basis for believing that the after-acquired evidence of wrongdoing will be revealed.") Specifically, McBeath made misrepresentations on her resume about her employment status and, as the records reflect, she lied about the basis for her termination from Alliance. Defendants subpoenaed Alliance to, among other things, establish the true history of McBeath's prior employment in light of the inconsistencies between her resume and her testimony and to impeach her on the inconsistencies ultimately revealed. Thus, Defendants not only had a reasonable basis to subpoena Alliance, but the subpoena also was reasonably calculated to yield impeachment evidence – evidence expressly discoverable as a matter of law. See id. at *3 (holding that prior employment records are discoverable because they could be relevant for impeachment purposes). Accordingly, even assuming McBeath's objection was timely, exceptional grounds do not exist to quash the subpoena or destroy the production materials. See Berrey, 2014 WL 6908525.

Finally, to the extent McBeath is concerned with her privacy, she can agree to a

00322632.1

protective order in this matter like the parties previously agreed in the Superior Court Case. Indeed, Defendants have suggested and offered to enter a similar protective order in this venue but received no response from McBeath.  See Ex. Z, R. Garcia E-mail, March 21, 2017 ("attached is a slightly modified version of the Protective Order already in place in the state court action for filing in the federal case.  Will you please stipulate to this order…").

### D. McBeath's Objection to the Murphy subpoena is disingenuous and lacks merit.

McBeath's objection typifies the difficulties Defendants have faced dealing with McBeath and her attorney engaged in the unauthorized practice of law, Marquez. Defendants' counsel will meet with McBeath only to have the reasonable agreements reached during the meeting rescinded or revoked after Marquez determines the agreement does not favor McBeath or serve their campaign to harass Defendants through frivolous motion practice.  Here, for example, Defendants agreed to limit the scope of the subpoena to documents and communications exchanged between January 1, 2015 and December 31, 2016 – ostensibly the period McBeath received her supposed offer.  See Ex. L.  Two weeks later, Marquez retracted McBeath's agreement and unilaterally demanded the subpoena provide even further restrictions to the scope of documents, without regard or knowledge of McBeath's conflicting and uncertain testimony related to Murphy's offer.

Defendants' subpoena should stand as-is because the requests are narrowly tailored to produce relevant information.  Defendants seek records related to McBeath's prior employment or potential employment with Murphy as well as communications that reflect pre-employment offers.  Both sources of information related to prior employment are expressly discoverable in cases like McBeath's.  See, e.g., Guitron, 2011 WL 4345191 at *2.  Further, McBeath's own uncertainty related to the time frame during which she received the offer from Murphy vitiates against any temporal limitations on the communications.  According to McBeaths' testimony, the communications began after Alliance terminated her employment up to and around the time TTC hired her in 2015.

00322632.1

These communications are clearly relevant to establish McBeath's allegations, but a more expansive timeframe is appropriate to determine the veracity of McBeath's claim, notwithstanding Defendants' offer to narrow the scope to resolve a discovery dispute.[5] Given McBeath's uncertainty about the exact timeframe and the general issues with her credibility, it is equally likely that this supposed offer occurred well before her interview process with TTC in early 2015. Should Murphy's responses reveal that McBeath indeed received the supposed offer years before her interview process with TTC, that evidence would be fodder for impeachment at trial.

Communications exchanged between McBeath and Murphy during and after McBeath's employment with TTC are likewise relevant and discoverable. Communications exchanged during McBeath's employment will unquestionably reflect a candid assessment of her position at TTC, any suspicions she may or may not have had about Defendants' alleged discriminatory animus, as well as any attempts McBeath undertook to pursue alternative employment after Defendants allegedly refused to promote her to the Business Development Position. For similar reasons, McBeath's communications with Murphy post-employment termination are relevant to assess her efforts to mitigate damages. Surely, if McBeath had a prior offer of employment with Murphy – an individual she also considers a friend – it is more likely than not she would have reengaged with Murphy to possibly pursue the opportunity she previously declined in favor of employment with TTC. Indeed, McBeath admits she was in contact with Murphy and ostensibly discussed employment opportunities with him sufficient to enable her to testify that Murphy could offer temporary employment only. See Ex. U at 344:8-20. Simply, the requests are tailored to produce evidence substantiating McBeath's claims and obligations to mitigate her damages.

---

[5] Defendants' efforts to resolve the scope of Murphy's subpoena should not be used as a sword against Defendants' ability to discover relevant evidence. Because of McBeath's historically vexatious motion practice, Defendants have made and continue to make significant concessions to preserve their legal resources as well as judicial resources. Indeed, Defendants' offer to narrow the scope of Murphy's subpoena clearly reflects a potentially damaging concession from Defendants. McBeath claims her communications began with Murphy months before January 2015, suggesting critical information about her employment status as well as the legitimacy of Murphy's offer would potentially go undiscovered by narrowing the time frame to January 2015 through December 2016.

00322632.1

Because Defendants' subpoena is narrowly tailored to produce relevant evidence, particularly in light of McBeath's testimony, the Court should deny McBeath's motion to quash.

### III. CONCLUSION

For the reasons set forth above, Defendants request the Court deny the relief sought by McBeath in its entirety and award Defendants their fees and costs incurred to oppose McBeath's Motion pursuant to Fed. R. Civ. P. 37(a).

RESPECTFULLY SUBMITTED this 15th day of May, 2017.

FARHANG & MEDCOFF

By /s/ Travis L. Tufts
Ali J. Farhang
Roberto C. Garcia
Travis L. Tufts

Attorneys for Defendants / Counterplaintiff

### CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed electronically with the Clerk of the United States District Court for the District of Arizona, with notice of case activity generated and sent electronically this 15th day of May, 2017 to:

Melissa Martin McBeath
3463 E. Terra Alta Blvd.
Tucson, AZ 85716

/s/ Letitia L. Wright

00322632.1