MELISSA MARTIN McBEATH
3463 E. TERRA ALTA BLVD.
TUCSON, AZ 85716
Ph: (520) 449-9753
*mel.mcbeath@cox.net*

Pro Se

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA, TUCSON DIVISION

| | |
|---|---|
| MELISSA MARTIN McBEATH, an individual, <br><br> Plaintiff, <br><br> v. <br><br> TUCSON TAMALE COMPANY, an Arizona corporation; TODD RUSSELL MARTIN; an individual; SHERRY MARTIN, an individual; and LISA MARTIN, an individual, <br><br> Defendants. <br> _____ <br><br> AND TUCSON TAMALE COMPANY'S RELATED COUNTERCLAIMS | Case No. CV 16-462-TUC-DCB (BPV) <br><br><br> **RESPONSE TO COUNTERPLAINTIFF'S STATEMENT OF FACTS IN CONNECTION WITH THE PARTIES' CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT MOTION** <br><br> [L. R. Civ. 56.1] <br> _____ <br><br> Assigned to: Hon. David C. Bury <br><br> Complaint Filed: July 11, 2016 |

10399.1

| Tucson Tamale Company's Facts and Supporting Evidence | Melissa Martin McBeath's Response and Supporting Evidence |
|---|---|
| 12. In the course and scope of her employment as Area Manager, McBeath had access to TTC's confidential and proprietary data. See Ex. A, Decl. S. Martin at ¶¶ 3-6; see also Ex. B, Decl. T. Martin at ¶¶ 3-4; Ex. C, Decl. L. Martin at ¶¶ 3-4 | Admit. |
| 13. On or about March 19, 2015, in consideration for her employment at TTC, McBeath executed a Confidentiality Agreement (the "Agreement"). See Ex. A at ¶¶ 3-6; see also Ex. B at ¶¶ 3-4; Ex. C at ¶¶ 3-4; Ex. D, Confidentiality Agreement; see also Ex. E, M. McBeath Dep. Tr.1 at p. 233-234. | Admit. |
| 14. Therein, McBeath acknowledged TTC may disclose or give her confidential information during her employment and further agreed, among other things, that "the confidential information includes [TTC's] trade secrets, sales and profit figures, customer lists, relationships with contractors, customers, or suppliers, and opportunities for new or developing business" (the "Confidential Information"). See Ex. D; see also Ex. E. | The Agreement speaks for itself. |
| 15. McBeath agreed "[she] will not use or disclose to any other person or entity any confidential information or materials (either written or unwritten) except when I am required to do so as required by law." Further, "[she] will not, except in performing [her] duties, | The Agreement speaks for itself. |

| Tucson Tamale Company's Facts and Supporting Evidence | Melissa Martin McBeath's Response and Supporting Evidence |
|---|---|
| remove or copy any confidential information or materials or assist anyone in doing so without [TTC]'s written permission." See Ex. D; see also Ex. E. | |
| 16.   McBeath admitted she entered the Agreement before she was hired, that her signature appears on the Agreement, that she signed it without duress, and that the Agreement was reasonable and necessary. See, e.g., Ex. E. | McBeath admits that she signed the Agreement. |
| 17.   After TTC terminated McBeath's employment, Defendants Todd Russell Martin, Sherry Martin, and Lisa Martin (collectively, the "Martins") engaged in an exhaustive review of McBeath's TTC e-mail account to determine whether McBeath shared TTC's Confidential Information without permission. See Ex. A at ¶¶ 7-8; see also Ex. B at ¶¶ 5-6; Ex. C at ¶¶ 5-6. | McBeath has no personal knowledge regarding this allegation. |
| 18.   Collectively, the Martins spent at least 55 hours reviewing tens-of-thousands of communications in McBeath's e-mail account, then, armed with the results of their investigation, the Martins spent additional time and money on behalf of TTC to identify its legal rights and remedies. See Ex. A at ¶¶ 7-8; see also Ex. B at ¶¶ 5-6; Ex. C at ¶¶ 5-6. | McBeath has no personal knowledge regarding this allegation. How much time Defendants have spent in connection with this case is not relevant to damages. Even where *pro se* litigants are practicing attorneys, the prevailing *pro se* plaintiffs cannot recover fees for time spent litigating their cases. *Kay v. Ehrler,* 499 U.S. 432, 437-38 (1991) (denying fees to prevailing party who was a *pro se* attorney). |

