# EXHIBIT "A"

The State Bar *of California*

Q

# Attorney search

# Francisco Xavier Marquez - #172631

## Current Status:  Disbarred

**This member is prohibited from practicing law in California by order of the California Supreme Court.**

See below for more details.

## Profile Information

*The following information is from the official records of The State Bar of California.*

| | | | |
|---|---|---|---|
| **Bar Number:** | 172631 | | |
| **Address:** | Marquez & Associates PO Box 720997 San Jose, CA 95172 | **Phone Number:** | (408) 634-6119 |
| | | **Fax Number:** | (408) 969-1639 |
| | | **Email:** | Not Available |
| **County:** | Santa Clara | **Undergraduate School:** | Stanford Univ; Stanford CA |
| **District:** | District 6 | | |
| **Sections:** | None | **Law School:** | UC Hastings COL; San Francisco CA |

## Status History

| Effective Date | Status Change |
|---|---|
| Present | Disbarred |
| 10/16/2014 | Disbarred |
| 5/10/2014 | Not Eligible To Practice Law in CA |
| 12/8/1994 | Admitted to The State Bar of California |

Explanation of member status

The State Bar *of California*                                     Q

| Effective Date | Description | Case Number | Resulting Status |
|---|---|---|---|

## Disciplinary and Related Actions

Overview of the attorney discipline system.

| Effective Date | Description | Case Number | Resulting Status |
|---|---|---|---|
| 10/16/2014 | Disbarment | 11-O-16244 | Disbarred |
| 5/10/2014 | Ordered inactive | 11-O-16244 | Not Eligible To Practice Law in CA |

## Administrative Actions

This member has no public record of administrative actions.

Copies of official attorney discipline records are available upon request.

Explanation of common actions

## State Bar Court Cases

**NOTE:** *The State Bar Court began posting public discipline documents online in 2005. The format and pagination of documents posted on this site may vary from the originals in the case file as a result of their translation from the original format into Word and PDF. Copies of additional related documents in a case are available upon request. Only Opinions designated for publication in the State Bar Court Reporter may be cited or relied on as precedent in State Bar Court proceedings. For further information about a case that is displayed here, please refer to the State Bar Court's online docket, which can be found at: http://apps.statebarcourt.ca.gov/dockets.aspx*

**DISCLAIMER:** *Any posted Notice of Disciplinary Charges, Conviction Transmittal or other initiating document, contains only allegations of professional misconduct. The attorney is presumed to be innocent of any misconduct warranting discipline until the charges have been proven.*

| Effective Date | Case Number | Description |
|---|---|---|
| 10/16/2014 | 11-O-16244 | Decision [PDF] [WORD] |

The State Bar *of California* 

*Summaries from the California Bar Journal are based on discipline orders but are not the official records. Not all discipline actions have associated CBJ summaries. Copies of official attorney discipline records are available upon request.*

## October 16, 2014

FRANCISCO XAVIER MARQUEZ [#172631], 49, of San Jose, was disbarred Oct. 16, 2014 and ordered to comply with rule 9.20 and make restitution.

The State Bar Court found Marquez culpable of failing to obey court orders, failing to maintain funds in his client trust account, collecting an illegal fee and misappropriation in one client matter. He also had two misdemeanor convictions for driving under the influence of alcohol.

In the client matter, Marquez was hired to represent a man in a dispute involving his mother's estate. There was a question of whether Marquez's client was the sole beneficiary of the estate or a co-beneficiary with his siblings. Despite the dispute, the client sold his mother's home in July 2006 and Marquez placed the sales proceeds totaling $721,008.05 into his business checking account. That same day, Marquez transferred $681,008.05 into his personal savings account and $40,000 to a partner at his firm. Although Marquez claimed the $40,000 was for his partner's fees for working on the case, the court found no evidence to support it.

On April 13, 2009, the probate court of San Mateo County enjoined Marquez and his client from using any sale proceeds from the home and ordered the money placed in a blocked, interest-bearing account. Two months later, the court filed an order demanding an accounting and a return of estate funds. That July, Marquez filed a response stating $13,475 had been paid to his client for repair expenses to prepare the home for sale, $419,595 had been paid to Marquez's firm for costs and legal services and the estate had lost $93,059 as a result of the financial crash in fall 2008. He said there was $194,877 in remaining estate funds. Although he acknowledged receipt of $419,595 in total payments from the estate, Marquez's billing records accounted for only $288,059.25 as attorney fees for services rendered. The court ultimately disqualified Marquez from representing the client and ordered Marquez to repay the $419,595. The litigation was dismissed, and the remaining estate funds of $194,877 were distributed to the three siblings.

The State Bar *of California*     Q

in his favor, Marquez appealed it unsuccessfully. He then filed an appeal with the California Supreme Court, which affirmed the appellate court's ruling. As of the date of the State Bar Court's decision, he still had not repaid the money.

He was ordered to pay $419,595 plus interest in restitution.

In mitigation, Marquez had no prior record of discipline and presented evidence of his good character.

Start New Search »

Protecting the public & enhancing
the administration of justice.

ABOUT

FOR THE PUBLIC

FOR ATTORNEYS

ADMISSIONS

ACCESS TO JUSTICE

Log in

News

Forms

Contact

SAN FRANCISCO (Main Office)

180 Howard St.
San Francisco, CA 94105

The State Bar *of California*      🔍

LOS ANGELES

845 S. Figueroa St.
Los Angeles, CA 90017
213-765-1000

© 2017 The State Bar of California    FAQ   |   Site Map

# EXHIBIT "B"

**FILED APRIL 10, 2014**

STATE BAR COURT OF CALIFORNIA

HEARING DEPARTMENT - SAN FRANCISCO

| | |
|---|---|
| In the Matter of                        ) | Case Nos.: **11-O-16244-PEM; 12-C-17746;** |
|                               ) |               **12-C-17748 (Cons.)** |
| **FRANCISCO XAVIER MARQUEZ,**     ) | |
|                               ) | |
| **Member No. 172631,**            ) | **DECISION; ORDER TO SEAL PORTION** |
|                               ) | **OF TRIAL RECORD; AND ORDER OF** |
| A Member of the State Bar.       ) | **INVOLUNTARY INACTIVE** |
|                               ) | **ENROLLMENT** |

**Introduction**[1]

This contested matter involves three consolidated cases: misappropriation of $419,595 in one client matter and two alcohol-related driving convictions.

In the first matter, the California Court of Appeal found that respondent Francisco Xavier Marquez had converted more than $400,000 in funds belonging to the estate of his client's deceased parents and had committed financial elder abuse against his client's brother. As a result, respondent is charged with six counts of misconduct in this disciplinary proceeding: (1) failing to deposit client funds in a trust account; (2) failing to obey a court order; (3) collecting an illegal fee; (4) committing an act of moral turpitude; (5) failing to comply with the law; and (6) failing to perform with competence.

The next two matters are based on respondent's misdemeanor convictions: (1) reckless driving while under the influence of alcohol or drugs in April 2006 (Veh. Code, § 23103.5, subd.

---

[1] Unless otherwise indicated, all references to rules refer to the State Bar Rules of Professional Conduct. Furthermore, all statutory references are to the Business and Professions Code, unless otherwise indicated.

(a)); and (2) driving with blood alcohol level of .08% or more in July 2011 (Veh. Code, § 23152, subd. (b)).

The court finds, by clear and convincing evidence, that (1) respondent is culpable on four of the charged counts of misconduct; and (2) the facts and circumstances surrounding his second conviction did not involve moral turpitude but constituted other misconduct warranting discipline. Due to the serious nature and extent of respondent's misconduct, as well as the aggravating circumstances, the court recommends that respondent be disbarred from the practice of law and pay restitution of $419,595.

## **Significant Procedural History**

### *Case No. 11-O-16244*

The Office of the Chief Trial Counsel of the State Bar of California (State Bar) initiated this proceeding by filing a Notice of Disciplinary Charges (NDC) on September 20, 2012. Respondent filed a response on October 9, 2012.

On March 4, 2013, respondent filed a motion to abate. The State Bar acknowledged that there was an appeal pending before the appellate court, which included some issues that were substantially the same as those involved in this discipline case. Given that a resolution of those issues would expedite this case, the court granted the abatement pending the resolution of the appeal in *Lowe v. Marquez*, California Court of Appeal, First Appellate District, Division One, case number A134286 (*Lowe v. Marquez*).

On June 26, 2013, the appellate court filed an opinion affirming the probate court's second amended judgment. A petition for rehearing was denied on July 24, 2013. On August 5, 2013, respondent filed an appeal with the California Supreme Court (case No. S212553). In September 2013, the Supreme Court issued a remittitur affirming the Court of Appeal's judgment.

On October 4, 2013, the State Bar filed a motion for an order applying collateral estoppel to a judgment entered against respondent in the probate court and the appellate court (*Lowe v. Marquez*). Both the probate court and the appellate court found that the claims for conversion and financial elder abuse against respondent had been established by clear and convincing evidence.

On November 15, 2013, this court granted the State Bar's request that respondent be precluded from litigating the issues of conversion and financial elder abuse in this disciplinary case as the principles of collateral estoppel applied. (*In the Matter of Kittrell* (Review Dept. 2000) 4 Cal. State Bar Ct. Rptr. 195.)

### Case No. 12-C-17748

On January 23, 2013, the Review Department of the State Bar Court issued an order referring respondent's misdemeanor conviction of Vehicle Code section 23103.5, subdivision (a), for reckless driving while under the influence of alcohol or drugs, to the Hearing Department for a hearing and decision recommending the discipline to be imposed if the Hearing Department found that the facts and circumstances surrounding respondent's criminal violation involved moral turpitude or other misconduct warranting discipline.

On February 6, 2013, the State Bar Court issued and properly served a Notice of Hearing on Conviction on respondent. Respondent filed a response on February 26, 2013.

### Case No. 12-C-17746

On April 22, 2013, the Review Department issued another order referring respondent's misdemeanor conviction of Vehicle Code section 23152, subdivision (b), driving with blood alcohol level of .08% or more, to the Hearing Department for a hearing and decision recommending the discipline to be imposed if the Hearing Department found that the facts and

circumstances surrounding respondent's criminal violation involved moral turpitude or other misconduct warranting discipline.

On April 30, 2013, the State Bar Court issued and properly served a Notice of Hearing on Conviction on respondent.  Respondent filed a response on October 16, 2013.

On October 29, 2013, the three cases were consolidated (case Nos. 11-O-16244; 12-C-17748; and 12-C-17746).

*Trial*

A three-day trial was held on January 7, 8, and 9, 2014.  The State Bar was represented by Senior Trial Counsel Robert A. Henderson; respondent was represented by attorney Megan Zavieh.  On January 13, 2014, following closing arguments and briefs on culpability and discipline, the court took this matter under submission.

*Order to Seal Portion of Trial Record*

Attorney Zavieh also filed a motion to seal that part of the testimony dealing with respondent's financial situation as it had an impact on respondent's ongoing litigation.  The court hereby grants respondent's request and orders that part of the trial record containing respondent's testimony taken in a closed courtroom on January 9, 2014, be sealed.

## Findings of Fact and Conclusions of Law

Respondent was admitted to the practice of law in California on December 8, 1994, and has been a member of the State Bar of California at all times since that date.

**Case No. 11-O-16244 – The Lowe Matter**

*Background*

On January 24, 1995, Henry D. Lowe (Father) and Wai Yung Lowe (Mother) created a revocable living trust, the Lowe Trust.  They had three adult children:  Edmund Lowe, Jack

Lowe, and Bettina Cloud.  The trust provided that Jack was the sole beneficiary.  On August 28,

1995, Father died.

On October 23, 1995, Mother executed a new will witnessed by daughter Bettina and

Bettina's husband.[2]  Bettina did not tell either of her brothers about this will.  Under the terms of

the will, Mother's estate was to be divided equally among the three children.  On November 24,

1995, Mother revoked the Lowe Trust.

On May 16, 2003, Mother signed an amendment to the now revoked Lowe Trust.  The

amendment was prepared by respondent at the direction of son Jack as he was simply updating

Mother's 1995 trust because Jack was undergoing a life-threatening operation.  Again, Jack and

his wife would be the only beneficiaries.  At the time the amendment was prepared, respondent

had no direct communication with Mother.

On January 26, 2006, Mother died.  Bettina then told Edmund and Jack of the October

23, 1995 will and subsequent revocation of Mother's 1995 trust.  Edmund thought Mother's will

was effective.  He retained the law firm of Coleman & Horowitt, LLP, to represent him.[3]

On the other hand, Jack did not believe the will was effective and sought the legal advice

of respondent.[4]

**Facts**

On February 6, 2006, Jack retained respondent to assist him with the administration of

Mother's estate.  In the engagement letter, respondent stated that he would represent Jack in any

---

[2] Mother was taken to a notary public by Bettina's now deceased husband.  The will was not a self-proving will.

[3] Edmund testified that the only reason he pursued the matter was that Bettina needed the money that might be available if Mother's will was effective.

[4] Jack did not believe the will was effective because he was never told of the will, though he managed all the financial affairs of his parents.  Moreover, his sister did not tell him of the will until after Mother's death.  By the terms of the trust and all prior wills of his parents, Jack was the sole beneficiary.  This new will divided everything equally amongst the three siblings.

- 5 -

dispute or legal proceeding that Edmund may initiate against him individually or as trustee of Mother's trust. Thereafter, respondent represented Jack against Edmund in a contested matter involving whether Mother's estate would be distributed pursuant to trust documents or pursuant to a subsequently prepared will. The only thing of monetary value in the estate was a home in San Mateo, California.

Four months later, on June 20, 2006, respondent was formally notified by Edmund's lawyer, Eliot S. Nahigian of Coleman & Horowitt, that Mother had signed her last will and testament on October 23, 1995, and that she had revoked the Lowe Trust on November 24, 1995. Copies of the will and revocation of the trust were enclosed. Respondent was also advised that the original will was being delivered to the Clerk of the Superior Court of San Mateo County as required by the probate code. By the terms of this letter, Edmund was clearly asserting that the trust had been revoked and that the will was the operative document.

### *Sale of Mother's Home*

Nevertheless, Jack, believing that the trust was still the operative document, sold Mother's real property in July 2006. On July 17, 2006, the sale proceeds of $721,008.05 from Mother's home was placed in respondent's law firm's business checking account at Stanford Federal Credit Union. On the same day, $681,008.05 of those funds was transferred to respondent's personal savings account and $40,000 was transferred to Katharyn A. Bond, a partner in respondent's law firm. By July 31, 2006, respondent had a balance of $2,318.73 in his business checking account.

| Date | Business Checking Account | |
|------|------|------|
| 7/17/06 | $721,008.05 | Deposited from home sale proceeds |
| 7/17/06 | ($681,008.05) | Transferred to respondent's savings account |
| 7/18/06 | ($40,000.00) | Transferred to Katharyn A. Bond |
| 7/31/06 | $2,318.73 | Balance |

- 6 -

Respondent testified that the $40,000 payment to Katharyn A. Bond was for work she did on the case. But there's no evidence to support his testimony. Respondent's April 25, 2006 statement for professional services rendered for Jack from February through April 2006 was in the amount of $2,100. And his September 6, 2006 statement for professional services rendered for Jack from June through August 2006 was for $11,940. However, respondent at trial was unable to account for at least $25,960 ($40,000 - $14,040) that was paid to Bond, as follows:

| Date of Billing Statement | Attorney Fees |
|---|---|
| 4/25/06 | $2,100 |
| 9/6/06 | $11,940 |
| Total Billed | $14,040 |
| Paid to Katharyn A. Bond | ($40,000) |
| Amount Unaccounted For | ($25,960) |

On September 11, 2006, respondent wired $475,201.69 from his personal savings account into his business checking account with a notation "Jack J Lowe & Sylvia Lowe T." This left a balance of $205,806.36 in his personal savings account ($681,008.05 - $475,201.69) that was from the sale of Mother's home. None of the estate funds was deposited in respondent's client trust account.

On September 11, 2006, respondent paid Jack $13,475.60 for repairs to Mother's home. Respondent's savings account balance on October 31, 2006, was $74,145.73.

*Probate Litigation*

On March 27, 2007, Edmund filed a petition for probate of will in the Estate of Wai Yung Lowe. Edmund's attorney testified that he filed the petition long after the June 2006 letter because the will was not self-proving and thus it took time to locate the notary public who witnessed the will. On May 24, 2007, respondent under the direction of Jack filed a contest and opposition to probate of will.

- 7 -

On August 22, 2007, Edmund filed a petition to determine the validity of the May 2003 amended trust, along with a complaint against Jack for breach of fiduciary duty, fraud and misrepresentation, conversion, financial elder abuse, and constructive trust.

On April 17, 2009, Edmund filed an amended petition, adding respondent to the causes of action for fraud and misrepresentation, conversion, financial elder abuse, constructive trust, and accounting.[5]  The contest of whether the will or the trust governed dragged on with each side accumulating a staggering amount of legal expenses for an estate valued at less than $800,000. To date, Edmund owes his attorneys in excess of $500,000 in fees.

*Court Orders*

On April 13, 2009, the Probate Court of San Mateo County enjoined Jack and respondent from using funds generated from the sale of Mother's home.  It also ordered that respondent deposit all sale proceeds in an interest bearing blocked account at Stanford Federal Credit Union. The court noted:

> "[I]n this case, there is a specific sum of money at issue which is being drawn down by the conduct of JACK LOWE and his counsel and once that is gone, there is no evidence at all to support any kind of argument that there would be sufficient money available to pay damages in this case."

On May 14, 2009, Edmund was appointed special administrator of Mother's estate.

On June 23, 2009, the probate court filed an order re: an accounting and return of estate funds.  The court ordered respondent to provide a detailed accounting of all estate funds used to pay respondent's fees as follows:

---

[5]This amended petition was filed after Edmund's attorney learned that the proceeds from the sale of the house had been put in a non-trust account.

- 8 -

| Date | Withdrawal of Funds as Attorney Fees |
|------|--------------------------------------|
| 9/11/06 | $ 11,940.00 |
| 10/31/08 | $220,390.76 |
| 11/12/08 | $150,000.00 |
| 1/26/09 | $ 37,264.52 |
| *Total Withdrawals* | *$419,595.28* |

The probate court also ordered that $195,801.39 held in respondent's business savings account be transferred to Edmund, as Special Administrator of the Estate, to be deposited in a blocked, interest bearing account, subject to withdrawal only by court order.

On July 13, 2009, respondent filed a response on behalf of himself as well as Jack to the accounting.  The home sale proceeds were accounted for as follows:  (1) $13,475 as reimbursement to Jack for repair expenses incurred to prepare the home for sale; (2) $194,877 in remaining estate funds; (3) $419,595 in total payments the estate had made to respondent's law firm for costs incurred and legal services rendered from June 22, 2006 through February 2, 2009; and (4) $93,059 in losses the estate suffered as a result of the financial crash in Fall 2008, and paid in early withdrawal penalties and administrative fees.

Although respondent acknowledged receipt of $419,595 in total payments from the estate, his billing records accounted for only $288,059.25 as attorney fees for services rendered from February 13, 2006 through February 2, 2009.  Respondent's four billing statements for the three-year period provided the following charged fees and costs:

| Date of Billing Statements | Attorney Fees and Costs |
|----------------------------|-------------------------|
| 4/25/06 | $ 2,100.00 |
| 9/6/06 | $ 11,940.00 |
| 11/03/08 | $220,436.25 |
| 5/18/2009 | $ 53,583.00 |
| *Total Charged Fees and Costs* | *$288,059.25* |

- 9 -

Based on his billing statements and the amount that he withdrew from the business account as fees, $131,536.03 was unaccounted for ($419,595.2 - $288,059.25).  It appears that respondent simply credited the money he took as fees, whether supported or not.

On July 21, 2009, the probate court ordered respondent to file a detailed accounting accompanied by a verification in accordance with Probate Code sections 1061, 1062 and 1063.

On July 29, 2009, respondent and Jack filed a motion for a determination that no conflict of interest existed that warranted respondent's disqualification from continuing to represent Jack. Edmund filed a counter motion to disqualify respondent from representing Jack.

On October 7 and 27, 2009, the probate court filed an order and an amended order, denying respondent's motion and granted Edmund's motion disqualifying respondent from representing Jack.  The court also ordered respondent to return and refund the $419,000 in attorney fees and costs paid from the sale proceeds of Mother's home and place the funds in a blocked account pending the final resolution of the case.

Respondent timely received notice of these orders.  He then filed a petition for writ of supersedeas, prohibition or other appropriate relief seeking, in part, relief from the order to return and refund approximately $419,000.

The Court of Appeal granted in part respondent's petition for writ of superseadeas and issued an alternative writ of mandate on February 3, 2010, in which it ordered the probate court to set aside the portion of the October orders disqualifying respondent from representing Jack but left in place the order to return and refund approximately $419,000 in attorney fees.  On March 12, 2010, the probate court issued an order in which it vacated the October 7, 2009 order except for that portion of the order requiring placement of the attorney fees and costs in a blocked account.

After much litigation, the probate court on May 21, 2010, granted Edmund's motion for summary adjudication, finding that the trust had been revoked and that Jack held the proceeds of the estate as constructive trustee for Mother's estate.  In short, the court agreed with Edmund's position that the amended trust was void and invalid because the original Trust had been revoked by Mother in November 1995.  Respondent timely received notice of the order.

On March 21, 2011, Edmund and Jack settled their dispute and Jack was dismissed from the litigation.  As part of the settlement, the remaining estate funds of $194,877 were distributed to Jack, Edmund, and Bettina.

And on June 20, 2011, the court ordered:  "The Petition for Order Directing Transfer of Property to the Estate is GRANTED, consistent with the previous orders of this Court (Hon. Rosemary Pfeiffer on October 7, 2009 as amended on October 27, 2009) and the Alternative Writ issued by the Court of Appeal on February 3, 2010."  Respondent timely received notice of the order.

Thereafter, on July 15, 2011, the court ordered respondent jointly and severally with his partners "to pay $419,595.28 to Edmund Lowe as Special Administrator of the Estate of Wai Yung Lowe, within ten (10) days after service of the Notice of Entry of this Order."  Respondent timely received notice of the order.  The matter proceeded to trial on the remaining issues against respondent.

On November 10, 2011, the court issued an Amended Judgment After Trial.  Pursuant to the stipulation of Edmund, Jack, and respondent, Mother's will dated October 23, 1995, was admitted to probate and Edmund was appointed as administrator of the estate.  The court found that Edmund had proven by clear and convincing evidence that:

- Respondent was liable to Edmund for financial elder abuse under Welfare and Institutions Code section 15610 because he wrongfully and fraudulently

- 11 -

converted funds belonging to Mother's estate by comingling such funds with his firm's own funds in the business account.

- Respondent, Daniel Meisel and Katharyn A. Bond (law partners) were jointly and severally liable to Mother's estate for the sum of $419,595.28.

- Respondent was liable for conversion based on his comingling of funds belonging to Mother's estate and entrusted to him by Jack as trustee, in his firm's business operating account instead of placing such funds in a client trust account.

- Respondent in bad faith wrongfully took, concealed, and disposed of property belonging to Mother's estate in the sum of $419,595.28, justifying an award of damages under Probate Code section 859, in an amount twice the amount taken or $839,190.56, payable to Edmund as Administrator of Mother's estate.

*Court of Appeal*

Respondent appealed the court orders of October 7, 2009, October 27, 2009, and March 12, 2010, with respect to the return of the $419,000. Both the probate court and the appellate court found that the claims for conversion and financial elder abuse against respondent had been established by clear and convincing evidence. Specifically, on June 26, 2013, the appellate court confirmed the probate court's findings that (1) respondent had converted funds of Mother's estate to his own use and benefit in the amount of $419,595 by placing the funds in his firm's operating account rather than a client trust account; and (2) respondent had acted in bad faith under former Probate Code section 859, in that he had "wrongfully taken, concealed, or disposed of property belonging to the estate of a decedent, conservatee, minor, or trust."

A petition for rehearing was filed; it was denied on July 24, 2013. On August 5, 2013, respondent filed an appeal with the California Supreme Court (case No. S212553). In September 2013, the Supreme Court issued a remittitur affirming the appellate court's judgment. To date,

- 12 -

respondent has not complied with the various court orders to return to Mother's estate approximately $419,000 or pay the penalty under Probate Code section 859 for financial abuse of an elder with respect to funds belonging to the estate in the sum of $839,190 (liable for twice the value of the property for bad faith).

At trial respondent admitted that the court orders are final and that although he was disappointed and disagreed with the rulings of the probate court and the appellate court, he respects the rulings. He told this court the only reason he has not complied with the order is that he has not had enough time to gather the funds to pay the order.

**Conclusions**

**Count 1(A) - (§ 6103 [Failure to Obey a Court Order])**

Section 6103 provides, in pertinent part, that a willful disobedience or violation of a court order requiring an attorney to do or forbear an act connected with or in the course of the attorney's profession, which an attorney ought in good faith to do or forbear, constitutes cause for suspension or disbarment.

By clear and convincing evidence, respondent failed to obey several court orders:

(1) On June 20, 2011, the court ordered that property be transferred to the estate, consistent with the previous orders of October 7, 2009 as amended on October 27, 2009.

(2) On July 15, 2011, the court ordered respondent jointly and severally with his partners to pay $419,595.28 to Edmund as special administrator of Mother's estate within 10 days after service of the notice of entry of the order.

(3) On November 10, 2011, the court ordered respondent to pay $419,595.28 in damages for financial elder abuse. The court orders of October 7, 2009, October

- 13 -

27, 2009, and March 12, 2010, with respect to the return of the $419,000 are final as respondent has lost all his appeals of the orders.

Respondent admitted at trial that the court orders are final and that he has not complied with the various court orders to return to Mother's estate approximately $419,000. The only reason respondent has not complied with the court orders is that he does not have $419,000. However, respondent's inability to pay in accordance with the court orders is not a defense to the charged violation of section 6103.

It is well-settled that to be found culpable of willfully violating section 6103, the State Bar need not prove that respondent violated court orders in bad faith. (*In the Matter of Riordan* (Review Dept. 2007) 5 Cal. State Bar Ct. Rptr. 41.) Willfulness is established by proof that the attorney acted, or omitted to act, purposely. (*In the Matter of Respondent C* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 439.)

Here, by failing to refund and return $419,595 as ordered by the court on October 7, 2009, October 27, 2009, and March 12, 2010, respondent willfully disobeyed or violated an order of the court in willful violation of section 6103.

### Count 1(B) - (Rule 4-100(A) [Failure to Maintain Client Funds in Trust Account])

Rule 4-100(A) provides that all funds received or held for the benefit of clients must be deposited in a client trust account and no funds belonging to the attorney or law firm must be deposited therein or otherwise commingled therewith, except for limited exceptions.

Respondent was required to deposit the sale proceeds of Mother's home in the amount of $721,008.05 into a trust account for the benefit of Mother's estate. Instead, when he received the funds, respondent deposited $721,008.05 into his general business account at Stanford Federal Credit Union on July 17, 2006.

At trial respondent testified that he did not put any of the proceeds from Mother's estate in a client trust account because he never had to deal with the issue of where client money should be placed. Because of his previous work experience as a law clerk, an in-house counsel and an associate, he claimed that he was unfamiliar with the law regarding trust funds. The court finds his contention without merit and disingenuous, particularly for a practitioner of 12 years at the time of his misconduct.

Therefore, by depositing the funds belonging to Mother's estate into his general business account, respondent failed to deposit funds received for the benefit of a client in a client trust account in willful violation of rule 4-100(A).

### Count 1(C) - (Rule 4-200(A) [Illegal Fee])

Rule 4-200(A) provides that an attorney must not charge, collect or enter into an agreement for an illegal or unconscionable fee.

Respondent contends that at the time he took the fees he thought the trust was the operative document. Therefore, based on that belief, he argues that acceptance of payment for attorney fees paid out of trust assets without prior court approval for defense of a trust is not acceptance of an illegal fee.

The facts, however, demonstrate that such a belief, even if truly held, was unreasonable and did not change the nature of the estate funds. Even assuming that when he was initially hired in February he thought the amended trust was valid, respondent knew by June that the matter involved probate and at the least, the validity of the trust was at issue. Four months after respondent was hired to represent Jack, Edmund's lawyer notified respondent that the Lowe Trust had been revoked in 1995, forwarding a copy of the revocation of the trust and Mother's will to respondent. Upon receipt of this June 2006 letter, respondent knew or should have known that there was a potential dispute as to the validity of the amended trust. So when he received the

- 15 -

sale proceeds of Mother's home in July 2006, he knew or should have known that the amended trust may be invalid, that the funds may not belong to the alleged trust, and that he had no right to apply the funds towards his fees without court approval.

Under Probate Code section 17209, the administration of trusts is intended to proceed expeditiously and free of judicial intervention, subject to the jurisdiction of the court. But knowing that the trust was being challenged, respondent had a fiduciary duty to protect the funds, whether they were trust funds or estate funds. To obtain payment for his fees, he should have followed proper statutory procedures for obtaining court approval for his fees (Prob. Code, §§ 10810 and 10811). At a minimal, he should have placed the disputed funds in a client trust account and submitted billing statements to Jack, who could then later seek reimbursement from the probate court.

Because the probate court and the appellate court found that the amended trust was invalid, the sale proceeds of $721,008.05 was never a trust corpus and respondent's use of the estate funds was entirely unauthorized. Respondent's belief and reliance that the trust was valid is irrelevant to his culpability of unilaterally paying his fees out of the estate funds absent court approval. The fact remains – there was never a trust corpus for him to dip into. As the appellate court noted: "Because the Trust had been revoked, neither Jack nor [respondent] had any right to use any of these funds."

Therefore, respondent's collection of $419,595.28 from the estate as his attorney fees for the period between July 2006 and February 2009 without first seeking court approval of the fees violated the prohibition against charging or collecting an illegal fee, in willful violation of section 4-200(A). (See *In the Matter of Phillips* (Review Dept. 2001) 4 Cal. State Bar Ct. Rptr. 315 [collecting fee in probate case without obtaining court approval]; In *the Matter of Riley* (Review Dept. 1994) 3 Cal. State Bar Ct. Rptr. 91.)

***Count 1(D) - (§ 6106 [Moral Turpitude])***

Section 6106 provides, in part, that the commission of any act involving dishonesty, moral turpitude, or corruption constitutes cause for suspension or disbarment.

By clear and convincing evidence, the appellate court found that (1) respondent had converted funds of Mother's estate to his own use and benefit in the amount of $419,595 by placing the funds in his firm's operating account rather than in a client trust account; and (2) respondent had acted in bad faith under former Probate Code section 859 in that he had "wrongfully taken, concealed, or disposed of property belonging to the estate of a decedent, conservatee, minor, or trust."

Accordingly, by converting and misappropriating $419,595 in estate funds to his own use and benefit, respondent committed an act involving moral turpitude, dishonesty, or corruption in willful violation of section 6106.

***Count 1(E)  - (§ 6068, subd. (a) [Attorney's Duty to Support Constitution and Laws of United States and California])***

Section 6068, subdivision (a), provides that an attorney has a duty to support the Constitution and laws of the United States and California.

By taking the $419,595.28 as attorney fees and by failing to return the funds after having been ordered to do so, respondent engaged in financial elder abuse under Welfare and Institutions Code section 15610, and thereby respondent violated California law in willful violation of section 6068, subdivision (a).  However, because the same facts underlie both section 6068, subdivision (a), and section 6106 violations, it is not necessary to find him culpable of both violations.  Therefore, the court dismisses count 1(E) with prejudice.  Little, if any, purpose is served by duplicative allegations of misconduct.  (*Bates v. State Bar* (1990) 51 Cal.3d 1056, 1060.)

***Count 1(F)  - (Rule 3-110(A) [Failure to Perform Legal Services with Competence])***

Rule 3-110(A) provides that an attorney must not intentionally, recklessly, or repeatedly fail to perform legal services with competence.

The State Bar alleges that respondent's failure to file a petition under Probate Code section 17200 to determine whether the trust he was defending existed and that his acceptance of fees without the required court authorization are evidence of his failure to perform legal services with competence in willful violation of rule 3-110(A).

The court disagrees.  Since Edmund had already filed a petition to probate the will and a petition to determine the validity of the amended trust, it was unnecessary for respondent to do the same.  Respondent's filing oppositions to the petitions was adequate.  The real issues in this case are respondent's commingling and conversion of the estate funds, not his competence in representing Jack.  Therefore, there is no clear and convincing evidence that respondent willfully violated rule 3-110(A).

**Case Nos. 12-C-17746 and 12-C-17748**

Respondent has been convicted of two alcohol-related driving offenses in less than six years – the first was in 2006 and the second occurred in 2011.

Respondent is conclusively presumed, by the record of his conviction in this proceeding, to have committed all of the elements of the crime of which he was convicted.  (*In re Crooks* (1990) 51 Cal.3d 1090, 1097; *In re Duggan* (1976) 17 Cal.3d 416, 423.)  However, "[w]hether those acts amount to professional misconduct . . . is a conclusion that can only be reached by an examination of the facts and circumstances surrounding the conviction." (*In the Matter of Respondent O* (Review Dept. 1993) 2 Cal. State Bar Ct. Rptr. 581, 589, fn. 6.)

- 18 -

**Case No. 12-C-17748 (2006 Conviction)**

**Facts**

On November 20, 2005, respondent was arrested and charged with driving under the influence of alcohol and/or drugs in violation of Vehicle Code section 23152, subdivision (a), and driving while having 0.08% or more of alcohol in his blood in violation of Vehicle Code section 23152, subdivision (b), both misdemeanors, in San Mateo County.

On April 26, 2006, respondent pled nolo contendere to one count of reckless driving under Vehicle Code section 23103.5, subdivision (a). He was placed on probation for two years, fined $1,063 plus fees, and ordered to complete the first offender program. Respondent complied with the conditions of his probation.

**Conclusions**

Respondent argues that his conviction did not involve moral turpitude or other misconduct warranting discipline. He claims that his lapse in judgment does not evidence a lack of respect for the legal system or an alcohol abuse problem.

The State Bar does not contend that respondent's first conviction involved moral turpitude or other misconduct warranting discipline.

The court agrees. The facts and circumstances surrounding respondent's misdemeanor violation of Vehicle Code section 23103.5, subdivision (a) (reckless driving), did not involve moral turpitude or constitute other misconduct warranting discipline.

**Case No. 12-C-17746 (2011 Conviction)**

On February 11, 2011, respondent was arrested and charged with Vehicle Code section 23152, subdivisions (a) and (b), and a separate prior conviction within the meaning of Vehicle Code section 23103. On July 28, 2011, respondent pleaded no contest to a misdemeanor violation of Vehicle Code section 23152, subdivision (b), in Santa Clara County, making it

unlawful for a person who has .08% or more, by weight, of alcohol in his blood to drive a vehicle. He was placed on probation for three years, fined $1,500 plus $800 in costs, and ordered to participate in an alcohol education program and 20 days of community service. He has paid his fines and completed the program.

**Conclusions**

Respondent again claims that this conviction did not involve moral turpitude or other misconduct warranting discipline. He argues that his first and second convictions were unrelated, separated by six years, and that the incidents did not demonstrate any alcohol problem or disregard for the sanctity of the courts.

The State Bar contends that respondent's level of intoxication in his second conviction was .20%, more than twice the legal limit, and thus, as a second conviction, the offense involved other misconduct warranting discipline.

In *In re Carr* (1988) 46 Cal.3d 1089, the attorney had pled no contest to two separate counts of DUI while he was on suspension for another disciplinary matter involving federal felony drug offense. The Supreme Court found that his conduct did not involve moral turpitude, but did involve other misconduct warranting discipline.

Similarly, in *In re Kelley* (1990) 52 Cal.3d 487, the attorney had twice been convicted of drunk driving over a 31-month period. The second conviction occurred while she was still on probation for the first conviction. The attorney participated in the disciplinary proceeding and presented evidence in mitigation, including the absence of a prior disciplinary record, extensive community service, compliance with all criminal probation conditions since her second conviction and cooperation in the disciplinary proceedings. Nevertheless, the Supreme Court concluded that the facts and circumstances surrounding her second conviction warranted discipline since she demonstrated disrespect for the legal system by violating probation orders

and her two convictions within such a short time indicated an alcohol abuse problem. Both problems, if not checked, could spill over into her professional practice and adversely affect her representation of clients and her practice of law.

Like the attorneys in *Carr* and *Kelley*, respondent has two alcohol-related driving convictions. As the Supreme Court noted, "We cannot and should not sit back and wait until [respondent's] alcohol abuse problem begins to affect [his] practice of law." (*Kelley, supra,* 52 Cal.3d at p. 495.) Despite two convictions, respondent argues that he does not have an alcohol problem.