| Tucson Tamale Company's Facts and Supporting Evidence | Melissa Martin McBeath's Response and Supporting Evidence |
|---|---|
| 19. The investigation was outside what the Martins do as a matter of course and diverted them from other matters including the proper running of their business. See Ex. A at ¶¶ 7-8; see also Ex. B at ¶¶ 5-6; Ex. C at ¶¶ 5-6. | *See* Response to Fact No. 18, above. |
| 20. Between December 9, 2015 and January 9, 2016, McBeath shared TTC's sales and profits figures with Chavez on at least three separate occasions. See Ex. A ¶¶ 9-11; see also Ex. F, Chavez E-mail and Attach., December 9, 2015; Ex. G, Chavez E-mail and Screenshot, December 10, 2015 (redacted); Ex. H, Chavez E-mail and Revel Dashboard, January 14, 2016 (redacted); Ex. I, Dep. Tr. at 242:3-22, 252:20 – 253:10; 256:14-20. | McBeath admits that she showed to Chavez the documents marked as Exhibits F-I. She did so while performing her duties as Area Manager for TTC. |
| 21. Specifically, McBeath shared TTC's Sales Summaries from its Tanque Verde restaurant and an Operations Report related to TTC's Broadway restaurant. See Ex. A ¶¶ 9-11; see also Ex. F, G, H, & I. | McBeath admits that she showed to CPA Chavez the documents marked as Exhibits F-I. She did so while performing her duties as Area Manager for TTC. |
| 22. In the course of the Martins' review, they also identified e-mails between McBeath and Ehud Gavron ("Gavron") wherein McBeath again shared TTC's Confidential Information. See Ex. A at ¶ 12. | Deny. McBeath did not share any Confidential Information with Ehud Gavron. |
| 23. McBeath e-mailed Gavron asking him to access TTC's Revel Point of Sale system ("Revel") – a system utilized to aggregate, compile, and track TTC's sales, profits, and operations data. See | Deny. The email TTC produced is incomplete and does not support this fact. Sherry Martin's declaration states that she "believes . . . Gavron had probably accessed Revel previously |

| Tucson Tamale Company's Facts and Supporting Evidence | Melissa Martin McBeath's Response and Supporting Evidence |
|---|---|
| id. at ¶ 10-12; see also Ex. J, Gavron E-mail, Oct. 21, 2015; Ex. K, Dep. Tr. at 250:13-20. | using McBeath's credentials." This statement is not based on personal knowledge or expert opinion.<br><br>Ehud Gavron Declaration, dated May 16, 2017 (***"Gavron Dec."***) ¶¶ 4-7. |
| 24.    Gavron needed McBeath's TTC username and password to access Revel, which she provided. See Ex. A at ¶ 12. | Deny. McBeath never gave out her username and password to anyone. Gavron never accessed TTC's Revel account.<br><br>Gavron Dec. ¶¶ 6-7 |
| 25.    TTC never authorized Gavron's access to Revel and to this date is unaware of what he accessed or what were his true ends in accessing a system with sensitive Confidential Information. See Ex. A at ¶ 12; see also Ex. B at ¶ 7; Ex. C at ¶ 7. | Admit that Gavron was not authorized to access TTC's Revel account. Gavron never accessed TTC's Revel account.<br><br>Gavron Dec. ¶¶ 6-7. |
| 26.    Over the course of her employment, McBeath shared hundreds of e-mails with Gavron including, among other things, internal practices and policies like TTC and its owners' financial obligations, implementation of TTC's processes in Revel, and intimate details involving employee misconduct and corrective action, none of which should have been discussed outside the workplace, as provided by TTC's workplace policies. See Ex. A. at ¶ 13; see also Ex. L, McBeath E-mail, Aug. 30, 2015 (financial obligations) (redacted); Ex. M, McBeath E-mail, December 4, 2015 (implementation of Revel | Deny. McBeath's email exchanges with Gavron did not disclose sensitive financial information or proprietary trade secrets.<br><br>Gavron Dec. ¶¶ 7-8. |