In view of his two convictions, the court finds that the facts and circumstances surrounding respondent's misdemeanor violation of Vehicle Code section 23152, subdivision (b), did not involve moral turpitude, but constituted other misconduct warranting discipline.

**Aggravation[6]**

### Multiple Acts of Wrongdoing (Std. 1.5(b).)

Respondent's commingling of client funds in his business checking account, misappropriation of $419,595 of estate funds, failure to obey court orders, failure to deposit client funds in a trust account, collection of an illegal fee, and two misdemeanor convictions of driving under the influence involve multiple acts of misconduct and are considered an aggravating factor.

### Significant Harm to the Client, the Public, or the Administration of Justice (Std. 1.5(f).)

Respondent's conversion and misappropriation of $419,595 of estate funds and financial elder abuse significantly harmed Jack, Edmund, and Bettina. His failure to obey court orders harmed the administration of justice, wasting valuable judicial time and resources by requiring

---

[6] All references to standards (Std.) are to the Rules of Procedure of the State Bar, title IV, Standards for Attorney Sanctions for Professional Misconduct.

the courts to repeatedly order him to put the estate funds in a blocked, interest bearing account, pending a final resolution of the probate matter.

### Refusal or Inability to Account for Entrusted Funds or Property (Std. 1.5(e).)

Respondent's inability to account for the $25,960 paid to his law partner and the $131,536.03 paid to himself as attorney fees is an aggravating factor.

### Failure to Make Restitution (Std. 1.5(i).)

Respondent's failure to make restitution of $419,595 is a serious aggravating factor.

## Mitigation

### No Prior Record (Std. 1.6(a).)

Respondent had no prior record of discipline for 12 years at the time of his misconduct in the Lowe matter.

### Good Character (Std. 1.6(f).)

Respondent presented evidence of good character. Nine witnesses and one expert witness testified on his behalf. The character witnesses, including four attorneys and former and current clients, many of whom have known him for at least 15 years, attested to his integrity, trustworthiness, honesty, tenacity and compassion.

Respondent's character evidence is entitled to mitigation.

## Discussion

The purpose of State Bar disciplinary proceedings is not to punish the attorney but to protect the public, the courts, and the legal profession; to maintain the highest possible professional standards for attorneys; and to preserve public confidence in the legal profession. (Std. 1.1; *Chadwick v. State Bar* (1989) 49 Cal.3d 103, 111.)

In determining the appropriate level of discipline, the court looks first to the standards for guidance. (*Drociak v. State Bar* (1991) 52 Cal.3d 1095, 1090; *In the Matter of Koehler* (Review

- 22 -

Dept. 1991) 1 Cal. State Bar Ct. Rptr. 615, 628.)  The Supreme Court gives the standards "great weight" and will reject a recommendation consistent with the standards only where the court entertains "grave doubts" as to its propriety.  (*In re Silverton* (2005) 36 Cal.4th 81, 91-92; *In re Naney* (1990) 51 Cal.3d 186, 190.)  Although the standards are not mandatory, they may be deviated from when there is a compelling, well-defined reason to do so.  (*Bates v. State Bar* (1990) 51 Cal.3d 1056, 1061, fn. 2; *Aronin v. State Bar* (1990) 52 Cal.3d 276, 291.)

Standard 1.7(a) provides that, when a member commits two or more acts of misconduct and the standards specify different sanctions for each act, the most severe sanction must be imposed.

However, standard 1.7(b) provides that if aggravating circumstances are found, they should be considered alone and in balance with any mitigating circumstances, and if the net effect demonstrates that a greater sanction is needed to fulfill the primary purposes of discipline, it is appropriate to impose or recommend a greater sanction than what is otherwise specified in a given standard.  On balance, a greater sanction is appropriate in cases where there is serious harm to the client, the public, the legal system, or the profession and where the record demonstrates that the member is unwilling or unable to conform to ethical responsibilities in the future.

In this case, the standards provide a broad range of sanctions ranging from reproval to disbarment, depending upon the gravity of the offenses and the harm to the victim.  Standards 2.1(a), 2.2(a), 2.3(b), 2.7, 2.8(a), and 2.12 apply in this matter.

Standard 2.1(a) provides that disbarment is appropriate for intentional or dishonest misappropriation of entrusted funds or property, unless the amount misappropriated is insignificantly small or the most compelling mitigating circumstances clearly predominate, in which case actual suspension of one year is appropriate.

- 23 -

Standard 2.2(a) provides that actual suspension of three months is appropriate for commingling or failure to promptly pay out entrusted funds.

Standard 2.3(b) provides that suspension or reproval is appropriate for entering into an agreement for, charging, or collecting an illegal fee for legal services.

Standard 2.7 provides that disbarment or actual suspension is appropriate for an act of moral turpitude, dishonesty, fraud, corruption or concealment of a material fact, depending on the magnitude of the misconduct and the extent to which the misconduct harmed or misled the victim and related to the member's practice of law.

Standard 2.8(a) provides that disbarment or actual suspension is appropriate for disobedience or violation of a court order related to the attorney's practice of law, the attorney's oath, or the duties required of an attorney under Business and Professions Code section 6068, subdivisions (a) – (h).

Finally, standard 2.12 provides that suspension or reproval is appropriate for final conviction of a misdemeanor not involving moral turpitude but involving other misconduct warranting discipline.

The State Bar argues that respondent be disbarred from the practice of law for misappropriation under standard 2.1(a) and various cases, including *Chang v. State Bar* (1989) 49 Cal.3d 114; *Kennedy v. State Bar* (1989) 48 Cal.3d 610; *In re Ewaniszyk* (1990) 50 Cal.3d 543; and *Harford v. State Bar* (1990) 52 Cal.3d 93.

Respondent contends that if he was found culpable of any misconduct, a nine months' stayed suspension with one year's probation is adequate.

"In a society where the use of a lawyer is often essential to vindicate rights and redress injury, clients are compelled to entrust their claims, money, and property to the custody and control of lawyers. In exchange for their privileged positions, lawyers are rightly expected to

exercise extraordinary care and fidelity in dealing with money and property belonging to their clients. [Citation.]  Thus, taking a client's money is not only a violation of the moral and legal standards applicable to all individuals in society, it is one of the most serious breaches of professional trust that a lawyer can commit." (*Howard v. State Bar* (1990) 51 Cal.3d 215, 221.)

In *Chang v. State Bar, supra,* 49 Cal.3d 114, the attorney was disbarred for misappropriating over $7,000 by secretly opening a trust account in his own name while employed by a law firm, depositing his client's funds in the trust account, later taking the funds, failing to comply with the client's request for copies of bank records, and refusing to pay the client the funds owed.  The attorney was also found to have failed to cooperate in the disciplinary investigation by making misrepresentations to a State Bar investigator.  The attorney offered no evidence in mitigation, but it was noted that he had no prior record of discipline.  In ordering disbarment, however, the Supreme Court noted that it had several reasons to doubt that the attorney would conform his conduct in the future to the professional standards required of attorneys in California.  In particular, the Supreme Court noted that the attorney had never acknowledged the impropriety of his actions; he had made no effort at reimbursing the client and displayed a lack of candor to the State Bar.

In *Kennedy v. State Bar, supra,* 48 Cal.3d 610, the attorney was disbarred for his misconduct involving three client matters and misappropriation of over $10,000 from clients without any effort at reimbursement.  His mishandling of the matters took place five years after he was admitted to the practice of law.

In *In re Abbott* (1977) 19 Cal.3d 249, the attorney intentionally misappropriated approximately $30,000 from a single client, and as a result, he was convicted of grand theft.  In mitigation, he had practiced law blemish-free for 13 years before his misconduct, presented evidence that he suffered from manic-depressive psychosis, submitted character evidence from

- 25 -

several attorneys and judges, and had displayed remorse.  The Supreme Court did not find these

factors sufficiently compelling to warrant less than disbarment.

"It is well-settled that an attorney may not unilaterally determine his own fee and

withhold trust funds to satisfy it even though he may be entitled to reimbursement for his

services." (*Murray v. State Bar* (1985) 40 Cal.3d 575, 584.)

Here, respondent unilaterally paid his fees with estate funds without court approval,

failed to return the funds to the administrator of the estate, despite several court orders to do so,

and justified his taking by insisting that he was free to withdraw trust funds without court

intervention.  His misconduct was not a single act of misappropriation.  Rather, he took the

money out of the commingled account to pay himself over three years.  When the probate court

ordered him to provide an accounting, he claimed that he was entitled to withdraw from those

entrusted funds to pay his fees of $419,595.  Yet, in this proceeding, he could not account for the

payment of $25,960 to his law partner in July 2006 nor could the four billing statements totaling

$288,059 support his withdrawals of $419,595.

An attorney-client relationship is of the highest fiduciary character and always requires

utmost fidelity and fair dealing on the part of the attorney.  (*Beery v. State Bar* (1987) 43 Cal.3d

802, 813.)  The appellate court stated: "As Jack's attorney and an officer of the court in the

probate matter, and as the custodian of the sale proceeds, [respondent] owed a duty to the Estate,

and, as such, to all the beneficiaries of the will, including Edmund."  Consequently, respondent

had flagrantly breached his fiduciary duties by violating rules 4-100(A) and 4-200(A) and

sections 6103 and 6106.

In recommending discipline, the "paramount concern is protection of the public, the

courts and the integrity of the legal profession."  (*Snyder v. State Bar* (1990) 49 Cal.3d 1302.)

The misappropriation of client funds is a grievous breach of an attorney's ethical responsibilities,

violates basic notions of honesty and endangers public confidence in the legal profession. Therefore, in all but the most exceptional cases, it requires the imposition of the harshest discipline – disbarment.  (*Grim v. State* Bar (1991) 53 Cal.3d 21.)

Moreover, under standard 2.1(a), lesser discipline than disbarment is not warranted because the amount misappropriated is not insignificantly small and the most compelling mitigating circumstances do not clearly predominate.  After considering the evidence, the standards, other relevant law, and above all, his misappropriation of $419,595, the court concludes that respondent's disbarment is appropriate to protect the public and preserve public confidence in the legal profession.  Accordingly, the court so recommends.

**Recommendations**

It is recommended that respondent Francisco Xavier Marquez, State Bar Number 172631, be disbarred from the practice of law in California and his name be stricken from the roll of attorneys.

**Restitution**

It is also recommended that respondent Francisco Xavier Marquez be ordered to make restitution to the following payee:

1. **Estate of Wai Yung Lowe** in the amount of $419,595 plus 10 percent interest per year from October 1, 2013.

Any restitution owed to the Client Security Fund is enforceable as provided in Business and Professions Code section 6140.5, subdivisions (c) and (d).

**California Rules of Court, Rule 9.20**

It is further recommended that respondent be ordered to comply with the requirements of rule 9.20 of the California Rules of Court, and to perform the acts specified in subdivisions (a)

and (c) of that rule within 30 and 40 days, respectively, after the effective date of the Supreme Court order in this proceeding.

**Costs**

It is recommended that costs be awarded to the State Bar in accordance with Business and Professions Code section 6086.10, and are enforceable both as provided in Business and Professions Code section 6140.7 and as a money judgment.

<u>**Order of Involuntary Inactive Enrollment**</u>

Respondent Francisco Xavier Marquez is ordered transferred to involuntary inactive status pursuant to Business and Professions Code section 6007, subdivision (c)(4).  Respondent's inactive enrollment will be effective 30 calendar days after this order is served by mail and will terminate upon the effective date of the Supreme Court's order imposing discipline herein, or as provided for by rule 5.111(D)(2) of the State Bar Rules of Procedure, or as otherwise ordered by the Supreme Court pursuant to its plenary jurisdiction.

<u>**Order to Seal Portion of Trial Record**</u>

Respondent's request that part of the trial record containing respondent's testimony taken in a closed courtroom on January 9, 2014, be sealed is GRANTED.  It is so ordered.

Dated:  May _____, 2014

PAT McELROY
Judge of the State Bar Court

- 28 -

# EXHIBIT "C"

# Melissa Martin McBeath

3463 E. Terra Alta Blvd, Tucson, AZ 85716 • 520.449.9753 • *mel.mcbeath@cox.net*

<u>VIA E-MAIL ONLY</u>
*Todd@TucsonTamaleCompany.com*
*Sherry@TucsonTamaleCompany.com*
*Lisa@TucsonTamaleCompany.com*

April 12, 2016

Todd Martin
Sherry Martin
Lisa Martin
Tucson Tamale Company
2550 N. Dragoon Street, Suite 12
Tucson, Arizona 85745

Re:     <u>Demand for Preservation of Evidence</u>

Dear Todd, Sherry and Lisa:

I have retained advisory counsel to assist me with the preparation of a lawsuit for wrongful discharge. That will be filed shortly in Pima County Superior Court.

In the meantime, I have been advised to serve on you this "litigation hold" letter. You should anticipate that much of the information subject to disclosure or responsive to discovery in my case is stored on the company's current and former computer systems and other media and devices (including personal digital assistants, voice-messaging systems, online repositories and cell phones). Inform Tucson Tamale staff immediately of their obligation of the anticipated litigation to preserve not only documents and tangible things, but also **_all_** electronically stored information including e-mails. In particular, you must not destroy unique, relevant information that might be useful to the case.

You and Tucson Tamale have a duty to preserve information you know, or reasonably should know:

(i)      is relevant to the parties' claims or defenses or the subject matter involved in the lawsuit;

(ii)     is reasonably calculated to lead to the discovery of admissible evidence; or

(iii)    I am reasonably likely to request during discovery.

This duty to preserve extends to employees likely to have relevant information—the "key players" in the case. The duty encompasses items made by those key players that Tucson Tamale may use to support its defenses, and any such items made for them to the extent the items can be readily identified (*e.g.*, the "to" field in e-mails).

10100.1

Todd Martin
Sherry Martin
Lisa Martin
April 12, 2016
Page 2

<u>Litigation Hold</u>

Effective immediately, Tucson Tamale <u>*must*</u> suspend its routine information retention/destruction/recycling policy and put in place a "litigation hold" to ensure the preservation of appropriate information. Ensure that, at a minimum, that you and staff take the following steps to comply with this demand:

1.    Immediately determine all sources of potentially relevant information and place them "on hold," and please communicate the details of that "hold" to me in writing.

2.    Immediately notify all the key players in writing that they must place on "hold" and preserve all information potentially relevant to this litigation.

3.    Please refrain from deleting the potentially relevant information of the key players from active files and transferring it to backup tapes or media *only*.

4.    In particular, regarding backup disks and media for electronically-stored information (including, but by no means limited to, e-mails), under the litigation hold, they *must* be identified, segregated, stored and preserved (*i.e.*, not recycled) separate and apart from other backup disks and media in two instances:

     (i)    If they are "accessible" (*i.e.,* actively used for information retrieval);

     (ii)   With respect to *all* backup disks or media—regardless whether they are "accessible" or "inaccessible" (*i.e.*, those typically maintained solely for the purpose of disaster recovery)—those disks or media storing relevant information of the key players.

Attached is a document titled "DEMAND FOR PRESERVATION OF EVIDENCE" that I request you provide to staff to ensure strict and full compliance with this demand. Please confirm <u>*no later than April 22, 2016*</u>, that all employees have been notified of this demand and have taken the steps outlined in this letter to preserve all information and tangible documents potentially relevant to the parties' claims and defenses.

Best regards,

Melissa Martin McBeath

10100.1

## DEMAND FOR PRESERVATION OF EVIDENCE

Melissa Martin McBeath will be filing a lawsuit against Tucson Tamale Company, Todd Martin, Sherry Martin and Lisa Martin. In anticipation of litigation, the parties must preserve all information that they may need to assert their respective claims and defenses. Below is the demand she has made that we are required to follow by law. We request your cooperation in complying with this request.

For the purpose of this demand, "you" and "your" means Tucson Tamale's officers, directors, agents, attorneys, accountants, employees, partners and other persons occupying similar positions or performing similar functions. Electronically stored information ("ESI") should be afforded the broadest possible meaning and includes (by way of example and not as an exclusive list) potentially relevant information electronically, magnetically, optically or otherwise stored as:

- Digital communications (e-mail, voice mail, instant messaging, text messages)
- E-Mail Server Stores (e.g., Lotus Domino .NSF or Microsoft Exchange .EDB)
- Word processed documents (e.g., Word or WordPerfect files and drafts)
- Spreadsheets and tables (e.g., Excel or Lotus 123 worksheets)
- Accounting Application Data (e.g., QuickBooks, Money, Peachtree data)
- Image and Facsimile Files (e.g., .PDF, .TIFF, .JPG, .GIF images)
- Sound Recordings (e.g., .WAV and .MP3 files)
- Databases (e.g., Access, Oracle, SQL Server data, SAP);
- Contact and Relationship Management Data (e.g., Outlook, ACT!);
- Calendar and Diary Application Data (e.g., Outlook PST, blog entries);
- Online Access Data (e.g., Temporary Internet Files, History, Cookies);
- Presentations (e.g., PowerPoint, Corel Presentations)
- Network Access and Server Activity Logs;
- Computer Aided Design/Drawing Files; and
- Backup and Archival Files (e.g., Veritas, Zip, .GHO).

ESI resides not only in areas of electronic, magnetic and optical storage media reasonably accessible to you, but also in areas you may deem not reasonably accessible. You are obliged to preserve potentially relevant evidence from both sources of ESI, even if you do not anticipate producing such ESI.

**NOTHING IN THIS DEMAND FOR PRESERVATION OF ELECTRONICALLY STORED INFORMATION SHOULD BE UNDERSTOOD TO DIMINISH THE CONCURRENT OBLIGATION TO PRESERVE DOCUMENTS, TANGIBLE THINGS AND OTHER POTENTIALLY RELEVANT EVIDENCE.**

10100.1

### Preservation Requires Immediate Intervention

You must act immediately to preserve potentially relevant ESI, including, without limitation, information with the earlier of a Created or Last Modified date on or after January 3, 2015 through the date of this demand and concerning:

1.   Marketing, advertising, and sales materials regarding Tucson Tamale products.

2.   The tasks that Melissa Martin McBeath performed while she worked at Tucson Tamale.

3.   ESI that Melissa Martin McBeath may use to support claims for (and that you or Tucson Tamale may support your defenses against):

   -   Retaliatory discharge in violation of Arizona's Employment Protection Act.

   -   Fraud in the inducement regarding the terms of her employment.

   -   Negligent misrepresentation regarding the terms of her employment.

   -   Breach of the terms of her employment agreement as outlined in the offer letter and other written and oral representations made to her.

   -   Failure to pay earned bonuses (wages) in violation of Arizona's Wage Act.

   -   Conversion.

   -   Restitution / unjust enrichment.

Adequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence. You must intervene to prevent loss due to routine operations or malfeasance and employ proper techniques and protocols to preserve ESI. Booting a drive, examining its contents or running any application may irretrievably alter the evidence it contains and constitute unlawful spoliation of evidence. Preservation requires action.

### Suspension of Routine Destruction

You are directed to immediately initiate a litigation hold for potentially relevant ESI, documents and tangible things and to act diligently and in good faith to secure and audit compliance with such litigation hold. You are further directed to immediately identify and modify or suspend features of your information systems and devices that, in routine operation, operate to cause the loss of potentially relevant ESI.

Examples of such features and operations include:

•   Purging the contents of e-mail repositories by age, capacity or other criteria;

•   Using data or media wiping, disposal, erasure or encryption utilities or devices;

•   Overwriting, erasing, destroying or discarding backup media;

•   Re-assigning, re-imaging or disposing of systems, servers, devices or media;

2

- Running antivirus or other programs effecting wholesale metadata alteration;
- Releasing or purging online storage repositories;
- Using metadata stripper utilities;
- Disabling server, packet or local instant messaging logging; and
- Executing drive or file defragmentation or compression programs.

Act to Prevent Spoliation

You should take affirmative steps to prevent anyone with access to your data, systems and archives from seeking to modify, destroy or hide ESI on network or local hard drives and on other media or devices (such as by deleting or overwriting files, using data shredding and overwriting applications, defragmentation, re-imaging, damaging or replacing media, encryption, compression or the like).

Preservation in Native Form

All ESI, including but not limited to spreadsheets and databases, must be preserved in the form or forms in which it is ordinarily maintained (i.e., native form). Accordingly, you should preserve ESI in such native forms, and you should not employ methods to preserve ESI that remove or degrade the ability to search the ESI by electronic means or that make it difficult or burdensome to access or use the information. You should additionally refrain from actions that shift ESI from reasonably accessible media and forms to less accessible media and forms if the effect of such actions is to make such ESI not reasonably accessible.

Metadata

You must preserve system and application metadata. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location and dates of creation and last modification or access. Application metadata is information automatically included or embedded in electronic files, but which may not be apparent to a user, including deleted content, draft language, commentary, collaboration and distribution data and dates of creation and printing. For electronic mail, metadata includes all header routing data and Base 64 encoded attachment data, in addition to the To, From, Subject, Received Date, CC and BCC fields. Metadata may be overwritten or corrupted by careless handling or improper preservation, including by moving, copying or examining the contents of files.

Servers

With respect to servers used to manage e-mail (e.g., Microsoft Exchange, Lotus Domino) and network storage (often called a "network share"), the complete contents of each user's network share and e-mail account must be preserved.

Home Systems, Laptops, Online Accounts and Other ESI Venues

To the extent that you have sent or received potentially relevant e-mails or created or reviewed potentially relevant documents away from the office, you must preserve the contents of systems, devices and media used for these purposes (including not only potentially relevant data from portable and home computers, but also from portable thumb

3

drives, CD- R/DVD-R disks and the user's PDA, smart phone, voice mailbox or other forms of ESI storage.). Similarly, if you used online or browser-based e-mail accounts or services (such as Gmail, AOL, Yahoo Mail or the like) to send or receive potentially relevant messages and attachments, the contents of these account mailboxes (including Sent, Deleted and Archived Message folders) must be preserved.

Ancillary Preservation

You must preserve documents and other tangible items that may be required to access, interpret or search potentially relevant ESI, including logs, control sheets, specifications, indices, naming protocols, file lists, network diagrams, flow charts, instruction sheets, data entry forms, abbreviation keys, user ID and password rosters and the like. You must preserve passwords, keys and other authenticators required to access encrypted files or run applications, along with the installation disks, user manuals and license keys for applications required to access the ESI. You must preserve cabling, drivers and hardware, other than a standard 3.5" floppy disk drive or standard CD or DVD optical disk drive, if needed to access or interpret media on which ESI is stored. This includes tape drives, bar code readers, Zip drives and other legacy or proprietary devices.

Paper Preservation of ESI is Inadequate

As hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions. If information exists in both electronic and paper forms, you should preserve both forms.

Agents, Attorneys and Third Parties

Your preservation obligation extends beyond ESI in your care, possession or custody and includes ESI in the custody of others that is subject to your direction or control. Accordingly, you must notify any current or former agent, attorney, employee, custodian and contractor in possession of potentially relevant ESI to preserve such ESI to the full extent of your obligation to do so, and you must take reasonable steps to secure their compliance.

4

# EXHIBIT "D"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Melissa Martin McBeath,                )
                                       )
            Plaintiff,                 )
                                       ) No.
vs.                                    ) 4:16-CV-00462
                                       ) TUC-DCB (BPV)
Tucson Tamale Company,                 )
                                       )
            Defendants.                )
_____

VIDEOTAPED DEPOSITION OF:  MELISSA MCBEATH

Tucson, Arizona

March 22, 2017

Patricia Gerson, RMR
Certified Court Reporter #50429
KATHY FINK & ASSOCIATES
COURT REPORTERS
2819 East 22nd Street
Tucson, Arizona  85713
(520) 624-8644

Page 137

1     A.    At one time, it was.

2     Q.    **Was it in November of 2015, a law firm?**

3     A.    No.

4     Q.    **Is that a misleading advertisement there?**

5     A.    I'm not in charge of people's domain names, so I

6  just know that's an e-mail address that existed,

7  obviously, for him.

8     Q.    **You were e-mailing Mr. Marquez to meet with him;**

9  **right?**

10    A.    I can tell you right now that I never had a

11 meeting with Mr. Marquez, in person.  Certainly if I was

12 -- if we had set up a time to talk, it was as friends.

13 This is the first time I've seen this.  I certainly wasn't

14 contacting him for any legal advice.

15    Q.    **What is Mr. Marquez's full name?**

16    A.    Francisco Marquez.

17    Q.    **Does he have a middle name?**

18    A.    Xavier.

19    Q.    **Does he have any other surnames?**

20    A.    Not that I'm aware of.

21    Q.    **Mr. Marquez has a residence at 451 West Calle**

22 **Bolita, that in Sahuarita; doesn't he?**

23    A.    That's his mom's residence, if I'm not mistaken.

24    Q.    **Do you know if Mr. Marquez is listened as the**

25 **owner of that residence?**

Page 138

```
 1      A.    I do not know that.

 2      Q.    Have you ever met Mr. Marquez at the residence?

 3      A.    Met him?

 4      Q.    Mm-hmm.

 5      A.    I have been to the residence for family events.

 6      Q.    What is your history with Mr. Marquez?

 7      A.    I have known him since we were 12 years old.

 8      Q.    Mr. Marquez resides in San Jose, California, or

 9 has a residence there?

10      A.    Yes.

11      Q.    Mr. Marquez was delivering some of your papers

12 and pleadings in this lawsuit, initially; correct?

13      A.    Yes.

14      Q.    And he was using the pseudonym Xavier Molina;

15 isn't that correct?

16      A.    Oh, right, yes.

17      Q.    And he was using that pseudonym because he didn't

18 want us to discover his involvement in this case; correct?

19      A.    Well, you're not entitled to discover any one of

20 my informal experts' identities, or what they do for me,

21 or anything.

22      Q.    Is Mr. Marquez an attorney?

23      A.    No.

24      Q.    He formerly was an attorney; correct?

25      A.    Yes.
```

Page 139

1     Q.   But he has been disbarred by the state of

2  California?

3     A.   Yes.

4     Q.   Are you aware of any other states Mr. Marquez is

5  licensed to practice?

6     A.   No.

7     Q.   Do you know when Mr. Marquez was disbarred?

8     A.   No.

9     Q.   Do you have any reason to believe that he was

10  licensed to practice law in November of 2015?

11     A.   Do I have -- I'm sorry, restate that.

12     Q.   Any reason to believe he was licensed to practice

13  law in November of 2015?

14     A.   No, he wasn't, at that time.

15     Q.   You would agree with me that no attorney-client

16  privilege exists between you and Mr. Marquez?

17     A.   How could an attorney-client privilege exist if

18  he's not an attorney?

19     Q.   So you agree with me, no attorney-client

20  privilege exists?

21     A.   I agree that I have privileges that exist for

22  expert consultants, that I consult informally, yes.

23          You're well aware of my position on FRC

24  26(b)(4)(B), so --

25     Q.   I appreciate that.  But I'm asking a very

1   specific question, and that is, you do not have an

2   attorney-client privilege with Francisco Marquez; correct?

3       A.   Correct.

4       Q.   Which of your claims require testimony from an

5   expert with a background in law?

6       A.   Testimony?  I've never claimed that he was going

7   to be -- to testify as an expert.  I have people that I

8   consult informally who are experts on many, many areas of

9   my claims.

10      Q.   What areas does Mr. Marquez consult with you on?

11      A.   You're not entitled to know that.

12      Q.   Ms. McBeath, I'm entitled to know what

13  Mr. Marquez's involvement is in this case, and what

14  information that you have shared with him in connection

15  with this case.

16           And if you do not answer the questions that I'm

17  asking, be aware and be on notice that I will move the

18  court to compel you to respond to those questions.  And I

19  reserve the right to take your deposition again, should

20  you choose to refuse to respond to the questions I have

21  about Mr. Marquez.

22           Okay?

23      A.   Understood.

24      Q.   Oh.  What is the nature of the privilege that

25  exists between you and Mr. Marquez?

1    A.    There are people that I consult informally as

2  experts, and I stand by what I've said before, you

3  understand my position, you're not entitled to know the

4  nature or scope of anything about my experts that I

5  consult informally.

6         And I'm not going to answer any questions today

7  about that, about anyone that I consult informally, and

8  what they do and the nature and scope.  I can consult with

9  a garbage man and you are not entitled to know that.

10 So --

11   **Q.    So if you consult with your neighbor about a**

12 **lawsuit that you have, who is a garbage man, you're able**

13 **to shield that neighbor --**

14   A.    Depends on what --

15   **Q.    -- from --**

16         **Let me finish my question.**

17   A.    It depends on what that person does.

18   **Q.    Let me finish my question.**

19         **You're able to shield that neighbor, the garbage**

20 **man, from discovery from the other party; is that right?**

21   A.    Yeah, just as much as I could have a spiritual

22 advisor or someone who's, you know, helping me manage the

23 stress of this.

24         Because simply I say that I'm involved in a

25 lawsuit, which is public record, with Tucson Tamale

Page 142

1    Company, you know, they could be doing something to help

2    me towards --

3        **Q.    So anybody that you --**

4        A.    -- preparation for trial.

5        **Q.    So anybody that you talk to about the facts of**

6    **your lawsuit, they cannot be subject to the discovery of**

7    **the defendants, because you're making those communications**

8    **with them during the pendency of your lawsuit?**

9        A.    Yeah.  If they are -- if they are people that I

10   consider to be consulting informally, in preparation for

11   trial, absolutely.

12       **Q.    How do you determine who is a consultant and who**

13   **is not a consultant?**

14       A.    That's, I think, my discretion, under the rule.

15       **Q.    So, if somebody is speaking with you about how to**

16   **explain the facts of your case, they're a protected**

17   **consultant?**

18       A.    If someone is -- sorry, restate your -- or just

19   say it again.  Sorry.

20       **Q.    So if you're talking with somebody to help flesh**

21   **out the facts of what happened in your employment, that**

22   **person would be a consultant shielded from discovery?**

23       A.    Yes.  Yes under 26(b)(4)(B), sure.  If they're

24   helping me in an informal way, sure.

25            I don't recall reading any certain classes of

1  about.  One lived with me, so I don't know how much we

2  talked or discussed casually over dinner.  The other two

3  did not live with -- don't live with me, and did not live

4  with me at the time.

5      Q.   I'm going to show you what we'll label as

6  Exhibit 14.

7           Oh, sorry.

8           (Exhibit 14 marked for identification.)

9  BY MR. TUFTS:

10     Q.   Do you recognize Exhibit 14?

11     A.   I do.

12     Q.   These are your responses to Tucson Tamale

13 Company's first set of interrogatories?

14     A.   Mm-hmm.

15     Q.   I'm going to direct your attention to the bottom

16 left corner.  Do you see that number, 10218.1?

17     A.   Yeah.

18     Q.   What is that number?

19     A.   It's a document tracking number, basically.

20     Q.   So you have a document management system?

21     A.   I have software, yes, that is available to me to

22 use.

23     Q.   Who makes the software available to you?

24     A.   I'm not at -- I don't have to answer to you what

25 consultants that I use that help me with software that

Page 149

1    helps me write -- do pleadings -- filings.

2         Q.   **What is the name of the software that you use?**

3         A.   I can't even remember what the name of it is,

4    right now.

5         Q.   **You agree you filed numerous motions, discovery**

6    **responses, letters and things of that sort; correct?**

7         A.   Yeah.

8         Q.   **And they're all in your document management**

9    **system?**

10        A.   Yes.

11        Q.   **And you can't remember today what the name of**

12   **your document management system is?**

13        A.   I cannot remember today what the name of it is.

14        Q.   **Did you pay for document management system?**

15        A.   I did not.

16        Q.   **How did you obtain access to a document**

17   **management system without paying for it?**

18        A.   That has to do with my consultants, so I'm not

19   going to answer.  Through people that I consult, have

20   been --

21        Q.   **So people that are helping you with this**

22   **litigation are the ones that have the access to the**

23   **document management system?**

24        A.   Yes.

25        Q.   **When Tucson Tamale Company terminated your**

Page 348

1    dollars a day.

2        Q.    **How many hours do you think you spent working on**

3    **your two lawsuits?**

4        A.    I've never kept track.  I don't know.

5        Q.    **You filed a few motions; right?**

6        A.    Yeah.  It's a lot --

7        Q.    **Filed the pleadings and --**

8        A.    It's certainly a lot.

9        Q.    **Give me an estimate of how long you think you've**

10    **spent?**

11        A.    I honestly, Travis, I have no idea.

12        Q.    **More than 500 hours?**

13        A.    I wouldn't know where to begin.

14        Q.    **You can't estimate between one and 10?**

15        A.    Well, it's more than 10.

16        Q.    **10 and 100, 100 and 1,000?**

17        A.    I have never thought about it.  I honestly have

18    not thought about it.

19        Q.    **How many hours during the day to you spend on**

20    **this matter, on average?**

21        A.    Depends.  Some days there's when I have the time,

22    you know, some -- and then certainly there's things of

23    higher priority or things that are pending.  I'll make the

24    time.

25             But it's not a consistent that I'm doing every

Page 349

1   day X amount of hours kind of thing.  I kind of take it as

2   it comes.

3       Q.   I think you told me before that it's been a

4   significant part of your life; right?

5       A.   Absolutely.  Isn't litigation like this always a

6   significant part of someone's life?

7       Q.   Let me go back to your testimony earlier.  You

8   indicated that you believe that a privilege exists with

9   those individuals that you consult with about this

10  litigation; right?

11      A.   Yes.

12      Q.   Even if that's the garbage man that you talk to;

13  right?

14      A.   Right.

15      Q.   Why then are you entitled to communications with

16  an insurance broker that TTC talked with about your

17  litigation?

18      A.   Well, are you claiming that they're your clients'

19  informal experts?  I mean, are you comparing apples to

20  apples?

21      Q.   Well, is the garbage man your informal

22  consultant?

23      A.   If I decide to let it -- give him that, per the

24  rule, sure.

25      Q.   So if he --

# EXHIBIT "E"



# EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## INTAKE QUESTIONNAIRE

Please immediately complete the entire form and return it to the U.S. Equal Employment Opportunity Commission ("EEOC"). **REMEMBER**, a charge of employment discrimination must be filed within the time limits imposed by law, generally within 180 days or in some places 300 days of the alleged discrimination. Upon receipt, this form will be reviewed to determine EEOC coverage. **Answer all questions as completely as possible, and attach additional pages if needed to complete your response(s). If you do not know the answer to a question, answer by stating "not known." If a question is not applicable, write "n/a." Please Print.**

**1.  Personal Information**

Last Name: MCBEATH          First Name: MELISSA          MI: M

Street or Mailing Address: 3463 E. TERRA ALTA BLVD.          Apt Or Unit #:

City: TUCSON          County: PIMA          State: AZ          ZIP: 85716

Phone Numbers: Home: ( 520 ) 449-9753          Work: ( )

Cell: ( )          Email Address:

Date of Birth:          Sex: Male ☐  Female ☒          Do You Have a Disability? ☐ Yes ☒ No

**Please answer each of the next three questions.**  i. Are you Hispanic or Latino?          ☒ Yes  ☐ No

ii. What is your Race? Please choose all that apply.  ☐ American Indian or Alaska Native  ☐ Asian  ☒ White  ☐ Black or African American  ☐ Native Hawaiian or Other Pacific Islander

iii. What is your National Origin (country of origin or ancestry)? MEXICAN

**Please Provide The Name Of A Person We Can Contact If We Are Unable To Reach You:**

Name: FRANCISCO X. MARQUEZ          Relationship: CLOSE FRIEND

Address: 451 W. CALLE LA BOLITA          City: SAHUARITA          State: AZ          Zip Code: 85629

Home Phone: ( )          Other Phone: ( )

**2. I believe that I was discriminated against by the following organization(s):** (Check those that apply)

☒ Employer  ☐ Union  ☐ Employment Agency  ☐ Other (Please Specify)

**Organization Contact Information** (If the organization is an employer, provide the address where you actually worked. If you work from home, check here ☐ and provide the address of the office to which you reported.) **If more than one employer is involved, attach additional sheets.**

**Organization Name:** TUCSON TAMALE COMPANY

Address: 2545 E. BROADWAY          County: PIMA

City: TUCSON          State: CA  Zip: 85716          Phone: ( 520 ) 305-4760

Type of Business: RESTAURANT          Job Location if different from Org. Address:

Human Resources Director or Owner Name: TODD RUSSELL MARTIN & SHERRY MARTIN          Phone: (520) 465-7314

**Number of Employees in the Organization at All Locations**: Please Check (√) One

☐ Fewer Than 15  ☒ 15 - 100  ☐ 101 - 200  ☐ 201 - 500  ☐ More than 500

**3.  Your Employment Data** (Complete as many items as you can)          **Are you a Federal Employee?** ☐ Yes ☒ No

Date Hired: 4/20/2015          Job Title At Hire: AREA MANAGER

Pay Rate When Hired: $45,000 ANNUAL SALARY          Last or Current Pay Rate: $50,000 ANNUAL SALARY

Job Title at Time of Alleged Discrimination: AREA MANAGER          Date Quit/Discharged: 2/22/2016

Name and Title of Immediate Supervisor: SHERRY MARTIN - OWNER

MM66

**If Job Applicant,** Date You Applied for Job _____    Job Title Applied For _____

**4.  What is the reason (basis) for your claim of employment discrimination?**
*FOR EXAMPLE, if you feel that you were treated worse than someone else because of race, you should check the box next to Race. If you feel you were treated worse for several reasons, such as your sex, religion and national origin, you should check all that apply. If you complained about discrimination, participated in someone else's complaint, or filed a charge of discrimination, and a negative action was threatened or taken, you should check the box next to Retaliation.*

☒ Race   ☐ Sex   ☒ Age   ☐ Disability   ☐ National Origin   ☐ Religion   ☐ Retaliation   ☐ Pregnancy   ☐ Color (typically a difference in skin shade within the same race)   ☐ Genetic Information; choose which type(s) of genetic information is involved:

☐ i. genetic testing   ☐ ii. family medical history   ☐ iii. genetic services (genetic services means counseling, education or testing)

If you checked color, religion or national origin, please specify: _____

If you checked genetic information, how did the employer obtain the genetic information? _____

Other reason (basis) for discrimination (Explain). _____

**5.  What happened to you that you believe was discriminatory?**  Include the date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who you believe discriminated against you.  **Please attach additional pages if needed.**
*(Example: 10/02/06 - Discharged by Mr. John Soto, Production Supervisor)*

A) Date: 2/22/2016          Action: DISCHARGED BY TODD RUSSELL MARTIN & SHERRY MARTIN

Name and Title of Person(s) Responsible: OWNERS OF TUCSON TAMALE COMPANY

B) Date:          Action:

Name and Title of Person(s) Responsible: _____

**6.  Why do you believe these actions were discriminatory? Please attach additional pages if needed.**
I was promised health benefits that for an older employee like me are more costly than for a younger employee.
The owners also did not want a person of color in the visible and high-level position of Business Development Manager that I was promised I would be transitioned into within six months.