| Tucson Tamale Company's Facts and Supporting Evidence | Melissa Martin McBeath's Response and Supporting Evidence |
|---|---|
| processes); Ex. N, McBeath E-mail, Aug. 26, 2015 (employee misconduct and corrective action); Ex. O, Defs' Supp. Discl. Stmnt. at 11:11-12 (e-mails to/from Gavron). | |
| 27. McBeath agrees Chavez and Gavron are third-parties, unaffiliated with TTC. See Ex. P, Dep. Tr. at 237:1-5; 263:25 – 264:2. | Admit. |
| 28. McBeath agrees the Sales Summaries and Operations Report contain TTC's sales and profits data. See Ex. Q, Dep. Tr. at 241:25 – 242:15; see also Ex. I. Unambiguously, she knew this information was confidential. See Ex. Q at 257:13-21. | Admit. |
| 29. Neither TTC nor the named Defendants authorized McBeath's disclosure of this information to Chavez or Gavron, either orally or in writing. See Ex. A at ¶¶ 9-14; Ex. B at ¶ 7; Ex. C at ¶ 7. | Deny.<br><br>The Agreement expressly provides that McBeath did not need TTC's written permission to disclose confidential information to third parties in the performance of her duties. |
| 30. Because they do not exist, McBeath is not aware of any writing memorializing permission for her to disclose Confidential Information shared to Chavez or Gavron. See, e.g., Ex. R, Dep. Tr. at 244:5-19; 246:14 – 247:9; 253:24 – 254:1; see also Ex. P at 263:25– 264:2. | Deny. The Confidentiality Agreement states—*in writing*—that McBeath did not need to obtain written permission to disclose this confidential information because she did so in the performance of her duties. |
| 31. The two communications alluding to her communications with Chavez, omits any reference to Chavez or the breadth of information McBeath | Admit. Sherry Martin knew that McBeath had spoken with Chavez therefore the email did not need to identify him. |

| Tucson Tamale Company's Facts and Supporting Evidence | Melissa Martin McBeath's Response and Supporting Evidence |
|---|---|
| shared with him. See Ex. S, M. McBeath E-mail, Dec. 9, 2015; see Ex. T, M. McBeath E-mail, Jan. 14, 2016. | |
| 32. The Martins were not contemporaneously aware of the scope of Confidential Information shared with Chavez based on McBeath's communication nor did they ratify McBeath's conduct. See Ex. A at ¶ 14-15; see also Ex. B at ¶ 7; Ex. C at ¶ 7. | Deny.<br><br>McBeath informed Sherry Martin of her communication with Chavez. |
| 33. McBeath was not required by law to share the Confidential Information with Chavez or Gavron. See Ex. U, Dep. Tr. at 244:5-7. | Admit. McBeath deemed it appropriate to share this information, however, to perform her duties in furtherance of TTC's business interests. |
| 34. McBeath agrees that Marquez [sic] serves as her counsel in this matter. See Ex. V, Dep. Tr. at 136 – 141; see also Ex. W, M. McBeath Litigation Hold Letter ("I have retained advisory counsel"); Ex. X, E. Gavron E-mail, June 27, 2016 (copying Marquez [sic]). | Deny.<br><br>Márquez is not an attorney. |
| 35. All employees, including McBeath, are subject to TTC's workplace policies and procedures. Among those policies is a Zero Tolerance Policy related to Proprietary and Confidential Information (the "Policy"). See Ex. A at ¶ 16; see also Ex. B at ¶ 8; Ex. C at ¶ 8; Ex. Y, Employee Handbook, at TTC 000072. | Deny.<br>During the time that McBeath worked for TTC, Defendants did not require rank and file employees to sign the Confidentiality Agreement.<br><br>McBeath Dec. ¶4 (TTC never trained or explained to its employees what TTC regarded as confidential information). |
| 36. The Policy expressly prohibits disclosure of TTC's proprietary processes and recipes and warns of potential legal action if found in violation of the Policy. See Ex. Y. | The Policy speaks for itself. |

| Tucson Tamale Company's Facts and Supporting Evidence | Melissa Martin McBeath's Response and Supporting Evidence |
|---|---|
| 37. TTC reasonably restricts access to Confidential Information with usernames, passcodes, and permission-based file access. Indeed, the permission-based files include TTC's accounting records. See Ex. A at ¶ 17; Ex. B at ¶ 9; (see also J. Cooper Decl., Doc. No. 52-3, at ¶¶ 9, 15.) | McBeath admits that some of the Confidential Information was accessible only through usernames and passwords, but not all of it was restricted in this way. |
| 38. Access to TTC's overall sales and profits figures are restricted to executive management. Certain data, like payroll information, is even restricted from certain higher level management, like McBeath. See Ex. A at ¶ 17; Ex. B at ¶ 9; Ex. Z, M. McBeath Dep. Tr. at 164:11-18 (regarding payroll information); (see also J. Cooper Decl., Doc. No. 52-3, at ¶¶ 9, 15.) | Admit. |
| 39. TTC commonly binds employees with access to TTC's Confidential Information to confidentiality agreements similar to the Agreement. See Ex. A at ¶¶ 6, 17; Ex. B at ¶ 9; (see also J. Cooper Decl., Doc. No. 52-3, at ¶¶ 9, 15.) | Deny. During the time that McBeath worked for TTC, Defendants did not require rank and file employees to sign the Confidentiality Agreement. |
| 40. McBeath, under oath, denied TTC terminated her employment because she asked TTC to pay her a bonus. See Ex. AA, Dep. Tr. at 124:18-24; 126:1-4. | Deny. The deposition testimony cited is taken out of context and is contradicted by the allegations in the verified Second Amended Complaint. |
| 41. McBeath cannot identify written permission to disclose Confidential Information despite full knowledge of the communications she had with TTC representatives and ample | Admit. McBeath deemed it appropriate to share this information, however, to perform her duties in furtherance of TTC's |