**7.  What reason(s) were given to you for the acts you consider discriminatory?  By whom?  His or Her Job Title?**

**8. Describe who was in the same or similar situation as you and how they were treated.  For example, who else applied for the same job you did, who else had the same attendance record, or who else had the same performance?  Provide the race, sex, age, national origin, religion, or disability of these individuals, if known, and if it relates to your claim of discrimination.  For example, if your complaint alleges race discrimination, provide the race of each person; if it alleges sex discrimination, provide the sex of each person; and so on.  Use additional sheets if needed.**

Of the persons in the same or similar situation as you, who was treated *better* than you?

| A. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| LINDSAY WELCH | WHITE - EARLY 30S | Futurist, Business Development |
| Description of Treatment | She was offered the position that I was promised. She has no restaurant wholesale experience, which is one of the key job requirements of the position. I have 18+ years of restaurant wholesale experience. | |
| B. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
| Description of Treatment | | |

MM67

**Of the persons in the same or similar situation as you, who was treated *worse* than you?**

| A. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|

Description of Treatment

| B. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|

Description of Treatment

**Of the persons in the same or similar situation as you, who was treated the *same* as you?**

| A. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|

Description of Treatment

| B. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|

Description of Treatment

**Answer questions 9-12 <u>only</u> if you are claiming discrimination based on disability.  If not, skip to question 13.  Please tell us if you have more than one disability.  Please add additional pages if needed.**

9.   **Please check all that apply:**

☐   Yes, I have a disability

☐   I do not have a disability now but I did have one

☐   No disability but the organization treats me as if I am disabled

**10.  What is the disability that you believe is the reason for the adverse action taken against you?  Does this disability prevent or limit you from doing anything?**  (e.g., lifting, sleeping, breathing, walking, caring for yourself, working, etc.).

**11.  Do you use medications, medical equipment or anything else to lessen or eliminate the symptoms of your disability?**

**Yes** ☐    **No** ☐

If "Yes," what medication, medical equipment or other assistance do you use?

**12.  Did you ask your employer for any changes or assistance to do your job because of your disability?**

**Yes** ☐    **No** ☐

If "YES", when did you ask? _____    How did you ask (verbally or in writing)? _____

Who did you ask?  (Provide full name and job title of person)

Describe the changes or assistance that you asked for:

How did your employer respond to your request?

4

**13.** **Are there any witnesses to the alleged discriminatory incidents?  If yes, please identify them below and tell us what they will say.** (Please attach additional pages if needed to complete your response)

| A.  Full Name | Job Title | Address & Phone Number |
|---|---|---|
| | | |

**What do you believe this person will tell us?**

| B.  Full Name | Job Title | Address & Phone Number |
|---|---|---|
| | | |

**What do you believe this person will tell us?**

---

**14.   Have you filed a charge previously in this matter with EEOC or another agency?**      Yes ☐     No ☒

**15.   If you have filed a complaint with another agency, provide name of agency and date of filing:**

**16.   Have you sought help about this situation from a union, an attorney, or any other source?**     Yes ☐     No ☒
Provide name of organization, name of person you spoke with and date of contact. Results, if any?

**Please check one of the boxes below to tell us what you would like us to do with the information you are providing on this questionnaire.**  If you would like to file a charge of job discrimination, you must do so either within 180 days from the day you knew about the discrimination, or within 300 days from the day you knew about the discrimination if the employer is located in a place where a state or local government agency enforces laws similar to the EEOC's laws.  **If you do not file a charge of discrimination within the time limits, you will lose your rights.**  If you would like more information before filing a charge or you have concerns about EEOC's notifying the employer, union, or employment agency about your charge, you may wish to check Box 1.  If you want to file a charge, you should check Box 2.

Box 1   ☐   I want to talk to an EEOC employee before deciding whether to file a charge.  I understand that by checking this box, I have not filed a charge with the EEOC.  **I also understand that I could lose my rights if I do not file a charge in time.**

Box 2   ☒   I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above.  I understand that **the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name.**  I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.

_____                              APRIL 20, 2016
            **Signature**                                              **Today's Date**

**PRIVACY ACT STATEMENT:** This form is covered by the Privacy Act of 1974: Public Law 93-579. Authority for requesting personal data and the uses thereof are:
1. **FORM NUMBER/TITLE/DATE.** EEOC Intake Questionnaire (9/20/08).
2. **AUTHORITY.** 42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626. 42 U.S.C. 12117(a), 42 USC §2000ff-6.
3. **PRINCIPAL PURPOSE.** The purpose of this questionnaire is to solicit information about claims of employment discrimination, determine whether the EEOC has jurisdiction over those claims, and provide charge filing counseling, as appropriate. Consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(c), this questionnaire may serve as a charge if it meets the elements of a charge.
4. **ROUTINE USES.** EEOC may disclose information from this form to other state, local and federal agencies as appropriate or necessary to carry out the Commission's functions, or if EEOC becomes aware of a civil or criminal law violation. EEOC may also disclose information to respondents in litigation, to congressional offices in response to inquiries from parties to the charge, to disciplinary committees investigating complaints against attorneys representing the parties to the charge, or to federal agencies inquiring about hiring or security clearance matters
5. **WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION.** Providing of this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge. It is not mandatory that this form be used to provide the requested information.

Print Form                                                                               MM69

# EXHIBIT "F"

MELISSA MARTIN McBEATH
3463 E. TERRA ALTA BLVD.
TUCSON, AZ 85716
Ph:  (520) 449-9753
*mel.mcbeath@cox.net*

Pro Se

## SUPERIOR COURT OF ARIZONA
## COUNTY OF PIMA

| | |
|---|---|
| MELISSA MARTIN McBEATH, an individual, | Case No. C20161794 |
| Plaintiff,<br><br>v.<br><br>TUCSON TAMALE COMPANY; an Arizona corporation, *et al.*,<br><br>Defendants. | **PLAINTIFF'S MOTION TO STRIKE NEW ARGUMENT ("ABUSE OF LITIGANT'S PRIVILEGE") RAISED FOR THE FIRST TIME IN DEFENDANTS' REPLY BRIEF**<br><br>[Ariz. R. Civ. P. 7.1(f)] |
| TUCSON TAMALE COMPANY; an Arizona corporation,<br><br>Counterclaimant,<br><br>v.<br><br>MELISSA MARTIN McBEATH, an individual, *et al.*,<br><br>Counterdefendants. | Assigned to Hon. Gus Aragon |

10139.1

1

2

3   Dated:  June 14, 2016                    Respectfully submitted,

4

5                                            Melissa Martin McBeath

6

7

8

9

10

11

12

13

14   ORIGINAL filed via TurboCourt on June 14, 2016 with:

15   Clerk of the Court

     Pima County Superior Court

16

17   COPY served via TurboCourt to:

18   Roberto C. Garcia

19   rgarcia@fmazlaw.com

     Travis L. Tufts

20   ttufts@fmazlaw.com

21

22   Attorneys for:

     Tucson Tamale Company

23   Todd Russell Martin

     Sherry Martin

24   Lisa Martin

25

26

27   Xavier Molina

28

# EXHIBIT "G"

FILED
TONI L. HELLON
CLERK, SUPERIOR COURT

5/27/2016 8:09:47 PM

BY: ALAN WALKER
DEPUTY

MELISSA MARTIN McBEATH

3463 E. TERRA ALTA BLVD.

TUCSON, AZ 85716

Ph:  (520) 449-9753

*mel.mcbeath@cox.net*

Pro Se

# SUPERIOR COURT OF ARIZONA
## COUNTY OF PIMA

MELISSA MARTIN McBEATH, an
individual,

          Plaintiff,

    v.

TUCSON TAMALE COMPANY; an
Arizona corporation, et al.,

        Defendants.

TUCSON TAMALE COMPANY; an
Arizona corporation, et al.,

        Counterclaimant,

    v.

MELISSA MARTIN McBEATH, an
individual, et al.,

        Counterdefendants.

Case No. C20161794

**MELISSA MARTIN McBEATH'S
MOTION TO DISMISS
COUNTERCLAIMS
(COUNTS II, III, IV & V)**

[Ariz. R. Civ. P. 12(b)(6)]

Assigned to Hon. Gus Aragon

10124.1

ORIGINAL filed via TurboCourt on May 27, 2016 with:

Clerk of the Court
Pima County Superior Court

COPY served via TurboCourt to:
Roberto C. Garcia
*rgarcia@fmazlaw.com*
Travis L. Tufts
*ttufts@fmazlaw.com*

Attorneys for:
Tucson Tamale Company
Todd Russell Martin
Sherry Martin
Lisa Martin

Xavier Molina

# EXHIBIT "H"

**Tish Wright**

| | |
|---|---|
| **From:** | Robert Garcia |
| **Sent:** | Tuesday, June 14, 2016 6:15 PM |
| **To:** | 'E-SERVICE' |
| **Cc:** | Autumn Bonnell; Travis L. Tufts |
| **Subject:** | RE: McBeath v. Tucson Tamale Co. et al. (First Set of NUIs to Sherry Martin) |

Mr. Molina:

We've seen your name appear on various documents in this litigation.  Are you an attorney?  If so, do you represent Ms. McBeath?  If you are not an attorney, are you a document preparer?  We are preparing discovery requests and would like to know whether there is a privilege issue we need to be aware of before sending such requests.  Thanks.

Best regards,

## FARHANG   MEDCOFF
──────── Attorneys ────────

**Robert C. Garcia**
Profile | vCard

4801 East Broadway Boulevard | Suite 311 | Tucson, Arizona 85711
General: 520.790.5433 | Direct: 520.396.2205 | Fax: 520.790.5736

**From:** E-SERVICE [mailto:mcbeathdocs@gmail.com]
**Sent:** Tuesday, June 14, 2016 5:57 PM
**To:** Robert Garcia <rgarcia@fmazlaw.com>; Travis L. Tufts <ttufts@fmazlaw.com>
**Cc:** Autumn Bonnell <abonnell@fmazlaw.com>; Mel M <Mel.McBeath@cox.net>
**Subject:** McBeath v. Tucson Tamale Co. et al. (First Set of NUIs to Sherry Martin)

## Counsel,

## Attached is the following document:

PLAINTIFF'S FIRST SET OF NON-UNIFORM INTERROGATORIES TO SHERRY MARTIN

## Thank you.

-Xavier Molina

# EXHIBIT "I"

**Tish Wright**

| | |
|---|---|
| **From:** | Travis L. Tufts |
| **Sent:** | Tuesday, March 21, 2017 2:29 PM |
| **To:** | Tish Wright |
| **Subject:** | FW: discovery/calendar |
| **Importance:** | High |

---------- Forwarded message ----------
From: **Ehud Gavron** <gavron@wetwork.net>
Date: Mon, Jun 27, 2016 at 9:09 PM
Subject: discovery/calendar
To: "Francisco X. Márquez" <fxm@marquezlegal.com>, Mel McBeath <mel@tucsontamalecompany.com>

6/13 we received the RFAs but not the UIs.  Calendar
spreadsheet shows UIs.

I don't want to "edit this out from under you" so please
advise if in the future if we see something like this to
correct it or TELL YOU so you can correct it.

Also they are late.  All inters due 6/24 and there's no
 vay they snail-mailed them [because to effect Rule 4
service they'd have to Certified/Registered return-receipt...
and that obviates the agreement to electronic service]

E

# EXHIBIT "J"

# Liddy Legal Support Services

PO Box 2007, Phoenix, AZ 85001
63 E. Pennington St., #102, Tucson, AZ 85702
2700 Woodlands Village Blvd., #300-420, Flagstaff, AZ 86001
Phoenix 602-297-0676, Tucson 520-628-2824, Flagstaff 928-225-7737

Client File # 2546-001
Account   # 0607
Invoice    # 264129
Liddy      # 198667-1

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF PIMA

**MELISSA MARTIN MCBEATH, an individual,**

|                              |                                                              |
|------------------------------|--------------------------------------------------------------|
| **Plaintiff(s),**            | **AFFIDAVIT OF ATTEMPTED SERVICE**                           |
| **vs**                       | **BY PRIVATE PROCESS SERVER**                                |
| **TUCSON TAMALE COMPANY, et al.,** | Case No. C20161794                                     |
| **Defendant(s).**            |                                                              |

STATE OF ARIZONA
Pima County

On 6/29/16 I received a Subpoena and Notice of Deposition and in each instance I personally attempted to serve the documents listed on those named below, in the manner and at the time and place shown, that all attempts, except where noted, were made with Pima County, AZ.

Upon FRANCISCO X. MARQUEZ at 451 W. Calle La Bolita, Sahuarita, AZ 85629; on 6/28/16 at 4:39pm, no answer, neighbor stated hasn't seen anyone there recently, usually 2 Hispanic women and 1 child, rarely sees men there; on 7/5/16 at 8:15am, no answer, front yard cleaned; on 7/10/16 at 5:45pm, no answer. I am returning the documents to the client.

**Received from FARHANG & MEDCOFF, PLLC, ( ROBERT GARCIA #026246 )**

PROCESS SERVER:   Tracy Janiga #572

**The undersigned states: That I am a certified private process server in the county of Pima and am an Officer of the Court.**

SIGNATURE OF PROCESS SERVER: _Tracy Janiga_                    Date: 7/13/2016

| Item             | Amount   |
|------------------|----------|
| Mileage          | $72.00   |
| Affidavit/Notary | $10.00   |

Subscribed and sworn before me on 7/13/2016

_Vicki Rieffer_
Vicki Rieffer

NOTARY PUBLIC
STATE OF ARIZONA
Pima County
VICKI RIEFFER
Commission Expires June 10, 2018

Notary Public
My Commission Expires
June 10, 2018

Tax ID# 90-0533870

| Total | $82.00 |
|-------|--------|

ORIGINAL

# Liddy Legal Support Services

PO Box 2007, Phoenix, AZ 85001
63 E. Pennington St., #102, Tucson, AZ 85702
2700 Woodlands Village Blvd., #300-420, Flagstaff, AZ 86001
Phoenix 602-297-0676, Tucson 520-628-2824, Flagstaff 928-225-7737

Client File # 2546-1
Account  # 0607
Invoice  # 267775
Liddy   # 204372-1

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF PIMA

MELISSA MARTIN MCBEATH,

                          Plaintiff(s),        **AFFIDAVIT OF ATTEMPTED SERVICE**
vs                                             **BY PRIVATE PROCESS SERVER**
                                                    Case No. C20161794
TUCSON TAMALE COMPANY, et al.,

                          Defendant(s).

---

STATE OF ARIZONA
Pima County

On 9/1/16 I received a Subpoena and Amended Notice of Deposition and in each instance I personally attempted to serve the documents listed on those named below, in the manner and at the time and place shown, that all attempts, except where noted, were made with Pima County, AZ.

Upon FRANCISCO X MARQUEZ at 451 W. Calle La Bolita, Sahuarita, AZ 85629; on 9/1/16 at 6:30pm, no answer; on 9/2/16 at 8:15am, no answer, plants watered, looks lived in; on 9/5/16 at 6:10pm, Dina Stoner, Sister, stated defendant lives in California at 855 N. 17th St., San Jose, CA 95112. I am returning the documents to the client.

Received from FARHANG & MEDCOFF, PLLC, ( TRAVIS TUFTS #029373 )

PROCESS SERVER:   Tracy Janiga #572

The undersigned states: That I am a certified private process server in the county of Pima and am an Officer of the Court.

SIGNATURE OF PROCESS SERVER: _____        Date: 9/9/2016

| Item | Amount | |
| --- | --- | --- |
| Mileage | $60.00 | Subscribed and sworn before me on 9/9/2016 |
| Rush Charge Service | $30.00 | |
| Affidavit/Notary | $10.00 | Vicki Rieffer |

NOTARY PUBLIC
STATE OF ARIZONA
Pima County
VICKI RIEFFER
My Comm Expires June 10, 2018

Notary Public
My Commission Expires
June 10, 2018

Tax ID# 90-0533870

Total   $100.00



| TRAVIS L. TUFTS, ESQ. (520) 790-5433 <br> FARHANG & MEDCOFF <br> 4801 EAST BROADWAY, SUITE 311 <br> TUCSON, AZ 85711 <br> ATTORNEY FOR: DEFENDANT/COUNTERCLAIMANT | FOR COURT USE ONLY |
|---|---|
| SUPERIOR COURT OF THE STATE OF CALIFORNIA <br> IN AND FOR THE COUNTY OF SANTA CLARA | |
| PLAINTIFF : <br> MELISSA MARTIN MCBEATH | |
| DEFENDANT : <br> TUCSON TAMALE COMPANY, ET AL. | |

| REFERENCE NO.: <br> 916464416 | DECLARATION OF DILIGENCE | CASE NUMBER: <br> 16CV300072 |
|---|---|---|

I am and was on the dates herein mentioned over the age of eighteen years and not a party to this action. My business address is 31 N. 2nd Street, Ste. 200, San Jose, CA 95113. I received the within process on **SEPTEMBER 19, 2016** and that after due and diligent effort I have been unable to effect personal service on the within name

**FRANCISCO X. MARQUEZ**

Residence address (H):   855 N. 17TH STREET, SAN JOSE, CA 95112

Business address (B):    UNKNOWN

<u>Below is a list of dates, times and details regarding efforts to effect service.</u>
09/19/2016 @ 4:50PM (H) - NO ANSWER. GARBAGE CAN OUT ON THE CURB. NO VEHICLES PRESENT. NO ACTIVITY. ATTEMPTED BY CHRISTOPHER ROMAN
09/21/2016 @ 8:55AM (H) - NO ANSWER. NO VEHICLES IN THE DRIVEWAY. NO ACTIVITY DETECTED. BLINDS OPEN TO THE LEFT OF THE DOOR. ATTEMPTED BY CHRISTOPHER ROMAN
09/23/2016 @ 4:19PM (H) - NO ANSWER. NO ACTIVITY. NO VEHICLES IN THE DRIVEWAY. ATTEMPTED BY CHRISTOPHER ROMAN
09/28/2016 @ 7:11PM (H) - NO ANSWER AT THE FRONT DOOR. NO CARS IN THE DRIVEWAY. THERE WERE LIGHTS ON INSIDE THE HOUSE. ATTEMPTED BY SAMUEL SAMANIEGO
10/01/2016 @ 8:55AM (H) - THERE WAS NO ANSWER AT THE FRONT DOOR WHEN THE SERVER KNOCKED. SOME OF THE WINDOW BLINDS WERE OPEN, BUT NO ACTIVITY WAS DETECTED INSIDE THE HOUSE. THERE WAS A SILVER HONDA PARKED IN THE DRIVEWAY. ATTEMPTED BY SAMUEL SAMANIEGO
10/04/2016 @ 5:45PM (H) - THE DOCUMENTS WERE SERVED VIA SUBSTITUTE SERVICE UPON ROBERT "DOE" (LAST NAME NOT PROVIDED) (CAUCASIAN MALE IN HIS 30'S, 5'11", 190 LBS., WITH BROWN HAIR & A BEARD). THE PROCESS SERVER APPROACHED THE CO-OCCUPANT AS HE WAS COLLECTING THE MAIL FROM THE MAIL BOX. THE CO-OCCUPANT DROVE A BLACK CHEVY VOLT THAT HE PARKED ACROSS THE STREET FROM THE HOUSE. SERVED BY SAMUEL SAMANIEGO



31 N. SECOND STREET
SUITE 200
SAN JOSE, CA 95113

(408) 291-5000

Registered in Santa Clara County
Registered California Process Server No. 1542

The fee for service was:

Declarant: SAMUEL SAMANIEGO

I am a registered California process server: INDEPENDENT CONTRACTOR
Registration No.: 1600
County: SANTA CLARA

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:   OCTOBER 4, 2016

Signature: _____
                    SAMUEL SAMANIEGO

| TRAVIS L. TUFTS, ESQ.                                    (520) 790-5433 | FOR COURT USE ONLY |
|---|---|
| FARHANG & MEDCOFF | |
| 4801 EAST BROADWAY, SUITE 311 | |
| TUCSON, AZ 85711 | |
| ATTORNEY FOR:  DEFENDANT/COUNTERCLAIMANT | |
| SUPERIOR COURT OF THE STATE OF CALIFORNIA | |
| IN AND FOR THE COUNTY OF SANTA CLARA | |
| PLAINTIFF : | |
| MELISSA MARTIN MCBEATH | |
| DEFENDANT : | |
| TUCSON TAMALE COMPANY, ET AL. | |

| REFERENCE NO.: 916464416 | **PROOF OF SERVICE** | CASE NUMBER: 16CV300072 |
|---|---|---|

At the time of service I was at least eighteen years of age and not a party to this action, and I served copies of the:

APPLICATION FOR DISCOVERY SUBPOENA IN ACTION PENDING OUTSIDE CALIFORNIA; DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS, ELECTRONICALLY STORED INFORMATION, AND THINGS IN ACTION PENDING OUTSIDE CALIFORNIA; SUBPOENA IN A CIVIL CASE

in the within action by personally delivering true copies thereof to the person served as follows:

| | | |
|---|---|---|
| Witness | : | FRANCISCO X. MARQUEZ |
| By serving | : | ROBERT "DOE" (LAST NAME NOT PROVIDED) (CAUCASIAN MALE IN HIS 30'S, 5'11", 190 LBS., WITH BROWN HAIR & A BEARD), CO-OCCUPANT |
| Address | : | 855 N. 17TH STREET SAN JOSE, CA 95112 |
| Date of Service | : | OCTOBER 4, 2016 |
| Time of Service | : | 5:45PM |
| Witness fees | : | WERE NOT DEMANDED OR PAID. |



31 N. SECOND STREET
SUITE 200
SAN JOSE, CA 95113

(408) 291-5000

PACIFIC COAST
LEGAL SERVICES

Registered in Santa Clara County
Registered California Process Server No. 1542

The fee for service was:
Person serving:  SAMUEL SAMANIEGO
I am a registered California process server.
Registration No.: 1600
County: SANTA CLARA

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:   OCTOBER 4, 2016                    Signature: _____

                                                          SAMUEL SAMANIEGO

# EXHIBIT "K"

**Tish Wright**

| | |
|---|---|
| **From:** | Melissa Martin McBeath <mel.mcbeath@cox.net> |
| **Sent:** | Wednesday, April 5, 2017 1:41 PM |
| **To:** | Travis L. Tufts |
| **Cc:** | Robert Garcia; Jamie Archibald; Tish Wright; Lynn Salcido |
| **Subject:** | Google subpoena |
| **Attachments:** | 2017-04-05 T. Tufts (Google subpoena).pdf; 2017-04 Google Subpoena.pdf; 2017-04 EXHIBIT A - Google subpoena .pdf; RELEASE CONSENT FORM.docx |

**Travis,**

**Apologies for the delayed response.**

**I was otherwise engaged yesterday.**

**Please see attached letter and accompanying attachment.**

**Best regards,**

**–F**

On Mon, Apr 3, 2017 at 5:20 PM, Travis L. Tufts wrote:

> Ms. McBeath,
>
> Are you available for a telephonic conference about this mechanism tomorrow?  I believe we are
amenable to this mechanism but we need some additional details and information before we can agree to
it.  I would imagine we would need less than 15-20 minutes.
>
> Please let me know about your availability tomorrow.
>
> Travis
>
>
> [cid:image001.jpg@01D14186.84DD1700]
>
> Travis L. Tufts
> Profile<http://www.fmazlaw.com/travis-t-tufts> | vCard<https://s3.amazonaws.com/law-
media/uploads/191/24243/original/Travis%20L%20%20Tufts%20(00239226xC01F0).VCF?1451341154>
> 4801 East Broadway Boulevard | Suite 311 | Tucson, Arizona 85711
> General: 520.790.5433 | Direct: 520.398.7466 | Fax: 520.790.5736
> www.fmazlaw.com<http://www.fmazlaw.com/>
>
> From: Melissa Martin McBeath [mailto:mel.mcbeath@cox.net]
> Sent: Thursday, March 30, 2017 12:34 PM
> To: Travis L. Tufts <ttufts@fmazlaw.com>
> Cc: Robert Garcia <rgarcia@fmazlaw.com>; Jamie Archibald <jarchibald@fmazlaw.com>; Tish Wright
<twright@fmazlaw.com>; Lynn Salcido <lsalcido@fmazlaw.com>
> Subject: RE: McBeath v. Tucson Tamale - Defendant's Objections and Responses to Discovery Requests
>
> Please see attached letter.
>
> Thank you.

>
> -Melissa
>
>
> On Mon, Mar 27, 2017 at 5:21 PM, Tish Wright wrote:
>
> > Attached please find Defendant's Objections and Responses to your Non-Uniform Interrogatories and Request for Production in the Federal Court matter.
> >
> > [00112003]
> > Letitia "Tish" Wright
> > Legal Assistant
> > 4801 East Broadway Boulevard | Suite 311 | Tucson, Arizona 85711
> > General: 520.790.5433<tel:520.790.5433> | Direct: 520.777.8757<tel:520.790.5736> |Fax: 520.790.5736<tel:520.790.5736>
> >
> www.fmazlaw.com<http://www.fmazlaw.com/<http://www.fmazlaw.com%3chttp:/www.fmazlaw.com/>>
> >
> >
> > PLEASE NOTE: This email message (including any attachments) contains information that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information, and no privilege is waived by your inadvertent receipt. Improper or unauthorized use of this email may be unlawful. If you received this message in error, please notify the sender by replying to this e-mail and then permanently delete it from your system.

# EXHIBIT "L"

FILED
TONI L. HELLON
CLERK, SUPERIOR COURT

4/15/2016 12:03:42 PM

BY: ALAN WALKER
DEPUTY

Case No. C20161794
HON. GUS ARAGON

1

MELISSA MARTIN McBEATH

2

3463 E. TERRA ALTA BLVD.

3

TUCSON, AZ 85716

Ph: (520) 449-9753

4

*mel.mcbeath@cox.net*

5

6

Pro Se

7

8

9

**SUPERIOR COURT OF ARIZONA**

10

**COUNTY OF PIMA**

11

12

Case No. _____

13

MELISSA MARTIN MCBEATH, an

14

individual,

**VERIFIED COMPLAINT**

15

Plaintiff,

16

v.

**DEMAND FOR JURY TRIAL**

17

TUCSON TAMALE COMPANY; an

1. Retaliatory Discharge in Violation of the Employment Protection Act

18

Arizona corporation,

19

TODD RUSSELL MARTIN, an

2. Fraud in the Inducement

individual; SHERRY MARTIN, an

20

individual; and LISA MARTIN, an

3. Negligent Misrepresentation

21

individual,

4. Breach of Employment Agreement

22

Defendants.

5. Failure to Pay Bonuses in Violation of Arizona's Wage Act

23

24

6. Conversion

25

7. Unjust Enrichment

26

27

28

10105.1

## THE PARTIES

1.     Plaintiff MELISSA MARTIN MCBEATH (*"__Plaintiff__"*) brings this action against her former employer, TUCSON TAMALE COMPANY (*"__TTC__"*), for (i) retaliatory discharge in violation of Arizona's Employment Protection Act, (ii) fraud in the inducement, (iii) negligent misrepresentation, (iv) breach of employment agreement, (v) failure to pay bonuses in violation of Arizona's Wage Act, (vi) conversion, and (vii) restitution / unjust enrichment. Plaintiff seeks general, special, compensatory and punitive damages, attorneys' fees, costs, pre-judgment interest, post-judgment interest, and other appropriate relief.

2.     Plaintiff is an individual who resides in Pima County, Arizona.

3.     TUCSON TAMALE COMPANY is and, at all times mentioned in this Verified Complaint, was authorized to operate by the State of Arizona and qualified to do business in Pima County, Arizona. *See AZ Corporation Commission File No. 14604539.* TTC has a place of business and offices located at 2550 N. Dragoon Street, Suite 120, Tucson, Arizona 85745.

4.     Defendant TODD RUSSELL MARTIN (*"__TODD__"*) is a co-founder and, at all times relevant to this Verified Complaint, has been TTC's President and Chief Executive Officer. He resides and does business in Pima County, Arizona.

5.     Defendant SHERRY MARTIN (*"__SHERRY__"*) is a co-founder and, at all times relevant to this Verified Complaint, has been TTC's Secretary. She resides and does business in Pima County, Arizona.

6.     Defendant LISA MARTIN (*"__LISA__"*) is and, at all times relevant to this Verified Complaint, has been an individual that TTC employs to provide "global oversight" and "leadership development." She does business in Pima County, Arizona.

7.     TODD, SHERRY, LISA and TTC are referred to collectively as *"__Defendants__"* in this Verified Complaint.

8.     TODD and SHERRY are co-founders of the following three additional businesses authorized to operate by the State of Arizona and qualified to do business in Pima County:

      a.     Tucson Tamale Company Oracle, LLC

      b.     Tucson Tamale Company Tanque Verde, LLC

      c.     Tucson Tamale Wholesale Company, LLC

9.     Plaintiff is informed and believes that each Defendant was associated or affiliated with one or more of the other Defendants in connection with matters and conduct sued upon herein.

10.     Plaintiff is informed and believes that, at all times relevant to this Verified Complaint, each Defendant acted with one or more of the other Defendants under a common scheme, course of action, enterprise or conspiracy and each Defendant is liable to Plaintiff for the events, happenings and damages alleged.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over the alleged torts and state law claims under Arizona Constitution Art. 6 and Ariz. Rev. Stat. § 12-123.

12.     Venue is proper under Ariz. Rev. Stat. § 12-401 because the acts alleged in this Verified Complaint occurred, and all Defendants reside or do business, in Pima County, Arizona.

13.     The demand or value of property in controversy in this Verified Complaint, exclusive of interest and costs, exceeds the minimum jurisdictional requirements.

14.     This case is not subject to compulsory arbitration because the amount in controversy exceeds $50,000.

**TERMS OF PLAINTIFF'S EMPLOYMENT**

**AND TERMINATION**

15.     Plaintiff began the interview process with TODD, SHERRY, and LISA in February 2015. They met at least six times over the course of several weeks, and talked for hours about the business and the vision Defendants had to grow TTC's tamale wholesale business. They expressed to Plaintiff that she would be ideally suited for the position they were going to create to run this business because of her close to twenty years' experience in wholesale sales and distribution.

16.     Defendants explained to Plaintiff that they were actively searching for a production facility to lease and therefore were not ready to hire her as a business development manager whose sole focus would be to grow and to manage TTC's expanded wholesale business.

17.     Defendants pleaded with Plaintiff to temporarily assume the Area Manager position ($45,000 annual salary) to oversee their three other affiliated restaurant and food service businesses (listed in Paragraph 8).

18.     Plaintiff stated that she needed an annual base salary of $75,000.

19.     TODD and SHERRY assured Plaintiff that after she completed the 90-day probationary period, her annual salary would be reviewed and increased to at least $50,000, based on performance. Of course even this salary would be temporary, pending the opening of the new production facility. At that point, Plaintiff would transition into the new role at an increased annual salary.

20.     Defendants unequivocally represented to Plaintiff that the new position would allow her an opportunity to make more money.

21.     Defendants further assured Plaintiff that she would not remain in the Area Manager position for more than six months.

22.     During the interview process, Defendants informed Plaintiff that TTC did not offer health benefits yet, but would shortly make them available.

23.   In light of the promises made to her regarding the terms of her employment, Plaintiff agreed to join TTC.

24.   Plaintiff turned down a more lucrative job offer she had received because she was excited and looked forward to the promising opportunities for professional growth at TTC that Defendants described to her.

25.   Plaintiff started working for TTC on April 20, 2015.

26.   Plaintiff was made a part of TTC's executive management team and in that capacity reported to TODD, SHERRY, and LISA.

27.   Defendants further told Plaintiff, and put in her offer letter, that she would be paid up to $2,500 under TTC's quarterly incentive plan. Plaintiff would be eligible to participate in the incentive plan after 90 days.

28.   After Plaintiff successfully completed the 90-day probationary period, she requested a salary review as promised and inquired about the health benefits she was promised. She was told to wait.

29.   In a written evaluation titled "90 Day Assessment," dated September 1, 2015, Plaintiff received glowing reviews in every area of responsibility because she performed her duties in an exemplary manner. This evaluation should have been conducted in July 2015.

30.   In September 2015, her annual salary was finally raised to $50,000.

31.   Plaintiff's first quarterly bonus was due by October 22, 2015. When Plaintiff asked TODD and SHERRY in an email when she would be paid the bonus, they responded that the bonus would be paid as soon as they finalized "the industry metrics used to evaluate performance."

32.   Plaintiff asked about the payment of her bonuses several times over the next few weeks but was told to wait until after the holidays because TODD and SHERRY were just too busy.

33.   In November 2015, Plaintiff began to report solely to SHERRY due to an in internal TTC restructuring of management roles.

VERIFIED COMPLAINT                                    -4-

34.     When TTC senior staff was notified about the change in roles, one of the general managers expressed great concern to Plaintiff. Having worked with SHERRY for several years, this general manager lamented to Plaintiff in tears: "You won't last long. She [SHERRY] runs all the good people off."

35.     At the end of January 2016, when the second quarterly bonus was due, Defendants failed even to acknowledge that Plaintiff was owed this money.

36.     Refusing to be brushed off any more, Plaintiff sent a direct and sternly-worded email to SHERRY on February 15, 2016, and insisted that Defendants address her bonuses and compensation before the end of the week.

37.     In response, SHERRY scheduled a meeting at the TTC corporate office on Friday, February 19, 2016.

38.     The meeting did not go well. SHERRY snidely asked Plaintiff: "Do you think you deserve your bonuses?" The tone of her voice clearly communicated to Plaintiff that Defendants had no intention of paying her this money. Plaintiff revisited the issue of TTC's obligation to pay not just her bonuses, but the bonuses owed to the general managers.

39.     Plaintiff also insisted that Defendants honor the promise they made in October 2015 to TTC's front-line employees to increase their wages.

40.     In an article titled *"20 million tamales: Tucson company plans big expansion,"* published in the Arizona Daily star on October 24, 2015, TODD boasted that: "The company plans to hire about 30 to 40 employees over the next year to handle demand, and plans to pay better than minimum wage, starting at $10 to $12 per hour. . . ."

> *http://tucson.com/business/local/million-tamales-tucson-company-plans-big-expansion/article_e25d4c29-4e64-50ea-a28e-d7229429e2cb.html*

41.     To date, not a single TTC front-line employee is paid $10 per hour.

42.     Finally, Plaintiff expressed her dismay that Defendants did not

honor their promise to make her the business development manager for the wholesale business, which was the reason she had agreed to work at TTC in the first place.