| Tucson Tamale Company's Facts and Supporting Evidence | Melissa Martin McBeath's Response and Supporting Evidence |
|---|---|
| opportunities to inspect TTC's email production. See Ex. BB, TTC's Resp. Request Production and TTC's Supp. Resp. Request Production. | business interests.<br><br>Melissa Martin McBeath Declaration, dated March 27, 2017 (*"McBeath Dec."*) Exhibit A (Confidentiality Agreement). |
| 42.   McBeath argues her interpretation of the Agreement, which she admits is not consistent with its plain text, authorized her to disclose TTC's Confidential Information to Chavez because he is a CPA and is "also bound by confidentiality." See Ex. CC, Dep. Tr. at 243:14-18; 244:13-21; 242:16-21. | Deny.<br><br>The Agreement expressly provides that McBeath did not need TTC's written permission to disclose confidential information to third parties in the performance of her duties. |
| 43.   Marquez [sic] has avoided TTC's numerous efforts to serve a subpoena upon him and, though a process server perfected service upon him, he has disregarded his obligations to respond. See Ex. DD, Marquez [sic] Subpoena Service Attempts and Marquez [sic] Proof of Service. | McBeath has no personal knowledge regarding this allegation and on that basis denies it.<br><br>The Proof of Service produced in support of this allegation, however, shows that Márquez was not personally served as required under California law. *See* Cal. Code Civ. Proc. § 2020.220 (c) ("Personal service of any deposition subpoena is effective to require all of the following of any deponent who is a resident of California at the time of service:  (1) Personal attendance and testimony, if the subpoena so specifies. (2) Any specified production, inspection, testing, and sampling.") |
| 44.   Gavron evaded service until the Superior Court intervened. See Ex. EE, Order Granting Mot. Alternative Service and Gavron Proof of Service. | McBeath has no personal knowledge regarding this allegation and on that basis denies it. |

| Tucson Tamale Company's Facts and Supporting Evidence | Melissa Martin McBeath's Response and Supporting Evidence |
|---|---|
| 45. McBeath refused to consent to the depositions of Gavron, Chavez, and her son Maximillian Ivankovich ("Ivankovich"), which precluded TTC from taking their depositions under the Arizona Rules of Civil Procedure absent court intervention. See Ex. FF, T. Tufts E-mail dated Feb. 3, 2017 and M. McBeath Objection dated Feb. 7, 2017. | Deny.<br><br>Exhibit FF attached to TTC's Separate Statement contains a letter from McBeath's attorney that informs counsel for TTC that "Defendants may proceed with the deposition of Ehud Gavron and Ernesto Chavez after Defendants identified and produce the e-mails, in native electronic form, that contain the confidential information that Ms. McBeath allegedly disclosed to these two witnesses without authorization."<br><br>McBeath refused to consent to Ivankovich's deposition because he is being harassed solely because he is McBeath's son. He never took any of TTC's confidential information. He would have no use for it.<br><br>Maximilian Ivankovich Declaration, dated May 16, 2017 |
| 46. TTC did not enter any agreement with Ernesto Chavez regarding the confidentiality of communications of TTC representatives with him. See Ex. GG, Dep. Tr. at 253:21-23. | Admit. |

Dated: May 16, 2017

Respectfully submitted,

_Melissa Martin McBeath_
Melissa Martin McBeath

## CERTIFICATE OF SERVICE

I hereby certify that the above document was filed electronically with the Clerk of the United States District Court for the District of Arizona, and was served via hyperlink generated by the court's CM/ECF system, which was sent electronically to:

Roberto C. Garcia
*rgarcia@fmazlaw.com*
Travis L. Tufts
*ttufts@fmazlaw.com*
Farhang & Medcoff PLLC
4801 E Broadway Blvd., Ste. 311
Tucson, AZ 85711
(520) 790-5433

I declare under penalty of perjury under the laws of the State of Arizona and the United States of America that the foregoing is true and correct.

Dated: May 16, 2017

_____
Melissa Martin McBeath