43.     On Monday, February 22, 2016, three days after they met, TODD and SHERRY terminated Plaintiff's employment. The only reason they gave: *"Our definition of success is different than yours."*

44.     The remark reminded Plaintiff of something SHERRY once said when Plaintiff asked her to purchase an inexpensive rod and curtain for a nursing mother returning to work and needed some privacy to express milk postpartum: "I'm not fucking paying for that! If she wants to pay for it, that's up to her." Plaintiff purchased the rod and curtain at her own expense.

45.     Defendants' definition of success apparently means that not only will they refuse their employees even the smallest of professional courtesies if it will cost Defendants anything, but they will lie, cheat and steal from their employees to avoid paying them even the wages they've earned and deserve.

46.     TTC offered a discretionary severance payment of $6,250 to Plaintiff that is the precise amount of the bonuses (prorated to the month) that TTC owes to Plaintiff. The severance payment was conditioned on Plaintiff signing a Release of Claims and Separation Agreement (*"Release"*).

47.     The Release is essentially a take-it-or-leave-it contract of adhesion that is unlawful under Arizona law because:

a.     The Release [Paragraph VI (I)] has a non-solicitation restriction that is too broad because it forbids soliciting or accepting any business from "Business Affiliates" that encompasses any "person, company, corporation, or other entity with whom TTC and/or the TTC Group has or had a relationship, on the Resignation Date or during the six (6) months prior, with respect to the sale or servicing of any property, casualty, life, disability, homeowners, automobile, bonds, medical insurance, and/or related insurance products or services."

1           b.    TTC is in the food industry. TTC does not have a protectable

2    commercial interest related to the motley businesses identified in the Release's

3    non-solicitation restriction. *See Olliver/Pilcher Ins. v. Daniels,* 148 Ariz. 530, 532

4    (1986) (holding that with respect to customers, employees, and independent

5    contractors, a non-solicitation restriction may only protect against solicitation of

6    those individuals with whom the employer has formed a meaningful business

7    relationship); *Amex Distrib. Co., Inc. v. Mascari,* 150 Ariz. 510 (1986) (holding that

8    restrictive covenants that "tend to prevent an employee from pursuing a similar

9    vocation after termination of employment are disfavored" and are strictly

10   construed against the employer).

11          c.    The 24-month, boundaryless non-solicitation restriction is

12   invalid because it is unreasonable in time and geographic scope. *Amex Distrib.*

13   *Co. v. Mascari,* 150 Ariz. 510, 518 (1986) ("When the restraint is for the purpose of

14   protecting customer relationships, its duration is reasonable only if it is no longer

15   than necessary for the employer to put a new man on the job and for the new

16   employee to have a reasonable opportunity to demonstrate his effectiveness to

17   the customers."); *Olliver/Pilcher Ins. v. Daniels,* 148 Ariz. 530, 532 (1986) (holding

18   that the geographic scope of a restrictive covenant must be reasonably necessary

19   to protect the employer's business and may not unreasonably restrict the right of

20   the employee to work in her chosen occupation).

21          d.    The Release [Paragraph VI (H)] states that the Restricted

22   Period may be 24, 18, 12 or 6 months, depending on what a "court of competent

23   jurisdiction determines." Because under Arizona law restrictive covenants are

24   strictly construed, this vague language of TTC's non-solicitation restriction

25   regarding the duration of the Restricted Period makes the restriction

26   procedurally and substantively unconscionable. An employee should not be

27   forced to sue an employer in court to find out how long the restrictive covenant

28   applies.

## TUCSON TAMALE COMPANY'S UNLAWFUL AND
## UNETHICAL BUSINESS PRACTICES

48.     Shortly after Plaintiff assumed her position as Area Manager, she became aware that TTC (and its three affiliated businesses) engaged in unlawful and unethical business practices.

A.      Failure to comply with state and federal withholding laws.

49.     TTC did not withhold the proper taxes from employees' tips, and did so partly to artificially inflate employees' wages so that they would not insist on wage increases.

50.     Tips were pooled and illegally distributed to restaurant employees who are not part of the "chain of customer service," such as managers and back-of-the-house employees who did not serve the patrons who paid the tips, in further violation of state and federal law.

51.     TTC does not take a "tip credit." *See* AZ Admin. Code R20-5-1207(B)(4) (allowing only employers who take a tip credit to enforce tip-sharing with employees not in the chain of customer service); *Oregon Rest. & Lodging Ass'n v. Perez,* 2016 U.S. App. LEXIS 3119, 26 Wage & Hour Cas. 2d (BNA) 10 (9th Cir. Feb. 23, 2016) (upholding the more restrictive federal regulation that prohibits tip-sharing with employees not part of the chain of service irrespective of whether the employer takes a tip credit).

52.     Until November 2015, a  production team of "tamale rollers" and prep cooks worked at the restaurant located at 2545 E. Broadway, Tucson, AZ 85716. This production team made tamales exclusively for TTC's wholesale and retail shipping orders placed online, and occasionally for catering orders placed as this location.

53.     Defendants required the other two TTC non-production restaurants to contribute $200 out of their tipping pool per pay period and distributed these tips to the production team who did not service the patrons who paid the tips.

1   54.   The  production team was also included in the Broadway

2   restaurant's  tipping pool.

3   55.   When Plaintiff brought this illegal tip-sharing practice to

4   Defendants' attention shortly after she joined the company, SHERRY angrily

5   responded, "If we can't give them those tips, how the hell am I supposed to

6   make that up?"

7   56.   Plaintiff explained to SHERRY that the proper thing to do was to

8   increase the wages of the members of the production team and not to use the

9   hard-earned tip money of other TTC employees to subsidize the wages of staff

10   who are not legally entitled to receive any part of those tips.

11   57.   Plaintiff told Defendants to cease this unlawful practice as recently

12   as December 2015, but SHERRY disregarded Plaintiff's advice. The unlawful

13   practice continued through January 2016.

14   B.   Unlawful Refusal to Pay Tips Earned.

15   58.   TTC illegally forced employees to forfeit tips earned if they quit

16   without giving at least two weeks' notice or missed a scheduled shift.

17   59.   Tips are paid out in cash every 14 days.

18   60.   Plaintiff repeatedly told Defendants that they had to stop these

19   blatantly unlawful practices tantamount to wage theft, but was ignored.

20   C.   Unlawful Deductions.

21   61.   Defendants charged all TTC employees a non-discretionary meal fee

22   for every shift worked regardless of whether the employees ate TTC restaurant

23   food.

24   62.   The meal fees were automatically deducted from all TTC employees'

25   wages without their consent. Ariz. Rev. Stat. § 23-352 ("No employer may

26   withhold or divert any portion of an employee's wages unless . . . [t]he employer

27   has prior written authorization from the employee.").

28

D.    Unlawful Retention of Bonuses Owed to General Managers.

63.    TTC's three general managers were told when they were hired that they would receive quarterly bonuses. Their offer letters do not state they must meet specific sales goals to qualify for these bonuses.

64.    Sometime in October 2015, TODD and SHERRY unilaterally decided that bonuses would be paid annually, not quarterly. And for the first time, Defendants disclosed sales targets that general managers must meet that are impossibly unattainable.

E.    Violation of Fair Labor Standards Act's Overtime Pay Requirements.

65.    TTC's general managers are employees whose job duties and responsibilities are not exempt from the requirements to pay overtime under the Fair Labor Standards Acts ("*FLSA*").

66.    Defendants improperly classified, and continue to classify, these employees as exempt for the purpose of overtime compensation eligibility under the FLSA without reference to the types of duties those workers perform.

67.    Plaintiff observed the general managers customarily and regularly perform non-exempt physical or manual work. That is, the primary duties of the general managers consist and/or consisted of handling food and beverage items, busing tables, operating cash registers, cleaning, stocking, receiving and storing of products and supplies and serving TTC customers and patrons.

68.    The general managers rarely, if ever, exercise true discretionary powers in connection with matters of significance.

69.    The general managers are seldom authorized to make substantive decisions regarding hiring or firing nor are they relatively free from supervision in connection with matters of significance.

70.    Defendants seldom, if ever, disclose TTC's financial information to the general managers that they would need to perform high-function duties of greater responsibility.

10105.1

1    71.    The general managers routinely and regularly work in excess of

2    forty (40) hours per workweek without being paid overtime wages.

3    72.    Plaintiff is informed and believes that Defendants are, or should be,

4    aware that state and federal law require TTC to pay its employees performing

5    non-exempt duties overtime wages for hours worked in excess of forty per week.

6    73.    Plaintiff is informed and believes that Defendants are aware, or

7    should be aware, that the general managers customarily and regularly perform

8    non-exempt physical or manual work consisting of handling food and beverage

9    items, busing tables, operating cash registers, cleaning, stocking, receiving and

10    storing of products and supplies and serving TTC customers and patrons and

11    rarely exercise true discretionary powers in connection with matters of

12    significance and were not and are not relatively free from supervision in

13    connection with matters of significance.

14    74.    Consequently, the general managers do not fall within the

15    "administrative, executive, or professional" exemptions from the overtime

16    requirements. Nor do they fall within any other exemption from the obligation to

17    pay overtime compensation under state and federal law.

18    75.    Plaintiff is informed and believes that Defendants' failure to pay the

19    general managers overtime wages for their work in excess of forty (40) hours per

20    week is willful and without justification.

21    76.    Plaintiff is informed and believes that SHERRY for years computed

22    overtime wages for non-exempt TTC staff based on an expanded eighty (80)

23    hour pay period rather than a forty (40) hour workweek to avoid paying

24    overtime.

25    77.    As a result of Defendants' unlawful acts, Plaintiff is informed and

26    believes that TTC employees have been deprived of wages, and are entitled to

27    recover these unpaid wages, plus liquidated damages, interest, attorneys' fees,

28    and costs.

F.     Violation of Arizona's Consumer Fraud Act.

78.     Arizona's Consumer Fraud Act makes it illegal for companies to misrepresent that goods or services are of a particular standard or quality if they are not, and falsely advertise goods or services with intent not to sell them as advertised. This public policy of the State of Arizona is designed to protect consumers and the community at large from fraudulent business practices. *Madsen v. Western Am. Mortgage Co.*, 143 Ariz. 614 (1985) ("The term 'deceptive' has been interpreted to include representations that have a 'tendency and capacity' to convey misleading impressions to consumers even though interpretations that would not be misleading also are possible. The meaning and impression are to be taken from all that is reasonably implied, not just from what is said, and in evaluating the representations, the test is whether the least sophisticated reader would be misled. Technical correctness of the representations is irrelevant if the capacity to mislead is found.").

79.     TTC engages in deceptive marketing schemes intended to mislead consumers, in violation of Arizona's Consumer Fraud Act. Ariz. Rev. Stat. § 44-1522 (A) ("The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false promise, misrepresentation, or concealment, suppression or omission, of any material fact with intent that others rely upon such . . . is declared to be an unlawful practice.").

80.     Genetically modified organisms (GMOs) are prohibited in organic products. To entice customers to purchase TTC food products, TTC's marketing materials repeatedly use the term "organic" to describe several of its products in a manner intended to mislead consumers into believing that *all* of its products are non-GMO and organic.

81.     Only TTC tamales are made from non-GMO masa and the ingredients *in* nearly all of the tamales are not organic. Masa is made from white or blue corn meal.

82.     Plaintiff is informed and believes that *__less than 1% of TTC's food__*
*__products may be classified as being 100% organic.__*

83.     Defendants intended to commit acts that were deceptive and/or
fraudulent, namely, to market, sell and distribute TTC food products as
"organic" or "non-GMO" when, in fact, they are not. For example, the most
popular product, the vegetarian Green Corn Tamale, TTC describes as follows:

> A Sonoran tradition, organic sweet corn and organic white corn make a
> moist and creamy masa. We fill the tamales with roasted green chiles
> and Cheddar and Monterey Jack Cheese.
>
> *https://tucsontamale.com/store/all-tamales/green-corn-tamale.html*

84.     Green Corn Tamales are not made from "green corn" or "organic
sweet corn and organic white corn." They are made from the same masa as all
the other tamales that TTC sells. The green chiles and cheese are not organic.

85.     The deceptive marketing scheme concerning TTC products violates
Arizona's Consumer Fraud Act, because, among other things, Defendants:

    a.     knowingly conceal, suppress, or omit material information
regarding the ingredients of products that customers are led to believe are made
entirely from non-GMO organic ingredients, but are not; and

    b.     market, promote, and advertise products in a manner that
leads customers to believe that all TTC food products are made from non-GMO
organic ingredients.

86.     Plaintiff overheard TTC restaurant patrons comment to staff how
glad they were to eat at TTC because all the food is organic. Defendants made
clear to TTC's employees not to correct or to disabuse customers who mistakenly
believe that all of TTC's food products are organic and non-GMO.

87.     Plaintiff is informed and believes that sometime in the fall of 2014,
TTC ran a promotion through the popular website "LivingSocial.com"—an

1  internet company with a business model similar to Groupon. Customers

2  purchase coupons for products sold at a significant discount. Customers then

3  redeem the coupons at the place of business within a certain period of time set by

4  the sponsoring merchant.

5      88.    Plaintiff is informed and believes that SHERRY instructed all TTC

6  staff to tell the customers that they had to provide their email addresses to

7  redeem their coupon, a condition not disclosed at the time the customers

8  purchased the coupons. Had this requirement been disclosed, many customers

9  would not have proceeded with the purchase.

10     89.    When Plaintiff oversaw a similar promotion the following year

11 when she was the Area Manager, she instructed staff not to lie to the customers,

12 but to ask them politely if they wished to be placed on the company's mailing

13 list. That year, only about 30% of the customers gave their email addresses.

14     90.    At a management meeting in October 2015, SHERRY turned

15 beet-red angry at the staff for the low number of email addresses collected and

16 when the general managers told her they had ceased lying to customers as she

17 had instructed them to do the prior year. She stomped her feet and pounded the

18 table as she screamed and ranted at Plaintiff and the general managers for nearly

19 half an hour, hurtling insults and offensive epithets in rapid succession.

20     91.    Never in her entire professional career had Plaintiff seen such rage

21 and abuse directed at employees. But the general managers stood their ground.

22 They refused to lie again to customers, and two of them even threatened to

23 resign on the spot.

24     92.    Since December 2015 until Plaintiff was terminated, TODD and

25 SHERRY for months posted signs and instructed staff to tell TTC patrons that the

26 popular "pico de gallo" salsa is not available because TTC has had to reject the

27 tomatoes provided by its vendors because they do not meet TTC's high standard

28 of quality for freshness. This is not true.

93.     TODD purchased a machine to dice tomatoes that either does not function properly because it mashes the tomatoes, or more likely, TODD simply selected the wrong machine.

94.     Because of hubris, TODD and SHERRY prefer to lie to TTC's customers than admit the truth. In the meantime, TTC staff must uncomfortably mislead restaurant patrons with excuses to cover their petty lie.

95.     Defendants' concealment, suppression, omissions, deceptions, mis-representations, and/or unconscionable practices have the tendency, capacity, and likelihood to deceive TTC customers.

**MANAGEMENT SILENCE EMPLOYEES WHO**

**SPEAK OUT AGAINST UNETHICAL BUSINESS PRACTICES**

96.     During the time that Plaintiff was employed by TTC, she tried to set in place business processes and procedures consistent with industry standards. In fact, part of her written job description specifically states that one of her roles was to ***"ensure the working environment is positive and free of drama, drugs and dingbats."***

97.     Plaintiff tried to do whatever she could to ensure that TTC did not continue to violate state and federal law.

98.     Plaintiff further tried to do whatever she could to ensure that TTC did not continue to breach its duty to exercise reasonable care in hiring, training and supervising employees as necessary to conduct TTC's business operations so that the public generally, and TTC employees specifically, would not be negligently harmed, which duty Defendants failed.

99.     Plaintiff tried to change TTC's oppressive management style, which adversely affects employee morale, but was thwarted by SHERRY at every turn because of her uncompromising refusal to collaborate, even though Plaintiff was a member of the company's executive management team.

100.   In the months that Plaintiff worked at TTC, she could not pierce through SHERRY's obsession with how things appear to others, even to the point of believing that outward image is more important than underlying reality. SHERRY was condescending, self-satisfied, self-important, pretentious, ego-absorbed, and always thought she was right. She was inconsistent and applied different rules in similar circumstances; she was habitually secretive and withheld information to control the narrative.

101.   SHERRY set unreasonable expectations. At times she inserted herself into matters not within her purview or outside of established process, either from a desire to feel involved, or from an unfounded belief that staff is not competent to make the right decisions.

102.   Plaintiff sensed that SHERRY knew that to prevent others from discovering the disturbing truth about her lack of knowledge or skill in a certain area, or about her character, SHERRY fabricated an image of competence, integrity, teamwork and leadership. And, of course, the most telltale sign of insecurity:  she cannot tolerate people who publicly stand up to her and challenge her ideas or suggestions.

103.   SHERRY's punitive and autocratic management style thwarted every effort Plaintiff made to ensure that TTC complied with the law and did not engage in unethical business practices because:

    a.   SHERRY micro-manages TTC employees. Plaintiff heard SHERRY speak to and of employees with contempt, disdain, condescension, and hostility. She adopts one-way communication; she does not consult with employees or give them a chance to provide their opinions, no matter the potential benefit of such input.

    b.   SHERRY involves herself in detailed day-to-day activities, and rarely delegates or empowers subordinates.

c.    SHERRY assumes that employee motivation comes not through empowerment, but by creating a structured set of rewards and punishments.

d.    SHERRY gets work done by issuing threats and punishments and evoking fear.

e.    SHERRY is short-sighted and concerns herself mostly with dealing with the work at hand and not on developmental activities.

104.    When confronted, SHERRY was evasive and denied responsibility. She misled people by omitting significant information that would explain a situation and reveal the underlying truth about what happened. When others countered with a fact-based explanation, she misstated and belittled that person's viewpoint. When facts were not on her side, she misquoted others, or misrepresented their meaning, then claimed they supported her ideas. She rewrote history if she had to, and made herself believe it.

105.    SHERRY brags about herself, and exaggerates her own importance. She tries to look as powerful as possible by telling stories that highlight her cleverness and accomplishments. She portrays herself as highly adept and skilled by claiming superior knowledge and experience on most topics. Of course, she seldom admits mistakes and never apologizes.

106.    SHERRY is duplicitous and Machiavellian in her political machinations to get her way, no matter who she harms along the way to further her agenda. She lies, dissembles, and twists the truth.

107.    In short, SHERRY creates a toxic workplace for TTC employees. Her avarice prevents her from caring about anything but money.

108.    SHERRY's obsession with the bottom line overrides any concern for protecting TTC employees, providing accurate information to customers regarding the ingredients of TTC's products, or even complying with basic state wage laws.

**COUNT I**

**RETALIATORY DISCHARGE IN VIOLATION**

**OF THE EMPLOYMENT PROTECTION ACT**

**Ariz. Rev. Stat. § 23-1501**

**(Against All Defendants)**

109.    Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Verified Complaint.

110.    An employer's traditional right to discharge an at-will employee is subject to limits imposed by public policy, in light of an employee's right to exercise statutory or constitutional rights or privileges. Whenever the basis of the discharge contravenes a fundamental public policy, such public policy must inure to the benefit of the public at large and must be grounded in some statutory or constitutional provision.

111.    Under Arizona's Employment Protection Act, it is unlawful to terminate an employee in retaliation for the employee's reasonable disclosure of the employer's violation of Arizona law. Ariz. Rev. Stat. § 23-1501 (A)(3)(c).

112.    At all times relevant to this Verified Complaint, it was the public policy of the State of Arizona, as codified, expressed and mandated by Arizona's Income Tax Act of 1978, Ariz. Rev. Stat. § 43-401(A) that:  "Every employer at the time of the payment of wages, salary, bonus or other emolument to any employee whose compensation is for services performed within this state shall deduct and retain from the compensation an amount prescribed by tables adopted by the department."

113.    At all times relevant to this Verified Complaint, it was the public policy of the State of Arizona, as codified, expressed and mandated by Arizona's Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522 (A) that:  "The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false promise, misrepresentation, or concealment, suppression or omission, of

1    any material fact with intent that others rely upon such. . . . is an unlawful

2    practice." This public policy of the State of Arizona is designed to protect

3    consumers and the community at large from fraudulent business practices.

4      114. Plaintiff complained to Defendants that their willful failure to

5    withhold, account for, and pay withholding taxes from tips paid by TTC

6    customers to employees was illegal. *See generally* Ariz. Admin. Code R20-5-1210

7    (General Recordkeeping Requirements).

8      115. Plaintiff complained to Defendants that it was illegal for TTC to

9    require its employees to share tips with all restaurant employees, including

10   managers who did not serve the restaurant patrons who paid the tips.

11     116. Plaintiff complained to Defendants that they were willfully

12   committing wage theft because:

13      a. TTC may not force employees to forfeit tips earned if they quit

14   without giving at least two weeks' notice or miss a scheduled shift.

15      b. TTC may not unilaterally change the terms and conditions of

16   employment for the general managers by setting unattainable sales goals that

17   were never disclosed to the general managers when they received their written

18   offer letters.

19      c. TTC may not charge employees for meals if they did not eat

20   TTC's restaurant food.

21     117. Plaintiff expressed her concerns regarding Defendants' business

22   practice of marketing, selling and distributing TTC food products in a manner

23   intended to mislead consumers into believing that **_all_** TTC food products are

24   organic when, in fact, that is not true.

25     118. TTC violated Plaintiff's statutory rights when TTC terminated her

26   employment because she objected to the Defendants' illegal and unethical

27   business practices.

28     119. TTC further violated Plaintiff's rights when Defendants conditioned

1   the payment of severance benefits on the signing of a Release that contains an

2   illegal non-solicitation restriction that violates Arizona law for the reasons

3   explained above.

4        120.   Defendants either knew, or in the exercise of reasonable care, should

5   have known that their conduct was unlawful.

6        121.   Defendants' policies, practices and customs described above have

7   resulted in unjust enrichment and an unfair business advantage over businesses

8   that routinely adhere to the strictures of state and federal laws.

9        122.   Unless restrained by this Court, Defendants will continue to engage

10  in the unlawful conduct alleged above.

11       123.   Plaintiff is informed and believes that she was tortiously retaliated

12  against in contravention of the substantial public policy not to commit fraud or

13  to engage in illegal and unfair business practices. Accordingly, Defendants'

14  retaliation against Plaintiff on the grounds alleged and described in this Verified

15  Complaint were wrongful and in contravention and violation of the express

16  public policy of the State of Arizona and Arizona's Employment Protection Act.

17       124.   As a direct, foreseeable and proximate result of Defendants' wrong-

18  ful acts, Plaintiff has suffered substantial damages, including lost salary, benefits,

19  bonuses, loss of employment-related opportunities for growth, humiliation, and

20  embarrassment, all in an amount according to proof at time of trial.

21       125.   Defendants' acts were committed maliciously, fraudulently, or

22  oppressively with the intent to injure Plaintiff, and/or with a willful and

23  conscious disregard of Plaintiff's right to work in an environment free from

24  retaliation. Because these acts were carried out by managerial employees in a

25  despicable, deliberate and intentional manner, Plaintiff is entitled to recover

26  punitive damages in a sum sufficient to punish and deter future such conduct.

27       126.   An award of punitive damages will serve to punish Defendants and

28  set an example to other companies who may be in similar violations of state law.

10105.1

## COUNT II

## FRAUD IN THE INDUCEMENT

### (Against All Defendants)

127.   Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Verified Complaint.

128.   The elements of fraudulent inducement are the functional equivalent of fraud:  (a) a representation, (b) its falsity, (c) its materiality, (d) the speaker's knowledge of its falsity or ignorance of its truth, (e) the speaker's intent that the information should be acted upon by the hearer and in a manner reasonably contemplated, (f) the hearer's ignorance of the information's falsity, (g) the hearer's reliance on its truth, (h) the hearer's right to rely thereon, and (i) the hearer's consequent and proximate injury. *Taeger v. Catholic Family & Cmty. Servs.*, 196 Ariz. 285 (1999); *American Pepper Supply Co. v. Federal Ins. Co.*, 205 Ariz. 465 (2003).

129.   Defendants knowingly and willfully conspired and agreed among themselves to harm Plaintiff by engaging in a pattern of intentional, willful, and malicious misrepresentations regarding the terms of her employment.

130.   Defendants committed actual fraud and fraudulently induced Plaintiff not to pursue or explore other employment so that she would agree to work at TTC, and continued to commit fraud and fraudulently induced Plaintiff to continue her employment with TTC and to continue working on the projects assigned to her by representing that employment with TTC would be more profitable, with the promise of future salary increases, bonuses and professional development.

131.   Plaintiff was induced to become an employee of TTC, not to seek positions elsewhere, and to share her knowledge and expertise with Defendants who leveraged her name, experience, and credibility, with current and prospective customers, clients, and employees. Plaintiff has lost income and

1    income opportunities.

2        132.   Defendants knew at the time they induced Plaintiff to accept TTC's

3    offer of employment that they would not honor the promises upon which

4    Plaintiff relied not to accept another, more lucrative offer of employment, and

5    which Plaintiff relied on to remain and to continue her employment with TTC

6    until she was wrongfully terminated.

7        133.   In September 2015, TODD asked Plaintiff to meet and to interview

8    the person he intended to hire as the business development manager for TTC's

9    expanded wholesale business. This was the position that Defendants had

10   promised to Plaintiff when they interviewed her and the only reason why

11   Plaintiff agreed to temporarily assume the restaurant Area Manager position for

12   TTC at a lower salary. Defendants filled the business development manager

13   position in September 2015 with a candidate who had absolutely no wholesale or

14   restaurant experience.

15       134.   Defendants designed, and intended to design, a scheme and artifice

16   to defraud Plaintiff by making promises, misrepresentations, and misstatements

17   that Defendants knew they had no intention of keeping or knew were false and

18   misleading, or in the alternative, by making such misrepresentations and

19   misstatements with disregard for their truth, veracity, or misleading nature with

20   the desire and intent to defraud Plaintiff and to avoid payment of due

21   compensation.

22       135.   The misrepresentations, misstatements and omissions were material

23   misrepresentations, misstatements and omissions of past or existing facts, or

24   false promises to do some act in the future on which Defendants intended

25   Plaintiff to rely, or on which Defendants induced Plaintiff to take further actions.

26   Plaintiff relied on the misrepresentations to her detriment and injury.

27       136.   As a direct, foreseeable and proximate result of Defendants'

28   wrongful acts, Plaintiff has suffered substantial damages, including lost salary,

1  benefits, bonuses, loss of employment-related opportunities for growth, humi-

2  liation, and embarrassment, all in an amount according to proof at time of trial.

3      137.   Defendants' acts were committed maliciously, fraudulently, or

4  oppressively with the intent to injure Plaintiff, and/or with a willful and con-

5  scious disregard of Plaintiff's right to work in an environment free from fraud

6  and retaliation. Because these acts were carried out by managerial employees in

7  a despicable, deliberate and intentional manner, Plaintiff is entitled to recover

8  punitive damages in a sum sufficient to punish and deter future such conduct.

9                          **COUNT III**

10                **NEGLIGENT MISREPRESENTATION**

11                    **(Against All Defendants)**

12      138.   Plaintiff realleges and incorporates by reference the allegations of

13  each of the other paragraphs set forth in this Verified Complaint.

14      139.   Alternatively, if Defendants' representations and omissions

15  regarding the terms and conditions of Plaintiff's employment were not made

16  with the intent to defraud, they were negligently made. Plaintiff reasonably

17  relied on those misrepresentations and has been damaged as a result.

18      140.   Plaintiff is entitled to recover all actionable damages (including

19  general, consequential, incidental and special damages, lost wages, lost

20  opportunities and other damages) sustained as a proximate cause of Defendants'

21  negligent misrepresentations.

22                          **COUNT IV**

23              **BREACH OF EMPLOYMENT AGREEMENT**

24                **(Against Tucson Tamale Company)**

25      141.   Plaintiff realleges and incorporates by reference the allegations of

26  each of the other paragraphs set forth in this Verified Complaint.

27      142.   During the period of Plaintiff's employment with TTC, there existed

28  an express and implied in fact employment contract that set forth the terms and

1  conditions of PLAINTIFF's employment relationship with TTC.

2  143.   The total employment contract was evidenced by an offer letter and

3  written and oral representations Defendants made to Plaintiff.

4  144.   TTC breached the employment agreement by failing to provide the

5  wage increase, bonuses and benefits that Defendants promised to Plaintiff.

6  145.   TTC's refusal to perform its duties under the employment

7  agreement was unlawful, without justification and/or excuse, and constituted a

8  total and material breach of the agreement between the parties.

9  146.   As a direct, foreseeable and proximate result of TTC's breach of the

10  employment agreement, Plaintiff has suffered substantial damages, including

11  lost salary, benefits, bonuses, and loss of employment-related opportunities for

12  growth, all in an amount according to proof at time of trial. Plaintiff has sought

13  to mitigate wage-related damages.

14  147.   Plaintiff is entitled to recover her attorneys' fees and costs under

15  Ariz. Rev. Stat. §§ 12-341 and 12-341.01.

16  ## COUNT V

17  ### FAILURE TO PAY EARNED WAGES

18  ### IN VIOLATION OF ARIZONA'S WAGE ACT

19  **Ariz. Rev. Stat. § 23-350 *et seq.***

20  **(Against Tucson Tamale Company)**

21  148.   Plaintiff realleges and incorporates by reference the allegations of

22  each of the other paragraphs set forth in this Verified Complaint.

23  149.   After the 90-day probationary period expired, TTC failed to pay the

24  promised increased salary and bonuses that Plaintiff accrued through the date of

25  her termination. To date, TTC has failed and refused, and continues to fail and

26  refuse, to pay the wages due.

27  150.   By the acts and omissions set forth above, including by failing to pay

28  all bonuses due to Plaintiff, TTC violated Arizona's Wage Act.

10105.1

151.   As a result of TTC's violations of Ariz. Rev. Stat. § 23-351, Plaintiff has been harmed, has suffered substantial losses and has been deprived of compensation. Plaintiff is therefore entitled to an award of the unpaid wages, with prejudgment interest, and treble the amount of such wages, together with attorneys' fees and costs pursuant to Ariz. Rev. Stat. § 23-355.

**COUNT VI**

**CONVERSION**

**(Against All Defendants)**

152.   Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Verified Complaint.

153.   Plaintiff performed labor and services for TTC, at Defendants' request, as described above. Defendants' committed wage theft because they have wrongfully and unlawfully converted Plaintiff's wages by deliberately failing to pay the promised increased salary, bonuses and benefits.

154.   By failing to pay the wages and benefits owed, and retaining the sums earned by Plaintiff, Defendants wrongfully exercised dominion over Plaintiff's property. Once Defendants intentionally applied these monies for their own use and benefit, the conversion was complete.

155.   Plaintiff is informed and believes that Defendants withheld her wages owed and failed to provide the promised benefits as a means of decreasing overhead costs and increasing their profits, and to increase monies directly or indirectly flowing to Defendants.

156.   As a result of Defendant's conversion, Plaintiff has been damaged in an amount to be proven at trial.

157.   Defendants' acts were committed maliciously, fraudulently, or oppressively with the intent to injure Plaintiff, and/or with a willful and con-scious disregard of Plaintiff's rights. Because these acts were carried out by managerial employees in a despicable, deliberate and intentional manner,

10105.1

1   Plaintiff is entitled to recover punitive damages in a sum sufficient to punish and

2   deter future such conduct.

3   **COUNT VII**

4   **RESTITUTION / UNJUST ENRICHMENT**

5   **(Against All Defendants)**

6       158.   Plaintiff realleges and incorporates by reference the allegations of

7   each of the other paragraphs set forth in this Verified Complaint.

8       159.   Defendants benefited unjustly from their actions in wrongfully and

9   unlawfully failing to pay wages owed to Plaintiff.

10       160.   Defendants were under a duty to comply with Arizona's wage laws.

11       161.   Defendants have unjustly retained Plaintiff's wages.

12       162.   Defendants' unjust enrichment was conscious, deliberate,

13   intentional and/or malicious.

14       163.   Plaintiff is informed and believes that as a result of Defendants'

15   wrongful acts, they have been unjustly enriched in the amount to be proven at

16   trial.

17

18

19   **DEMAND FOR JURY TRIAL**

20   *Plaintiff Melissa Martin McBeath hereby demands trial of this matter by jury.*

21

22

23

24

25

26

27

28

10105.1

VERIFIED COMPLAINT                                -26-

## PRAYER FOR RELIEF

Plaintiff Melissa Martin McBeath prays for judgment as follows:

1.  General, special and compensatory damages;

2.  Punitive damages;

3.  All statutory damages;

4.  Reasonable attorneys' fees due pursuant to contract and according to all attorney-fee statutes found by the Court to apply to the facts presented at trial;

5.  Pre-judgment and post-judgment interest on all damages awarded;

6.  Costs of suit incurred; and

7.  For such other and further relief as the Court deems just and proper.


Dated:  April 15, 2016

/s/ *Melissa Martin McBeath*
Melissa Martin McBeath

VERIFIED COMPLAINT                    -27-

**VERIFICATION**

MELISSA MARTIN McBEATH, being first duly sworn, upon her oath deposes and says:

I am the plaintiff in this matter. I have read and know the contents of the foregoing:

VERIFIED COMPLAINT:

1.     Retaliatory Discharge in Violation of the Employment Protection Act

2.     Fraud in the Inducement

3.     Negligent Misrepresentation

4.     Breach of Employment Agreement

5.     Failure to Pay Earned Bonuses in Violation of Arizona's Wage Act

6.     Conversion

7.     Unjust Enrichment

The facts alleged in the Verified Complaint are within my own knowledge and I know those facts to be true, except as to those matters stated upon my information and belief, and as to those matters I also believe them to be true.

I declare (or certify, verify or state) under penalty of perjury under the laws of the State of Arizona that the foregoing is true and correct. Executed on April 15, 2016.

/s/ *Melissa Martin McBeath*
Melissa Martin McBeath

# EXHIBIT "M"

FILED
TONI HELLON
CLERK, SUPERIOR COURT
8/19/2016 2:23:03 PM
By: Victoria Soto

ARIZONA SUPERIOR COURT, PIMA COUNTY
HON. GUS ARAGON

CASE NO.   C20161794

COURT REPORTER:   Bonnie Gray
Courtroom - 814

DATE:   August 15, 2016

MELISSA MARTIN MCBEATH
    Plaintiff
VS.

In Proper Person

TUCSON TAMALE COMPANY,
TODD RUSSELL MARTIN,
SHERRY MARTIN, and
LISA MARTIN
    Defendants

Travis L Tufts, Esq. and Robert C. Garcia, Esq.
- Counsel for Defendants

## M I N U T E   E N T R Y

**ORAL ARGUMENT:**

Plaintiff is present. Defendant is not present.

As to the defendants' motion to strike,

Mr. Tufts argues to the Court.

The plaintiff argues to the Court in response.

The Court directs the plaintiff and counsel to meet and confer. The Court will defer ruling on this matter.

As to the motion to dismiss,

Mr. Tufts makes statements to the Court.

IT IS ORDERED deferring consideration of the motion to dismiss pending any future amendments that may occur with respect to the complaint and those future amendments are yet to be determined. The deferral of the motion to dismiss is without prejudice to reasserting it at a future date when it is more appropriate and timely.

As to the plaintiff's motion to strike new argument,

Mr. Garcia makes statements to the Court.

The plaintiff makes statements to the Court in response.

THE COURT FINDS that it is appropriate to defer ruling on the two motions to strike, one filed June 14, 2016 and one filed June 22, 2016. Both motions deal with two separate topics, neither of which are timely. Therefore, the Court will defer, without prejudice, to allowing the parties to reassert those motions if and when they become appropriate based upon any new set of pleadings that may exist.

_____
Victoria Soto
Deputy Clerk

**M I N U T E   E N T R Y**

Page 2                              Date:  August 15, 2016                         Case No.:  C20161794

The Court notes another motion, filed June 30, 2016 is the plaintiff 's motion to compel response to interrogatories.

There being no objection to deferring this matter,

The Court will defer, at plaintiff's request, the motion to compel without prejudice to the motion being reasserted later on if it becomes more appropriate or timely.

The Court notes that plaintiff has the motion to take non-party depositions filed July 8, 2016.

The plaintiff makes statements to the Court regarding the motion as to the three individuals stated in court (Shawn Kaylor, Delaney Hare, Meaghan Anderson).

Mr. Garcia makes statements to the Court in response.

The Court will allow the depositions of the above-listed 3 individuals.

The Court informs the plaintiff that there is a statute that will require her to reimburse the defendant or employer for the time taken to take the depositions.

As to the three individuals mentioned,

IT IS ORDERED that the motion to preclude their depositions is DENIED.

The Court further informs the plaintiff that there are time limits with how long depositions can be and instructs the plaintiff to familiarize herself with those rules.

As to witness, Lindsey Welch, the plaintiff makes statements to the Court.

Mr. Garcia makes statements to the Court in response.

For the same reasons as stated with respect to the first three witnesses,

IT IS ORDERED that plaintiff is permitted to take the deposition of Lindsey Welch.

As to Alejandra Valenzuela and Joshua Cooper,

The plaintiff makes statements to the Court.

Mr. Garcia defers to his previous argument.

Taking the prior arguments into account,

IT IS ORDERED that plaintiff is permitted to depose Alejandra Valenzuela.

As to Joshua Cooper,

The plaintiff argues to the Court.

Mr. Garcia argues to the Court in response.

The Court and counsel discuss the matter.

***

Victoria Soto
Deputy Clerk

**M I N U T E   E N T R Y**

Page 3        Date:  August 15, 2016        Case No.:  C20161794

IT IS ORDERED granting the protective order with respect to Joshua Cooper and the plaintiff will not be permitted to depose him.  The plaintiff may have leave to request that the issue be reconsidered if it becomes necessary down the road.

As to the defendant's motions for Rule 56(f) relief filed on July 20, 2016, (Defendant filed 2 such motions on the same date).

The Court and counsel discuss the matter.

IT IS ORDERED that any motions for summary judgment shall be deferred.  The Court will not rule on those motions until the parties send a joint report indicating that at least one of the parties feels as though the issue of summary judgment needs to be addressed.  In the mean time, the Rule 56(f) requests are moot because the urgency of Rule 56 motions has been removed.

As to the defendant's motion for alternative subpoena duces tecum service,

Mr. Garcia makes statements to the Court.

The plaintiff makes statements to the Court in response.

The Court and counsel discuss the matters.

IT IS ORDERED the request is GRANTED.

IT IS FURTHER ORDERED that the parties meet and confer, and if possible, arrive at a stipulation as to what Mr. Gavron is required to provide by way of response to the subpoena.  The defendant may serve Mr. Gavron by posting a physical copy of the document at the Gavron residence and  to his email.  The plaintiff is also directed to notify Mr. Gavron that he has been subpoenaed.

Mr. Garcia notes for the Court that plaintiff filed a motion for protective order for Gavron and Marquez, and further presumes that the motion for protective order is moot until we have further discussion.

The Court states it will not address any protective orders with respect to Gavron and Marquez until the parties have had a chance to structure the issues as to what they might provide information on.

IT IS ORDERED that at least at the current time, Mr. Gavron shall not be required to provide information or testimony about those things upon which he has been consulted  as an expert, unless he is disclosed as an expert on the topic upon which discovery is being shought.

The Court notes again that the parties should meet and confer to determine whether they can come to some understanding as to what each other's position is.

IT IS ORDERED that the parties take 15 minutes at this time to meet and confer on the issue of the re-structuring and rewording of the complaint.

 

                                    _____ Victoria Soto _____
                                          Deputy Clerk

**M I N U T E   E N T R Y**

Page 4          Date: August 15, 2016          Case No.:  C20161794

LATER IN COURT:

Same parties, counsel present.

Mr. Garcia informs the Court that they have reached some stipulations as stated on the record.

The plaintiff concurs with the agreements as stated by Mr. Garcia.

The Court notes that the parties have also stipulated to set a deadline for the plaintiff to submit a proposed amended complaint to the defendants by no later than August 23, 2016.  Defendants will provide their input on the proposed amended complaint by no later than August 26, 2016.  Thereafter the plaintiff will file the amended complaint

The Court further notes that the parties have agreed that at the end of this process, the plaintiff will file her amended complaint by no later than Friday, September 2, 2016.  There will be no need to file a motion to amend the complaint.  Plaintiff has been cautioned during the hearing that her current Complaint contains parts that are not in compliance with ARCP Rule 8 (short and plain statement of the claim); and that  her amended complaint should be significantly shorter.

Mr. Garcia informs the Court that the parties have also reached an agreement on the following: as to the subpoena for Mr. Gavron, the parties discussed and agree that Mr. Gavron will produce, and plaintiff will not object to, information throughout the entire relevant period both before and after the filing of the store communications act claims.  However, as to the plaintiff's claims that a witness privilege exists, the plaintiff and Mr. Gavron will withhold the information purportedly protected by this privilege and provide a privilege log.

The Court notes that the parties have stipulated as well that Mr. Gavron shall respond to the subpoena that has been discussed on the record and will produce documents generated  before and after a certain claim which the parties are calling the stored communications claim.  The parties further agree that Mr. Gavron or the plaintiff shall be permitted to withhold information that she claims is privileged.  The plaintiff shall follow the procedures set forth for a privilege log.

The parties have also agreed that the joint report under Rule 16(b) shall be due no later than September 16, 2016.

IT IS ORDERED that the parties submit along with the joint report, a proposed scheduling order for the Court's consideration by September 16, 2016.

IT IS FURTHER ORDERED that any motions that have not been ruled upon or stipulated to, and motions to which ruling has been deferred, are deemed withdrawn, with leave to reassert those motions at a later

_____ Victoria Soto _____
Deputy Clerk

**M I N U T E   E N T R Y**

Page  5                                    Date:  August 15, 2016                          Case No.:   C20161794

date.

The parties shall  list  any motion that they feel still remains to be resolved  in the Rule 16(b) joint

report.

LATER IN CHAMBERS:

Any motion that was not resolved this date and which is not listed as needing resolution in the Joint

Report shall be deemed denied.

cc:     Hon. Gus Aragon
        Robert C. Garcia, Esq.
        Travis L Tufts, Esq.
        Melissa Martin McBeath

                                                                    Victoria Soto
                                                                    Deputy Clerk

# EXHIBIT "N"

1

MELISSA MARTIN McBEATH

2

3463 E. TERRA ALTA BLVD.

3

TUCSON, AZ 85716

Ph:  (520) 449-9753

4

*mel.mcbeath@cox.net*

5

6

Pro Se

7

8

9

**SUPERIOR COURT OF ARIZONA**

**COUNTY OF PIMA**

10

11

12

MELISSA MARTIN McBEATH, an
individual,

Case No. C20161794

13

14

Plaintiff,

PLAINTIFF'S SECOND SET OF
NON-UNIFORM INTERROGATORIES
TO TODD RUSSELL MARTIN

15

v.

16

TUCSON TAMALE COMPANY; an
Arizona corporation, *et al.,*

[Ariz. R. Civ. P. 33 and 33.1]

17

18

Defendants.

19

20

TUCSON TAMALE COMPANY; an
Arizona corporation,

Assigned to Hon. Gus Aragon
Division 30

21

22

Counterclaimant,

23

v.

24

25

MELISSA MARTIN McBEATH, an
individual, *et al.,*

26

27

Counterdefendants.

28

Under Arizona Rules of Civil Procedure 33 and 33.1, Plaintiff MELISSA MARTIN McBEATH requests that Defendant TODD RUSSELL MARTIN respond to the following interrogatories under oath within forty (40) days after service of these interrogatories.

A.     All information is to be divulged that is in YOUR possession, custody, or control.

B.     When an individual interrogatory calls for an answer that involves more than one part, each part of the answer should be clearly set out so that it is understandable.

C.     If you cannot answer an interrogatory in full and you have exercised thorough diligence in an attempt to secure the information requested, then you must so state. You must also explain to the fullest extent possible the specific facts concerning your inability to answer the interrogatory and supply whatever information or knowledge you have concerning any unanswered portion of an interrogatory.

D.     If your answer to any interrogatory is "unknown," "not applicable," or any similar phrase or answer, state the following:

1.     Why the answer to that interrogatory is "unknown";

2.     Efforts made to obtain the answers to the particular interrogatory; and

3.     The name and address of any person who may know the answer.

E.     Where an interrogatory requires you to state facts you believe support a particular allegation, contention, conclusion, or statement, set forth with particularity:

1.     All facts relied upon;

2.     The identity of all lay witnesses who will or may be called to testify with respect to those facts; and

PLAINTIFF'S SECOND SET OF NON-UNIFORM
INTERROGATORIES TO TODD RUSSELL MARTIN

-1-

C20161794

3.     The identity of all experts who will or may be called to testify with respect to those facts.

E.     If you contend that an answer to any interrogatory is privileged in whole or in part, or if you object to any interrogatory in whole or in part, state the reasons for your objection and identify each person having knowledge of the factual basis, if any, on which the privilege is asserted.

F.     Please complete return a signed original and attach a verification.

G.     These interrogatories are intended as continuing interrogatories that require you to supplement your answers, setting forth any information within the scope of the interrogatories as may be required by you, your agents, attorneys, or other representatives following the service of your original answers.

## DEFINITIONS

1.     "YOU" or "YOUR" means defendant TODD RUSSELL MARTIN and representatives, agents, employees, attorneys, investigators, or any other person acting on behalf of TODD RUSSELL MARTIN.

2.     "PERSON" means an individual, firm, corporation, association, organization, or any other entity.

3.     "IDENTIFY" means when used with respect to a natural person to give his or her full name, address and phone number.

4.     The term "DOCUMENT" includes all electronic media or other tangible forms in which information is stored and includes all written or graphic matter of every kind and description, however produced or reproduced, WHETHER DRAFT OR FINAL, original or reproduction, including, but not limited to, letters, correspondence, memoranda, notes, films, transcripts, contracts, agreements, licenses, memoranda of telephone conversations or personal conversations, microfilm, telegrams, books, newspaper articles, magazines, advertisements, periodicals, bulletins, circulars, pamphlets,

statements, notices, reports, rules, regulations, directives, teletype messages, minutes of meetings, interoffice communications, reports, financial statements, ledgers, books of account, proposals, prospectuses, offers, orders, receipts, working papers, desk calendars, appointment books, diaries, time sheets, logs, movies, tapes for visual or audio reproduction, recordings or materials similar to any of the foregoing, however denominated, and including writings, drawings, graphs, charts, photographs, data processing results, printouts and computations (both in existence and stored in memory components), and other compilations from which information can be obtained or translated, if necessary, through detection devices into reasonably usable form.

5.   THE TERM "DOCUMENT" INCLUDES ALL COPIES OF A DOCUMENT WHICH CONTAIN ANY ADDITIONAL WRITING, UNDERLINING, NOTES, DELETIONS, OR ANY OTHER MARKINGS OR NOTATIONS, OR ARE OTHERWISE NOT IDENTICAL COPIES OF THE ORIGINAL.

**SECOND SET OF**

**NON-UNIFORM INTERROGATORIES**

**INTERROGATORY NO. 9:**

Section 4980H of the Internal Revenue Code of 1986 (Code) provides that companies that have a common owner or are otherwise related generally are combined and treated as a single employer, and so would be combined for purposes of determining whether or not they collectively employ at least 50 full-time employees (including full-time equivalents). List all the companies in which you have an ownership interest (collectively, *"YOUR COMPANIES"*)?

**INTERROGATORY NO. 10:**

How many full-time employees did YOUR COMPANIES employ each month in 2014?

**INTERROGATORY NO. 11:**

How many employees who worked less than full time did YOUR COMPANIES employ each month in 2014?

**INTERROGATORY NO. 12:**

How many full-time employees did YOUR COMPANIES employ each month in 2015?

**INTERROGATORY NO. 13:**

How many employees who worked less than full time did YOUR COMPANIES employ each month in 2015?

**INTERROGATORY NO. 14:**

How many full-time employees did YOUR COMPANIES employ each month in 2016?

**INTERROGATORY NO. 15:**

How many employees who work less than full time have YOUR COMPANIES employed each month in 2016?

**INTERROGATORY NO. 16:**

Under the Affordable Care Act's employer shared responsibility provisions, certain employers must either offer minimum essential coverage that is "affordable" and that provides "minimum value" to their full-time employees (and their dependents), or potentially make an employer shared responsibility payment to the IRS.

*See* https://www.irs.gov/affordable-care-act/employers/employer-shared-responsibility-provisions

Explain whether YOUR COMPANIES are subject to the employer shared responsibility provisions of the Affordable Care Act.

**INTERROGATORY NO. 17:**

If YOUR COMPANIES are subject to the employer shared responsibility provisions of the Affordable Care Act, explain why they did not offer health insurance to their employees during the time that Plaintiff worked for Tucson Tamale Company?

**INTERROGATORY NO. 18:**

Beginning in 2016 (for calendar year 2015) all applicable large employers must report to the IRS and provide statements to all full-time employees certain information regarding coverage offered to full-time employees, including whether the coverage offered meets the minimum value requirements.  (A plan provides minimum value if it covers at least 60 percent of the total allowed cost of benefits that are expected to be incurred under the plan.)

If Tucson Tamale Company is subject to the employer shared responsibility provisions of the Affordable Care Act, explain whether it has complied with these reporting obligations.

*See* https://www.irs.gov/affordable-care-act/employers/questions-and-answers-on-reporting-of-offers-of-health-insurance-coverage-by-employers-section-6056#Basics

**INTERROGATORY NO. 19:**

Describe all COMMUNICATIONS that YOU or YOUR COMPANIES have had

with the U.S. Department of Agriculture (USDA) regarding the tamales that were

recalled because they were not inspected in the manner explained in the

following USDA press release:

http://www.fsis.usda.gov/wps/portal/fsis/topics/recalls-and-public-health-

alerts/recall-case-archive/archive/2016/recall-081-2016-release

**INTERROGATORY NO. 20:**

IDENTIFY all individuals who responded to any COMMUNICATIONS relating

to the USDA's recall order issued in September 2016.

Dated:  October 7, 2016

Melissa Martin McBeath

# CERTIFICATE OF SERVICE

I, Melissa Martin McBeath, declare as follows:

    I am over the age of eighteen years and not a party to this action.

    On October 7, 2016, I served a true and correct copy of the within document(s):

**PLAINTIFF'S SECOND SET OF NON-UNIFORM INTERROGATORIES TO TODD RUSSELL MARTIN**

☐    by **PERSONAL DELIVERY**. I personally delivered the document(s) listed above, addressed as set forth below.

☐    **U.S. MAIL.** I served the following persons by placing the document(s) listed above in a sealed envelope, addressed as set forth below, with postage thereon fully prepaid, and deposited the envelope for collection.

☒    by **ELECTRONIC SUBMISSION**. I electronically served the document(s) listed above to the following persons pursuant to Rule 5(c) of the Arizona Rules of Civil Procedure. The parties have a written agreement to accept service electronically.

Robert C. Garcia
Travis L. Tufts
Farhang & Medcoff
4801 E. Broadway, Suite 311
Tucson, AZ 85711
**rgarcia@fmazlaw.com**
**ttufts@fmazlaw.com**

Tel: (520) 790-5433
Fax: (520) 790-5736

    I declare (or certify, verify or state) under penalty of perjury under the laws of the State of Arizona that the foregoing is true and correct. Executed on October 7, 2016.

10231.1

C20161794

# EXHIBIT "O"

FILED
TONI HELLON
CLERK, SUPERIOR COURT
11/7/2016 9:28:15 AM
By: Victoria Soto

ARIZONA SUPERIOR COURT, PIMA COUNTY

| | |
|---|---|
| HON. GUS ARAGON | CASE NO.   C20161794 |
| COURT REPORTER:   Cindy Benner<br>Courtroom - 814 | DATE:        October 31, 2016 |
| MELISSA MARTIN MCBEATH<br>    Plaintiff<br>VS. | In Proper Person |
| TUCSON TAMALE COMPANY,<br>TODD RUSSELL MARTIN,<br>SHERRY MARTIN, and<br>LISA MARTIN<br>    Defendants | Travis L Tufts, Esq.<br>- Counsel for Defendants |

## M I N U T E   E N T R Y

**ORAL ARGUMENT ON PENDING MATTERS/MOTIONS:**

The plaintiff is present.  The defendants are not present.

The Court, counsel and plaintiff discuss how to proceed with the hearing this date.

As to the application for entry of default,

Ms. McBeath argues to the Court.

Mr. Tufts argues to the Court in response.

The Court, counsel and the plaintiff discuss the matter.

IT IS ORDERED that the defendants shall have until the close of business on November 11, 2016 to file their response to the first amended complaint.

As to plaintiff's motion to compel filed September 21, 2016,

Ms. McBeath makes statements to the Court.

As to the motion to compel filed September 21, 2016,

THE COURT FINDS that the motion to compel is now moot as there is an amended complaint titled First Amended Complaint that has not been answered.  Whatever the basis for the answer, it will be subject to further discovery after today.

IT IS ORDERED that the motion to compel is DENIED as moot.

As to the defendants' motion for protective order filed August 12, 2016,

Mr. Tufts argues to the Court.

The Court, counsel and plaintiff discuss the matter.

Victoria Soto
Deputy Clerk

# MINUTE ENTRY

Page 2                    Date: October 31, 2016                    Case No.:  C20161794

Ms. McBeath makes statements to the Court.

The Court, counsel and plaintiff further discuss the matter.

THE COURT FINDS that there has been a *prima facia* case made for the right to a confidentiality requirement of disclosed information.

IT IS ORDERED that the defendants shall submit a proposed confidentiality order by November 4, 2016 at the close of business.  Thereafter, the plaintiff may submit her own proposed form of order by no later than the close of business on November 11, 2016 regarding confidentiality if she does not find the defendant's submission acceptable.  The Court will then evaluate the parties' positions and make a determination regarding the matter.

As to the defendant's motion to dismiss filed on May 25, 2016,

The Court makes statements regarding the matter.

Mr. Tufts makes statements to the Court.

The Court, counsel and plaintiff discuss the matter.

IT IS ORDERED the motion to dismiss is DENIED as moot without prejudice to file a new motion to dismiss which addresses the First Amended Complaint.

Mr. Tufts makes statements to the Court regarding the proposed joint report and scheduling order that was filed September 22, 2016.

The Court, counsel and plaintiff discuss the matters.

IT IS ORDERED that the parties meet and confer regarding the possibility of the appointment of a special master.  The parties are alerted that the Court will not appoint a special master without very specific terms being worked out that would be fair to the parties and fair to the special master as well.  The Court is not inclined to put a special master at risk of doing work and not getting paid for it.

The Court notes it is inclined to consider steps towards special case management as stated on the record.

The Court further notes the following: if motions are filed or requests made in the future without a meet and confer first, it will consider the imposition of sanctions upon any party that files a motion or request to the Court with first meeting and conferring with the other party in an attempt to resolve matters without first filing motion.  The Court will also consider any other steps that might be useful to the Court in managing the case. The parties are advised that the ability to have unlimted discovery does not exist under the Rules of Civil Procedure.

Ms. McBeath makes statements to the Court regarding her request as to recalled products.

Victoria Soto
Deputy Clerk

**M I N U T E   E N T R Y**

Page 3                              Date: October 31, 2016                 Case No.:  C20161794

The Court states it will strike any request for information regarding a recall of products from last month relating to this case as it has no relevance to this case. As to the plaintiff's theory about unethical business practices, there will be limits.   Any of Plaintiff's requests for information of this nature are ORDERED STRIKEN.

The Court further informs the plaintiff that if there are discovery requests that need to be reconsidered and withdrawn, she should do so now.   If there is a motion to compel or to strike the plaintiff's discovery requests, the Court will strike them and consider sanctions for the reasons stated on the record.   The parties are ORDERED to meet and confer before filing any motions to strike discovery requests.

As to plaintiff's motion for protective order filed August 14, 2016,

Mr. Tufts makes statements to the Court.

THE COURT FINDS that it is appropriate to delay further ruling on the August 14, 2016 plaintiff's motion for protective order and the Court will impose a deadline for response.

IT IS ORDERED that the motion filed August 14, 2016 shall be treated as though filed this date, and the rules relating to deadlines for responses shall apply from this day forward.

The Court states that since it is the plaintiff's motion, she may reply within the deadlines.   If either party should want oral argument set on the matter, they shall notify the Court.

As to the motion to quash plaintiff's subpoena to defendant's liability insurance carrier filed October 20, 2016,

Mr. Tufts makes statements to the Court.

IT IS ORDERED that plaintiff shall have whatever time the rules permit with respect to motion to quash the plaintiff's subpoena, the motion having been filed October 16, 2016.

Ms. McBeath makes statements to the Court regarding a motion to compel.

The Court, counsel and petitioner discuss the issues.

IT IS ORDERED that the motion to compel filed August 3, 2016 is DENIED with leave to reassert it at a later date if appropriate in light of future confidentiality orders that may be entered by the Court.

Mr. Tufts makes statements to the Court regarding a request for attorney's fees.

Ms. McBeath makes statements to the Court in response.

THE COURT FINDS that having heard the comments of the parties regarding the request for award of attorney's fees, and taking into account that it was early in the case and technically there was a tardy response,

IT IS ORDERED the request for attorneys fees is DENIED for the reasons stated on the record.

_____
Victoria Soto
Deputy Clerk

**M I N U T E   E N T R Y**

Page 4                    Date: October 31, 2016              Case No.:   C20161794

     The Court and counsel discuss other matters related to the case.

     The Court states it will be up to the parties to contact the Court to schedule follow up hearings.   Any contact with this Court's Judicial Administrative Assistant can be done by calling 724-8005. Any such call to the JAA shall be a conference call with both sides attending by phone in order to accommodate the calendars of both sides and the Court.

     LATER IN CHAMBERS:

     IT IS ORDERED that, because of amended complaint, any motions that have not heretofore been addressed are deemed denied.


cc:     Hon. Gus Aragon
        Robert C. Garcia, Esq.
        Travis L Tufts, Esq.
        Melissa Martin McBeath


                                                  Victoria Soto
                                               Deputy Clerk

# EXHIBIT "P"

FILED
TONI L. HELLON
CLERK, SUPERIOR COURT

6/30/2016 6:52:17 PM

BY: ALAN WALKER
DEPUTY

MELISSA MARTIN McBEATH
3463 E. TERRA ALTA BLVD.
TUCSON, AZ 85716
Ph: (520) 449-9753
*mel.mcbeath@cox.net*

Pro Se

## SUPERIOR COURT OF ARIZONA
## COUNTY OF PIMA

| | |
|---|---|
| MELISSA MARTIN McBEATH, an individual, <br><br> Plaintiff, <br><br> v. <br><br> TUCSON TAMALE COMPANY; an Arizona corporation, *et al.,* <br><br> Defendants. | Case No. C20161794 <br><br> **MELISSA MARTIN McBEATH'S MOTION TO COMPEL TUCSON TAMALE COMPANY TO RESPOND TO INTERROGATORIES** <br><br> [Ariz. R. Civ. P. 37(a)] |
| TUCSON TAMALE COMPANY; an Arizona corporation, <br><br> Counterclaimant, <br><br> v. <br><br> MELISSA MARTIN McBEATH, an individual, *et al.,* <br><br> Counterdefendants. | Assigned to Hon. Gus Aragon <br> Division 30 |

10166.1

**LEGAL DISCUSSION**

Plaintiff Melissa Martin McBeath moves under Ariz. R. Civ. P. 37(a) for an order to compel Defendant/Counterclaimant Tucson Tamale Company (*"__TTC__"*) to respond to Uniform Interrogatories and Non-Uniform Interrogatories served on April 25, 2016.

The Verified Complaint was served on TTC on April 22, 2016.

Ariz. R. Civ. P. 33(a) states in part:

> The party upon whom the interrogatories have been served shall serve a copy of the answers, and objections if any, within 40 days after the service of the interrogatories, except that a defendant may serve answers or objections within 60 days after service of the summons and complaint upon that defendant, or execution of a waiver of service, by that defendant. The court may allow a shorter or longer time.

After waiting more than a week past the due date, McBeath asked to meet with TTC's attorneys—as Rule 37(a)(2)(C) requires—to discuss when TTC would serve its responses to the interrogatories that were due on June 21, 2016.

Travis L. Tufts, counsel for TTC, declined to meet, but conceded that the responses still had not been completed.[1]

TTC did not ask the Court for a longer time to respond to the interrogatories. Nor did TTC alert McBeath that its responses would not be served on time or even offer the courtesy of providing a reason for the delay.

This conduct of violating the rules of civil procedure has become a pattern. TTC did not file a timely answer to the Verified Complaint, forcing McBeath to file an Application for Entry of Default to prod TTC and the other defendants to file their responsive pleading.

Having no reason to believe that the responses to the interrogatories will be served unless TTC is forced to comply, McBeath requests that the Court order

---

[1]   Melissa Martin McBeath Declaration In Support of Motion to Compel Responses to Interrogatories, dated June 30, 2016.

1   TTC to respond immediately or be subject to whatever sanctions the Court

2   deems appropriate.

3

4   Dated:  June 30, 2016                          Respectfully submitted,

5

6

7                                                  Melissa Martin McBeath

8

9

10

11

12

13

14

15

16

17   ORIGINAL filed via TurboCourt on June 30, 2016 with:
     Clerk of the Court

18   Pima County Superior Court

19

20   COPY served via TurboCourt on June 30, 2016 to:

21   Roberto C. Garcia
     *rgarcia@fmazlaw.com*

22   Travis L. Tufts
     *ttufts@fmazlaw.com*

23

24   Attorneys for:

25   Tucson Tamale Company, Todd Russell Martin, Sherry Martin and Lisa Martin

26

27   Melissa Martin McBeath

28

# EXHIBIT "Q"

## Travis L. Tufts

| | |
|---|---|
| **From:** | Travis L. Tufts |
| **Sent:** | Thursday, June 30, 2016 3:38 PM |
| **To:** | mel.mcbeath |
| **Cc:** | Robert Garcia; Autumn Bonnell; Jamie Archibald |
| **Subject:** | RE: McBeath v. Tucson Tamale Co. et al |

Ms. McBeath,

We are not available to meet and confer about the discovery responses on such short notice.  We are occupied with other matters today and will be out of the office tomorrow for the upcoming holiday.  However, we are available to meet next week to discuss the status of the discovery responses.  Please let us know your availability.  So you are aware, the responses are nearly complete and will be forthcoming shortly.

Travis

Travis L. Tufts
Profile | vCard
4801 East Broadway Boulevard | Suite 311 | Tucson, Arizona 85711
General: 520.790.5433 | Direct: 520.398.7466 | Fax: 520.790.5736 www.fmazlaw.com

-----Original Message-----
From: mel.mcbeath@cox.net [mailto:mel.mcbeath@cox.net]
Sent: Thursday, June 30, 2016 9:41 AM
To: Robert Garcia <rgarcia@fmazlaw.com>; Travis L. Tufts <ttufts@fmazlaw.com>
Cc: Autumn Bonnell <abonnell@fmazlaw.com>; Jamie Archibald <jarchibald@fmazlaw.com>
Subject: McBeath v. Tucson Tamale Co. et al

Gentlemen:

As required under ARCP 37, I write to schedule a convenient time to discuss when I can expect to receive Tucson Tamale Company's overdue responses to the uniform and non-uniform interrogatories hand-delivered on April 25, 2016.

I am available to speak with you in person any time today after 12:30 p.m. or tomorrow after 4 pm. I can meet with you anywhere you wish, except your law offices.

Be advised that I will promptly file a motion to compel if the written responses to the interrogatories are not served via e-mail by the close of business on July 1, 2016.

Regards,

Melissa

**Tish Wright**

| | |
|---|---|
| **From:** | Travis L. Tufts |
| **Sent:** | Thursday, July 7, 2016 4:39 PM |
| **To:** | mel.mcbeath |
| **Cc:** | Robert Garcia; Autumn Bonnell; Jamie Archibald; Tish Wright |
| **Subject:** | RE: McBeath v. Tucson Tamale Co. et al (ARCP 26.1) |

Ms. McBeath,

I write in response to a number of recent developments in this case.

Last Thursday, June 30, 2016, you sent an e-mail seeking to coordinate a meet and confer to discuss Defendants' outstanding discovery responses. I responded to your message later that day, indicating that we were not available to meet with you on short notice and also because we would be out of the office on Friday, July 1, 2016, due to the July 4th holiday. I then offered to meet with you this week, July 4 – 8, to discuss the status of the responses. As a courtesy and to minimize your concerns, I informed you that the discovery responses were nearly complete and would be served shortly. Soon thereafter, on the same day, in lieu of responding to my e-mail message or provide your availability for the week of July 4, 2016 to meet and confer, you instead filed a Motion to Compel.

In the Motion to Compel, you represented to the Court that I declined to meet with you to discuss the discovery responses, ostensibly to satisfy Ariz. R. Civ. P. 37(a)(2)(C). Not only was that a misrepresentation to the Court, but you know that statement is entirely false. I offered to meet with you within 2 business days of your e-mail. In addition to making a material misrepresentation to the Court, you did not made a good faith effort to resolve the discovery dispute after personal consultation as required by Ariz. R. Civ. P. 37(a)(2)(C). You sent me one e-mail message asking to meet and confer. When I responded that we were unavailable on short notice, were out of the office the next day, but would meet with you the following week, you immediately filed a Motion to Compel. Simply, that is not a good faith effort to resolve a dispute let alone a personal consultation.

If you would have acted in good faith and met with me this week I would have told you that we required additional time to complete the discovery responses. You propounded 39 interrogatories asking my clients to provide extensive information related to their business operations and your employment over the course of more than one year. I would have also told you that my responses to interrogatories will not be "cut and paste" boilerplate responses and objections, rather, I am preparing comprehensive responses arguably exceeding my obligations under Arizona law, requiring significant time and effort. Finally, I would have also told you that, as a matter of course and professional courtesy in complex matters like these (involving seven separate causes of action and six counterclaims), extensions are regularly granted, particularly when the litigation is in the initial stages of discovery and when a scheduling order isn't even in place. Not to mention, I have obligations to other clients on equally pressing matters, creating unavoidable delays in responding to your discovery. I understand you and the disbarred California attorney advising you in this matter, Francisco Marquez aka "Xavier Molina," may be unaware of these professional circumstances. That is one of the reasons we suggested you seek counsel licensed to practice in Arizona, familiar with litigation practice in this state.

Unfortunately, you did not provide me an opportunity to explain the delay for discovery responses before you filed your Motion to Compel, mischaracterized and misrepresented my response to your meet and confer inquiry, and filed a completely groundless Motion to Compel before you complied with obligations under Rule 37(a)(2)(C), likely on the basis of inaccurate advice from Mr. Marquez. Please consider this a formal request you immediately withdraw your Motion to Compel. If you do not withdraw your Motion I will file my Opposition outlining the foregoing and seek sanctions pursuant to Ariz. R. Civ. P. 11.

Yesterday, July 6, 2016, we received an e-mail from you regarding Defendants' disclosure statement. You indicate a desire to have a meet and confer to discuss the July 5, 2016 deadline to submit disclosure statements. You copied my clients, Todd Martin, Sherry Martin, and Lisa Martin, on that e-mail correspondence. You shall not contact my clients on any matters related to this lawsuit from this point forward. They do not wish to communicate with you regarding this matter.

Regarding your wish to meet and confer, I will meet with you tomorrow, Friday July 8, 2016 or Monday July 11, 2016, at the Viscount Suite on Broadway Boulevard. Because you have dropped off documents at our office, yet refuse to meet with us here, you will be aware that this hotel is located next door to our office and has a café/bar (Wilber's Grill) where we can meet to discuss disclosures. Please provide your availability on those dates. If, as before, you file a Motion to Compel on this issue, I will file an Opposition and motion for sanctions without providing you similar courtesies discussed above.

Finally, we are also in receipt of your correspondence from July 1, 2016, wherein you outline your desire to depose six non-parties and seek our agreement pursuant to Ariz. R. Civ. P. 30(a)(1). We do not stipulate to these depositions at this time. As you are aware, there are multiple motions pending before the Judge, including my clients' Motion to Dismiss, your Motion to Dismiss, and your Motion for Summary Judgment. Each of these motions are dispositive motions with the potential for eliminating causes of action. Because these motions are pending, it is premature at this stage to take depositions which, depending on the Court's rulings, may be wholly unnecessary and entirely irrelevant to the viable claims in this suit. We will reassess our position after the Court rules on these motions. If you choose to file a motion with the Court to take these depositions, do so with the understanding of my position and that I take exception to your characterization that I am burdening Judge Aragon with "yet another motion."

Kindly advise whether you will withdraw your Motion to Compel. Additionally, please provide your availability for a meet and confer regarding the Disclosure Statement, at which point we can also discuss my clients' discovery responses and, hopefully, reach a good faith resolution of your concerns.

Regards,

Travis Tufts



Travis L. Tufts
Profile | vCard
4801 East Broadway Boulevard | Suite 311 | Tucson, Arizona 85711
General: 520.790.5433 | Direct: 520.398.7466 | Fax: 520.790.5736 www.fmazlaw.com


-----Original Message-----
From: mel.mcbeath@cox.net [mailto:mel.mcbeath@cox.net]
Sent: Wednesday, July 6, 2016 4:28 PM
To: Robert Garcia <rgarcia@fmazlaw.com>; Travis L. Tufts <ttufts@fmazlaw.com>
Cc: Autumn Bonnell <abonnell@fmazlaw.com>; Jamie Archibald <jarchibald@fmazlaw.com>;
todd@tucsontamalecompany.com; sherry@tucsontamalecompany.com; lisa@tucsontamalecompany.com
Subject: McBeath v. Tucson Tamale Co. et al (ARCP 26.1)

Gentlemen:

Attached is a courtesy copy of the following correspondence sent via U.S. Mail.

2016-07-06 Letter to Robert Garcia and Travis Tufts

Best Regards,

Melissa

# EXHIBIT "R"

# Melissa Martin McBeath

3463 E. Terra Alta Blvd. • Tucson, AZ 85716 • 520.449.9753 • mel.mcbeath@cox.net

SENT VIA E-MAIL ONLY

July 18, 2016

Travis L. Tufts
Farhang & Medcoff
4801 E. Broadway, Suite 311
Tucson, AZ 85711

Re:   *McBeath v. Tucson Tamale Company et al.*
      Pima County Superior Court Case No. C20161794

Dear Mr. Tufts:

I write to respond to your e-mail dated July 15, 2016, demanding that I withdraw the Motion to Compel I filed on June 30, 2016.

Tucson Tamale Company's untimely responses to the interrogatories (served on July 15, 2016) are incomplete. Many of them were not answered unless a protective order is in place or because they are not relevant, overbroad or unduly burdensome. As I have made clear in prior correspondence, all such objections were waived for failure to respond within the statutory deadline.

The motion to compel will not be withdrawn until I receive complete, unqualified and unequivocal responses without any objections.

Best Regards,

Melissa Martin McBeath

10181.1

# EXHIBIT "S"

**Tish Wright**

| | |
|---|---|
| **From:** | mel.mcbeath@cox.net |
| **Sent:** | Monday, July 18, 2016 4:19 PM |
| **To:** | Robert Garcia; Travis L. Tufts |
| **Cc:** | Autumn Bonnell; Tish Wright; Jamie Archibald |
| **Subject:** | McBeath v. Tucson Tamale Co. et al (Motion to Compel ARCP 26.1 (a) Disclosures) |
| **Attachments:** | 2016-07-18 McBeath MTC ARCP 26.1 Disclosures.pdf; 2016-07-18 McBeath Dec. ISO MTC ARCP 26.1 Disclosures.pdf |

Gentlemen:

I just dropped off at your office a copy of the attached Motion to Compel ARCP 26.1(a) disclosures.

As a professional courtesy, I will not file this motion if your clients produce all documents and electronically stored information (ESI) that should have been produced on July 15, 2016. At minimum, your clients must produce the documents, and pay the expenses, discussed in the motion.

I must receive all unredacted documents and ESI via e-mail before the close of business on Wednesday, July 20.

I remain most willing to meet and confer with you regarding the stipulated protective order you sent last week. I simply need to know which documents, and how many, will be covered by the order. Unless and until you describe and itemize these documents, I will not blindly sign your proposed order, however "standard" you say it is.

I'm well aware that you may move for a protective order at any time. I invite you to work with me. I certainly am willing to work with you, but we must meet somewhere in the middle. If you decline, then I'll proceed with the Motion to Compel, which clearly explains my position on this matter.

Please let me know before noon tomorrow, July 19, 2016, if your clients will produce the documents and ESI no later than July 20, 2016.

I'm available to meet at your convenience.

Best Regards,

Mel

1

# EXHIBIT "T"

1   MELISSA MARTIN McBEATH
2   3463 E. TERRA ALTA BLVD.
3   TUCSON, AZ 85716
    Ph:  (520) 449-9753
4   *mel.mcbeath@cox.net*
5
6   Pro Se
7
8
                    **SUPERIOR COURT OF ARIZONA**
9                        **COUNTY OF PIMA**
10
11

12   MELISSA MARTIN McBEATH, an       Case No. C20161794
     individual,
13
                                      **MELISSA MARTIN McBEATH'S**
14         Plaintiff,                 **MOTION TO COMPEL ALL**
                                      **DEFENDANTS TO COMPLY WITH**
15      v.                            **ARIZ. R. CIV. P. 26.1(a) DISCLOSURE**
                                      **REQUIREMENTS**
16   TUCSON TAMALE COMPANY; an
     Arizona corporation, *et al.*,
17
                                      [Ariz. R. Civ. P. 37(a)(2)(A)]
18         Defendants.
19
                                      Assigned to Hon. Gus Aragon
20   TUCSON TAMALE COMPANY; an        Division 30
     Arizona corporation,
21
22         Counterclaimant,
23      v.
24
     MELISSA MARTIN McBEATH, an
25   individual, *et al.*,
26
           Counterdefendants.
27
28

10180.1

# INTRODUCTION

Plaintiff Melissa Martin McBeath moves under Ariz. R. Civ. P. 37(a)(2)(A) for an order to compel Defendants Tucson Tamale Company ("*TTC*"), Todd Russell Martin, Sherry Martin and Lisa Martin to comply with the disclosure requirements of Ariz. R. Civ. P. 26.1(a), especially their obligation to produce all relevant *electronically stored information*. *See* Ariz. R. Civ. P. 26.1(a)(9).

On May 25, 2016, Defendants filed a Motion to Dismiss Plaintiff's entire action.

On May 26, 2016, Defendants filed their untimely Answer to Plaintiff's Verified Complaint; it was due on May 11, 2016.

On May 27, 2016, Plaintiff filed a Motion to Dismiss Counts II, III, IV and V alleged as counterclaims in Defendants' Answer.

Ariz. R. Civ. P. 26.1(b)(1) states in part:

> The parties shall make the initial disclosure required by subdivision (a) as fully as then possible within forty (40) days after the filing of a responsive pleading to the Complaint, Counterclaim, Crossclaim or Third Party Complaint unless the parties otherwise agree, or the Court shortens or extends the time for good cause.

The last day for the parties to exchange their respective initial disclosures was July 5, 2016.

Plaintiff served her disclosures and accompanying documents on time, but Defendants did not.

They did not ask Plaintiff for an extension of time, or seek leave of court to extend the time to serve the disclosures past the due date, following a showing of good cause. *See* Ariz. R. Civ. P. 26.1(b)(1). Nor did Defendants ask for an extension when she met and conferred with defense counsel, and still to date have not done so.

MOTION TO COMPEL ALL DEFENDANTS TO COMPLY
WITH ARIZ. R. CIV. P. 26.1(a) DISCLOSURE
REQUIREMENTS

C20161794

1

**LEGAL DISCUSSION**

2   Reluctantly, Plaintiff is forced to file yet another Motion to Compel to ask

3   the Court to order Defendants to comply with the rules of civil procedure

4   because they refuse to do so unless threatened with court intervention and

5   sanctions.[1]

6   A.   <u>The Parties met and conferred.</u>

7   On July 11, 2016, Plaintiff met and conferred with defense counsel, Travis

8   Tufts, to discuss when Defendants were going to serve their overdue initial

9   disclosures. He told Plaintiff she would receive them by Friday, July 15, 2016. He

10   then asked Plaintiff to consider entering into a stipulated protective order

11   because some of the documents Defendants must disclose contain confidential

12   sales history/data. This was the first time he brought up this new condition that

13   Plaintiff must meet before Defendants fully comply with their disclosure

14   obligations.[2]

15   On July 12, 2016, Mr. Tufts sent his proposed protective order for

16   Plaintiff's review. She promptly responded via e-mail early the next morning, on

17   July 13, and informed him that she felt uncomfortable blindly signing the order

18   as is because it was more expansive and restrictive than he had represented.

19   Wishing to discuss the categories and the volume of documents that

20   would be covered by the order, Plaintiff offered to meet with Mr. Tufts in person

21   again on July 13, 14, or 15.[3]

22   Making communication deliberately difficult, Mr. Tufts and his co-counsel,

23   Robert Garcia, refuse to speak with Plaintiff over the phone. Any time she needs

24   to meet and confer with them, as the rules require, she is forced to meet with

25

26   [1]   On June 30, 2016, Plaintiff filed a Motion to Compel TTC to Respond to
Interrogatories. Incomplete responses were served on July 15, 2016.

27   [2]   McBeath Dec. ¶5.

28   [3]   McBeath Dec. ¶7 – <u>Exhibit B</u>.

MOTION TO COMPEL ALL DEFENDANTS TO COMPLY
WITH ARIZ. R. CIV. P. 26.1(a) DISCLOSURE          -2-                    C20161794
REQUIREMENTS

1    them in person.

2        Mr. Tufts did not respond to Plaintiff's request to meet and confer. Instead,

3    on July 15, 2016, Mr. Tufts served Defendants' initial disclosure statement and

4    produced hard copies of 285 pages of documents (a majority of which appear to

5    be heavily redacted or devoid of any meaningful content), and unilaterally

6    decided to withhold all responsive documents in their custody, possession or

7    control that they deem confidential because Plaintiff declined to sign their overly

8    broad proposed protective order.[4]  Defendants did not produce any

9    electronically stored information.[5]

10       B.    <u>Defendants waived all objections because they have no excuse for</u>

11             <u>their failure to comply with ARCP 26.1(a) on time.</u>

12       On April 12, 2016, before she filed the lawsuit, Plaintiff sent a litigation

13   hold letter to Defendants, informing them of their obligation to preserve all

14   electronically stored information.[6]

15       On May 11, 2016, Plaintiff wrote to defense counsel, Robert Garcia, to ask

16   him to ensure his clients timely complied with their disclosure obligations under

17   ARCP 26, and listed fourteen (14) categories of documents she expected to

18   receive.[7] Plaintiff sent this letter because she is very familiar with TTC's business

19   operations.

20       She saw first-hand Defendants' disorganized management systems and

21   practices during the ten months that she worked for the company. She knew

22   Defendants would need ample advance notice and extra help to sift through and

23   cull all the documents they must produce.

24

25

26      [4]   McBeath Dec. ¶¶9, 15 – <u>Exhibit F</u>.

27      [5]   McBeath Dec. ¶10.

   [6]   McBeath Dec. ¶11 – <u>Exhibit C</u>.

28      [7]   McBeath Dec. ¶12.

MOTION TO COMPEL ALL DEFENDANTS TO COMPLY
WITH ARIZ. R. CIV. P. 26.1(a) DISCLOSURE       -3-       C20161794
REQUIREMENTS

1       On May 13, 2016, Mr. Tufts responded as follows to Plaintiff's courtesy
2   May 11 letter:

3
4   > While we appreciate your effort to remind us of our discovery obligations
    > under the Arizona Rules of Civil Procedure, we are completely aware of
    > our legal and ethical obligations. We will comply with the rules and
5   > relevant law.[8]

6
7       Defendants have missed three statutory deadlines since then. They did not
8   file a timely Answer to the Verified Complaint (and had to be threatened with
9   default to prompt them to respond).[9] They served incomplete responses to
10  interrogatories nearly a month after they were due.[10]

11      Now Defendants have served untimely and incomplete ARCP 26.1(a)
12  disclosures that they have had nearly three months' notice of their obligation to
13  prepare (they were served with the Verified Complaint on April 21, 2016).

14      On July 11, 2016, after her in-person meet-and-confer discussion with
15  Mr. Tufts, Plaintiff sent a letter summarizing the key points of the conditions she
16  set for accepting Defendants' untimely initial disclosures. Plaintiff emphasized
17  she was not granting an extension of time to respond, but rather was simply not
18  going to file another motion to compel if Defendants served their disclosures and
19  all relevant information and (unredacted) documents no later than July 15, 2016.

20  > To be clear, my agreement to accept the untimely service of the Disclosure
    > Statement, documents and responses to the interrogatories is not
21  > intended as an extension of time because, ***to date, your clients have never
    > asked for one.*** I simply agree not to file another motion to compel at this
22  > time. In other words, all objections your clients may have to the requested
23  > information are deemed waived (including objections based on privilege)
24  > because they failed to comply with the statutory deadlines.[11]

25
26    [8]  McBeath Dec. ¶13 – Exhibit E.
      [9]  Application for Notice of Default was filed on May 12, 2016.
27    [10]  McBeath Dec. ¶14.
28    [11]  McBeath Dec. ¶6 – Exhibit A.

10180.1    MOTION TO COMPEL ALL DEFENDANTS TO COMPLY
WITH ARIZ. R. CIV. P. 26.1(a) DISCLOSURE    -4-    C20161794
REQUIREMENTS

1    Ignoring Plaintiff's unequivocal condition to produce all relevant

2  documents and information, Defendants refused to produce any documents they

3  deem confidential until a protective order is in place.[12]

4    Nothing in the statute permits Defendants to decide unilaterally to

5  withhold any pertinent information without stating good cause for doing so

6  within the 40-day deadline set by ARCP 26.1(b)(1). *See* ARCP 26.1(a)(9) ("Unless

7  *good cause is stated for not doing so,* a copy of the documents and electronically

8  stored information listed shall be served with the disclosure.") (emphasis added).

9    Plaintiff agreed in good faith to consider defense counsel's proposed

10  stipulated protective order, but she is not obligated to enter into one, certainly

11  not if they can't be bothered to extend the professional courtesy of providing

12  more specific details regarding the documents that would be covered.

13    Additionally, Defendants attempted to constrain Plaintiff's access to

14  information by giving themselves the unrestricted right to designate whatever

15  they want as "protected information."

16    Defendants should have stated their "good cause" objections before the 40-

17  day deadline and promptly moved for a protective order if they wished to avail

18  themselves of that added protection. They should not now be heard to complain

19  for the failure to do so, or worse, blame Plaintiff for declining to sign such a

20  sweeping, one-sided protective order with so little advance notice.

21    There is no excusable neglect, much less good cause, for Defendants to

22  warrant this relief. *See Addison v. Cienega,* Ltd., 146 Ariz. 322, 324 (App. 1985)

23  (defining "excusable neglect" as "the type of error which might be made by a

24  reasonably prudent person who attempted to handle the matter in a prompt and

25  diligent fashion.").

26

27

28    [12]   McBeath Dec. ¶15 – Exhibit F.

C.    Court order requested.

Ariz. R. Civ. P. 26(b) defines a very broad scope for discovery to facilitate the identification of issues, assist in the efficient resolution of disputes and to avoid trial becoming a guessing game.[13]

Plaintiff requests that the Court order Defendants to produce all responsive ***electronically stored information and documents***.

At a minimum, Defendants must disclose or produce:

1.    A copy of the videotape that Defendants contend show Maximilian Ivankovich stealing TTC's trade secrets and confidential information that he then passed on to Plaintiff.

2.    Computer logs that show the time, date, description and title of the documents that Maximilian Ivankovich and/or Plaintiff printed without authorization and then disclosed to unauthorized third parties.

3.    Insurance policy.

4.    All documents relating to any oral/written communications between Plaintiff and any of the Defendants and between the Defendants during Plaintiff's employment, including documents regarding Plaintiff's employment status, job description, job responsibilities, terms of employment, compensation, performance, and benefits.

---

[13]    Ariz. R. Civ. P. 26(b)("Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense…. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."); *see Cornet Stores v. Superior Court In and For Yavapai County,* 108 Ariz. 84, 492 P.2d 1191 (1972) ("[T] he burden of proving the validity of the objection is upon the objecting party."); *Watts v. Superior Court In and For Maricopa County,* 87 Ariz. 1, 347 P.2d 565 (1959).

5.    All documents relating to Plaintiff's job duties during the time that she worked for TTC.

6.    All documents relating to the terms and conditions of Plaintiff's employment with TTC.

7.    All documents relating to personnel policies.

8.    All documents relating to Plaintiff's job performance during the time that she worked for TTC.

9.    Any documents pertaining to oral/written communications between Defendants and any current or former employee regarding the events and circumstances set forth in Plaintiff's complaint.

10.    All written statements rendered by persons who have knowledge of facts relating to the defenses alleged in the answer filed by Defendants.

11.    All documents supporting any contention by Defendants that she is not entitled to past and future earnings as alleged in Plaintiff's complaint.

12.    All documents supporting any contention by Defendants that they did not retaliate against Plaintiff as alleged in Plaintiff's complaint.

13.    Financial records referenced in the written discovery or that support TTC's responses to Plaintiff's Requests for Admissions and Plaintiff's Uniform and Non-Uniform Interrogatories.

14.    All documents supporting any denial by Defendants of Plaintiff's claim that she was wrongfully terminated as alleged in Plaintiff's complaint.

15.    All documents that evidence, refer or relate to any correspondence or communications between Defendants or with any person, with the exception of privileged communications with counsel, regarding the events and circumstances set forth in Plaintiff's complaint.

1    D.    <u>Request for sanctions.</u>

2        Plaintiff requests that the Court impose sanctions against Defendants

3    and/or their attorneys to reimburse Plaintiff expenses incurred in connection

4    with bringing this motion (*e.g.*, TurboCourt filing fees, copy costs, gas and

5    parking fees paid when Plaintiff went to and from the Pima County Law Library

6    and University of Arizona Law Library).

7        Plaintiff also requests reimbursement for the law books she has had to

8    purchase.[14]

9        If the Court imposes sanctions, Plaintiff will submit a separate bill of costs.

10       Finally, Plaintiff further requests that the Court censure Defendants and

11   their attorneys for engaging in bad-faith litigation tactics, and admonish them to

12   abide by the rules of civil procedure.

13       Plaintiff does not wish to burden the Court with unnecessary motion

14   practice, but Defendants' refusal to play by the rules leave her no other recourse.

15

16   Dated: July 18, 2016                      Respectfully submitted,

17

18                                              Melissa Martin McBeath

19

20

21

22

23

24   _____

25   [14]    *See* Ariz. R. Civ. P. 37(a)(4)(A)("If the motion is granted or if the disclosure
     or requested discovery is provided after the motion was filed, the court shall,

26   after affording an opportunity to be heard, require the party or deponent whose
     conduct necessitated the motion or the party or attorney advising such conduct

27   or both of them to pay the moving party the reasonable expenses incurred in
     making the motion....").

28

1

<u>ORIGINAL filed via TurboCourt on August 3, 2016 with:</u>

2

Clerk of the Court

3

Pima County Superior Court

4

5

<u>COPY hand-delivered on July 18, 2016 to:</u>

Roberto C. Garcia

6

Travis L. Tufts

7

FARHANG & MEDCOFF

4801 E. Broadway Blvd., Suite 311

8

Tucson, AZ 85711

9

Attorneys for:

10

Tucson Tamale Company, Todd Russell Martin, Sherry Martin and Lisa Martin

11

12

Melissa Martin McBeath

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO COMPEL ALL DEFENDANTS TO COMPLY
WITH ARIZ. R. CIV. P. 26.1(a) DISCLOSURE
REQUIREMENTS

-9-

C20161794

# EXHIBIT "U"

## Tish Wright

**From:** Travis L. Tufts
**Sent:** Wednesday, August 3, 2016 3:40 PM
**To:** 'Mel McBeath'
**Cc:** Robert Garcia; Autumn Bonnell; Tish Wright; Jamie Archibald
**Subject:** RE: McBeath v. Tucson Tamale Company et al (7/26/2016 Meet and Confer)

Ms. McBeath,

Thank you for the letter, but I do not agree with everything stated therein. First, I do not estimate a trial date in March 2017 in the federal court action. I believe we discussed and agreed to a one year period of discovery for both the state and federal cases, making the completion of discovery in July 2017 and a trial date sometime thereafter. We discussed expert disclosures beginning in March 2017. Second, with respect to your demands for electronically stored information ("ESI") in native form, I asked that you send me a formal Request for Production identifying exactly what you seek and the electronic format sought. We already provided copies of ESI in an acceptable format with our initial disclosures. Contrary to the authority provided, producing these e-mails in native form is not as simple as outlined, not to mention you are asking my clients to incur additional time and costs to perform what amounts to a very broad request - a request you indicated is based almost entirely on the fact you don't trust my clients, not because of any specific e-mails or documents in our disclosures. As I indicated, we do not necessarily object that you are entitled to discover the native form. However, we do not agree to engage in an expensive, overly broad, fishing expedition without basis. Once you produce a formal request for production, we will comply with the deadlines for responding to the same.

With respect to your motion to compel - signed and dated July 18, 2016 but not filed - there are multiple issues precluding the filing of that motion. Among them, you misstate the facts regarding the protective order. I did not refuse to make disclosures unless you sign the protective order. Rather, I said I would not make disclosures of those documents which are confidential and/or reflect trade secrets until a protective order is in place - court ordered or stipulated. TTC clearly and unequivocally complied with its disclosure obligations after our meet and confer, including the production of ESI, redacting only that information which it claims is privileged pending the entry of a protective order. There is absolutely no authority for your argument that TTC waives privilege objections by producing late disclosures. Additionally, to the extent you believe there are documents or communications that were overlooked or not produced, your remedy is to send me a Request for Production, not file a motion to compel. I asked you to send me that request the last time we met because we produced what we believe at this point in discovery is relevant and reasonably calculated to lead to admissible evidence. You have not sent me a formal Request for Production and are now seeking instead to file a motion to compel on issues that have either been resolved or are subject to ongoing good faith discussions to resolve - i.e. the production of ESI in a format which you informally requested for the first time after TTC made its initial disclosures. Similar to my position before you filed your last motion to compel, should you wish to file another motion to compel based on TTC's disclosures, I will seek sanctions because the motion is not well grounded in law or fact.

Sincerely,

Travis L. Tufts
Profile | vCard
4801 East Broadway Boulevard | Suite 311 | Tucson, Arizona 85711
General: 520.790.5433 | Direct: 520.398.7466 | Fax: 520.790.5736 www.fmazlaw.com

-----Original Message-----
From: Mel McBeath [mailto:mel.mcbeath@cox.net]
Sent: Friday, July 29, 2016 8:13 PM

To: Travis L. Tufts <ttufts@fmazlaw.com>
Cc: Robert Garcia <rgarcia@fmazlaw.com>; Autumn Bonnell <abonnell@fmazlaw.com>
Subject: McBeath v. Tucson Tamale Company et al (7/26/2016 Meet and Confer)

Travis,

I hope you're enjoying a restful vacation. Attached is the following
correspondence:

2016-07-29 Letter to Travis Tufts

I look forward to hearing from you when you return.

Best,

Melissa

EXHIBIT "V"

FILED
TONI HELLON
CLERK, SUPERIOR COURT
3/1/2017 11:05:04 AM
By: L. Lundy

ARIZONA SUPERIOR COURT, PIMA COUNTY

HON. GUS ARAGON

CASE NO.   C20161794

COURT REPORTER:   Maria Geare
Courtroom - 814

DATE:       February 28, 2017

MELISSA MARTIN MCBEATH
   Plaintiff

Rafael F. Gallego, Esq. counsel for the
Plaintiff

VS.

TUCSON TAMALE COMPANY,
TODD RUSSELL MARTIN,
SHERRY MARTIN,  and
LISA MARTIN
   Defendants

Travis L Tufts, Esq. and Ali Farhang, Esq. counsel
for Tucson Tamale Company, Todd Russell
Martin, Sherry Martin,  and Lisa Martin

## M I N U T E   E N T R Y

**PENDING MOTIONS**

Plaintiff is present.  Defendants are not present.

Mr. Gallego states that plaintiff's attorney, Mr. Agrawal, had personal issues and is unable to appear today and requests on behalf of the plaintiff, that that the matter be continued.

Mr. Farhang states an objection to a continuance, states concerns regarding the manner in which the case has been litigated, requests sanctions, requests that Pro Hac counsel be disqualified and that plaintiff be admonished that further violation will result in the striking of her answer to defendant's counter claims.

Upon inquiry of the Court,

Mr. Gallego states that he does not have a way to contact Mr. Agrawal at this time.

THE COURT FINDS that Mr. Gallego is counsel of record in this matter.

IT IS ORDERED that a postponement of the proceeding is denied.

*As to defendant's Motion to Dismiss filed May 25, 2016,*

Mr. Farhang argues to the Court.

Mr. Gallego submits on any and all written pleadings that were submitted.

*As to defendant's Motion for Rule 56(f) Relief filed on July 20, 2016,*

Mr. Tufts argues the motion to the Court.

Mr. Gallego submits on any and all written pleadings that were submitted.

*As to defendant's Motion to Quash Third Party Subpoena and Entry of Protective Order filed on October 23, 2016,*

L. Lundy
Deputy Clerk

**M I N U T E   E N T R Y**

Page 2                          Date: February 28, 2017                    Case No.:      C20161794

Mr. Farhang argues the motion to the Court and requests that the Court quash the subpoena.

Mr. Gallego submits on any and all written pleadings that were submitted.

Mr. Farhang requests to address plaintiff's Motion for a Protective Order to Shield Identity and Communication with Experts Consulted Informally filed August 14, 2016, plaintiff's Motion to Compel Lisa Martin to Sit for Her Oral Deposition in Tucson, Arizona filed October 6, 2016, and plaintiff's Motion to Compel Production of Documents and Supplemental Responses to Unanswered Written Discovery filed December 22, 2016, at this time.

Mr. Gallego submits on any and all written pleadings that were submitted.

THE COURT FINDS that the plaintiff has waived her right to present oral argument and therefore declines to allow the defendant to present oral argument except through Mr. Gallego and he has indicated that Plaintiff rests upon the previously filed motion papers.

The Court will rule on the plaintiff's motions, based upon the written motion papers.

Counsel for the defendants are directed to provide an affidavit from Lisa Martin indicating what her travel customs are with respect to coming to Tucson.

The Court advises counsel that if they have a ruling from the Court on a motion and the file another motion on the same topic, the Court is likely to impose duplicative motions sanctions.

IT IS ORDERED that plaintiff's counsel in California, Mr. Agrawal, shall provide an affidavit through Mr. Gallego to the Court, no later than thirty (30) days from this date, explaining his absence today and why he did not do more to advise the Court and opposing counsel with more notice of his nonappearance today.

The Court takes the matter under advisement at this time.

LATER IN CHAMBERS;

As to the Rule 56(f) Motion of Defendants, the Court notes that the Rule is now known as Rule 56(d). Apparently this motion was filed on July 20, 2016 and was never set for hearing. The Court finds good cause to allow more time for discovery before any parties' response to summary judgment motions are filed. This extension shall apply to all parties. The Court now notes that Plaintiff has filed another summary judgment motion on February 14, 2017. IT IS ORDERED that this shall be the Plaintiff's one and only summary judgment motion permitted by the Court.

The Court notes that the motion practice in this case has been extensive, and in many respects, unproductive and unnecessary. THEREFORE IT IS FURTHER ORDERED that no further motions will be permitted without leave of the Court. No motion that has not been ruled upon as of this date shall be considered

L. Lundy
Deputy Clerk

# MINUTE ENTRY

| | | |
|---|---|---|
| Page 3 | Date: February 28, 2017 | Case No.:   C20161794 |

submitted for decision unless oral argument is scheduled and conducted upon the motion.  It shall be the moving party's obligation to set that party's motions for oral argument.

The Court was taken aback by the nonappearance of Mr. Agrawals for the oral argument conducted on February 28, 2017.  He was present when the hearing was scheduled.  Mr. Gallego was not able to provide a reason for the nonappearance. The Court will consider the imposition of sanctions after considering the reasons for the nonappearance.

As to the Defendants' Motion to Quash Subpoena issued to Kory-Leavitt, filed on October 20, 2016, the Motion is ORDERED GRANTED.  The Court finds that the information sought is not admissible nor is it reasonable calculated to lead to the discovery of admissible evidence.

Regarding Plaintiff's Motion Re Emails filed on December 22, 2016, the Court notes that Plaintiff retained counsel shortly after filing the motion.  THEREFORE IT IS ORDERED Plaintiff's counsel advise the Court by March 17, 2017, whether counsel is adopting the motion.  If so, it shall be the responsibility of Plaintiff's counsel to have the motion set for hearing.  The motion shall be deemed denied if counsel does not contact the Court by March 30, 2017, to set the matter for hearing.

cc:     Hon. Gus Aragon
        Rafael F. Gallego, Esq.
        Robert C. Garcia, Esq.
        Travis L Tufts, Esq.
        Clerk of Court - Under Advisement Clerk

_____L. Lundy_____
Deputy Clerk

EXHIBIT "W"

# Melissa Martin McBeath

3463 E. Terra Alta Blvd. • Tucson, AZ 85716 • 520.449.9753 • *mel.mcbeath@cox.net*

<u>SENT VIA E-MAIL ONLY</u>

March 2, 2017

Travis L. Tufts
Farhang & Medcoff
4801 E. Broadway, Suite 311
Tucson, AZ 85711

Re:   *Melissa Martin McBeath v. Tucson Tamale Company*
        Ariz. U.S. District Court Case No. CV-16-462-TUC-DCB

Dear Mr. Tufts:

I write to meet and confer with you regarding the following discovery issues to avoid further delay in the prosecution of my federal case.

1.      Tucson Tamale Company (TTC) has not served on me or filed with the District Court its Fed. R. Civ. Proc. 26(a) Initial Disclosures and accompanying documents and electronically stored information. Please do so no later than Monday, March 9, 2017.

2.      I request that TTC produce all responsive Gmail e-mails in their native electronic format. Because I specify the manner in which these e-mails should be produced, e-mails that are transferred to Outlook or tampered with in any way that differs from the way that they are "kept in the usual course of business" will not comply with Fed. R. Civ. Proc. 34(b)(2)(E). As a gesture of good faith, I will agree to abide by the same terms and conditions of the Protective Order issued on December 8, 2016 in the state court action regarding any confidential information TTC discloses if all responsive documents and electronically stored information are produced no later than Monday, March 9, 2017.

3.      Fed. R. Civ. Proc. 26(b)(4)(B) makes clear that TTC is not entitled to inquire into any communications I have had with any experts I consult informally. Will TTC serve written discovery on, or intend to take the oral deposition of, Ehud Gavron, Francisco Marquez, or anyone else whom TTC believes I have consulted informally as an expert to assist me with this case? Please state affirmatively whether TTC will take the same or similar position TTC has taken in the long-standing dispute the parties have had in the state court proceedings regarding this issue.

4.      Lastly, insurance agreements are expressly discoverable under Fed. R. Civ. P. 26(a)(1)(A)(iv). I will serve a subpoena duces tecum on Koty-Leavitt Insurance Agency, Inc. because yesterday the Pima County Superior Court granted TTC's Motion to Quash the subpoena served on the insurance broker in connection with the state court action. In my reading of the federal rules, any items are properly discoverable if they relate to "any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b).

10362.1

Travis L. Tufts
March 2, 2017
Page 2

The information sought need not be admissible at the trial if the information sought "appears reasonably calculated to lead to the discovery of admissible evidence." *Id.*

A relevant matter is "any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978). Because discovery is designed to define and clarify the issues, it is not limited to only those specific issues raised in the pleadings. *Id.* I believe I am entitled to all non-privileged information I seek from Koty-Leavitt that relates to my claims.

Please let me know no later than Monday, March 6, 2017, your client's response to the above issues so that I may determine what relief to seek from the Court next week. I invite you to call me if you wish to discuss any of these matters.

Best Regards,

*Melissa Martin McBeath*

Melissa Martin McBeath

10362.1

EXHIBIT "X"

# Melissa Martin McBeath

3463 E. Terra Alta Blvd. • Tucson, AZ 85716 • 520.449.9753 • mel.mcbeath@cox.net

<u>SENT VIA E-MAIL ONLY</u>

March 6, 2017

Robert C. Garcia
Farhang & Medcoff
4801 E. Broadway, Suite 311
Tucson, AZ 85711

Re:    *McBeath v. Tucson Tamale Company*
        U.S. District Court of Arizona Case No. 4:16-cv-00462-BPV

Dear Mr. Garcia:

I would like to revisit your clients' offer to consolidate my state and federal actions into one. I wish to proceed in federal court.

Please let me know no later than March 8, 2017, if your clients will stipulate to my filing a second amended complaint in federal court and simultaneous dismissal of the state court action.

Best Regards,

*Melissa Martin McBeath*
Melissa Martin McBeath

10364.1

EXHIBIT "Y"

FILED
TONI HELLON
CLERK, SUPERIOR COURT
1/18/2017 8:41:37 AM
By: Karla Ronquillo

ARIZONA SUPERIOR COURT, PIMA COUNTY

| | |
|---|---|
| HON. GUS ARAGON | CASE NO.   C20161794 |
| COURT REPORTER:   Maria Geare<br>Courtroom - 814 | DATE:        January 17, 2017 |
| MELISSA MARTIN MCBEATH<br>    Plaintiff | Ruchit Kumar Agrawal, counsel *Pro Hac Vice* for<br>Plaintiff |
| VS. | |
| TUCSON TAMALE COMPANY,<br>TODD RUSSELL MARTIN,<br>SHERRY MARTIN, and<br>LISA MARTIN<br>    Defendants | Travis L Tufts, Esq. counsel for Defendants |

---

## M I N U T E   E N T R Y

**PLAINTIFF MELISSA MARTIN MCBEATH'S MOTION FOR A PROTECTIVE ORDER TO SHIELD IDENTITY AND COMMUNICATIONS WITH EXPERTS CONSULTED INFORMALLY/ PLAINTIFF MELISSA MARTIN MCBEATH'S MOTION FOR A PROTECTIVE ORDER THAT PROTECTS WITNESSES FROM INTIMIDATION AND PERMITS PLAINTIFF TO HAVE EX PARTE CONTACT WITH DEFENDANTS' EMPLOYEES/DEFENDANTS' MOTION TO QUASH THIRD PARTY SUBPOENA AND ENTRY OF PROTECTIVE ORDER/PLAINTIFF MELISSA MARTIN MCBEATH'S MOTION TO COMPEL LISA MARTIN TO SIT FOR HER ORAL DEPOSITION IN TUCSON, ARIZONA**

Plaintiff is present.  Defendants are not present.

The Court notes it is in receipt of the Plaintiff's Motion to Associate Counsel *Pro Hac Vice* filed on January 13, 2017.

With no objection from defense counsel,

IT IS ORDERED that the motion is GRANTED.

IT IS FURTHER ORDERED that the Plaintiff's Motion to Associate Counsel *Pro Hac Vice* shall be considered a Notice of Appearance by Rafael F. Gallego, Esq. in this matter.

Counsel argue to the Court.

Karla Ronquillo<br>
Deputy Clerk

# MINUTE ENTRY

Page 2            Date: January 17, 2017            Case No.: C20161794

IT IS ORDERED that the Proposed Scheduling Order previously filed is hereby withdrawn. An updated Proposed Scheduling Order shall be filed no later than February 21, 2017, at 5:00 PM.

*As to Plaintiff Melissa Martin McBeath's Motion for a Protective Order that Protects Witnesses from Intimidation and Permits Plaintiff to have Ex Parte Contact with Defendants' Employees:*

IT IS ORDERED that the motion is DENIED

IT IS FURTHER ORDERED that the plaintiff may not have contact with defendants' employees or former employees except through defense counsel. The remainder of the motion will be addressed at a time to be chosen by plaintiff's counsel.

*As to Plaintiff's Motion to Compel Lisa Martin to Sit for Her Oral Deposition in Tucson, Arizona:*

IT IS ORDERED that the motion is GRANTED in part.

IT IS FURTHER ORDERED that in the event Lisa Martin is in Tucson, Arizona while on business for the Tucson Tamale Company, counsel may depose her at that time by coordinating the deposition with defendants' counsel.

*As to Defendants' Motion to Quash Third Party Subpoena and Entry of Protective Order:*

IT IS ORDERED that on an interim basis, any obligations to comply with the subpoena shall be held in abeyance pending the Court's ruling on the motion.

The Court notes that Plaintiff Melissa Martin McBeath's Motion for a Protective Order to Shield Identity and Communications With Experts Consulted Informally remains pending.

IT IS ORDERED that the hearing set this date is continued to February 28, 2017, at 1:30 PM, in Division 30. Estimated length of hearing is 3.25 hours.

IT IS FURTHER ORDERED that a Hearing Re: Plaintiff's Motion for Summary Judgment is set on February 28, 2017, at 1:30 PM, in Division 30. Estimated length of hearing is 3.25 hours.

In the event there are more than fifteen exhibits, counsel shall make arrangements with the Clerk's Office to have them pre-marked one week prior to the hearing by calling (520) 724-8279.

cc:    Hon. Gus Aragon
        Rafael F. Gallego, Esq.
        Robert C. Garcia, Esq.
        Travis L Tufts, Esq.

                                      Karla Ronquillo
                                        Deputy Clerk

EXHIBIT "Z"

FILED
TONI L. HELLON
CLERK, SUPERIOR COURT

7/8/2016 5:02:03 PM

BY: ALAN WALKER
DEPUTY

MELISSA MARTIN McBEATH
3463 E. TERRA ALTA BLVD.
TUCSON, AZ 85716
Ph: (520) 449-9753
*mel.mcbeath@cox.net*

Pro Se

## SUPERIOR COURT OF ARIZONA
## COUNTY OF PIMA

| | |
|---|---|
| MELISSA MARTIN McBEATH, an individual, | Case No. C20161794 |
| Plaintiff, | **MELISSA MARTIN McBEATH'S MOTION FOR LEAVE OF COURT TO TAKE NON-PARTY DEPOSITIONS** |
| v. | |
| TUCSON TAMALE COMPANY; an Arizona corporation, *et al.*, | [Ariz. R. Civ. P. 30(a)] |
| Defendants. | |
| TUCSON TAMALE COMPANY; an Arizona corporation, | Assigned to Hon. Gus Aragon Division 30 |
| Counterclaimant, | |
| v. | |
| MELISSA MARTIN McBEATH, an individual, *et al.*, | |
| Counterdefendants. | |

10170.1

1

**LEGAL DISCUSSION**

2    Plaintiff Melissa Martin McBeath moves under Ariz. R. Civ. P. 30(a) for

3  leave of court to take the depositions of the following six non-party witnesses:

4  Lindsay Welch, Alejandra Valenzuela, Shawn Kaylor, Delaney Hare, Meaghan

5  Anderson, and Joshua Cooper. The first five witnesses are employees of Tucson

6  Tamale Company (*"TTC"*). They have intimate knowledge of TTC's business

7  operations, policies and procedures, and, of course, can speak to the illegal and

8  unethical conduct alleged in the complaint. Four of these employees reported

9  directly to McBeath because she was on the Executive Team.

10    The witnesses will also testify regarding the content of the conversations

11  McBeath had in confidence with them regarding Defendant Sherry Martin's

12  unlawful and truculent management practices. Mr. Cooper is the IT consultant

13  who set up the company's computer network and oversees its technology

14  infrastructure. Mr. Cooper will testify regarding the security measures (not)

15  taken to protect the company's ostensible "trade secrets."

16    TTC responded as follows to McBeath's request to allow her to depose

17  these individuals:

18
19  > We do not stipulate to these depositions at this time. As you are aware,
20  > there are multiple motions pending before the Judge, including my clients'
     > Motion to Dismiss, your Motion to Dismiss, and your Motion for Summary
21  > Judgment. Each of these motions are dispositive motions with the
     > potential for eliminating causes of action. Because these motions are
22  > pending, it is premature at this stage to take depositions which, depending
     > on the Court's rulings, may be wholly unnecessary and entirely irrelevant
23  > to the viable claims in this suit. We will reassess our position after the
     > Court rules on these motions.[1]
24
25    Defendants' position has no basis in law. Dispositive motions do not now,

26  and never have affected whether discovery should proceed. Discovery does not

27  ────────────────

28  [1]   Melissa Martin McBeath Declaration In Support of Motion for Leave
     of Court to Take Non-Party Depositions, dated July 8, 2016.

MOTION FOR LEAVE OF COURT
TO TAKE NON-PARTY DEPOSITIONS                -1-                          C20161794

1  get suspended just because a Rule 12(b)(6) or Rule 56 motion is pending, at least

2  not without a court order staying the proceedings. Professor Wright instructs,

3  "Defendants are obliged to participate [in discovery-related matters and

4  planning] even if they have made a motion under Rule 12." *See* Charles Alan

5  Wright, *et al.*, Federal Practice and Procedure, § 2051.1 at 624 (2d ed. 1994).

6       Arizona's rules are patterned after the federal rules, and under those rules

7  discovery proceeds notwithstanding a pending motion to dismiss *See Moran v.*

8  *Flaherty*, 1992 U.S. Dist. LEXIS 14568, No. 92 Civ. 3200, 1992 WL 276913, at *1

9  (S.D.N.Y. Sept. 25, 1992) ("[D]iscovery should not be routinely stayed simply on

10  the basis that a motion to dismiss has been filed."). Defendants' argument fares

11  even worse when analyzed in light of policy and precedent. They are correct that

12  motions have been filed (and are pending), but contrary to defense counsel's

13  mistaken assertion, neither the rules, policy, custom, nor practice result in a stay

14  of proceedings while motions are pending.

15       If a motion to dismiss (or any other dispositive motion) operated to stay

16  proceedings, any party could affect interminable delay through the simple

17  expedient of filing a motion to dismiss every few weeks or months. The rules just

18  do not work that way. *See, e.g., Levy v. United Healthcare Corp.*, 1996 WL 1031813

19  (D. Minn. 1996) (denying motion to suspend Rule 26(f) conference during

20  pendency of motion to dismiss).

21       If Defendants believe a stay of proceedings is warranted, they should file a

22  motion to that effect. Unless and until they do, however, Defendants cannot rely

23  on the pending motions to derail the orderly administration of case proceedings

24  prescribed by the rules of civil procedure.

25  Dated: July 8, 2016                 Respectfully submitted,

26

27

28  Melissa Martin McBeath

ORIGINAL filed via TurboCourt on July 8, 2016 with:
Clerk of the Court
Pima County Superior Court


COPY hand-delivered on July 8, 2016 to:
Roberto C. Garcia
Travis L. Tufts
FARHANG & MEDCOFF
4801 E. Broadway Blvd., Suite 311
Tucson, AZ 85711

Attorneys for:
Tucson Tamale Company, Todd Russell Martin, Sherry Martin and Lisa Martin

Melissa Martin McBeath

MELISSA MARTIN McBEATH'S REQUEST
FOR LEAVE TO TAK NON-PARTY DEPOSITIONS

C20161794

EXHIBIT "AA"

MELISSA MARTIN McBEATH
3463 E. TERRA ALTA BLVD.
TUCSON, AZ 85716
Ph:  (520) 449-9753
*mel.mcbeath@cox.net*

Pro Se

## SUPERIOR COURT OF ARIZONA
## COUNTY OF PIMA

| | |
|---|---|
| MELISSA MARTIN McBEATH, an individual, | Case No. C20161794 |
| Plaintiff, | **MELISSA MARTIN McBEATH'S MOTION TO COMPEL LISA MARTIN TO SIT FOR HER ORAL DEPOSITION IN TUCSON, ARIZONA** |
| v. | |
| TUCSON TAMALE COMPANY; an Arizona corporation, *et al.*, | [Ariz. R. Civ. P. 37(a)(1)] |
| Defendants. | |
| TUCSON TAMALE COMPANY; an Arizona corporation, | Assigned to Hon. Gus Aragon Division 30 |
| Counterclaimant, | |
| v. | |
| MELISSA MARTIN McBEATH, an individual, *et al.*, | |
| Counterdefendants. | |

10229.1

**LEGAL DISCUSSION**

Plaintiff Melissa Martin McBeath moves under Ariz. R. Civ. P. 37(a)(1) for an order to compel Defendant Lisa Martin to sit for her oral deposition in Tucson, Arizona.

Lisa Martin resides in Colorado, but travels to Arizona every month and works on site at Tucson Tamale Company's main office for several days at a time.

Lisa Martin insists, however, that McBeath travel to Colorado to take her deposition or pay for her travel expenses to Arizona. Defendants know full well that McBeath cannot afford that.

Continuing in the pattern and practice of discovery abuses that Defendants and their attorneys have engaged in since this case started, Lisa Martin refuses to be deposed in Tucson when she is in town solely to prevent McBeath from obtaining critical testimony that she needs to prove her case.

Accordingly, McBeath requests that the Court order Lisa Martin (i) to disclose her travel schedule to Arizona in November 2016 and December 2016, and (ii) to sit for her oral deposition in Tucson, Arizona on a date certain.

Dated: October 6, 2016

Respectfully submitted,

Melissa Martin McBeath

MOTION TO COMPEL LISA MARTIN TO SIT FOR
HER ORAL DEPOSITION IN TUCSON, ARIZONA

-1-

C20161794

ORIGINAL filed via TurboCourt on October 6, 2016 with:
Clerk of the Court
Pima County Superior Court


COPY served via TurboCourt on October 6, 2016 to:
Roberto C. Garcia
*rgarcia@fmazlaw.com*
Travis L. Tufts
*ttufts@fmazlaw.com*

Attorneys for:
Tucson Tamale Company, Todd Russell Martin, Sherry Martin and Lisa Martin

_____
Melissa Martin McBeath

MOTION TO COMPEL LISA MARTIN TO SIT FOR
HER ORAL DEPOSITION IN TUCSON, ARIZONA

-2-

C20161794

EXHIBIT "BB"

1
2
3
4
5
6

MELISSA MARTIN McBEATH
3463 E. TERRA ALTA BLVD.
TUCSON, AZ 85716
Ph: (520) 449-9753
*mel.mcbeath@cox.net*

Pro Se

7

8
9

**SUPERIOR COURT OF ARIZONA**
**COUNTY OF PIMA**

10
11
12

MELISSA MARTIN McBEATH, an
individual,

13

        Plaintiff,

14

    v.

15
16

TUCSON TAMALE COMPANY; an
Arizona corporation, *et al.,*

17

        Defendants.

18

19
20

TUCSON TAMALE COMPANY; an
Arizona corporation,

21

        Counterclaimant,

22

    v.

23
24

MELISSA MARTIN McBEATH, an
individual, *et al.,*

25

26

        Counterdefendants.

27

28

Case No. C20161794

**MELISSA MARTIN McBEATH'S**
**DISCLOSURE STATEMENT**

[Ariz. R. Civ. P. 26.1]

Assigned to Hon. Gus Aragon
Division 30

10168.1

1    Plaintiff Melissa Martin McBeath hereby submits the following Disclosure

2  Statement under Ariz. R. Civ. P. 26.1.

3

4  **1.    ARCP 26.1(a)(1):   Factual basis for each claim**

5         1.1    Count I - Retaliatory Discharge

6    Plaintiff complained to Defendants that their willful failure to withhold,

7  account for, and pay withholding taxes from tips paid by Tucson Tamale

8  Company ("_**TTC**_") customers to employees was illegal. _See generally_ Ariz.

9  Admin. Code R20-5-1210 (General Recordkeeping Requirements).

10    Plaintiff complained to Defendants that it was illegal for TTC to require its

11  employees to share tips with all restaurant employees, including managers who

12  did not serve the restaurant patrons who paid the tips.

13    Plaintiff complained to Defendants that they were willfully committing

14  wage theft because:

15         a.    TTC may not force employees to forfeit tips earned if they quit

16  without giving at least two weeks' notice or miss a scheduled shift.

17    TTC may not unilaterally change the terms and conditions of employment

18  for the general managers by setting unattainable sales goals that were never

19  disclosed to the general managers when they received their written offer letters.

20         b.    TTC may not charge employees for meals if they did not eat

21  TTC's restaurant food.

22         c.    Plaintiff was terminated after she expressed her concerns

23  regarding the above practices and their business practice of marketing, selling

24  and distributing TTC food products in a manner intended to mislead consumers

25  into believing that _**all**_ TTC food products are organic when, in fact, that is not

26  true, in violation of Arizona's Consumer Fraud Act. _See_ Ariz. Rev. Stat. § 44-1522

27  (A).

28

## 1.2   Count II - Fraud in the Inducement

Defendants knowingly and willfully conspired and agreed among themselves to harm Plaintiff by engaging in a pattern of intentional, willful, and malicious misrepresentations regarding the terms of her employment.

Defendants induced Plaintiff not to pursue or explore other employment so that she would agree to work at TTC, and continued to commit fraud and fraudulently induced Plaintiff to continue her employment with TTC and to continue working on the projects assigned to her by representing that employment with TTC would be more profitable, with the promise of future salary increases, bonuses and professional development.

Plaintiff was induced to become an employee of TTC, not to seek positions elsewhere, and to share her knowledge and expertise with Defendants who leveraged her name, experience, and credibility, with current and prospective customers, clients, and employees. Plaintiff has lost income and income opportunities.

Defendants knew at the time they induced Plaintiff to accept TTC's offer of employment that they would not honor the promises upon which Plaintiff relied not to accept another, more lucrative offer of employment, and which Plaintiff relied on to remain and to continue her employment with TTC until she was wrongfully terminated.

In September 2015, Defendant Todd Russell Martin asked Plaintiff to meet and to interview the person he intended to hire as the business development manager for TTC's expanded wholesale business. This was the position that Defendants had promised to Plaintiff when they interviewed her and the only reason why Plaintiff agreed to temporarily assume the restaurant Area Manager position for TTC at a lower salary. Defendants filled the business development manager position in September 2015 with a candidate who had absolutely no wholesale or restaurant experience.

EXHIBIT "CC"

MELISSA MARTIN McBEATH
3463 E. TERRA ALTA BLVD.
TUCSON, AZ 85716
Ph: (520) 449-9753
*mel.mcbeath@cox.net*

Pro Se

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA, TUCSON DIVISION

|  |  |
|---|---|
| MELISSA MARTIN MCBEATH,<br>an individual,<br><br>                Plaintiff,<br><br>        v.<br><br>TUCSON TAMALE COMPANY,<br>an Arizona corporation,<br><br>                Defendant. | Case No. 4:16-cv-00462-BPV<br><br>**MELISSA MARTIN McBEATH'S<br>RESPONSES TO DEFENDANT<br>TUCSON TAMALE COMPANY'S<br>FIRST SET OF INTERROGATORIES**<br><br>[Fed. R. Civ. P. 33]<br><br>Assigned to: Hon. Bernardo P. Velasco<br><br>Complaint Filed: July 11, 2016 |

10218.1

Pursuant to Federal Rule of Civil Procedure 33, Plaintiff Melissa Martin McBeath (*"**Plaintiff**"*) hereby responds to Defendant Tucson Tamale Company's (*"**TTC**"*) First Request For Production of Documents:

## PRELIMINARY STATEMENT

Plaintiff has not completed her investigation of facts, witnesses or documents relating to this case, has not completed discovery, has not completed the analysis of available information, and has not completed her preparation for trial. Each of the responses contained below is based only upon information available to, analyzed by and specifically known to Plaintiff.

The responses to this First Set of Interrogatories are given without prejudice to Plaintiff's right to use facts, witnesses or documents omitted from these responses by oversight, inadvertence, or good faith error or mistake. The information furnished by Plaintiff may include hearsay and other forms of evidence that are neither reliable nor admissible.

Plaintiff reserves all objections to the admissibility at trial of any documents or information identified.

The identification or supplying of any document or information will not constitute an admission by Plaintiff that such document or information is relevant to or admissible in the pending litigation.

Plaintiff reserves the right to object to further inquiry with respect to any subject matter.

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify why you believe your age was a factor in TI C's decision not to hire you as Business Development Manager.

**RESPONSE:**

TTC hired Lindsay Welch as Business Development manager. She had no experience with: wholesale distribution, wholesale sales, wholesale supplier management, restaurant management and operations, supply chain mangement and logistics, food production, or catering sales. She had no experience whatsover operating any for-profit business because all her experience was in the non-profit sector. Plaintiff has experience working in every aspect of wholesale sales and distribution. Plaintiff previously owned her own three-tier distribution company that sold highly sought-after and top-rated consummable products throughout Arizona. Plaintiff had direct contact and strong relationships with wholesale restaurant and grocery retail vendors locally and nationally in the course of her career spanning two decades, and particularly, when Plaintiff was growing her own small business.

Plaintiff was prepared and ready to leverage her extensive network of long-term vendor partners to launch TTC into new markets and channels to which Defendants Todd Martin, Sherry Martin and Lisa Martin had no way of accessing and Lindsay Welch had even less. Plaintiff was more qualified than Lindsay Welch to be TTC's Business Manager Development Manager.

Todd served on the board of the American Heart Association's Southern Arizona Chapter while Ms. Welch was Director. They formed a friendship and alliance while working together. After she was summarily ousted by the board (Todd had previously resigned), Ms. Welch called Todd to lament her situation and he offered her the position. There was no interview process; the position was never posted internally or externally, no communications were made to staff

1    prior to her hiring, and no conversations occured with Plaintiff regarding her

2    hiring until after the fact.

3    **INTERROGATORY NO. 2:**

4        Identify what you did to try to obtain the position of Business

5    Development Manager.

6    **RESPONSE:**

7        Plaintiff was offered the position prior to being hired in April 2015. There

8    was no formal process offered by which she could do anyting "to try to obtain

9    the position." When Ms. Welch no longer had a position at the AHA, Todd gave

10    her the position. Had there been an opportunity to discuss the position

11    previously promised to Plaintiff prior to hiring Ms. Welch, Plaintiff would have

12    reminded them of the agreement Todd and Sherry made several months prior.

13    **INTERROGATORY NO. 3:**

14        Identify the evidence you have to support your claim that TTC allegedly

15    denied you the position of Business Development Manager because of your age.

16    **RESPONSE:**

17        See response to Interrogatory No. 1.

18    **INTERROGATORY NO. 4:**

19        Identify when you first suspected TTC's hiring of Lindsay Welch was

20    motivated by discriminatory animus.

21    **RESPONSE:**

22        Within a few weeks of after TTD hired Lindsay Welch, it became apparent

23    that she was utterly incompetent for even the catering responsibilities. Plaintiff

24    fielded complaints almost immediately after her hire from all of the general

25    managers regarding her lack of knowledge regarding restaurant operations. She

26    disrupted business in each of the outlets because of her lack of experience. She

27    complained openly about Shawn Kaylor "putting her to work" assembling

28    caterings as well as complaining to Todd and Sherry that she was being asked to

EXHIBIT DD

**Tish Wright**

| | |
|---|---|
| **From:** | Melissa Martin McBeath <mel.mcbeath@cox.net> |
| **Sent:** | Thursday, May 4, 2017 6:16 PM |
| **To:** | Travis L. Tufts |
| **Cc:** | Robert Garcia; Jamie Archibald; Lynn Salcido; Tish Wright; sherry@tucsontamalecompany.com; todd@tucsontamalecompany.com; lisa@tucsontamalecompany.com |
| **Subject:** | McBeath v. Tucson Tamale Co., et al. (Sherry Martin Interrogatories) |
| **Attachments:** | 2017-05-04 Sherry Martin Interrogatories.pdf |

Please see attached.

EXHIBIT EE

**Tish Wright**

| | |
|---|---|
| **From:** | Travis L. Tufts |
| **Sent:** | Tuesday, July 12, 2016 4:42 PM |
| **To:** | mel.mcbeath@cox.net |
| **Cc:** | Robert Garcia; Autumn Bonnell; Jamie Archibald |
| **Subject:** | RE: McBeath v. Tucson Tamale Co. et al (7-11-16 meeting recap) |
| **Attachments:** | Joint Motion for Protective Order (00274072xC01F0).docx; Protective Order (00274129xC01F0).docx |

Ms. McBeath,

I am in receipt of your e-mail and letter dated July 11, 2016. I notice that, again, you copied my clients Todd Martin, Sherry Martin, and Lisa Martin on the e-mail message. As I indicated in my e-mail correspondence on July 7, 2016, my clients do not wish to be contacted by you on any matters related to this lawsuit. That includes carbon copying them on e-mail or letter correspondence with my office. I will again instruct you to not contact Todd Martin, Sherry Martin, or Lisa Martin on matters related to this lawsuit. This is a reasonable and common courtesy in matters like this. I hope there will be no further need to address this issue.

With respect to the assertions in your letter, I agreed only to provide a proposed Protective Order today and to provide my disclosure statement and discovery responses by Friday, July 15, 2016. I did not agree to any of the legal conclusions asserted in your letter.

Attached, please find a copy of the proposed Stipulation and Protective Order. If you have any suggested revisions, please provide them to me for consideration. If you approve the Stipulation and Protective Order, please provide permission for me to sign on your behalf and file.

Regards,

Travis

Travis L. Tufts
Profile | vCard
4801 East Broadway Boulevard | Suite 311 | Tucson, Arizona 85711
General: 520.790.5433 | Direct: 520.398.7466 | Fax: 520.790.5736 www.fmazlaw.com

-----Original Message-----
From: mel.mcbeath@cox.net [mailto:mel.mcbeath@cox.net]
Sent: Monday, July 11, 2016 4:28 PM
To: Travis L. Tufts <ttufts@fmazlaw.com>
Cc: Robert Garcia <rgarcia@fmazlaw.com>; Autumn Bonnell <abonnell@fmazlaw.com>; Jamie Archibald <jarchibald@fmazlaw.com>; todd@tucsontamalecompany.com; sherry@tucsontamalecompany.com; lisa@tucsontamalecompany.com
Subject: McBeath v. Tucson Tamale Co. et al (7-11-16 meeting recap)

Attached is the following correspondence:

2016-07-11 Letter to Travis Tufts

Best Regards,

Melissa

EXHIBIT FF

MELISSA MARTIN McBEATH
3463 E. TERRA ALTA BLVD.
TUCSON, AZ 85716
Ph:  (520) 449-9753
*mel.mcbeath@cox.net*

Pro Se

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA, TUCSON DIVISION

| | |
|---|---|
| MELISSA MARTIN McBEATH,<br>  an individual,<br><br>          Plaintiff,<br>     v.<br><br>TUCSON TAMALE COMPANY, an<br>Arizona corporation;<br>TODD RUSSELL MARTIN;<br>an individual;<br>SHERRY MARTIN, an individual; and<br>LISA MARTIN, an individual,<br><br>          Defendants.<br><br>―――――――――――――――<br><br>AND TUCSON TAMALE COMPANY'S<br>RELATED COUNTERCLAIMS | Case No. CV 16-462-TUC-DCB (BPV)<br><br>**FIRST SET OF INTERROGATORIES<br>TO SHERRY MARTIN**<br><br>[Fed. R. Civ. P. 33]<br><br>―――――――――――――――<br><br>Assigned to Hon. David C. Bury<br><br>Complaint filed:  July 11, 2016 |

10393.1

Under Rule 33 of the Federal Rules of Civil Procedure, MELISSA MARTIN McBEATH requests that Defendant SHERRY MARTIN ("YOU" or "YOUR") respond to the following interrogatories under oath within thirty (30) days after service of these interrogatories.

**INTERROGATORIES**

**INTERROGATORY NO. 1:**

Are YOU aware that YOUR attorneys, Ali Farhang and Travis Tufts, were ordered to appear before Judge Gus Aragon of the Pima County Superior Court to explain why they committed a fraud on the court at a hearing held on February 28, 2017? Attached as <u>Exhibit 1</u> is the judge's order and as <u>Exhibit 2</u> the supporting documents that explain the basis for why the order was issued.

**INTERROGATORY NO. 2:**

Without disclosing privileged communications, state every fact upon which YOU base YOUR response to Interrogatory No. 1.

**INTERROGATORY NO. 3:**

After the federal court rules on the pending motions, Plaintiff will report YOUR attorneys' misconduct to the Arizona State Bar. Are YOU aware that YOU may do so as well at any time?

**INTERROGATORY NO. 4:**

Without disclosing privileged communications, state every fact upon which YOU base YOUR response to Interrogatory No. 3.

**INTERROGATORY NO. 5:**

Are YOU aware that all the motions YOUR attorneys filed or opposed in Pima County Superior Court will have no bearing in the federal proceeding? In other words, the case started anew when the state claims and federal claims were consolidated in the federal proceeding in March 2017.

1  **INTERROGATORY NO. 6:**

2      Without disclosing privileged communications, state every fact upon

3  which YOU base YOUR response to Interrogatory No. 5.

4  **INTERROGATORY NO. 7:**

5      Are YOU aware that for months YOUR attorneys refused to consolidate the

6  two lawsuits in federal court (which significantly increased litigations costs), but

7  promptly agreed within days after Judge Aragon ordered them to appear on

8  April 3, 2017, to explain the misrepresentations they made at the February 28,

9  2017 hearing?

10      By consolidating the cases in federal court, YOUR attorneys evaded having

11  to comply with Judge Aragon's order to explain their misconduct because all

12  scheduled state court hearings were vacated.

13  **INTERROGATORY NO. 8:**

14      Without disclosing privileged communications, state every fact upon which

15  YOU base YOUR response to Interrogatory No. 7.

16  **INTERROGATORY NO. 9:**

17      Are YOU aware that if YOU have a viable malpractice claim against YOUR

18  attorneys, their malpractice insurance can pay YOUR attorneys' fees if YOU

19  retain new counsel?

20  **INTERROGATORY NO. 10:**

21      Without disclosing privileged communications, state every fact upon which

22  YOU base YOUR response to Interrogatory No. 9.

23

24

25  Dated:  May 4, 2017                          _____

26                                                   Melissa Martin McBeath

27

28

PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO SHERRY MARTIN                                         CV-16-462-TUC –DCB (BPV)

EXHIBIT  1

FILED
TONI HELLON
CLERK, SUPERIOR COURT
3/8/2017 2:16:32 PM

ARIZONA SUPERIOR COURT, PIMA COUNTY

HON. GUS ARAGON

CASE NO.    C20161794

DATE:       March 08, 2017

MELISSA MARTIN MCBEATH
    Plaintiff

VS.

TUCSON TAMALE COMPANY,
TODD RUSSELL MARTIN,
SHERRY MARTIN,  and
LISA MARTIN
    Defendants

---

## R U L I N G

IN CHAMBERS RULING RE:  DEFENDANTS' MOTION TO DISMISS

This Motion was originally filed on May 25, 2016.  Thereafter the Motion was denied as moot in the Court's Minute Entry Order of October 31, 2016.  At that time the Court granted leave to file a new Motion to Dismiss addressing the allegations of the Amended Complaint filed on September 9, 2016.  Thereafter no new Motion was filed.  However, on February 21, 2017 Defendants filed a Notice of Motions for oral argument on February 28, 2017.  By this time Plaintiff, who originally filed her lawsuit pro se, had retained local counsel Rafael Gallego who had obtained an order from the Court allowing counsel from California, Ruchit Kumar Agrawal, to appear in this matter Pro Hac Vice.

In Defendants' Notice of February 21, 2017 Defendants indicated that the parties had conferred about pending Motions that were ripe for oral argument at the hearing of February 28, 2017 and then provided a list of Motions to be addressed at the hearing, including the Motion to Dismiss.  On February 28, 2017 the Court convened this matter for oral arguments.  Mr. Gallego appeared and requested a postponement indicating that he was unprepared and that Mr. Agrawal, for unknown reasons, was unable to appear.  The Court found that Mr. Agrawal had waived the right to appear and heard oral argument on the Defendants' Motion to Dismiss, after which the Motion was taken under advisement.

Since that time Plaintiff filed a Declaration on March 1, 2017 accusing defense counsel Ali J. Farhang of committing a fraud on the Court and making numerous false statements and misleading omissions.  Attached as

_____
R. Lee
Judicial Administrative Assistant

R U L I N G

| Page 2 | Date:  March 08, 2017 | Case No.:   C20161794 |
|---|---|---|

Exhibit A to the Declaration is an e-mail from Mr. Agrawal to defense counsel Travis Tufts dated February 22, 2017.  In that e-mail Mr. Agrawal disputes that the Defendants' Motion to Dismiss was appropriate for oral argument on February 28, 2017.  This information was not provided to the Court prior Plaintiff's Declaration filed on March 1, 2017.

Now having received Plaintiff's Declaration and the above e-mail, the Court has concerns about whether it was appropriate to proceed with oral argument on the Motion to Dismiss on February 28, 2017.

IT IS THEREFORE ORDERED setting this matter for hearing concerning whether defense counsel had received Mr. Agrawal's e-mail dated February 22, 2017 and whether there was any response to that e-mail or any other e-mail communications or other communication between Defendants' counsel and Plaintiff's counsel in and around the time frame between February 22, 2017 and February 28, 2017.  The hearing shall take place on **April 3, 2017 at 10:00 a.m.**

The Court notes that Mr. Gallego has moved to withdraw from further representation of the Plaintiff and he has moved to withdraw the admission Pro Hac Vice of Mr. Agrawal.  The Court has not as yet ruled upon those Motions.

cc:    Ali J. Farhang, Esq.
       Rafael F. Gallego, Esq.
       Robert C. Garcia, Esq.
       Ruchit Kumar Agrawal, Esq.
       Travis L Tufts, Esq.
       Melissa Martin McBeath

R. Lee
Judicial Administrative Assistant

EXHIBIT 2

FILED
TONI L. HELLON
CLERK, SUPERIOR COURT

3/1/2017 1:11:39 PM

BY: JIM ORR
          DEPUTY

Ruchit Kumar Agrawal (Cal. Bar No. 299290)
KUMAR LAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586
*Ruchit@kumarlawsv.com*

Rafael F. Gallego (Ariz. Bar No. 013726)
GALLEGO LAW FIRM, P.C.
1016 E Pennsylvania St. - Ste 308
Tucson, Arizona 85714
(520) 882-8300
*Rafael@gallegolawfirm.com*

Attorneys for Melissa Martin McBeath

## SUPERIOR COURT OF ARIZONA
## COUNTY OF PIMA

| | |
|---|---|
| MELISSA MARTIN McBEATH,<br>an individual,<br><br>Plaintiff/Counterdefendant,<br><br>v.<br><br>TUCSON TAMALE COMPANY,<br>an Arizona corporation, *et al.*,<br><br>Defendant(s)/Counterclaimant. | Case No. C20161794<br><br>MELISSA MARTIN McBEATH DECLARATION RE: FACTUAL MISREPRESENTATIONS THAT DEFENDANTS' COUNSEL MADE TO THE COURT AT THE FEBRUARY 28, 2017 HEARING |

10361.1

I, MELISSA MARTIN McBEATH, declare:

1.      I am the Plaintiff and Counterdefendant in this action. I have personal, first-hand knowledge of all matters stated herein and, if called to testify as to these matters, I could and would do so competently.

2.      I attended the hearing held on February 28, 2017. Defendants' counsel, Ali J. Farhang, committed a fraud on the Court that I feel duty-bound to bring to the Court's immediate attention.

3.      Mr. Ali made numerous false statements and misleading omissions regarding the factual record and procedural history of this case that violate Arizona Rules of Professional Conduct R. 3.3 (a)(1), which states that "[a] lawyer shall not knowingly. . . make a false statement of fact or law to a tribunal." *See also* Ariz. R. Prof. Cond. 8.4(c) ("It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.").

4.      Mr. Farhang knew (or should have known) that it was improper to reassert and argue Defendants' Motion to Dismiss filed on May 25, 2016, because the Court had already ***denied this motion as moot,*** as indicated in the Minute Entry Order for the hearing held on October 31, 2016. Attached as <u>Exhibit A</u> is a copy of the email, dated February 22, 2017, that my attorney sent to Travis L. Tufts, another one of Defendants' attorneys, that pointed out the mistake in the Notice of Motions For Oral Argument on February 28, 2017 that Mr. Tufts filed on February 21, 2017. The notice improperly listed Defendants' Motion to Dismiss as one of the pending motions this Court still had to consider. Mr. Tufts never responded to my attorney's email.

5.      In the Minute Entry Order for the hearing held on January 17, 2017, the Court ***granted in part*** my Motion to Compel the Deposition of Lisa Martin, filed on October 6, 2016. Mr. Tufts argued that I had to compensate Lisa Martin for the time she sat for her deposition, but could not cite any legal authority in support of his argument nor did the Court know of any.

6.     As a professional courtesy, the Court granted additional time for Mr. Tufts to provide to the Court whatever legal authority he could find in support of his argument on or before the February 28, 2017 hearing. I reasserted the motion so that the Court could rule on whether I had to compensate Lisa Martin for her time. Mr. Farhang falsely stated that I filed another "duplicative" motion asking for the same relief on a motion that had already been decided in its entirety. The Court's docket will confirm that this is not true.

7.     Mr. Farhang falsely stated that I did not properly serve the subpoena duces tecum on Tucson Tamale Company's (*"TTC"*) insurance broker because I never provided a proof of service.  Attached as <u>Exhibit B</u> is a copy of the signed proof of service I personally served via email on Defendants' counsel on October 26, 2016.

8.     Mr. Farhang falsely stated that I served a duplicate subpoena duces tecum on TTC's insurance broker in connection with the parallel federal action pending before the U.S. District Court for the District of Arizona, Case No. CV-16-462-TUC-DCB (BPV). I have served only one subpoena on TTC's insurance broker and that's the one served in connection with this state court proceeding.

9.     I began to serve discovery relating to my federal claims shortly after the U.S. District Court denied TTC's Motion for Judgment on the Pleadings, which asked for the dismissal of my federal complaint because I was allegedly claim-splitting. TTC further accused me of vexatious litigation because I elected to pursue my Title VII discrimination claims in federal court, an argument that Mr. Farhang repeated at the February 28 hearing.

10.     None of the claims alleged in the federal complaint are duplicative of the state law claims alleged in the First Amended Complaint filed in this Court on September 9, 2016. Attached as <u>Exhibit C</u> is a copy of the Report and Recommendation, dated January 31, 2017, issued by the magistrate judge, and related Order issued by the District Court Judge, dated February 23, 2017,

McBEATH DECLARATION RE: MISREPRESENTATIONS
DEFENDANTS' COUNSEL MADE TO THE COURT AT THE
FEBRUARY 28, 2017 HEARING

-2-

C20161794

1   adopting the magistrate judge's recommendation to deny TTC's meritless

2   Motion for Judgment on the Pleadings.

3       11.    Defendants seek to take the oral deposition of non-party deponents

4   whose testimony is either not relevant or is protected from disclosure under

5   Ariz. R. Civ. Proc. 26(b)(4)(B) because these individuals are experts that I consult

6   informally. Because I declined to stipulate to the deposition of these non-party

7   deponents does not mean I have deliberately impeded Defendants' discovery

8   efforts. I have done nothing to prevent Defendants from seeking leave of Court

9   to take these depositions after making the requisite offer of proof. In fact, they

10   ask for precisely this relief in the motion Defendants filed on February 15, 2017.

11       12.    Defendants filed a Motion for 56(f) Relief to request more time to

12   hire an expert to conduct a forensic analysis of TTC's computer systems. I filed

13   my Motion for Partial Summary Judgment on June 28, 2016.

14       13.    Defendants have had ***over ten months*** (they filed their counterclaims

15   against me in May 2016) to retain the expert witness whose expert testimony

16   Defendants represented to the Court was crucial to their opposition to my

17   motion. When I met in person with Mr. Tufts in December 2016 to discuss

18   discovery-related issues, he informed me that Defendants still had not retained

19   any expert witnesses and did not plan to retain one any time soon.

20       14.    TTC has failed to provide any evidence whatsoever to oppose my

21   Motion for Partial Summary Judgment and has not filed the Separate

22   Statement of Facts required by Ariz. R. Civ. Proc. 56(c)(2). Without any

23   documentary evidence or declarations offered to oppose my motion, there is no

24   evidence before this Court that raises factual issues. For this reason Count IV

25   (Violation of Stored Communications Act), Count V (Civil Conspiracy) and

26   Count VI (Aiding and Abetting) alleged in TTC's First Amended Counterclaims

27   should be summarily dismissed because the facts set out in my moving papers in

28   support of the summary judgment motion are undisputed as a matter of law.

1

2

3        I declare (or certify, verify or state) under penalty of perjury under the

4   laws of the State of Arizona that the foregoing is true and correct. Executed on

5   March 1, 2017.

6                                *Melissa Martin McBeath*

7                                Melissa Martin McBeath

8

9

10

11

12

13

14

15

16   ORIGINAL filed via TurboCourt on March 1, 2017 with:

17

18   Clerk of the Court
     Pima County Superior Court

19

20   COPY served via TurboCourt on March 1, 2017 to:
     Roberto C. Garcia

21   *rgarcia@fmazlaw.com*
     Travis L. Tufts

22   *ttufts@fmazlaw.com*

23

24   Attorneys for:
     Tucson Tamale Company, Todd Russell Martin, Sherry Martin and Lisa Martin

25   *Melissa Martin McBeath*

26   Melissa Martin McBeath

27

28

McBEATH DECLARATION RE: MISREPRESENTATIONS
                                DEFENDANTS' COUNSEL MADE TO THE COURT AT THE        -4-                    C20161794
                                FEBRUARY 28, 2017 HEARING

EXHIBIT  A

From: Kumar Law <ruchit@kumarlawsv.com>
Date: Wed, Feb 22, 2017 at 9:51 AM
Subject: Re: February 28 Hearing
To: Travis L. Tufts <ttufts@fmazlaw.com>
Cc: Robert Garcia <rgarcia@fmazlaw.com>, Tish Wright
<twright@fmazlaw.com>, Jamie Archibald <jarchibald@fmazlaw.com>


Travis,

I just now had a chance to review the Notice of Motions for Oral Argument on
February 28, 2017.

The Notice lists Defendants' Motion to Dismiss filed on May 25, 2016.

According to the Court's Order issued following the October 31, 2016 hearing,
this motion was denied as moot.

Weren't your clients going to file another motion to dismiss shortly after the
January 17, 2017 hearing?

I'll get back you on your proposal to submit all claims to binding arbitration.

Ruchit

--

**Ruchit Kumar Agrawal, Esq.**
| **Silicon Valley** 408.601.0586 | **Washington DC** 202.807.6180 |

Unless specifically indicated, nothing in this email should be interpreted as a digital or electronic signature that can be used to form, execute,
document, agree to, enter into, accept or authenticate a contract or other legal document. This electronic mail transmission and any attached
documents may contain confidential or privileged information for the sole use of the intended recipient(s). Any review, use, distribution or
disclosure by anyone other than the intended recipient(s) is strictly prohibited. If you believe that you have received this message in error,
please notify the sender by reply transmission and delete or destroy the message without copying or disclosing it.

EXHIBIT  B

| | |
|---|---|
| Name of Person Filing: | Melissa Martin McBeath |
| Mailing Address: | 3463 E. Terra Alta Blvd. |
| City, State, Zip Code: | Tucson, AZ 85716 |
| Telephone: | (520) 449-9753 |

FOR CLERK'S USE ONLY

## SUPERIOR COURT OF ARIZONA
## IN MARICOPA COUNTY

In the Matter of

Melissa Martin McBeath
_____
Petitioner(s) /Plaintiff(s)

Tucson Tamale Company et al.
_____
Respondent /Defendant(s)

**Case No.**   C20161794

## AFFIDAVIT OF SERVICE
## OF SUBPOENA

**Arizona Rules of Civil Procedure, Rule 45 (d)**
**Arizona Rules of Family Law Procedure, Rule 52**

**I received the Subpoena addressed to:**   Koty-Leavitt Insurance Agency

**which was dated:**   September 30, 2016   **I personally served the subpoena as follows:**

**On this date:**   October 6, 2016   **At this time:**   2:24 pm

**At this location:**   6992 E. Broadway Blvd., Tucson, AZ 85710

**To: (Name)**   Koty-Leavitt Insurance Agency  (Teagan Hassan)

**Manner of Service:**   personal service   (hand-delivered)
**(how served)**

**I was over the age of 18 at the time the subpoena was served.  I am not a party to the case.**

## UNDER PENALTY OF PERJURY:

By signing below, I state to the Court under penalty of perjury that the contents of this document are true and correct.

**Date:**   October 6, 2016

_____
Signature

**Printed Name:**   Ernesto A. Chavez
**Street Address:**   3173 E. Terra Alta
**City, State, Zip Code:**   Tucson, AZ 85716
**Telephone Number(s):**   _____

| | | |
|---|---|---|
| FEES | $ | 0.00 |
| MILEAGE CHARGES | $ | |
| OTHER | $ | |
| **TOTAL** | $ | 0.00 |

© Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED

Page 1 of 1

GNS28f-051911

EXHIBIT  C

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Melissa Martin McBeath, | No. CV-16-00462-TUC-DCB (BPV) |
| Plaintiff, | **REPORT AND** |
| v. | **RECOMMENDATION** |
| Tucson Tamale Company, | |
| Defendant. | |

Pending before the Court are:   (1) Defendant's Motion for Judgment on the Pleadings (Doc. 18); and Plaintiff's Motion for Leave to Amend Complaint (Doc. 25). This matter is referred to the undersigned Magistrate Judge for all pretrial proceedings and a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) and LRCiv. 72.1, 72.2.   For the following reasons, the Magistrate Judge recommends that the District Court:  (1) deny Defendant's Motion for Judgment on the Pleadings; and (2) grant Plaintiff's Motion for Leave to Amend Complaint.

**I.     FACTUAL & PROCEDURAL BACKGROUND**

**A.     FEDERAL ACTION**

On July 11, 2016, Plaintiff, acting *pro se,* filed the instant action against her former employer, the Tucson Tamale Company, alleging violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* (Doc. 1).  Plaintiff alleges that she is over the age of 40.  (Complaint at ¶40).  Plaintiff further alleges that in April 2015, she began employment with Defendant in the positon of Area Manager based upon the promise that after a 90-day probationary period, she would "transition into the new

1   role of Business Development Manager at an increased annual salary." (*Id.* at ¶¶14, 15,

2   21).   The transition did not occur after the 90-day probationary period and Plaintiff's

3   employment was ultimately terminated on February 22, 2016.   (*Id.* at ¶¶24, 32, 35).

4   Plaintiff also alleges that in or around September 2015, Defendant hired Lindsay Welch,

5   who "is in her early 30s[] for the position of Business Development Manager that had

6   been promised to Plaintiff." (*Id.* at ¶41).   According to Plaintiff, she "is more qualified

7   than Lindsay Welch to be [Defendant's] Business Development Manager, but was denied

8   the position because of Plaintiff's age and Hispanic national origin." (*Id.* at ¶47).

9       **B.   STATE ACTION**

10      On April 15, 2016, Plaintiff filed a *pro* se action in Arizona state court against the

11   following Defendants:  Tucson Tamale Company, the same Defendant against whom this

12   federal action is pending, and Todd Martin, Sherry Martin, and Lisa Martin all of whom

13   are associated with the Tucson Tamale Company. (Defendants' Motion for Judgment on

14   the Pleadings (Doc. 18), Exh. 1 (Doc. 18-1)).   Plaintiff alleges claims of:   retaliatory

15   discharge in violation of the Employment Protection Act, A.R.S. § 23-1501, against all

16   defendants; fraud in the inducement against all defendants; negligent misrepresentation

17   against all defendants; breach of employment agreement against the Tucson Tamale

18   Company; failure to pay earned wages in violation of Arizona's wage Act, ARS § 23-

19   350, *et seq.* against the Tucson Tamale Company; conversion against all defendants; and

20   restitution/unjust enrichment against all defendants.

21   **II.   DISCUSSION**

22      Defendant has filed a Motion for Judgment on the Pleadings pursuant to

23   Fed.R.Civ.P. 12(c), arguing that the matter should be dismissed because Plaintiff has

24   impermissibly split her claim between the Arizona state court and this Court.

25   (Defendant's Motion for Judgment on the Pleadings (Doc. 18)).   In addition to opposing

26   Defendant's Motion (*see* Doc. 19), Plaintiff seeks leave to amend her Complaint to

27   include a cause of action alleging national origin, race and ancestry discrimination in

28   violation of 42 U.S.C. §2000e-2(a).   (Plaintiff's Motion for Leave to Amend (Doc. 25)).

- 2 -

### A.   DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

#### 1.   STANDARD

"Judgment on the pleadings is properly granted when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir.2009). "Analysis under Rule 12(c) is substantially identical to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (internal quotation marks and citation omitted).

When analyzing a complaint under Rule 12(b)(6) for failure to state a claim, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Taylor v. Yee*, 780 F.3d 928, 935 (9th Cir. 2015) (internal quotation marks and citation omitted). However "[t]he tenet that a court must accept as true all of the allegations contained in a complaint..." does not apply to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009));; *see also Telesaurus VPC, LLC. v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010) (pleadings that are no more than legal conclusions "'are not entitled to the assumption of truth.'") (quoting *Iqbal*, 556 U.S. at 679). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Moreover, the court "cannot assume any facts necessary to [the plaintiff's]...claim that they have not alleged." *Jack Russell Terrier Network of Northern Calif. v. American Kennel Club, Inc.*, 407 F.3d 1027, 1035 (9th Cir. 2005).

The court will assume "'well-pleaded factual allegations,'. . . to be true, 'and then determine whether they plausibly give rise to an entitlement to relief.'" *Telesaurus*, 623 F.3d. at 1003 (quoting *Iqbal*, 556 U.S. at 679); *see also Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more

than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 570).   Determining plausibility is a "context-specific task..." that requires the court to "draw on its judicial experience and common sense." *Id.* at 679. A complaint cannot survive dismissal where the court can only infer that a claim is merely possible rather than plausible. *Id.*

Although courts will not normally look beyond the pleadings in resolving a motion to dismiss for failure to state a claim, the Court may take judicial notice of matters of public record, such as Plaintiff's state complaint, if the facts are not subject to reasonable dispute. *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir.2001), *impliedly overruled on other grounds as discussed in Gallardo v. Dicarlo*, 203 F.Supp.2d 1160, 1162 n.2 (C.D. Cal. 2002); *see also* Fed.R.Evid. 201.

## 2.   ANALYSIS

Defendant argues that Plaintiffs' federal action must be dismissed based upon impermissible claim-splitting.   "Plaintiffs generally have no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant." *Adams v. California Dep't of Heath Servs.,*487 F.3d 684, 688 (9th Cir. 2007) (internal quotation marks and citation omitted), *overruled on other grounds by Taylor v. Sturgell*, 533 U.S. 880, 904 (2008). Whether to dismiss an action on grounds of claim-splitting is a matter within the trial court's discretion. *Id.* The issue of claim-splitting has generally been viewed as a concern related to docket management. *See* 18A Charles Alan Wright, Arthur R. Miller, *Federal Practice & Procedure*, §4406 (3d ed.); *see also Kanciper v. Suffolk Cty. Soc. for the Prevention of Cruelty to Animals, Inc.*, 722 F.3d 88, 89, 91 nn. 2, 3 (2d Cir. 2013).

Here, Defendant requests dismissal of the instant federal action based upon Plaintiff's pending state court action. Unlike *Adams,* however, Plaintiff's actions are not pending in the "same court. . . ."[1] *Adams,* 487 F.3d at 688.

_____

[1] Although Defendant correctly indicated that the plaintiff in *Adams* "filed suit in state court" (Defendant's Motion at 5), that action was pending in federal court upon removal when the plaintiff filed the concurrent federal court action and when the claim-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Ninth Circuit has recognized the long-settled rule that "overlapping or even identical federal and state court litigation may proceed simultaneously, limited only by doctrines of abstention and comity. . . ." *Noel v. Hall,,* 341 F.3d 1148, 1159 (9th Cir. 2003). In *Noel,* the Ninth Circuit explained that:

> The rule that permits simultaneous litigation in state and federal court of overlapping and even identical cases is deeply rooted in our system. As the Court wrote in *Atlantic Coast Line Railroad v. Brotherhood of Locomotive Engineers,* 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970): "[T]he state and federal courts had concurrent jurisdiction in this case, and neither court was free to prevent either party from simultaneously pursuing claims in both courts." *Id.* at 295, 90 S.Ct. 1739 (citing *Kline v. Burke Constr. Co.,* 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226 (1922)). The Court has recognized that this rule can produce "inefficient simultaneous litigation in state and federal courts on the same issue.... But this is one of the costs of our dual court system...." *Parsons Steel, Inc. v. First Ala. Bank,* 474 U.S. 518, 524– 25, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986); *see also Doran v. Salem Inn, Inc.,* 422 U.S. 922, 928, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) ("[T]he very existence of one system of federal courts and 50 systems of state courts, all charged with the responsibility for interpreting the United States Constitution, suggests that on occasion there will be duplicating and overlapping adjudication of cases which are sufficiently similar in content, time, and location to justify being heard before a single judge had they arisen within a unitary system.")[.]

*Id.* at 1159. The court went on to explain that:

> The inefficiencies produced by the rule permitting simultaneous litigation in state and federal court are mitigated by a number of abstention doctrines that permit, and often require, a federal court to abstain in favor of state court litigation. They include *Younger* abstention, after *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Pullman* abstention, after *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Burford* abstention, after *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); and *Colorado River* abstention, after *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). In addition, a federal court may stay its proceedings based on comity even when none of the abstention doctrines requires that it do so. *See Deakins v. Monaghan,* 484 U.S. 193, 202–03, 108 S.Ct. 523, 98 L.Ed.2d 529 (1988). These federalism-based abstention and comity doctrines are complex and subtle, ensuring that a decision by a federal court to proceed, abstain, or stay in the

splitting issue was raised and decided. *See Adams,* 487 F.3d at 687-88.

face of parallel state court litigation will be made only after considering a number of case- and doctrine-specific factors.

*Id.* at 1159-60. *See also Rutledge v. Arizona Bd. of Regents,* 859 F.2d 732, 736 (9th Cir. 1988) (Plaintiff "chose to file parallel state and federal court actions simultaneously. There was concurrent jurisdiction and it was permissible for him to do so.").

Other than citing *Adams,* which indicates that the actions must be filed in the same court for the claim-splitting defense to apply, the parties have cited to no Ninth Circuit law specifically discussing whether a case may be dismissed on grounds of claim-splitting when the parallel action is pending in state court.[2]  Defendant has cited to *Clements v. Airport Authority of Washoe County,* 69 F.3d 321 (1995) for an explanation of the "objective" of the rule against claim-splitting.   (Defendant's Motion at 3-4). Although *Clements* involved parallel state and federal actions, the Ninth Circuit ultimately held that the defendants waived objections "to the splitting of any claim or to the prosecution of the two cases at the same time in the state and federal courts." *Clements,* 69 F.3d at 329.  Thus, *Clements* does not provide any assistance on the instant issue given that, in light of the defendants' waiver, the court was not required to address whether the defense would have applied to a concurrent state action in the first place.

In two unpublished decisions involving parallel state and federal actions, the Ninth Circuit has reversed district court dismissals based on claim-splitting because both actions were not pending in the same court *See Henderson v. Bonaventura,* 649 F. App'x 639, 641, 2016 WL   (9th Cir. 2016) (citing *Colorado River Water Conservation Dist.,*

---

[2] Plaintiff has cited an Arizona decision for the premise "that where two identical actions are filed in 'state and federal courts having concurrent jurisdiction' the action 'may proceed simultaneously until one court reaches judgment.'"  (Plaintiff's Opposition to Defendant's Motion for Judgment on the Pleadings (Doc. 19) at 2-3 (quoting *Tonnemacher v. Touche Ross & Co.,* 186 Ariz. 125, 128, 920 P.2d 5, 8 (App. 1996) (emphasis omitted)).  The *Tonnemacher* court held that Arizona's abatement doctrine did not apply and that the state court could not dismiss the state action based upon the pendency of a parallel federal action, a result which the court found was "harmonious with the federal rule, which is that a federal court will not generally dismiss a state law claim that has been asserted in a prior state court proceeding." *Tonnemacher,* 186 Ariz. at 130, 920 P.2d at 10 (citing *Colorado River Water Conservation Dist.,* 424 U.S. at 817).

- 6 -

1    424 U.S. at 818); *Sanzaro v. Ardiente Homeowners Ass'n LLC,* 513 F. App'x 646, 647,

2    2013 WL 1137378 (9th Cir. 2013) (citing *Noel,* 341 at 1159).[3]

3         The Second Circuit Court of Appeals has reversed dismissal entered by the district

4    court based upon a claim-splitting analysis, and held that the issue should, instead, be

5    decided under the *Colorado River* abstention doctrine.   *Kanciper,* 722 F.3d at 92-94.

6    (recognizing that federal courts are not barred from entertaining federal suits when a

7    parallel state action is pending).   Several district courts have also found the claim-

8    splitting defense inapplicable where the concurrent case is pending in state court.   *T.K. v.*

9    *Stanley,* 2016 WL 6217117, at *2 (W.D. Wash. Oct. 25, 2016) (denying motion for

10   reconsideration of court's order, *inter alia,* declining to apply claim-slitting defense when

11   the concurrent action is a state court proceeding.); *Deabay v. Philadelphia Indem. Ins.*

12   *Co.,* 2015 WL 4041735, *2 (D. Me. July 1, 2015) ("Because the present case involves

13   state-federal concurrent proceedings, the Defendant's 'claim splitting' argument is

14   unavailing."); *O'Dell v. CMH Homes, Inc.,* 2015 WL 4041302, at *3 (N.D.W. Va. July 1,

15   2015) ("This [claim-splitting] doctrine, however, has not been extended to apply to

16   parallel state and federal actions. As a general rule, the mere existence of a pending

17   parallel action in the state system will not bar proceedings regarding the same matter in a

18   federal court, 'despite what may appear to result in a duplication of judicial resources.'")

19   (quoting *McLaughlin v. United Va. Bank,* 955 F.2d 930, 934 (4th Cir.1992) (discussing

20   *Colorado River* abstention doctrine); *Steinberg v. Nationwide Mut. Ins. Co.,* 418 F. Supp.

21   2d 215, 223 (E.D.N.Y. 2006) ("However, claim splitting does not apply to parallel state

22   and federal actions. Courts have consistently declared that '[w]here there is concurrent

23   jurisdiction, however, it is permissible for a plaintiff to file parallel state and federal

24   actions simultaneously.'") (quoting *Rutledge,* 859 F.2d at 736).

25        Defendant's request for dismissal of Plaintiff's federal action based upon a claim-

26   splitting theory contravenes the rule "deeply rooted in our system" that "overlapping or

27   _____

28        [3] Pursuant to Ninth Circuit Rule 36-3(a), although these cases may be cited, they
     have no precedential value. *See also* Fed.R.App.P. 32.1.

1  even identical federal and state court litigation may proceed simultaneously, limited only

2  by doctrines of abstention and comity . . . ." *Noel,* 341 F.3d at 1159.  *Cf. Kanciper,* 722

3  F.3d at 92-94; *O'Dell,* 2015 WL 4041302, at \*3; *Steinberg,* 418 F. Supp. 2d at 223.

4  Because Plaintiff's concurrent actions are pending in state and federal court, dismissal on

5  a claim-splitting theory is not appropriate in this case and Defendant's Motion for

6  Judgment on the pleadings should be denied.[4]

7         **B.    PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE COMPLAINt**

8              **1.    Standard**

9         The Federal Rules of Civil Procedure provide that "the court should freely give

10  leave [to amend the complaint] when justice so requires[,]" Fed.R.Civ.P. 15(a)(2), and

11  the United States Supreme Court has made clear that "this mandate is to be heeded."

12  *Foman v. Davis,* 371 U.S. 178, 182 (1962). "If the underlying facts or circumstances

13  relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an

14  opportunity to test his claim on the merits." *Id.* However, leave to amend may be denied

15  in circumstances of undue delay, bad faith, futility of amendment, failure to cure

16  deficiencies by amendments previously allowed, and prejudice to the opposing party. *Id.*;

17  *Western Shoshone Nat'l Council v. Molini,* 951 F.2d 200, 204 (9th Cir. 2001); *Howey v.*

18  *United States,* 481 F.2d 1187 1190 (9th Cir.1973). The most important of these factors is

19  prejudice to the opposing party. *Jackson v. Bank of Hawaii,* 902 F.2d 1385, 1387 (9th

20  Cir. 1990). The party opposing amendment bears the burden of proving prejudice. *DCD*

21  *Programs, Ltd. v. Leighton,* 833 F.2d 183, 187 (9th Cir. 1987).  A district court's denial

22  of leave to amend is reviewed for an abuse of discretion, but the question of futility is

23  reviewed de novo. *United States v. United Healthcare Insur. Co.,* __ F.3d __, 2016 WL

24  7378731 \*7 (9th Cir. Aug. 10, 2016).

25

26

27

28

---

[4] The parties have not argued or briefed whether the Court is limited in this case by federal doctrines of abstention or comity and the Court offers no opinion on those issues at this point.

## 2.   ANALYSIS

Plaintiff seeks leave to amend her Complaint to include a claim of discrimination based upon national origin, race and ancestry in violation of 42 U.S.C. § 2000e-2(a). (Plaintiff's Motion for Leave to Amend the Complaint (Doc. 25)).  She did not include the claim in her original Complaint because the Equal Employment Opportunity Commission ("EEOC") had not yet issued its right to sue letter. (*Id.* at 2).  On November 2, 2016, the EEOC issued its right to sue letter and Plaintiff filed the instant Motion seeking leave to amend on December 12, 2016. (*Id.*).

Defendant opposes Plaintiff's Motion, arguing that it is futile because the action should be dismissed on grounds of claim-splitting as advanced in Defendant's Motion for Judgment on the Pleadings.  Because Defendant does not prevail in its request for dismissal based on claim-splitting, as discussed above, Plaintiff's amendment cannot be viewed as futile claim-splitting.

Defendant goes on to argue that amendment should not be permitted because Plaintiff is acting in "bad faith" by forcing Defendant to defend against litigation in state and federal forums, as well as in administrative proceedings. (Defendant's Opposition to Plaintiff's Motion for Leave to Amend Complaint (Doc. 27) at 3-4).  Defendant asserts that that "virtually none" of Plaintiff motions filed in state court have been granted. (*Id.* at 3 (emphasis omitted)).  Defendant also asserts that Plaintiff "is not . . . a mere *pro se* litigant wading into difficult areas of law and legal doctrine[,] [r]ather she is the face of a 'team'" including "one disbarred [by the state of California] attorney and an apparent jack-of-all-trades information technology 'litigation consultant. . . '" with whom Plaintiff has allegedly shared Defendant's confidential information. (*Id.*).

Plaintiff indicated in her original Complaint, which was filed in July 2016, that she anticipated amending the Complaint "to allege an additional claim for national origin discrimination if the EEOC elects to issue a right to sue letter in Plaintiff's pending national origin discrimination charge." (Complaint, ¶50).  A little over a month after she received the right to sue letter, Plaintiff filed the instant motion.  While Defendant's

1    Opposition suggests animosity between the parties, there has been no showing at this
2    point of a pattern of bad faith on behalf of Plaintiff so as to preclude the requested
3    amendment.  *See generally,* 6 Charles Alan Wright & Arthur R. Miller 6 *Federal*
4    *Practice & Procedure* §1487 n. 31 (collecting cases where bad faith prevented
5    amendment of the complaint).  Accordingly, Plaintiff should be permitted to file and
6    serve her First Amended Complaint.

7    **III.   RECOMMENDATION**

8          For the foregoing reasons, the Magistrate Judge recommends that the District
9    Court, after its independent review:

10         (1)    deny Defendant's Motion for Judgment on the Pleadings (Doc. 18); and

11         (2)    grant Plaintiff's Motion for Leave to Amend the Complaint (Doc. 25).

12         Pursuant to 28 U.S.C. §636(b) and Rule 72(b)(2) of the Federal Rules of Civil
13   Procedure and LRCiv 7.2(e), Rules of Practice of the U.S. District Court for the District
14   of Arizona, any party may serve and file written objections within **FOURTEEN (14) DAYS**
15   after being served with a copy of this Report and Recommendation.  A party may respond
16   to another party's objections within **FOURTEEN (14) DAYS** after being served with a copy.
17   Fed.R.Civ.P. 72(b)(2).  No replies to objections shall be filed unless leave is granted from
18   the District Court to do so.  If objections are filed, the parties should use the following
19   case number: **CV 16-462-TUC-DCB**.

20         Failure to file timely objections to any factual or legal determination of the
21   Magistrate Judge may be deemed a waiver of the party's right to review.

22         Dated this 31st day of January, 2017.

23

24

25

26                                    Bernardo P. Velasco
27                                    United States Magistrate Judge

28

- 10 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Melissa Martin McBeath, | No. CV-16-00462-TUC-DCB |
| Plaintiff, | **ORDER** |
| v. | |
| Tucson Tamale Company, | |
| Defendant. | |

     This matter was referred to Magistrate Judge Bernardo P. Velasco on November 23, 2016.  Pursuant to the Rules of Practice for the United States District Court, District of Arizona (Local Rules), Rule (Civil) 72.1(a), Magistrate Judge Velasco issued a Report and Recommendation (R&R) on January 31, 2017.  (Doc. 29: R&R).  He recommends denying the Defendant's Motion for Judgment on the Pleadings and granting Plaintiff leave to amend the Complaint.

<u>STANDARD OF REVIEW</u>

     The duties of the district court, when reviewing an R&R of a Magistrate Judge, are set forth in Rule 72 of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1).  The district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Fed.R.Civ.P. 72(b), 28 U.S.C. § 636(b)(1).  When the parties object to an R&R, "'[a] judge of the [district] court shall make a *de novo* determination of those portions of the [R&R] to which objection is made.'" *Thomas v. Arn,* 474 U.S. 140, 149-50 (1985) (quoting 28 U.S.C. § 636(b)(1)).

1   When no objections are filed, the district court does not need to review the R&R *de novo.*

2   *Wang v. Masaitis,* 416 F.3d 992, 1000 n. 13 (9th Cir.2005); *United States v. Reyna-Tapia,*

3   328 F.3d 1114, 1121-22 (9th Cir.2003) (*en banc*).

4        The parties were sent copies of the R&R and instructed they had 14 days to file

5   written objections. 28 U.S.C. § 636(b), *see also,* Federal Rule of Criminal Procedure 72

6   (party objecting to the recommended disposition has fourteen (14) days to file specific,

7   written objections). The Defendant has not filed an objection.

8                      <u>REPORT AND RECOMMENDATION</u>

9        The Honorable Bernardo P. Velasco, United States Magistrate Judge, considered

10  two issues: whether Plaintiff's federal action is impermissible claim splitting and whether

11  the claim of discrimination based on national origin, race and ancestry is futile.  The

12  Defendant's Motion for Judgment on the Pleadings turns on the answer to the first

13  question.  The Plaintiff's Motion to Amend the Complaint hinges on the second.

14       The Magistrate Judge found that Plaintiff's federal case is not precluded by claim

15  splitting.  She is free to litigate simultaneously in both the state and federal courts until

16  one reaches judgment, but may be limited by doctrines of abstention and comity, and the

17  Court's discretion to stay a case for judicial economy.  (R&R (Doc. 29) at 4-8.)  The

18  Magistrate Judge did not reach the doctrines of abstention or comity because they were

19  not raised by the motion.  *Id.* The Court finds the Magistrate Judge was correct in his

20  analysis of claim splitting and, it also does not reach questions of abstention or comity.

21       Of course, leave to amend is always freely granted. Fed. R. Civ. P. 15(a)(2).  The

22  record reflects that the Plaintiff was waiting for her right to sue letter prior to bringing the

23  discrimination claim.  The EEOC issued the right to sue letter on November 2, 2016, and

24  Plaintiff moved to amend the Complaint on December 12, 2016.  Like the Magistrate

25  Judge, this Court rejects Defendant's argument that Plaintiff proposed amendment is

26  made in bad faith.  (R&R (Doc. 29) at 9-10.)

27

28

- 2 -

1    While there are no objections and review has, therefore, been waived, the Court

2  nevertheless reviews at a minimum, *de novo*, the Magistrate Judge's conclusions of law.

3  *Robbins v. Carey*, 481 F.3d 1143, 1147 (9th Cir. 2007) (citing *Turner v. Duncan*, 158 F.3d

4  449, 455 (9th Cir. 1998) (conclusions of law by a magistrate judge reviewed *de novo*);

5  *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991) (failure to object standing alone will

6  not ordinarily waive question of law, but is a factor in considering the propriety of

7  finding waiver)).  The Court finds the R&R to be thorough and well-reasoned, without

8  any clear error in law or fact.  *See United States v. Remsing*, 874 F.2d 614, 617-618 (9th

9  Cir. 1989) (*United States v. Remsing*, 874 F.2d 614, 617-618 (9th Cir. 1989) (citing 28

10  U.S.C. § 636(b)(1)(A) as providing for the district court to reconsider matters delegated

11  to magistrate judge when there is clear error or recommendation is contrary to law).  The

12  Court accepts and adopts the R&R as the opinion of the Court, pursuant to 28 U.S.C. §

13  636(b)(1). For the reasons stated in the R&R, the Court denies the Motion for Judgment

14  on the Pleadings and grants the Motion to Amend the Complaint.

15    **Accordingly,**

16    **IT IS ORDERED** that the Report and Recommendation (Doc. 29)is adopted as

17  the opinion of the Court.

18    **IT IS FURTHER ORDERED** that the Motion for Judgment on the Pleadings

19  (Doc. 18) is DENID.

20    **IT IS FURTHER ORDERED** that the Motion for Leave to Amend the

21  Complaint (Doc. 25) is GRANTED.

22    **IT IS FURTHER ORDERED** that this case remains referred to Magistrate Judge

23  Bernardo P. Velasco, pursuant to 28 U.S.C. 636(b)(1) and LRCiv. 72.1 and 72.2.

24    Dated this 21st day of February, 2017.

25

26                        Honorable David C. Bury
27                        United States District Judge

28

- 3 -

FILED
TONI L. HELLON
CLERK, SUPERIOR COURT

3/29/2017 7:38:18 PM

BY: JIM ORR
DEPUTY

Ruchit Kumar Agrawal (Cal. Bar No. 299290)
KUMAR LAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586
*Ruchit@kumarlawsv.com*

# SUPERIOR COURT OF ARIZONA
## COUNTY OF PIMA

| | |
|---|---|
| MELISSA MARTIN McBEATH, an individual, <br><br> Plaintiff/Counterdefendant, <br><br> v. <br><br> TUCSON TAMALE COMPANY, an Arizona corporation, *et al.,* <br><br> Defendant(s)/Counterclaimant. | Case No. C20161794 <br><br> RUCHIT KUMAR AGRAWAL DECLARATION |

10383.1

1  I, Ruchit Kumar Agrawal, declare:

2      1.      I have personal, first-hand knowledge of all matters stated herein

3  and, if called to testify as to these matters, I could and would do so competently.

4              **Response to Minute Order entered on March 1, 2017**

5      2.      The Court requested that I explain why I did not attend in person

6  the hearing held on February 28, 2017. I informed Melissa Martin McBeath

7  approximately three weeks before the hearing that I would be unable to travel to

8  Tucson on February 28 due to a conflicting obligation that came up for me that

9  week. Ms. McBeath told me that she would ask co-counsel, Rafael Gallego, to

10  argue the various pending motions that were going to be heard that day.

11  Ms. McBeath informed me that she would alert Mr. Gallego of my conflict when

12  she would meet in person with him at his law office.

13      3.      Ms. McBeath informed me after the hearing that she had been

14  unable to schedule a meeting with Mr. Gallego until February 27, the day before

15  the hearing. Understandably, Mr. Gallego did not feel comfortable arguing the

16  motions with only one day's notice to prepare, and therefore requested a

17  continuance. I extend my sincerest apology to the Court for the inconvenience

18  caused by my absence. Certainly no disrespect was meant or intended to the

19  Court and co-counsel.

20              **Response to In Chambers Ruling entered on March 8, 2017**

21      4.      On April 3, 2017, the Court will conduct a hearing on Defendants'

22  Motion to Dismiss that Ali J. Farhang argued at the February 28, 2017 hearing. I

23  provide the additional information that the Court may find useful regarding this

24  issue.

25      5.      On February 3, 2017, I received an e-mail from Travis Tufts to meet

26  and confer regarding the motions that Defendants intended to resubmit for

27  argument. Mr. Tufts' email is attached as Exhibit A.

28

6.     On February 7, 2017, I responded to Mr. Tuft's email with a letter where I asked him when he anticipated filing another Motion to Dismiss, which the Court had given Defendants leave to refile after having denied as moot the first Motion to Dismiss at the October 31, 2016 hearing. My letter to Mr. Tufts is attached as Exhibit B.

7.     Mr. Tufts did not respond to my February 7 letter. The next time I heard from him was when I received via email the "Notice of Motions For Oral Argument on February 28, 2017" that he prepared and filed that same day on February 21, 2017. Mr. Tuft's Notice reasserted ***Defendants' Motion to Dismiss Claims for Retaliatory Discharge (Section II(b) of the Motion) and Breach of Employment Agreement (Section II(c) of the Motion), filed May 25, 2016.***

8.     I could find nothing in the Court's prior orders that permitted Defendants to reassert their previous Motion to Dismiss piecemeal. As I communicated to Mr. Tufts via email on February 22, Defendants would need to file an entirely new motion. That email is attached as Exhibit C. Mr. Tufts never responded to my email nor communicated further with me on this matter.

I declare (or certify, verify or state) under penalty of perjury under the laws of the State of Arizona that the foregoing is true and correct. Executed on March 29, 2017.

Ruchit Kumar Agrawal

ORIGINAL filed via TurboCourt on March 29, 2017 with:
Clerk of the Court
Pima County Superior Court
COPY served via TurboCourt on March 29, 2017 to:
Roberto C. Garcia
rgarcia@fmazlaw.com
Travis L. Tufts
ttufts@fmazlaw.com
Attorneys for:  Tucson Tamale Company, Todd Russell Martin, Sherry Martin and Lisa Martin
*Melissa Martin McBeath*
Melissa Martin McBeath

# EXHIBIT  A

From: Travis L. Tufts <ttufts@fmazlaw.com>
Date: Fri, Feb 3, 2017 at 2:35 PM
Subject: McBeath v. Tucson Tamale
To: Kumar Law <ruchit@kumarlawsv.com>

Hi Ruchit:

I hope you've been well and have had some time to get up to speed on this file. I want to follow up on a few pending issues from the last hearing as well as other matters pending in the state and federal cases.

We need to submit a Scheduling Order prior to the hearing later this month. I have attached my proposal. I propose essentially the same scheduling order Defendants/Counterclaimants submitted to the Court initially. However, I have extended the expert deadline and final supplemental disclosure deadline considering some of the deadlines as initially proposed expire in one week.

In connection with the scheduling order, I believe the Judge asked us to identify any motions that are ripe for decision at the next hearing. If you are agreeable, I would like to arrange a time to discuss pending motions before resubmitting anything. I am hopeful we can resolve some of the underlying issues without the need for reasserting the motions. Here are Defendants/Counterclaimants pending/ripe motions that I would like to discuss before resubmitting:

      -Defendants' Motion to Dismiss claims for Retaliatory Discharge (Section II(b)), Breach of Employment Agreement (Section II(c)), and Failure to Pay Earned Wages (Section II(h)).

      -Motion to Quash Third-Party Subpoena (to Defendants employment practices liability insurance broker)
Please let me know what you believe is pending and/or ripe for decision on your end so that we can try to resolve the issues if possible.

In addition to the Scheduling Order, I need to get your client's deposition back on the calendar. To accommodate your travel schedule, I propose to take her deposition the week of February 20th (any day that week), February 27, or March 1.

On the subject of depositions, we would like to take non-party depositions of Maximillian Ivankovich, Ehud Gavron, and Ernesto Chavez. To the extent you aren't already aware, Maximillian is Ms. McBeath's son. He was observed removing items from TTC on closed circuit surveillance after Ms. McBeath's employment termination. The other two gentlemen are individuals with whom TTC alleges Ms. McBeath shared its confidential information. Can we agree these depositions are permissible under the rules and to a convenient time to schedule these three depositions?

Finally, we have not received responses to the attached Non-Uniform interrogatories in the federal court matter. They were served in mid-December and are overdue. With respect to the discovery responses, I will provide an extension until 2/15/17. If there is an issue or you will not be able to produce the responses by this deadline, please let me know.

Please let me know your position on the scheduling order, pending motions, and depositions. If you prefer, I will be in the office all next week and available telephonically to address all of the issues discussed above. Ultimately, as I mentioned, I'd like to have a phone conference to address the pending/ripe motions if nothing else.

Have a nice weekend.

Regards,

Travis


**Travis L. Tufts**
Profile   vCard
4801 East Broadway Boulevard   Suite 311   Tucson, Arizona 85711
General: 520.790.5433   Direct: 520.398.7466   Fax: 520.790.5736
www.fmazlaw.com

PLEASE NOTE: This email message (including any attachments) contains information that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information, and no privilege is waived by your inadvertent receipt. Improper or unauthorized use of this email may be unlawful. If you received this message in error, please notify the sender by replying to this e-mail and then permanently delete it from your system.

EXHIBIT  B



# KUMARLAW

Ruchit Kumar Agrawal
*ruchit@kumarlawsv.com*

| | |
|---|---|
| Silicon Valley<br>408.601.0586 | 6525 Crown Blvd. #20072<br>San Jose CA 95160 |
| Washington D.C.<br>202.807.6180 | |

<u>SENT VIA E-MAIL ONLY</u>
*ttufts@fmazlaw.com*

February 7, 2017

Travis L. Tufts
Farhang & Medcoff
4801 E. Broadway, Suite 311
Tucson, Arizona 85711

Re:   *Melissa Martin McBeath v. Tucson Tamale Company et al.*
Pima County Superior Court Case No. C20161794

Dear Mr. Tufts:

I write to address each issue in the order discussed in your e-mail to me, dated February 3, 2017.

1.     We accept your proposed Scheduling Order as is. Please submit it to the Court at your earliest convenience.

2.     In my review of the docket, the pending motions ripe for decision are:

(a)     Plaintiff's Motion for Partial Summary Judgment

(b)     Plaintiff's Motion for a Protective Order to Shield Identity and Communications with Experts Consulted Informally

(c)     Plaintiff's Motion to Compel the Deposition of Lisa Martin

(d)     Defendants' Motion to Quash Third-Party Subpoena

(e)     Plaintiff's Motion to Compel Production of Documents and Supplemental Responses to Unanswered Written Discovery

3.     When do you anticipate filing Defendants' Motion to Dismiss?

10353.1

Travis L. Tufts
February 7, 2017
Page 2 of 2

4.     Regarding Ms. McBeath's deposition, we're not ready to proceed just yet. We're still making our way through the hundreds of pages that comprise the pleadings, motions, correspondence, and extensive written discovery and related responses propounded to date. Let's revisit this issue at the end of the month.

5.     Defendants may proceed with the deposition of Ehud Gavron and Ernesto Chavez after Defendants *identify and produce* the e-mails, in native electronic form, that contain the confidential information that Ms. McBeath allegedly disclosed to these two witnesses without authorization.

6.     With respect to the deposition of Maximilian Ivankovich, our client declines to consent to his oral deposition at this time.

7.     Thank you for granting our client until February 15, 2017 to respond to Tucson Tamale Company's Second Set of Interrogatories in the federal action. Be advised that she has elected to continue to represent herself in the federal proceeding for the time being; Mr. Gallego will serve as advisory counsel as needed.

Going forward, I am happy to meet and confer with you about any matter in this case. Ms. McBeath has instructed me, however, that we write or record our oral communications to ensure an accurate record. For telephone calls, I recommend using the service provided by *www.freeconferencecall.com*, which permits the participants to record their conversation and then generates a link to the recording that can be easily downloaded and saved for future reference.

Lastly, please serve all documents on me and Rafael Gallego via e-mail to ensure prompt delivery. We will reciprocate the same courtesy. It was a pleasure a pleasure to meet you in person last month. I look forward to our continuing dialogue as we move this case forward.

Sincerely,

KUMARLAW

Ruchit Kumar Agrawal

cc:  Rafael F. Gallego (via e-mail only)
     Melissa Martin McBeath (via e-mail only)

10353.1

EXHIBIT  C

From: Kumar Law <ruchit@kumarlawsv.com>
Date: Wed, Feb 22, 2017 at 9:51 AM
Subject: Re: February 28 Hearing
To: Travis L. Tufts <ttufts@fmazlaw.com>
Cc: Robert Garcia <rgarcia@fmazlaw.com>, Tish Wright
<twright@fmazlaw.com>, Jamie Archibald <jarchibald@fmazlaw.com>


Travis,

I just now had a chance to review the Notice of Motions for Oral Argument on
February 28, 2017.

The Notice lists Defendants' Motion to Dismiss filed on May 25, 2016.

According to the Court's Order issued following the October 31, 2016 hearing,
this motion was denied as moot.

Weren't your clients going to file another motion to dismiss shortly after the
January 17, 2017 hearing?

I'll get back you on your proposal to submit all claims to binding arbitration.

Ruchit

--

**Ruchit Kumar Agrawal, Esq.**
| **Silicon Valley** 408.601.0586 | **Washington DC** 202.807.6180 |


Unless specifically indicated, nothing in this email should be interpreted as a digital or electronic signature that can be used to form, execute,
document, agree to, enter into, accept or authenticate a contract or other legal document. This electronic mail transmission and any attached
documents may contain confidential or privileged information for the sole use of the intended recipient(s). Any review, use, distribution or
disclosure by anyone other than the intended recipient(s) is strictly prohibited. If you believe that you have received this message in error,
please notify the sender by reply transmission and delete or destroy the message without copying or disclosing it.

**CERTIFICATE OF SERVICE**

I, Melissa Martin McBeath, declare as follows:

I am over the age of eighteen years and a party to this action.

PLAINTIFF'S FIRST SET OF INTERROGATORIES TO SHERRY MARTIN

On May 4, 2017, I served a true and correct copy of the within document(s):

☐ by **U.S. MAIL**. I placed the document(s) listed above in a sealed envelope, addressed as set forth below, with postage thereon fully prepaid, and deposited such envelope for collection.

☐ by **HAND DELIVERY**. I personally delivered the document(s) listed above, addressed as set forth below.

☒ by **ELECTRONIC SUBMISSION**.  I electronically served the document(s) listed above to the following person(s) pursuant to Federal Rules of Civil Procedure 5(b)(2)(E). The parties have a written agreement to accept service electronically.

Roberto C. Garcia
*rgarcia@fmazlaw.com*
Travis L. Tufts
*ttufts@fmazlaw.com*
Farhang & Medcoff PLLC
4801 E Broadway Blvd., Ste. 311
Tucson, AZ 85711
520-790-5433

I declare under penalty of perjury, pursuant to 28 U.S.C. section 1746, that the foregoing is true and correct.

Melissa Martin McBeath